IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                        :

In re:                        :      Chapter 11
                         :

Synagro Technologies, Inc., et al.,   :      Case No. 13-11041 (BLS)
                         :

           Debtors.[1]       :      (Joint Administration Pending)
                         :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**DECLARATION OF JOHN R. CASTELLANO, CHIEF RESTRUCTURING
OFFICER OF THE DEBTORS, IN SUPPORT OF CHAPTER 11 PETITIONS
AND FIRST DAY PLEADINGS**

        I, John R. Castellano, hereby declare under penalty of perjury that the following is true to the best of my knowledge, information and belief:

        1.      I am the Chief Restructuring Officer of Synatech Holdings, Inc. ("Synatech"), the ultimate parent of the other debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "Debtors") and certain other affiliates of the Debtors (the "Non-Debtor Affiliates" and, together with the Debtors, "Synagro" or the "Company"), the Chief Restructuring Officer of Synagro Technologies, Inc. ("STI") and the Chief Restructuring Officer of each of the other Debtors.  To enable the Debtors to minimize the adverse effects of

---

[1]    The Debtors and the last four digits of their respective taxpayer identification numbers are as follows:  Drilling Solutions, LLC (9935); Earthwise Organics, LLC (5458); Environmental Protection & Improvement Company, LLC (2397); NETCO - Waterbury, LP (5202); New Haven Residuals, LP (2758); New York Organic Fertilizer Company (8694); Providence Soils, LLC (9061); Soaring Vista Properties, LLC (4015); South Kern Industrial Center, LLC (2099); ST Interco, Inc. (4897); Synagro - Connecticut, LLC (5532); Synagro - WCWNJ, LLC (0817); Synagro - WWT, Inc. (0492); Synagro Central, LLC (2568); Synagro Composting Company of California, LLC (7671); Synagro Detroit, LLC (1107); Synagro Drilling Solutions, LLC (4598); Synagro-Hypex, LLC (2544); Synagro Management, LP (4546); Synagro Northeast, LLC (2564); Synagro of California, LLC (8598); Synagro of Minnesota - Rehbein, LLC (7969); Synagro of Texas - CDR, Inc. (8566); Synagro Product Distribution, LLC (4357); Synagro South, LLC (2567); Synagro Technologies, Inc. (9860); Synagro Texas, LLC (4372); Synagro West, LLC (2566); Synagro Woonsocket, LLC (1634); Synatech Holdings, Inc. (5544). The Debtors' address is 1800 Bering Drive, Suite 1000, Houston, Texas 77057.

these Chapter 11 Cases (as defined below) on their business, the Debtors intend to request various types of relief in "first day" applications and motions (collectively, the "<u>First Day Pleadings</u>").[2]  I submit this declaration in support of the Debtors' (a) voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "<u>Bankruptcy Code</u>") and (b) First Day Pleadings.  I am authorized to submit this declaration (the "<u>Declaration</u>") on behalf of the Debtors.

2.      I was retained as financial advisor to the Company in June of 2012 and was appointed as Chief Restructuring Officer to the Debtors on April 23, 2013.  As a result of my tenure with the Debtors, my review of relevant documents, and my discussions with other members of the Debtors' management teams, I am familiar with the Debtors' day-to-day operations, business affairs, and books and records.  Except as otherwise noted, I have personal knowledge of the matters set forth herein and, if called as a witness, would testify competently thereto.  Except as otherwise stated, all facts set forth in this Declaration are based on my personal knowledge, my discussions with other members of the Debtors' senior management, my review of relevant documents, or my opinion, based on my experience and knowledge of the Debtors' operations and financial conditions.  In making this Declaration, I have relied in part on information and materials that the Debtors' personnel and advisors have gathered, prepared, verified, and provided to me, in each case under my ultimate supervision, at my direction, and/or for my benefit in preparing this Declaration.

3.      This Declaration is divided into two parts.  Part I of this Declaration provides background information about the Debtors, their business operations, their corporate

---

[2]      Unless otherwise defined herein, capitalized terms used herein shall have the meanings ascribed to them in the relevant First Day Pleading.

and capital structures, and the circumstances surrounding the commencement of these Chapter

11 Cases.  Part II sets forth the relevant facts in support of each of the First Day Pleadings.

## PART I
## BACKGROUND

### A.    Chapter 11 Filings

4.    On April 24, 2013 (the "Petition Date"), the Debtors each commenced a

case by filing a petition for relief under chapter 11 of the Bankruptcy Code (collectively, the

"Chapter 11 Cases").  The Debtors have requested that the Chapter 11 Cases be jointly

administered.

5.    The Debtors continue to operate their businesses and manage their

properties as debtors and debtors in possession pursuant to sections 1107(a) and 1108 of the

Bankruptcy Code.

6.    To date, no creditors' committee has been appointed in these Chapter 11

Cases by the United States Trustee.  In addition, no trustee or examiner has been appointed in the

Debtors' Chapter 11 Cases.

### B.    The Debtors' Business

7.    Synagro – including the Debtors and their Non-Debtor Affiliates – is the

largest recycler of biosolids and organic residuals in the United States and is one of the largest

national companies focused exclusively on biosolids recycling, which has a market size of

approximately $2 billion.  In particular, Synagro offers a broad range of water and wastewater

residuals management services focusing on the beneficial reuse of organic, nonhazardous

residuals, including solid or liquid material generated by  municipal wastewater treatment or

residuals management facilities, known as biosolids.  These services include drying and

pelletization, composting, incineration, alkaline stabilization, land application, collection and

transportation, regulatory compliance, dewatering, facility cleanout services, and product marketing, each as further described below.

8.      The Company was formed in 1986, under the name RPM Marketing, Inc. Since 1996, the Company has operated as a Delaware corporation under the name Synagro Technologies.  Synagro's corporate headquarters is currently located in Houston, Texas but is in the process of being transferred to White Marsh, Maryland.  The Company also has offices in Lansdale, Pennsylvania, Rayne, Louisiana, and Watertown, Connecticut.

9.      The Company's operations are divided into four primary divisions – Facilities, Services, Rail, and Drilling.

10.      <u>Facilities</u>.  The Company offers its water and wastewater residuals management services to customers at various facilities owned by the Company.  Currently, the Company has nine heat-drying and pelletization facilities, three composting facilities,[3] and three incineration facilities located throughout the country (collectively, the "<u>Facilities</u>").  The Company entered into arrangements with municipalities for the operation, design and construction of such Facilities and, thereafter, has utilized the Facilities to provide services to such municipalities through long-term contracts.

11.      Synagro's three composting Facilities are located in California and Arizona, with a Fourth facility contemplated to be constructed in Charlotte County, Florida. These Facilities employ a comprehensive range of composting technologies, all of which produce high-quality compost products that Synagro markets to landscapers, nurseries, farms, and fertilizer companies through its product sales force.

---

[3]      A fourth composting facility is contemplated to be constructed in Charlotte County, Florida.

12.     The Company built and currently operates nine heat-drying and pelletization facilities, located in Florida, Maryland, California, Hawaii, Connecticut, New Jersey, and Pennsylvania.  The heat drying process utilizes a recirculating system to evaporate water from wastewater residuals and creates pellets.  Synagro markets the resulting heat-dried biosolids products to the agricultural and fertilizer industries to be used as fertilizer or fuel through its product sales force.

13.     Finally, Synagro has built and operates three incinerator Facilities in Connecticut and Rhode Island.  These Facilities process wastewater residuals through either multiple-hearth or fluid bed  incineration, which vaporizes the residuals and results in an ash by-product that is nontoxic and inert, and can be beneficially used as alternative daily cover for landfills.

14.     Given the capital investment required in designing and building a Facility, the Company enjoys long-term stable cash flows from its contracts with its Facilities customers. The average remaining contract term for a Facilities contract is approximately 19 years.  As these Facilities are owned by the Company, the Company receives a higher profit margin on the services offered through the Facilities relative to the Company's other services.  For the 12 months ended December 31, 2012, approximately 37% of the Company's revenues were derived from its Facilities.

15.     <u>Services</u>.  In addition to services provided at its Facilities, the Company provides biosolids treatment services to municipal and industrial customers at facilities owned by such customers.   These services include: (i) residuals dewatering services for wastewater treatment facilities on either a permanent, temporary, or emergency basis through the Company's 54 permanent and 64 mobile dewatering units, (ii) cleaning and maintenance of the digesters and

lagoons at municipal and industrial wastewater facilities and agricultural land application or landfilling of the removed biosolids, (iii) alkaline stabilization through the Company's "BIO*FIX" process, which uses lime to improve the quality of the treated biosolids, (iv) collection and transportation of removed residuals via the Company's owned and leased fleet of tankers to either a land application site, a landfill, or one of the Company's residuals processing Facilities, (v) recycling of biosolids through agricultural land application programs in approximately 25 states, and (vi) provision of Synagro's proprietary Residuals Management System – an integrated data management system that has been designed to store, manage and report information about clients' wastewater residuals programs. For the year ended December 31, 2012, the Company's services division accounted for approximately 47% of revenues.

16.    Drilling. The Company's newly-acquired drilling operations provides sustainable, closed-loop solids control and waste management expertise to oil and gas exploration and production companies. Utilizing centrifuge technology, the drilling segment recovers, dewaters and recycles drilling fluids during the well development process. This closed-loop process allows drilling companies the ability to reuse the specialty drilling fluids as the recycling process preserves all critical attributes of such fluids. The Company's drilling division accounts for approximately 7% of revenues.

17.    Rail. The Company also provides an intermodal rail transportation service that can handle both non-hazardous and hazardous materials, including biosolids, contaminated soils, municipal solid waste and coal combustion byproducts. This division employs an extensive fleet of rail cars and intermodal containers from an intermodal operational base in New Jersey to transport and dispose of over 500,000 tons of waste per year. For the 12 months ended

December 31, 2012, approximately 12% of the Company's revenues were derived from its Rail division.

18.     Through its four divisions, the Company serves approximately 600 municipal and industrial water and wastewater treatment customers with operations in 36 states and the District of Columbia through hundreds of contracts and master service agreements with terms ranging from less than one or up to 30 years in length.  For the 12 months ended December 31, 2012, the Company's consolidated revenues were approximately $319 million. Approximately 90% of such revenues were attributable to contracts with municipalities.  The remaining 10% of revenues were generated from industrial and commercial waste generators (8%) and the sale of fertilizers, compost, and other residuals products (2%).  As of the Petition Date,  Synagro's current contracts have an estimated remaining value of future revenues – known as backlog – of approximately $1.9 billion, including renewal options, and approximately $1.1 billion, excluding renewal options.  Historically, Synagro has enjoyed high contract retention rates, including both renewals and rebids.  In 2012, the Company's contract retention rate was approximately 97%.

19.     Throughout its history, in addition to operational efficiencies and organic growth, the Company has grown in part through acquisitions.  For instance, in 2011, Synagro acquired the assets of HyPex, Inc.'s centrifuge repair services business, to compliment the Company's dewatering services  Also, in 2011, the Company acquired Drilling Solutions LLC, thus bringing the Company into the oil and gas industry.

## C.     The Debtors' Corporate and Capital Structures

20.     A corporate organization chart depicting the ownership structure of the Debtors and their Non-Debtor Affiliates is attached hereto as Exhibit A.

21.      Synatech is the direct or indirect parent company of each of the other Debtors and Non-Debtor Affiliates.  Synatech, a Delaware corporation, is a holding company, which is wholly owned by The Carlyle Group ("Carlyle"), by and through certain of its affiliates and subsidiaries.[4]  Synatech is the direct parent of STI, a Delaware corporation, which is in turn the direct parent of Synagro WWT, Inc. ("WWT"), a Maryland corporation.  STI is primarily a holding company, but employs certain executives and does a limited amount of business.  WWT is an operating company and is the direct or indirect parent of the majority of the Company's Debtor and non-Debtor operating subsidiaries.  The majority of the Debtors' employees (approximately 833 as of the Petition Date) are employed by WWT.  The Company's customer contracts are with a number of the Company's subsidiaries, with contracts generally assigned based on geographical region.

22.      As of the Petition Date, as further set forth below, Synagro had approximately $536 million of long term debt consisting of the following:

- $79 million of debt under a first lien revolving credit facility;

- $249 million of debt under a first lien term loan credit facility;

- $100 million of debt under a second lien term loan credit facility;

- $96 million of structurally senior bond debt; and

- $12 million of capital leases.

23.      The First Lien Credit Facility.  Simultaneously with the acquisition of the Company by Carlyle, and to finance the Company's daily operations, STI entered into a secured $100 million revolving credit facility (the "First Lien Revolver Facility") and a secured $290

---

[4]      The Company was publicly traded on the NASDAQ Small Cap market beginning in late 1994.  In June of 2005, the Company listed on the Pacific Stock Exchange (now known as NYSE Arca) and switched to the NASDAQ National exchange.  The Company traded under the symbol "SYGR".  In April of 2007, the Company was acquired by Carlyle and delisted.

million term loan credit facility (the "<u>First Lien Term Loan Facility</u>") pursuant to that certain

$390,000,000 First Lien Credit Agreement dated as of April 2, 2007 (as amended, the "<u>First</u>

<u>Lien Credit Agreement</u>")[5] between, <u>inter</u> <u>alia</u>, STI, as borrower, the several banks and other

financial institutions or entities time to time parties thereto as lenders (the "<u>First Lien Lenders</u>"),

and Bank of America, N.A., as administrative agent and collateral agent ("<u>BofA</u>" or the "<u>First</u>

<u>Lien Agent</u>").

24.    In addition, STI's obligations under the First Lien Credit Agreement are (i)

guaranteed by certain of the Debtors (collectively, the "<u>Guarantors</u>")[6] and (ii) secured by liens,

security interests, and/or pledges on substantially all of the assets of STI and the Guarantors.[7]

The First Lien Term Loan Facility matures in April of 2014. Pursuant to that certain

Amendment and Restatement Agreement, dated as of February 28, 2013, between STI, the First

Lien Guarantors, the First Lien Agent and the First Lien Lenders participating in the First Lien

Revolver Facility (the "<u>Revolver Amendment Agreement</u>"), the First Lien Revolver Facility

matures on September 30, 2013.[8]

---

[5]    Any summary of an agreement in this Declaration is qualified in its entirety by the terms of that agreement.

[6]    Specifically, as of the Petition Date, the Guarantors are Synatech Holdings, Inc., Synagro-WWT, Inc., ST Interco, Inc., Synagro Central, LLC, Synagro Northeast, LLC, Synagro South, LLC, Synagro West, LLC, Synagro-WCWNJ, LLC, South Kern Industrial Center, LLC, Synagro Woonsocket, LLC, Synagro Texas, LLC, Environmental Protection & Improvement Company, LLC, Syangro Of Texas-CDR, Inc., Earthwise Organics, LLC, Synagro Composting Company Of California, LLC, Synagro Of Minnesota-Rehbein, LLC, Synagro-Connecticut, LLC, Synagro Drilling Solutions, LLC, Drilling Solutions, LLC, Netco-Waterbury, LP, New Haven Residuals, LP, Synagro Management, LP, and New York Organic Fertilizer Company.

[7]    Provided, however, that the First Lien Lenders were not granted a security interest in, among other things, any leasehold interest in real property, any vehicles, railcars, securities or deposit accounts, cash or cash equivalents, property subject to certain permitted liens, or any property of Holdings, other than the equity of STI.

[8]    Provided, however, that such date shall be shortened in the event that the Second Lien Lenders (as defined herein) accelerate the obligations under the Second Lien Credit Agreement (as defined herein). In this instance, the First Lien Revolver Facility shall mature as of the date that is 150 days after the date of such acceleration.

25.     As of the Petition Date, there was approximately $79 million outstanding under the First Lien Revolver Facility and approximately $249 million outstanding under the First Lien Term Loan Facility.

26.     <u>The Second Lien Credit Facility</u>.  Simultaneously with the acquisition of the Company by Carlyle and entry into the First Lien Credit Facility, and to finance the Company's daily operations, STI entered into a secured $150 million term loan credit facility (the "<u>Second Lien Term Loan Facility</u>" and together with the First Lien Revolver Facility and the First Lien Term Loan Facility, the "<u>Prepetition Loan Facilities</u>") pursuant to that certain $150,000,000 Second Lien Credit Agreement dated as of April 2, 2007  (as amended, the "<u>Second Lien Credit Agreement</u>" and together with the First Lien Credit Agreement, the "<u>Prepetition Credit Agreements</u>") between, <u>inter alia</u>, STI, as borrower, the several banks and other financial institutions or entities time to time parties thereto as lenders (the "<u>Second Lien Lenders</u>" and, together with the First Lien Lenders, the "<u>Prepetition Lenders</u>"), and U.S. Bank National Association, as administrative agent and collateral agent ("<u>U.S. Bank</u>" or the "<u>Second Lien Agent</u>" and together with the First Lien Agent, the "<u>Prepetition Agents</u>").[9]

27.     In addition, STI's obligations under the Second Lien Credit Agreement are (i) guaranteed by the Guarantors and (ii) secured by liens, security interests, and/or pledges on substantially all of the assets of STI and the Guarantors.[10]  The Second Lien Term Loan Facility matures in October of 2014.  As of the Petition Date, there was approximately $100 million outstanding under the Second Lien Term Loan Facility.

---

[9]     U.S. Bank was appointed as successor administrative and collateral agent to Bank of America, N.A. pursuant to that certain Successor Agent Agreement, dated as of July 13, 2012.

[10]    The Collateral granted to the Second Lien Lenders is identical to, and contains the same exceptions as, that granted to the First Lien Lenders.

28.      The relative priority and rights of the First Lien Lenders and the Second Lien Lenders are governed by that certain Intercreditor Agreement (the "Intercreditor Agreement") dated as of April 2, 2007.

29.      The SPE Bond Debt.  Seven of the Company's Non-Debtor Affiliates – Synagro-Baltimore, LLC, Sacramento Project Finance, Inc., Synagro Organic Fertilizer Company of Sacramento, Inc., Philadelphia Project Finance, Inc., Philadelphia Project Holding, Inc., Philadelphia Renewable Bio-Fuels, LLC, and Philadelphia Biosolids Services, LLC (collectively, the "SPEs") – are special purpose entities which lease or operate four of the Company's Facilities, two of which are located in Baltimore, Maryland (the "Baltimore Facilities"), one in Philadelphia, Pennsylvania (the "Philadelphia Facility"), and one in Sacramento, California (the "Sacramento Facility").  Construction of these Facilities was financed through industrial revenue bonds ("IRBs") issued by the corresponding municipality or municipal authority.  In particular, approximately $58.6 million in IRBs were issued for the Baltimore Facilities, approximately $68 million in IRBs were issued for the Philadelphia Facility, and approximately $21 million in IRBs were issued for the Sacramento Facility (collectively, the "Project Finance Debt").  Revenue from the issuance of the bonds was then loaned by the municipality or municipal authority to the relevant SPE pursuant to loan agreements (the "SPE Loan Agreements") and used for construction of the Facility.  In particular, in Baltimore, Synagro-Baltimore LLC is the borrower; in Philadelphia, Philadelphia Project Finance, Inc. is the borrower; and in Sacramento, Sacramento Project Finance, Inc. is the borrower (collectively, the "SPE Borrowers").  The SPE Borrowers are indebted under the SPE Loan Agreements to the municipal authority which issued the IRBs and, indirectly, to the bondholders for repayment of the IRBs.  This indebtedness is repaid, indirectly, from service payments due from the

municipality to the applicable SPE Borrower under service contracts for the operation of the Facility.

30.     The obligations of the SPE Borrowers under the SPE Loan Agreements are secured by liens on the Facilities, the ground leases for the Facilities, and receivables under the municipal service contracts.  As of the Petition Date, in the aggregate, there was approximately $96 million outstanding under the SPE Loan Agreements.

31.     The SPE Facilities are operated under service agreements (the "SPE Service Agreements") between certain of the SPEs and the applicable municipality or municipal authority.  Performance of these service agreements is further guaranteed by STI (the "SPE Guarantees").

32.     The Debtors intend that the SPE Facilities, the SPE Service Agreements and the Project Finance Debt be unaffected by the filing of these Chapter 11 Cases.  As further discussed in the Sale Motion (as defined below), the Stalking Horse Bidder (as defined below) will purchase the interests of the SPEs and will assume the SPE Guarantees.  Until closing of the sale, STI intends to continue to honor its obligations under the SPE Guarantees.  In the unlikely event that the SPE Guarantees are called upon, the Debtors will return to this Court to seek the appropriate authorizations.

33.     Surety Bonds.  In the ordinary course of business, the Company is required to post and to maintain surety bonds to secure the Debtors' payment or performance of certain obligations, including, primarily, obligations owed to municipalities under the Company's service contracts, as well as obligations owed to state or federal agencies, contractual or permit obligations, and other obligations required by law.  These bonds ensure that, in the event the Company fails to perform its obligations under the municipal contract or otherwise, the

surety provider will perform or make payment in lieu of the Company. Failure to provide,

maintain, and timely replace these surety bonds could jeopardize the Debtors' ability to conduct

their operations.

34. More specifically, a significant portion of the Debtors' customer contracts

and, in particular, their larger customer contracts, require that the Debtors maintain a surety bond

with a specified minimum penal sum for the life of the contract, including for any extension or

renewal period. The failure to maintain an acceptable surety bond may constitute a breach under

many of the Debtors' customer contracts and could entitle the customer to cancel the contract.

35. While the surety bonds shift the risk of the Debtors' non-payment or non-

performance from the municipality or governmental entity to the surety, a surety bond is not an

insurance policy. Rather, in the event the surety incurs a loss on the surety bond as a result of the

Debtors' default on its underlying obligations, the surety is entitled to recover the full amount of

the loss from the Debtors. To maintain its surety bond program, STI has executed an indemnity

agreement in favor of each of the sureties pursuant to which STI agrees to indemnify the surety

in the event it is required to pay or perform under any of the surety bonds issued on behalf of any

of the Debtors or Non-Debtor Affiliates. Among other terms, the indemnity agreements

generally require that STI, at the request of the surety, establish loss reserves or post cash or

other acceptable collateral to protect the surety against actual or anticipated losses.

36. The priority of the surety obligations vis-à-vis the First and Second Lien

Lenders is set forth in the Intercreditor Agreement, which provides, first, that upon performance

under any bonded customer contract by a surety, the surety is subrogated to the rights of the

Debtors to receive any receivables owed on account of such bonded contract, and, thus, is

effectively senior to the rights of the First and Second Lien Lenders as to such receivables and,

second, that in any liquidation or dissolution of the Debtors or in an insolvency proceeding, the

sureties are entitled to payment in full of the surety obligations before any payments are made to

the Second Lien Lenders.

37.    As of the Petition Date, the Debtors have 202 outstanding Surety Bonds

issued by nine different sureties.[11]  The penal sums of these bonds total approximately $81

million.  None of the outstanding surety bonds are collateralized by cash.  The premiums for

most of the Debtors' surety bonds are determined annually and are paid upon issuance.  For

surety bonds currently outstanding, the Debtors have paid premiums totaling approximately $1.4

million.

38.    As further set forth below, the Debtors seek authorization to continue the

above-described surety program in the ordinary course from and after the Petition Date.

(i)    Alternative Fuel Mixture Credit Audit

39.    For the period from June 2009 through December 2011 (the "AFMC

Period"), three of the Debtors, Synagro Woonsocket LLC, Netco-Waterbury LP, and New Haven

Residuals LP (collectively, the "AFMC Subsidiaries") applied for and received cash payments

from the Internal Revenue Service (the "IRS") under section 6427(e)(1) of the Internal Revenue

Code (the "IRC").  Payments under this section of the IRC were available to claimants that

qualified for the Alternative Fuel Mixture Credit ("AFMC") under section 6426 of the IRC.

Each of the AFMC Subsidiaries qualified for the AFMC because it produced and used in its

businesses an alternative fuel mixture composed of thickened sludge liquid and at least 0.1%

diesel fuel, which mixture was a "liquid fuel derived from biomass" as defined in section

---

[11]    Seven (7) additional surety bonds  have been issued on behalf of certain of the Company's non-Debtor
affiliates.  These surety bonds are not reflected in the description of the Debtors' Surety Bond Program
contained herein.

6426(d)(2)(G).  During the AFMC Period, the AFMC Subsidiaries received approximately $53.5 million in AFMC payments.[12]

40.    In late 2011, the IRS notified the AFMC Subsidiaries that it was conducting an examination of the AFMC Subsidiaries to determine whether they were entitled to the AFMC payments.  The AFMC Subsidiaries have been and remain optimistic regarding the merits of their AFMC appeals.  However, because it represents a significant contingent liability and has hampered, to some extent, the Company's restructuring and sale efforts, as described further below, the AFMC Subsidiaries have, over the past several months, attempted to expedite processing of or settle the AFMC liability.  In particular, the AFMC Subsidiaries have reached out to both the appeals and collections divisions of the IRS to determine whether an expedited path to settlement could be arranged.  Although the parties have worked together in good faith in an effort to reach an expeditious and agreeable resolution regarding any AFMC liability, such efforts were ultimately unsuccessful, and on April 10, 2013, the collections division indicated that it would not be able to facilitate a settlement.

**D.    Events Leading to the Chapter 11 Cases**

(i)    <u>Restructuring Efforts and Sale Process</u>

41.    <u>Prepetition Credit Agreement Defaults and Lender Negotiations</u>.  In early 2012, the Company became aware that it likely would not satisfy its leverage ratio covenants under the First and Second Lien Credit Agreements in upcoming quarters due to, among other things,  a challenging operating environment in late 2011 and early 2012, a reduction in the permitted total leverage ratio under the First Lien Credit Agreement, and the discontinuation of the AFMC credit.  Accordingly, and in light of the maturity of the First Lien Revolver Facility in

---

[12]    AFMC payments are not available for periods after December 31, 2011.

April of 2013 and the significant debt burden of the Company, the Company began negotiations with its First Lien Lenders in the Spring of 2012 to discuss amending and extending or otherwise restructuring its indebtedness and to discuss the Company's business plan going forward.  To assist with these negotiations, the Company retained Evercore Group L.L.C. ("Evercore") as its investment banker, AlixPartners LLP ("Alix") as its financial advisor, and Skadden, Arps, Slate, Meagher & Flom LLP ("Skadden") as its legal advisor.  The Company began providing diligence materials to the First Lien Lender's advisors and engaged in discussions around a possible extension or refinancing of the First Lien Credit Facility.

42.     As a result of the above-described considerations, the Company's leverage ratio fell short of covenants set forth in the First Lien Credit Agreement in the second quarter of 2012.  This shortfall was cured for that quarter by an equity infusion from Carlyle of approximately $482,000, in August of 2012.  This provided a brief reprieve during which the Company continued to explore its alternatives for a broader solution.  To that end, in early Fall of 2012, the Company began engaging the Second Lien Lenders in the negotiations, as well.

43.     During the following months, the Company engaged in discussions with the First and Second Lien Lenders, and discussed a variety of alternatives, which ranged from an "amend and extend" type transaction, to a more comprehensive restructuring or a sale process.  Through these negotiations, it became clear that a sale represented the most viable alternative to maximize enterprise value.  Due to the likelihood that a sale would not result in a purchase price sufficient to fully satisfy the Company's obligations under the Second Lien Credit Facility, and a variety of other factors, the Company recognized that such sale (or other restructuring) may need to be effectuated through a bankruptcy process.

44.       <u>Waivers</u>.  In mid-November of 2012, the Company announced a default of its total leverage covenants under the First and Second Lien Credit Agreements for the third quarter of 2012.  The Company negotiated a temporary waiver of that default and any other existing defaults with its First Lien Lenders, dated as of November 28, 2012 (the "<u>First Lien Waiver</u>").  Pursuant to the First Lien Waiver, the First Lien Lenders agreed to waive the Company's existing defaults until February 28, 2013 if certain conditions were met, including, among other things, that the Company commence a sale process satisfactory to the First Lien Lenders.  The Company also negotiated a temporary waiver with the Second Lien Lenders, dated as of December 21, 2013 (the "<u>Second Lien Waiver</u>").  The Second Lien Waiver likewise provided a waiver of existing defaults until February 28, 2013.

45.       <u>Commencement of Sale Process</u>.  In accordance with the First Lien Waiver, beginning in November of 2012, the Company commenced a comprehensive sale process.  In particular, the Company, through Evercore, identified and contacted approximately 112 potential financial and strategic purchasers to gauge their interest in purchasing the Debtors' business as a going concern.  Approximately 41 of those parties entered into non-disclosure agreements ("<u>NDAs</u>") with the Company to further explore the potential purchase of the Debtors' business.  Among other things, Evercore distributed a Confidential Information Memorandum (the "<u>CIM</u>") to the parties that executed NDAs describing the Debtors' business and financial results in considerable detail.  Of the 41 parties receiving the CIM, five furnished written non-binding indications of interest and one expressed a verbal indication of interest; the other 35 indicated that they did not intend to participate further.

46.       After reviewing the six indications of interest, the Debtors invited three parties to continue to the next round of the sales process, during which the Debtors engaged

extensively with the potential bidders concerning a possible transaction.  Among other things, the Debtors arranged in-person meetings between the potential bidders and the Debtors' senior managers and advisors and afforded the potential bidders the opportunity for extensive due diligence via an electronic data room.  At the conclusion of this round of the sales process, in mid-February, one of the three potential bidders, EQT Infrastructure II Limited Partnership ("EQT"), made a formal proposal to acquire the Company.

47.     On February 22, 2013, the Company entered into an agreement with the EQT pursuant to which the Company agreed to grant EQT exclusivity for a period of 30 days, subject to extension for a further 15 days if EQT confirmed in writing that it was continuing to work in good faith toward a transaction consistent with its indication of interest.  However, such exclusivity did not preclude the Company from negotiating with and soliciting offers from American Securities Opportunity Fund II ("ASOF"), a substantial holder in the First and Second Lien Credit Facilities, and a potentially interested purchaser, regarding a potential restructuring transaction.  EQT provided the requisite written confirmation and the exclusivity period was continued for an additional 15 days, ending April 8, 2013.  During this exclusivity period, the Company and its advisors continued to work with EQT and its advisors and with ASOF and its advisors to provide all necessary diligence.

48.     Waiver Extensions and Revolver Amendment Agreement.  Given the conclusion of the temporary waivers granted by the First Lien and Second Lien Waivers on February 28, 2013, and in light of the ongoing sale process, the Company negotiated with the First and Second Lien Lenders to extend the waiver periods on conditions similar to those provided under the First Lien and Second Lien Waivers.  On February 28, 2013, STI and the Guarantors entered into a further waiver agreement with the First Lien Agent and a majority of

the First Lien Lenders (the "First Lien Waiver Extension") whereby the First Lien Lenders

waived the Company's existing defaults until July 19, 2013 if certain conditions were met

including, among other things, continued compliance with the conditions provided by the First

Lien Waiver, entry into the First Lien Amendment Agreement (as defined below), and entry into

a signed asset purchase agreement (or similar acquisition agreement) on or prior to April 19,

2103, which date was later extended to April 23, 2013.

49.    As noted above, the First Lien Revolver Facility was set to mature on

April 2, 2013.  Accordingly, concurrent with the First Lien Waiver Extension, the Company

entered into the Revolver Amendment Agreement with the First Lien Revolving Facility Lenders,

whereby the First Lien Credit Agreement was amended and restated to provide for an extension

of the First Lien Revolver Facility until the earlier of (i) September 19, 2013, or (ii) 150 days

after an acceleration by the Second Lien Lenders of the Company's obligations under the Second

Lien Credit Agreement.  In conjunction with the extension, the amount of the First Lien

Revolver Facility was reduced from $89 million[13] to $79 million.

50.    On March 8, 2013, the Company entered into a further waiver agreement

with a majority of the Second Lien Lenders (the "Second Lien Waiver Extension"), whereby the

Second Lien Lenders waived the Company's existing defaults until July 19, 2013 if certain

conditions were met.

51.    Entry into Purchase Agreement.  During the exclusivity period with EQT,

the Company and EQT negotiated the terms of an asset purchase agreement, to be effectuated

through a section 363 sale, subject to higher and better offers.  On April 9, 2013, EQT provided

---

[13]    The First Lien Revolver Facility had an original availability of $100 million.  However, availability was
         reduced by $11 million due to the bankruptcy filing of Lehman Brothers, a lender under the facility.

its final offer – setting out its purchase price for both a section 363 asset sale or an out-of-court

stock sale.  The stock transaction required, among other things, several substantial reserves.

Accordingly, an out-of-court stock sale became infeasible and the Company fully focused its

attention on finalizing an asset purchase agreement, pursuant to which STI Infrastructure

Company, Inc.,  a subsidiary of EQT (the "Stalking Horse Bidder")  would serve as stalking

horse bidder.  The Company executed the asset purchase agreement on April 23, 2013 (the

"Purchase Agreement").  The Purchase Agreement envisions, and seeks to facilitate, a

continuation of the Debtors' business operations in the ordinary course and, to that end, provides

for, among other things, the assumption and assignment to the Stalking Horse Bidder of a

material portion of the Debtors' trade claims and of all contracts related to the operation of the

business.

       52.    DIP Financing.  During the waiver period and sale process, in recognition

that a bankruptcy filing may ultimately become necessary, the Debtors (through Evercore) began

to seek debtor-in-possession ("DIP") financing.

       53.    The Debtors require DIP financing to fund the costs of working capital

obligations, operating expenses, and expenses relating to administration of the Chapter 11 Cases

to preserve and maintain the going concern value of the Debtors' estates through consummation

of a sale of substantially all of the Debtors' assets, as set forth above.  In particular, prior to the

Petition Date, due to a variety of factors, the Debtors' liquidity position had become precariously

low.  Absent access to DIP financing, the Debtors forecast that available unrestricted cash would

continue to decline.  The Debtors business requires significant liquidity to operate effectively and

to assure customers and vendors of the Debtors' financial health and wherewithal to perform

under various contracts.  The Debtors have been operating under constrained liquidity since the

execution of the First Lien Waiver and customers and vendors both have expressed concern with the diminishing liquidity position of the Company. Accordingly, without access to incremental liquidity, there is risk of immediate and irreparable harm to the Debtors.

54.     As an initial matter, the Debtors reached out the First Lien Lenders to discuss the terms of a proposed DIP financing facility. Moreover, substantially all of the Debtors' cash, including without limitation, all cash and other amounts on deposit or maintained by the Debtors in accounts with the First Lien Agent, and, therefore, constitute cash collateral within the meaning of section 363(a) of the Bankruptcy Code (the "Cash Collateral"). Accordingly, the Debtors also sought authorization to continue to use Cash Collateral. In addition, the Debtors and Evercore contacted 13 financial institutions, including commercial banks, alternative lending sources and certain First Lien Lenders and Second Lien Lenders to seek alternate sources of DIP financing. Several of the institutions contacted were familiar with the Debtors' businesses and/or held material ownership in prepetition obligations. Of the 13 institutions contacted, the Debtors entered into or already had in place NDAs with 12 to allow for due diligence and other exchanges of information, and the Debtors received five term sheets or initial proposals. Ultimately, only one additional potential lender, other than the First Lien Agent, was willing to provide a DIP on competitive terms and conditions relative to the first lien proposal. Despite diligent efforts, the Debtors have been unable to find a lender willing to extend post-petition credit on an unsecured basis.

55.     Taken as a whole, after additional negotiation, the Debtors determined that the proposal of the First Lien Agent, on behalf of the First Lien Lenders, offered the Debtors an acceptable cost of financing, after taking into consideration the expected length of the cases prior to consummation of a sale of the Debtors' assets and the costs, time and distraction that would be

associated with obtaining financing which required a non-consensual priming of the First Lien

Lenders' liens.  Accordingly, after careful consideration of the various alternatives generated by

the Debtors' efforts to obtain financing, and extensive discussion of those alternatives with the

Debtors' financial and legal advisors, the Debtors determined that the DIP financing proposal of

the First Lien Agent and a majority of the First Lien Lenders (the "<u>Proposed DIP Financing</u>")

was the Debtors' best available financing option under the circumstances.  The Proposed DIP

Financing is conditioned upon the Debtors undertaking a court-supervised sale process around

the Purchase Agreement with the Stalking Horse Bidder.

56.     On April 24, 2013, the Debtors commenced these Chapter 11 Cases.

## PART II

## FIRST DAY PLEADINGS

57.     In furtherance of the Company's restructuring efforts, the Debtors intend

to file the First Day Pleadings,[14] each as listed on the attached <u>Exhibit B</u>, concurrently with this

Declaration and respectfully request that the Court consider entering the proposed orders

granting such First Day Pleadings.  I have reviewed each of the First Day Pleadings and

proposed orders (including the exhibits thereto) and the facts set forth therein are true and correct

to the best of my knowledge, information and belief.  Moreover, I believe that the relief sought in

each of the First Day Pleadings (a) is vital to enable the Debtors to make the transition to, and

operate in, chapter 11 with minimum interruption or disruption to their businesses or loss of

productivity or value and (b) constitutes a critical element in maximizing value during these

Chapter 11 Cases.

---

[14]     Any term not defined herein has the meaning ascribed to it in the specific First Day Pleading being described.

**A.      Administrative Pleadings (Items 1 through 3)**

58.     The Debtors have filed three "administrative" pleadings that seek to (1) jointly administer the Debtors' chapter 11 cases for procedural purposes only, (2) extend the time for the Debtors to file their schedules and statements, and (3) to retain Kurtzman Carson Consultants, LLC as noticing and claims agent.  The Debtors' attorneys have explained to me the customary practices with regard to the requested relief in chapter 11 business reorganization cases and the rationale for these pleadings.

Joint Administration (Item 1)

59.     The Debtors are requesting that their chapter 11 cases be jointly administered only for procedural purposes.  As set forth above, Synatech is the direct or indirect parent of each of the other Debtors.  I believe that joint administration of these cases will avoid the unnecessary time and expense of duplicative motions, applications, orders and other pleadings, and related notices, that otherwise would need to be filed in each separate case absent joint administration.  Moreover, joint administration will relieve this Court of the burden of entering duplicative orders and maintaining duplicative files, and will ease the burden on the office of the United States Trustee in supervising these cases.  Accordingly, I believe that joint administration will save considerable time and expense for the Debtors, the Clerk of the Court, the U.S. Trustee and other parties in interest, which will, in turn, result in substantial savings for the Debtors' estates.

Extension of Time to File Schedules and Statements (Item 2)

60.     It is my understanding that the Debtors are requesting that the Court extend the time by which the Debtors must file their schedules of assets and liabilities and statements of financial affairs to thirty (30) days after the current deadline. It is my understanding that the Local Bankruptcy Rules automatically extended the Debtors' deadline

thirty (30) days because the Debtors filed a creditor matrix containing more than two hundred (200) creditors. Thus, the Debtors are requesting the Court to extend the deadline to file schedules and statements to sixty (60) days after the Petition Date.

61.     Given the substantial burdens already imposed on the Debtors' management by the commencement of these Chapter 11 Cases, the limited number of employees available to collect the information, the competing demands upon such employees, and the time and attention the Debtors must devote to the chapter 11 process, I believe that the Debtors may be unable to complete their Schedules and Statements by the current deadline imposed by the Bankruptcy Rules.

62.     Accordingly, the Debtors submit that "cause" exists to extend the current deadline imposed by Bankruptcy Rule 1007(c) for an additional thirty (30) days, until the Filing Deadline.  The requested extension will enhance the accuracy of the Debtors' Schedules and Statements and avoid the necessity of substantial subsequent amendments.

Application to Retain Kurtzman Carson Consultants LLC as Claims and Noticing Agent
(Item 3)

63.     The Debtors seek authority to retain Kurtzman Carson Consultants LLC ("KCC") as claim and noticing agent in these Chapter 11 Cases.  I understand that such appointment is required by the rules of this Court.  Moreover, such relief is prudent in light of the thousands of creditors, potential creditors, and parties in interest to whom certain notices will be sent.  I believe that KCC's  retention is the most effective and efficient manner of noticing these creditors and parties in interest of the filing of the Chapter 11 Cases and other developments in the Chapter 11 Cases.  In addition, KCC will transmit, receive, docket and maintain proofs of claim filed in connection with the Chapter 11 Cases.  Accordingly, I believe that retention of

KCC, an independent third party with significant experience in this role, to act as an agent of the Court, is in the best interests of the Debtors and their estates and creditors.[15]

**B.**      **Motion to Continue Cash Management System (Item 4)**

64.      The Debtors have filed a motion to continue their ordinary course banking practices. I understand that the Debtors maintain a highly automated cash management system (the "Cash Management System") consisting of four (4) domestic bank accounts (the "Bank Accounts") maintained in financially stable FDIC-insured banks, that facilitate the efficient flow and management of funds involved in the Debtors' operations. I believe that the Cash Management System is essential to enable the Debtors to control and monitor funds, ensure cash availability and liquidity, comply with the requirements of their financing arrangements, and reduce administrative expenses by facilitating the movement of funds and enhancing the development of accurate account balance information.

65.      Receipts. All of the Debtors receipts are channeled into a concentration account (the "Concentration Account"), which is the heart of the Debtor's Cash Management System. The receipts deposited in the Concentration Account include all revenue from the Debtors' customer contracts and all borrowings from the Debtors' credit facilities.

66.      Disbursements. The Concentration Account is linked to two disbursement accounts (the "Disbursement Accounts"), and funds are automatically transferred from the Concentration Account to the Disbursement Accounts as needed for immediate payment. One of the Disbursement Accounts is a payroll account, through which the Debtors fund all of their payroll obligations (including payroll obligations to employees employed by, or who provide services to, certain affiliated non-Debtor subsidiaries). The other is a general disbursement

---

[15]    The Debtors also intend to file an application to retain KCC to perform certain administrative services pursuant to section 327 of the Bankruptcy Code.

account through which the Debtors fund all other accounts payable, excluding the accounts payable of the SPEs.  The Disbursement Accounts are zero-balance accounts, meaning that they do not carry a balance.  The Debtors also maintain a petty cash account (the "Petty Cash Account") to fund small expenditures.

        67.    Business Forms.  In the ordinary course of business, the Debtors use a number of checks, business letterhead, purchase orders, invoices, envelopes, promotional materials, and other business forms and correspondence (collectively, the "Business Forms").  Because the Business Forms were used prepetition, they do not reference the Debtors' current status as debtors in possession.  Requiring the Debtors to modify the Business Forms would unnecessarily distract the Debtors from their restructuring efforts and impose needless expenses on the estates.

        68.    Intercompany Transactions.  In the ordinary course of business, the Debtors engage in various transactions relating to the business relationships between and among themselves (the "Intercompany Transactions").  I understand that the Intercompany Transactions are generally intended to reduce administrative costs and ensure the orderly and efficient operation of the Debtors' enterprise.  Specifically, the Intercompany Transactions (a) allow the Debtors to efficiently allocate employees between various Debtor and non-Debtor entities while consolidating administrative and human resource functions at a single entity; and (b) allow the Debtors to consolidate much of their sales and marketing operations within a single legal entity.  Accordingly, I strongly believe that the failure to continue the Intercompany Transactions in the ordinary course of business would unnecessarily and severely hinder the Debtors' operations.  Avoiding such potentially crippling hindrances by continuing the Intercompany Transactions is therefore in the best interests of the estates.

69.     Accordingly, the Debtors are requesting authorization to continue to maintain existing bank accounts and the existing Cash Management System and to pay related prepetition obligations.  The Debtors are also seeking authorization to continue using existing Business Forms.  Finally, the Debtors seek authorization for the continuation of Intercompany Transactions and accordance of administrative expense priority status to postpetition Intercompany Claims.  I believe such relief is necessary to the successful operations and, thus, restructuring efforts, of the Debtors postpetition.

**C.      Waiver of Investment and Deposit Requirements (Item 5)**

70.     I am advised by counsel that section 345 of the Bankruptcy Code establishes certain investment and deposit restrictions.  The Debtors maintain no investment accounts.  I believe that the Debtors' use of their bank accounts substantially conforms with the approved investment and deposit practices identified in section 345 of the Bankruptcy Code, and that all money deposits are safe and prudent and yield, under the circumstances, the maximum reasonable net return on such money.  Nonetheless, out of an abundance of caution, to the extent that such deposits do not conform to the approved practices identified in section 345 of the Bankruptcy Code, the Debtors seek to have such requirements waived so as to allow the Company's Banks to accept and hold such funds in accordance with the Debtors' prepetition practices.  In my opinion, a waiver of the section 345 requirements is in the best interests of the estates, all creditors and other parties in interest.

**D.      Payment of Employee and Payroll Obligations (Item 6)**

71.     I believe that in order to minimize the personal hardship employees will suffer if prepetition obligations are not honored, as well as the significant harm which would result to the Debtors if employee morale is not maintained, it is of critical importance that the Debtors pay prepetition wages, compensation, and amounts associated with employee benefits

programs and continue such programs in the ordinary course.  The Company currently employs

approximately 833 employees (the "Employees") in their corporate offices, field operations and

water treatment facilities.  Additionally, the Debtors employ both contractors and temporary

employees through a contract staffing agency or other outside firm.  I understand that many of

Company's Employees are employed on a full-time salaried basis, while others are employed on

an hourly or daily basis.  The Employees perform a wide array of vital tasks relating to the

management of the Company, and the processing, transportation, and disposal of municipal and

industrial wastewater residuals. The majority work on-site at the Company's various treatment

plants and composting, incinerator, pelletization facilities. I believe that retaining the Employees,

whose skills and understanding of the Debtors' operations and infrastructure are essential to the

effective operation and reorganization of the Debtors' businesses, is critical to the Debtors'

ability to operate in chapter 11 and to consummate a sale to the winning bidder or otherwise

pursue their restructuring efforts.

      72.    I believe that the overwhelming majority of the Debtors' Employees are

owed less than the priority cap and, I understand, may therefore have claims with respect to their

accrued but unpaid prepetition wages or salaries that I am told are granted priority over other

claims pursuant to the Bankruptcy Code.[16]

      73.    Wages and Salaries.  The Debtors' payroll obligations generally include

base wages and salaries, commissions, and bonuses, as applicable.  The average monthly payroll

for the Debtors' Employees is approximately $4,700,000, including payroll taxes.  As of the

Petition Date, the Debtors estimate that approximately $2,150,000, including wages, salaries,

---

[16]    To my knowledge, there are presently approximately 20 Employees who are owed in excess of $12,475 in prepetition compensation.  The Debtors seek to pay these Employees their full compensation, in excess of the priority cap, solely on a final basis, pursuant to a final order, but do not seek to exceed the priority cap for any Employees during the Interim Period.

commissions and bonuses, and related payroll taxes, is owed in respect of accrued but unpaid payroll for the Employees.

74.     <u>Short-Term Incentive Plan</u>. In addition, in the ordinary course of business, the Debtors offer an annual short-term incentive plan ("<u>STIP</u>") to provide selected Employees of the Company with compensation upon the achievement of specified performance goals of the Company. In light of the Company's distressed situation, I believe that the STIP is necessary to properly compensate and incentivize eligible Employees during the Chapter 11 Cases.

75.     <u>Other Compensation: Vacation, Holiday, and Sick Time, Severance and Business Expenses</u>. The Debtors also offer their Employees other forms of compensation, including vacation time, paid holidays, sick time, severance payments and reimbursement of certain business expenses.

76.     The precise amount of paid vacation time, holiday time, and sick time depends on whether the Employee is full- or part-time and whether the Employee is a Union Employee, in which case the appropriate CBA applies, and varies based on an Employee's length of service. The Debtors anticipate that their Employees will utilize any accrued Vacation Time, Holiday Time, or Sick Time in the ordinary course of business without resulting in any material cash flow requirements beyond the Debtors' normal payroll obligations.

77.     In addition, the Debtors maintain in the ordinary course of their businesses certain severance programs that are available to their non-management Employees under certain circumstances upon termination. Severance payments for non-management Employees are based on the Employee's length of service. The Debtors currently have no outstanding Severance Obligations to non-management Employees. In addition, the Debtors offer severance to certain of their management Employees on a case-by-case basis. As of the Petition Date, I

understand that the Debtors had outstanding Severance Obligations to two former management Employees. The Debtors seek authority to honor prepetition Severance Obligations to these Employees in an amount up to, but not exceeding, the Bankruptcy Code's priority cap.

78.    Finally, the Debtors routinely reimburse Employees for certain expenses incurred within the scope of their employment, including expenses for travel, lodging, ground transportation, meals, supplies, and miscellaneous business expenses (collectively, the "Reimbursable Expenses"). Employees who make frequent and/or large purchases for business purposes are provided with corporate credit cards to pay for these expenses. The Debtors currently have corporate card programs through Bank of America (Visa). Employees who do not have corporate credit cards and incur out-of-pocket, non-corporate card Reimbursable Expenses report these expenses by completing periodic expense reimbursement forms. As of the Petition Date, the Debtors estimate that their accrued and unpaid obligations for Reimbursable Expenses, including amounts outstanding on the corporate credit cards, are approximately $125,000.

79.    These forms of compensation are usual, customary and necessary if the Debtors are to retain qualified employees during the reorganization process.

80.    Employee Benefit Plans.  The Debtors have established plans and policies to provide their Employees with (a) health benefits, including medical, dental, and vision benefits and (b) insurance benefits, including short and long-term disability, life insurance, and accidental death and dismemberment insurance (collectively, the "Employee Benefits"). The Debtors fund the Medical and Insurance Benefits through Company contributions and Employee contributions. The Employee Benefits represent an important component of an Employee's compensation.

81.     The Debtors provide their full-time Non-Union Employees with medical benefits pursuant to three different self-funded preferred provider medical plans (collectively, the "Medical Plans") through High Mark BlueCross BlueShield ("BCBS"), offering varying levels of coverage.  In addition, the Debtors offer their Employees the use of flexible spending accounts for various medical claims not otherwise covered or payable by the Medical Plans.  The Medical Plans are funded through Employee contributions by participating Employees and by the Debtors. As of the Petition Date, the Debtors estimate that the total unpaid claims, costs, and surcharges under the Medical Plans are approximately $480,000, though there may exist claims submitted and not yet reported to the Debtors.

82.     The Debtors also offer their Employees dental benefits (the "Dental Plan") through United Concordia Group Dental Health and vision benefits (the "Vision Plan") through EyeMed Vision Care.  Full-time Non-Union Employees are eligible to receive benefits under the Dental and Vision Plans.  The Dental Plan is funded through contributions by participating Employees and by the Debtors.  As of the Petition Date, approximately $51,000 of claims, costs and surcharges remain outstanding under the Dental Plan.  The Vision Plan is funded through contributions by participating Employees.  The Debtors do not believe that there are any Employee contributions outstanding under the Vision Plan as of the Petition Date.

83.     The Debtors' Union Employees receive benefits through certain union health funds.  The Debtors do not believe that there are any unpaid contributions outstanding to the Union Health Funds as of the Petition Date

84.     The Debtors' Non-Union Employees also have the option to purchase, and in some cases the Debtors provide, for Non-Union Employees, life, accidental death and dismemberment, supplemental life, short-term disability, long-term disability and supplemental

long-term disability insurance (collectively, the "Life Insurance Plans") pursuant to policies issued by Unum Life Insurance Company of America ("Unum").  The Life Insurance Plans are paid primarily through employer contributions.  As of the Petition Date, the Debtors have approximately $51,000 in obligations outstanding under the Life Insurance Plans, inclusive of amounts withheld from Employees.

85.    Savings and Retirement Plans.  The Debtors offer certain Employees a savings and retirement plan through which they can accumulate savings.  Specifically, eligible Employees each year may contribute pre-tax compensation, consistent with IRS regulations, for investment in a 401(k) plan (the "401(k) Plan").  The Debtors provide a 100% matching contribution up to 3% of an Employee's compensation, and a 30% matching contribution for the next 5% of an Employee's compensation.  As of the Petition Date, approximately $38,000 is outstanding under the 401(k) Plan.  Under the CBAs, the Debtors participate in multi-employer pension funds for the benefit of certain Union Employees (the Multi-Employer Funds").  As of the Petition Date, the Debtors estimate that approximately $5,000 exists in accrued but unpaid employer contributions to the Multi-Employer Funds.  The Debtors are seeking authority during the Interim Period to remit all amounts that are related to the 401(k) Plan, including any administration fees in connection with the 401(k) Plan, on a go-forward basis, and to continue the 401(k) Plan in the ordinary course. The Debtors request authority pursuant to a final order to remit all amounts related to the 401(k) Plan that arose prior to the Petition Date in the ordinary course of the Debtors' business.

86.    Other Employee Benefits.  The Debtors provide workers' compensation benefits to all Employees.  These benefits are covered primarily under the Debtors' workers' compensation insurance program (the "Workers' Compensation Insurance") administered jointly

by the Debtors and their insurance carrier, American Zurich Insurance Company ("Zurich"). Additionally, the Debtors participate in state workers' compensation programs in Washington, Ohio, and North Dakota.  As of the Petition Date, approximately $95,000 is outstanding under the State Workers' Compensation Programs.

87.    Finally, the Debtors routinely withhold from Employee paychecks amounts that the Debtors are required to transmit to third parties.  Examples of such withholding include Social Security, FICA, federal and state income taxes, garnishments, union dues, charitable donations, health care payments, other insurance payments, 401(k) contributions, and certain other voluntary payroll deductions.

88.    Continuation of Employee Programs.  The Debtors seek to continue their ordinary course Employee compensation (including, without limitation, wages, salaries, commissions, bonuses and severance), paid time off, benefits (including, without limitation, insurance and retirement), expense reimbursement, corporate credit card, workers compensation, and related programs during the postpetition reorganization process.  I believe the continuation of these programs is essential to the success of the Debtors' reorganization and sale efforts.

89.    I firmly believe that continued payment, when due, of prepetition wages and salaries, and the continuation, without interruption, of compensation and benefit plans, policies, programs and practices described herein is necessary to ensure the ongoing services of the Debtors' Employees during the Chapter 11 Cases. It is my opinion that any significant deterioration in morale at this time will substantially and adversely impact the Debtors and their ability to consummate a sale or otherwise reorganize, thereby resulting in immediate and irreparable harm to the Debtors and their estates.

**E.      Utilities (Item 7)**

90.      In connection with the operation of their businesses and the management of their properties, the Debtors obtain water, gas, electricity, telephone and similar utility products and services (collectively, the "Utility Services") from various utility companies (the "Utility Companies").  The Debtors have filed a motion requesting that the Court approve the Debtors' proposed form of adequate assurance of postpetition payment (the "Proposed Adequate Assurance") to the Utility Companies, as that term is used in section 366 of the Bankruptcy Code, approving procedures for resolving any objections by the Utility Companies relating to the Proposed Adequate Assurance and prohibiting the Utility Companies from altering, refusing, or discontinuing service to, or discriminating against, the Debtors.

91.      I believe that any interruption in Utility Services, even for a brief period of time, would disrupt the Debtors' ability to continue operations.  Such a result could potentially jeopardize the Debtors' ability to perform under their customer contracts and impair the Debtors' reorganization efforts and, ultimately, the value of the Debtors' businesses.  In my opinion, it is critical that Utility Services continue uninterrupted during the Chapter 11 Cases.  I believe that the procedures the Debtors have proposed for the Utility Companies adequately protect the rights that I have been advised are provided to the Utility Companies under the Bankruptcy Code, while also protecting the Debtors' need to continue to receive, for the benefit of their estates, the Utility Services upon which their businesses depend.

**F.      Motions for Payment of Other Critical Business Expenditures (Items 8 through 12)**

92.      The Debtors have also filed a number of motions seeking authority to make critical business expenditures.

<u>Sales, Use and Other Trust Fund Tax Obligations (Item 8)</u>

93.    The Debtors, in the ordinary course of their businesses, incur various tax liabilities, including sales and payroll taxes, and have generally paid such tax liabilities as they become due.  As of the Petition Date, the Debtors were substantially current in the payment of assessed and undisputed Taxes; however, certain Taxes attributable to the prepetition period were not yet due.  Specifically, in the aggregate, the Debtors estimate that approximately $103,000 in prepetition Taxes will become due and payable following the Petition Date.

94.    It is my belief that the continued payment of the Taxes on their normal due dates will ultimately preserve the resources of the Debtors' estates, thereby promoting their prospects for a successful reorganization.  If such obligations are not timely paid, it is my understanding that the Debtors will be required to expend time and money to resolve a multitude of issues related to such obligations, each turning on the particular terms of each Taxing Authority's applicable laws. The Debtors desire to avoid unnecessary disputes with the Taxing Authorities – and expenditures of time and money resulting from such disputes – over a myriad of issues that are typically raised by such entities as they attempt to enforce their rights to collect taxes.  Accordingly, I believe that the Debtors could suffer irreparable harm if the prepetition Taxes are not paid when they become due and payable.

95.    Additionally, the Taxing Authorities may cause the Debtors to be audited if Taxes are not paid immediately. Such audits will unnecessarily divert the Debtors' attention away from the reorganization process. If the Debtors do not pay such amounts in a timely manner, the Taxing Authorities may attempt to revoke the Debtors' licenses, suspend the Debtors' operations and pursue other remedies that will harm the estates. In all cases, the Debtors' failure to pay Taxes could have a material adverse impact on their ability to operate in the ordinary course of business.

96.     I have also been advised that the federal government and many states in which the Debtors operate have laws providing that the Debtors' officers, directors or other responsible employees could, under certain circumstances, be held personally liable for the payment of certain Taxes. In such event, collection efforts by the Taxing Authorities would be extremely distracting for the Debtors and their directors and officers in their efforts to bring the Chapter 11 Cases to an expeditious conclusion.

Critical Vendors  (Item 9)

97.     The Debtors do business with several categories of vendors whose goods and services are essential to the Debtors' continued operations (the "Critical Vendors").  The Critical Vendors include, but are not limited to, (i) suppliers of specialized chemicals necessary for the treatment of biosolids necessary to produce residual materials in accordance with federal regulations; (ii) providers of specialized repair services for the Debtors' machinery and equipment; and (iii) providers of biosolids testing and analysis, who assist the Debtors in maintaining compliance with a vast array of regulations and requirements.

98.     The Debtors estimate that the unpaid prepetition claims of such Critical Vendors (the "Critical Vendor Claims") total approximately $750,000.  The Debtors seek authority to pay Critical Vendor Claims up to $250,000 on an interim basis, and $750,000 on a final basis, to be allocated at the Debtors' discretion.

99.     I anticipate that certain vendors that supply goods or services that are critical to the reliable operation of the Debtors' business will: (i) refuse to deliver goods and services without payment of their prepetition claims; (ii) refuse to deliver goods and services on reasonable credit terms absent payment of prepetition claims, thereby requiring the Debtors to use even greater liquidity and increase their operating costs; or (iii) suffer significant financial

hardship, such that the Debtors' non-payment of their prepetition claims could have a significant

negative impact on a Critical Vendor's business and therefore its ability to supply the Debtors

with needed goods and services.  Accordingly, the Debtors request the Court's authority to pay a

portion of the prepetition Critical Vendor Claims because payment of such claims is necessary to

an effective reorganization.

100.    In order to determine which of the Debtors' vendors are critical to the

Debtors' businesses, the Debtors used several criteria, including whether the vendor is: (i)

essential to the continued safe operation of the Debtors' business in accordance with applicable

regulations and customer contract specifications; (ii) contractually obligated to provide the

Debtors with such essential goods and/or services; (iii) replaceable without significant disruption

to the Debtors' postpetition operations; and/or (iv) likely to continue doing business with the

Debtors notwithstanding nonpayment of prepetition claims or to recognize the authority of this

Court with respect to continuing services.  I am confident that this process has appropriately

identified only those vendors that meet some or all of the foregoing stringent guidelines and that,

if the Debtors failed to pay for the vital goods and services they provided prepetition, such

vendors would likely cease to provide them in the future.  It is my opinion that the cessation of

such goods or services would adversely impact the Debtors' ability to reorganize, and any efforts

to replace such good or services would distract the Debtors from the chapter 11 process more

generally, at the expense of the Debtors' creditors and other parties in interest.

Subhaulers and Landfill Operators (Item 10)

101.    The Debtors' business involves the processing, removal, and application

of biosolids products generated from municipal wastewater.   Under the Debtors' customer

contracts, the Debtors must dewater biosolids from municipal wastewater treatment plants and

convert the biosolids into residual products such as fertilizer pellets or compost, suitable for land

application to farming fields, or, if weather or other conditions do not permit, disposal in landfills.
Because the Debtors' facilities are generally in continuous operation it is essential that the
Debtors maintain arrangements for the prompt, continuous, and reliable removal of biosolids
products.  Consequently, the Debtors require the services of specialized firms to transport such
biosolids products (the "Subcontract Haulers") and landfill facilities to dispose of them (the
"Landfills").

      102.    I do not believe that there are reasonable alternatives to the existing
Subcontract Haulers and Landfills.  The Subcontract Haulers are not ordinary freight companies
but, rather, companies with special expertise and experience in the transportation of biosolids.  In
addition, the Subcontract Haulers possess special permits or licenses that allow them to transport
biosolids.  Moreover, the distribution and disposal of biosolids frequently occurs within small
local markets where very few qualified Subcontract Haulers exist.  And even if the Debtors could
find alternatives to their current Subcontract Haulers, the disruptions that likely would
accompany the transition to new providers could materially threaten the Debtors' ability to
perform under the customer contracts.

      103.    Similarly, I believe the Debtors generally have no practical alternatives
their existing Landfills.  First, the Landfills are strategically located near the source of the
residual products generator site.  As the nearby location is essential to minimize transportation
costs and in many instances is required under a customer contract, the Debtors must use certain
Landfills and incur necessary tipping fees to dispose of such products.  Moreover, the Debtors
sometimes require Landfill services on short notice.  For instance, bad weather may require
residual biosolids products originally designated for land application to be diverted to Landfills.
The Landfills represent the Debtors' last resort for disposal of wastewater residuals; if the

Debtors do not have that option, they would be left with an accumulating amount of wastewater residuals and no safe or legal option for disposal.  Moreover, even if acceptable alternatives to the existing Landfills could be found, there is no guarantee that such substitute providers would provide Landfill access at rates and on terms commensurate with the existing Landfills and, as forth above, the Debtors may incur substantial transportation costs to alternative Landfills.  Likewise, there is no guarantee that alternative providers could be integrated into the Debtors' operations without material disruption.

104.    The Debtors estimate that they have outstanding prepetition amounts due to the Subcontract Haulers and Landfill Operators of approximately $3.5 million.  The Debtors seek authority to pay such amounts in the ordinary course of business up to an aggregate amount of $1 million on an interim basis and $3.5 million on a final basis.  I believe the Subcontract Haulers and Landfill Operators are absolutely indispensable to the Debtors' business.  Moreover, because the Debtors require the services of these vendors on a continuous basis to support their operations, any interruption, even temporary, could seriously impair the efficient operation of the Debtors' business.  I believe there is a material risk that some of the Subcontract Haulers and Landfill Operators would refuse to continue doing business with the Debtors, or would materially delay performance, if not paid in the ordinary course of business.  Consequently, I believe that the risks associated with non-payment of such claims are disproportionate to the amount of the claims.

Capital Vendor Claims (Item 11)

105.    The Debtors are currently engaged in an important capital project to improve a customer-owned facility in Woonsocket, Rhode Island.  The Debtors' have engaged the services of numerous third-party contractors (the "Capital Project Vendors") to assist them in

completing this capital project.  Successful completion of this project is necessary if the Debtors

are to  maintain good relations with the customer and continue to deliver reliable, high quality

service.  Moreover, if the Debtors successfully complete the project by November 2013, they are

eligible for an approximately $1.5 million incentive payment.  Finally, the Debtors believe that

certain of the Capital Project Vendors may be able to assert mechanics' or similar liens against

the Debtors' or their customer's property.

106.    As of the Petition Date, the Debtors had accrued approximately $1 million

in unpaid obligations to the Capital Project Vendors.  The Debtors are requesting authority to pay

such claims, up to an aggregate amount of $250,000 on an interim basis and $1 million on a final

basis, to ensure that the Capital Project Vendors provide uninterrupted service toward the

completion of the capital project.  Given the importance of the capital project, and the risk that

even temporary delays in performance by the Capital Project Vendors would result in the loss of

the $1.5 million incentive payment as well additional costs to the Debtors and their creditors

associated with replacing the Capital Project Vendors, I believe that payment of the Capital

Project Vendors' prepetition claims is in the best interests of the Debtors' estates.

Surety Program (Item 12)

107.    As described above, many of the Debtors' municipal customers require

that the Debtors furnish one or more surety bonds to secure the Debtors' payment or

performance obligations under the applicable customer contract.  In addition, the Debtors are

required to provide surety bonds to secure certain obligations owed to state or federal agencies,

contractual or permit obligations, and other obligations required by law.  Consequently, in the

ordinary course of their business, the Debtors have arranged for various commercial surety

providers (the "Sureties") to issue surety bonds (each such bond, a "Surety Bond") on the

Debtors' behalf for the benefit of their customers and governmental agencies (the "Surety Bond Program").

108.    Because Surety Bonds are required under most of the Debtors' customer contracts, the Debtors' inability to continue the Surety Bond Program in the ordinary course would seriously threaten the Debtors' viability as a going concern.  Accordingly, the Debtors seek authorization to continue the Surety Bond Program without interruption, including (i) the maintenance of cash collateral; (ii) the payment of all postpetition amounts arising under the Surety Bond Program; and (iii) the provision of additional cash or other acceptable collateral with respect to Surety Bonds, solely to the extent required by the Sureties and permitted under the Debtors' Proposed DIP Financing.  Given the critical importance of the Surety Bond Program, I believe the relief requested is in the best interests of the Debtors' estates.

109.    In connection with the continuation of the Surety Bond Program after the Petition Date, the Debtors have reached an understanding with their Sureties concerning several key issues.  First, to avoid potential disputes and ensure that the Debtors' relationship with their Sureties and customers continues uninterrupted, the Debtors and the Sureties have reached an understanding regarding the treatment of potential claims under an Indemnity Agreement in the unlikely event that one of the Debtors' customers seeks or threatens recourse against the Surety for the Debtors' alleged breach of a bonded contract.  Specifically, the Debtors and the Sureties agree that any claim asserted by a Surety for indemnification under any Indemnification Agreement, related to or arising out of any actual, potential, or asserted liability of the Surety to any beneficiary or obligee under any Surety Bond (including Surety Bonds issued on behalf of any Non-Debtor Affiliates) shall be treated as a postpetition claim to the extent that the actual, potential, or asserted liability of the Debtors to any beneficiary or obligee under the applicable

bonded contract arises out of a postpetition breach of such bonded contract. Second, the Debtors

and the Sureties have agreed that to the extent that any Surety Bond is issued or renewed

postpetition as part of the Surety Bond Program and is subject to a prepetition Indemnification

Agreement, the Debtors' indemnification obligations under such prepetition Indemnity

Agreement arising on account of such postpetition Surety Bond (including any reasonable fees

and expenses of counsel as provided for in such Indemnification Agreement) shall be deemed to

be postpetition obligations of the Debtors.

110.    Given the understandings described above, and provided that the Debtors

maintain their Surety Program in the ordinary course and are not in default with respect to any

such Surety Bond or have promptly upon demand cured any default thereunder, the Sureties

agree that they will not seek relief from the automatic stay to, or take any other action to, cancel

any outstanding Surety Bond. Accordingly, it is crucial that the Debtors receive authorization to

continue the Surety Bond Program in the ordinary course.

**G.      Approval of DIP Financing and Access to Cash Collateral (Item 13)**

111.    The Debtors are also requesting authorization to enter into the Proposed

DIP Financing pursuant to that certain Superpriority Priming Debtor-in-Possession Credit

Agreement (the "DIP Credit Agreement"). As set forth above, following a full marketing

process, the Debtors determined that the Proposed DIP Financing represented the best available

option for the Company to obtain essential post-petition financing.

112.    In connection with the Proposed DIP Financing the Debtors seek, among

other things, authorization to continue to use Cash Collateral; authorization to obtain the

Proposed DIP Financing in an aggregate principal amount up to $30,000,000 (the availability of

which shall be subject to the terms and conditions set forth in the Credit Documents), to be

provided by Bank of America, N.A. ("Bank of America"), acting as administrative agent (in such

capacity, the "DIP Agent"),  other financial institutions or entities acceptable to the DIP Agent

(together with Bank of America, the "DIP Lenders") and the DIP Lenders; authorization to grant

to the DIP Lenders, subject to the Carve Out (as defined below), superpriority administrative

expense claims with priority over all other administrative expenses pursuant to section 364(c)(1)

of the Bankruptcy Code with respect to all the DIP Obligations; authorization to grant valid,

binding, continuing, enforceable, fully-perfected first priority security interests to the DIP

Lenders, subject only to the Carve Out, under Bankruptcy Code section 364(c)(2) in the First

Lien Collateral not subject to valid, perfected and non-avoidable liens or security interests and

liens as of the Petition Date; authorization to grant valid, binding, continuing, enforceable, fully-

perfected first priority priming liens to the DIP Lenders, subject only to the Carve Out, under

Bankruptcy Code section 364(d) in all First Lien Collateral subject to any valid, perfected and

non-avoidable liens or security interests as of the Petition Date; authorization to grant valid,

binding, continuing, enforceable, fully-perfected security interests in the Junior Lien Collateral

(as defined below) and priming liens on the Junior Lien Collateral to each of the DIP Lenders

under Bankruptcy Code sections 364(c)(3) and 364(d), of the priority described below;

authorization to provide adequate protection to holders of secured claims under the First Lien

Facility and the Second Lien Facility pursuant to Bankruptcy Code sections 361, 363(e), and

364(d); an interim hearing on the Motion be held before this Court to consider entry of an

interim order, which would authorize the Borrowers to obtain the Proposed DIP Financing in an

aggregate principal amount of $15 million to (a) fund general corporate purposes of the Debtors

arising out of the operation of the Debtors' businesses, working capital and allowed

administrative expenses incurred during the Chapter 11 Cases, (b) pay interest, fees and expenses

payable under the DIP Facility, and (c) pay costs of administration of the Cases in a manner

consistent with the requirements of the Bankruptcy Code, in each case, in accordance with the

Budget[17] (as defined in the DIP Credit Agreement); and a final hearing on the Motion be held

before this Court within 28 days of the entry of the interim order to consider entry of a final

order.

113.    I believe that the Debtors have an immediate need for adequate

postpetition financing to continue operating their business in the ordinary course and preserve

the value of their assets pending consummation of the Asset Sale.  The Debtors were unable to

obtain adequate unsecured credit allowable as an unsecured claim or superpriority administrative

expense because nearly all of the Debtors' assets remain subject to prepetition liens.  I believe

the Proposed DIP Financing reflects the most favorable terms on which lenders were willing to

offer financing, particularly after consideration of the costs associated with obtaining DIP

financing on a non-consensual priming basis.  I further believe that the proceeds from the

Proposed DIP Financing will allow the Debtors to continue their operations in the ordinary

course, maintain prudent cash balances, satisfy working capital requirements, fund restructuring

costs, and otherwise meet their liquidity needs through the closing of the planned asset sale.

Finally, I believe, after consultation with the Debtors' advisors, that the terms of the DIP Credit

Agreement and other Credit Documents are fair and reasonable.

**H.     Motion to File Under Seal (Item 14)**

114.    As payment for services to be provided by the DIP Agent, the DIP Agent

and the Debtors have agreed that STI, as borrower under the DIP Credit Agreement (in such

capacity, the "Borrower") shall pay a fee to the DIP Agent (the "Agent Fee"), the terms and

---

[17]   The Budget will be adequate, considering all available assets, to pay all administrative expenses due or accruing
during the period covered by the financing.

amount of which are set forth in a letter (the "Fee Letter"), attached to the motion to approve the Proposed DIP Financing as Exhibit C.

115.    The Fee Letter provides that it is delivered on the understanding that neither it nor its terms shall be disclosed to any other person, with certain exceptions for insiders and advisors of the Borrower, and as required by law or for approval of this Motion by the Court and the Borrower will otherwise take commercially reasonable steps, including the filing of this Motion, to preserve the confidentiality of the Fee Letter.

116.    The Fee Letter contains highly confidential and commercially sensitive information regarding Bank of America's business practices and it impact future transactions in which Bank of America may participate.  For this reason, as set forth above, it was a condition of the Fee Letter that the Debtors exercise commercially reasonable efforts to maintain the confidentiality of the Fee Letter.

117.    The Debtors will provide the Fee Letter to the Court and to the U.S. Trustee for the District of Delaware.  No further public disclosure of the Fee Letter is necessary to protect the interests of the Debtors' creditors.  Furthermore, any party or member of the public with a compelling interest in reviewing the Fee Letter may request a further order from this Court.

I declare under penalty of perjury that the foregoing is true and correct.

Dated:        April 24, 2012

By:        */s/ John R. Castellano*
            Name: John R. Castellano
            Title: Chief Restructuring Officer

**<u>EXHIBIT A</u>**

**Corporate Organizational Chart**

**SYNAGRO ENTITY ORGANIZATIONAL CHART**

Ownership:

JABB II, LLC – Synagro-WWT, Inc. (40%), Carl D. Jones & Associates, P.C. (60%)
NETCO-Waterbury, LP – Synagro of Texas-CDR, Inc. (10%), Synagro Woonsocket, LLC (90%)
New Haven Residuals, LP – Synagro of Texas-CDR, Inc. (10%), Synagro Woonsocket, LLC (90%)
Philadelphia Biosolids Services, LLC – Synagro-WWT, Inc. (70%), The McKissack Group, Inc. (20%), Len Parker Associates, Inc. (10%)
Synagro-Baltimore, L.L.C. – Synagro-WWT, Inc. (30%), Synagro Woonsocket, LLC (10%), Synagro South, LLC (30%), EPIC (30%)
Synagro Management, LP – Synagro Texas, LLC (1%), Synagro-WWT, Inc. (99%)

Monday, April 22, 2013

## EXHIBIT B

## List of First Day Motions

1. Debtors' Motion for Order (A) Directing Joint Administration of Cases Pursuant to Bankruptcy Rule 1015(b) and Local Bankruptcy Rule 1015-1 and (B) Waiving Requirements of Bankruptcy Code Section 342(c)(1) and Bankruptcy Rules 1005 and 2002(n)

2. Debtors' Motion for Order Pursuant to Bankruptcy Code Sections 105 and 521, Bankruptcy Rule 1007(c) and Local Bankruptcy Rule 1007-1(b) Extending Time for Debtors to File Schedules and Statements

3. Debtors' Application for Order Pursuant to 28 U.S.C. § 156(c), Bankruptcy Rule 2002 and Local Bankruptcy Rule 2002-1(f) Authorizing Debtors to Employ and Retain Kurtzman Carson Consultants LLC as Notice, Claims and Solicitation Agent *Nunc Pro Tunc* to the Petition Date

4. Debtors' Motion for Order Pursuant to Bankruptcy Code Sections 105(a), 363, 364 and 503, Bankruptcy Rules 6003 and 6004 and Local Bankruptcy Rule 2015-2 (I) Authorizing (A) Continued Use of Existing Cash Management System, Bank Accounts and Business Forms, (B) Payment of Related Prepetition Obligations and (C) A Waiver of Certain Operating Guidelines Relating to Bank Accounts; (II) Authorizing Continued Engagement in Intercompany Transactions and (III) According Administrative Expense Priority Status to All Postpetition Intercompany Claims

5. Debtors' Motion for Interim and Final Orders Under Bankruptcy Code Sections 105 and 345 and Local Bankruptcy Rule 2015-2(b) Waiving Investment and Deposit Requirements

6. Debtors' Motion for Interim and Final Orders Pursuant to Bankruptcy Code Sections 105(a), 363, 507(a), 1107(a) and 1108 and Bankruptcy Rule 6003, Authorizing Debtors To, *Inter Alia*, Pay Prepetition Wages, Compensation and Employee Benefits

7. Debtors' Motion for Interim and Final Orders Pursuant to Bankruptcy Code Sections 105(a) and 366 (I) Approving Debtors' Proposed Form of Adequate Assurance of Payment, (II) Establishing Procedures for Resolving Objections by Utility Companies and (III) Prohibiting Utility Companies from Altering, Refusing or Discontinuing Service

8. Debtors' Motion for Order Pursuant to Bankruptcy Code Sections 105(a), 363, 507(a)(8), 541, 1107(a) and 1108 and Bankruptcy Rule 6003 Authorizing the Debtors to Pay Certain Prepetition  Taxes and Related Obligations

9. Debtors' Motion for Order Under Bankruptcy Code Sections 105(a), 363(b), 364, 1107(a), and 1108 and Bankruptcy Rule 6003 Authorizing Payment of Critical Vendors

10.    Debtors' Motion for Interim and Final Orders Pursuant to Bankruptcy Code Sections 105, 363, 1107 and 1108 and Bankruptcy Rules 6003 and 6004 Authorizing Payment of Subcontract Haulers and Landfill Operators in the Ordinary Course of Business

11.    Debtors' Motion for Interim And Final Orders Pursuant to Bankruptcy Code Sections 105(a), 363(b), 1107(a), and 1108 and Bankruptcy Rules 6003 and 6004 Authorizing Debtors to Continue Ongoing Capital Projects and Pay Prepetition Claims Related Thereto

12.    Debtors' Motion for Interim and Final Orders Pursuant to Bankruptcy Code Sections 363 and 364 and Bankruptcy Rules 6003 and 6004 Authorizing Debtors to Maintain, Continue, and Renew their Surety Bond Program

13.    Debtors' Motion For Interim And Final Orders Pursuant To Bankruptcy Code Sections 105, 361, 362, 363(c)(2), 363(e), 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1) And 364(e) and Bankruptcy Rules 2002 and 4001 (I) Authorizing the Debtors to (A) Obtain Postpetition Financing on a Secured, Superpriority Basis and (B) Use Cash Collateral, (II) Granting Adequate Protection, (III) Scheduling a Final Hearing Pursuant to Bankruptcy Rules 4001(B) and 4001(C), and (IV) Granting Related Relief

14.    Debtors' Motion for Order Under Bankruptcy Code Section 107(b) and Bankruptcy Rule 9018 to File DIP Agent Fee Letter Under Seal