IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                            :
In re:                                      :    Chapter 11
                                            :
SYNAGRO TECHNOLOGIES, INC., et al.,         :    Case No. 13-11041 (BLS)
                                            :
          Debtors.[1]                       :    (Joint Administration Pending)
                                            :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**DEBTORS' MOTION FOR ORDERS (A)(I) ESTABLISHING BIDDING PROCEDURES RELATING TO THE SALE OF SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS; (II) APPROVING BID PROTECTIONS; (III) ESTABLISHING PROCEDURES RELATING TO THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES, INCLUDING NOTICE OF PROPOSED CURE AMOUNTS; (IV) APPROVING FORM AND MANNER OF NOTICE OF ALL PROCEDURES, PROTECTIONS, SCHEDULES AND AGREEMENTS, AND (V) SCHEDULING A HEARING TO CONSIDER THE PROPOSED SALE, AND (B)(I) APPROVING THE SALE OF SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS FREE AND CLEAR OF LIENS AND ENCUMBRANCES; (II) AUTHORIZING THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES; AND (III) GRANTING CERTAIN RELATED RELIEF**

Synagro Technologies, Inc. and certain of its affiliates, the debtors and debtors in possession in the above-captioned cases (collectively, the "Debtors" and, together with the non-debtor affiliates and subsidiaries of Synagro Technologies, Inc., "Synagro" or the "Company") hereby move (the "Motion") this Court pursuant to sections 105, 363 and 365 of title 11 of the

---

[1]    The Debtors and the last four digits of their respective taxpayer identification numbers are as follows: Drilling Solutions, LLC (9935); Earthwise Organics, LLC (5458); Environmental Protection & Improvement Company, LLC (2397); JABB II, LLC (7433); NETCO - Waterbury, LLC (5202); New Haven Residuals, LP (2758); New York Organic Fertilizer Company (8694); Providence Soils, LLC (9061); Soaring Vista Properties, LLC (4015); South Kern Industrial Center, LLC (2099); ST Interco, Inc. (4897); Synagro - Connecticut, LLC (5532); Synagro - WCWNJ, LLC (0817); Synagro - WWT, Inc. (0492); Synagro Central, LLC (2568); Synagro Composting Company of California, LLC (7671); Synagro Detroit, LLC (1107); Synagro Drilling Solutions, LLC (4598); Synagro-Hypex, LLC (2544); Synagro Management, LP (4546); Synagro Northeast, LLC (2564); Synagro of California, LLC (8598); Synagro of Minnesota - Rehbein, LLC (7969); Synagro of Texas - CDR, Inc. (8566); Synagro Product Distribution, LLC (4357); Synagro South, LLC (2567); Synagro Technologies, Inc. (9860); Synagro Texas, LLC (4372); Synagro West, LLC (2566); Synagro Woonsocket, LLC (1634); Synatech Holdings, Inc. (5544). The Debtors' address is 1800 Bering Drive, Suite 1000, Houston, Texas 77057.

United States Code (the "Bankruptcy Code") and Rules 2002, 6004 and 6006 of the Federal

Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), for entry of an order (the "Bidding

Procedures Order"), substantially in the form attached hereto as Exhibit A, (i) approving the

proposed auction and bidding procedures (the "Bidding Procedures"), which are attached as

Exhibit 1 to the Bidding Procedures Order, for the potential sale of substantially all of the

Debtors' assets (the "Acquired Assets"); (ii) approving the proposed bid protections for the

Stalking Horse Bidder (as defined herein); (iii) establishing procedures for the assumption and

assignment of executory contracts and unexpired leases, including notice of proposed cure

amounts (the "Assumption and Assignment Procedures"); (iv) approving the form and manner of

notice of all procedures, protections, schedules, and agreements; and (v) scheduling a hearing

(the "Sale Hearing") to approve such sale (the "Sale Transaction").  The Debtors also hereby

move the Court, pursuant to Bankruptcy Code sections 105, 363 and 365 and Bankruptcy Rules

2002, 6004 and 6006, for entry of an order (the "Sale Order"), substantially in the form attached

hereto as Exhibit B, (i) authorizing the sale of the Acquired Assets free and clear of liens, claims,

interests and encumbrances; (ii) authorizing the assumption and assignment of certain executory

contracts and unexpired leases as set forth in the Purchase Agreement (as defined herein); and

(iii) granting related relief.[2]  In support of the Motion, the Debtors rely upon and incorporate by

reference the Declaration of John R. Castellano, the Chief Restructuring Officer of the Debtors

(the "First Day Declaration"), filed with the Court concurrently herewith.  In further support of

the Motion, the Debtors, by and through their proposed undersigned counsel, respectfully

represent:

---

[2]    This Motion contains the Debtors' request for entry of the Bidding Procedures Order and approval of the Sale
Order.  The Debtors are seeking approval of the Bidding Procedures Order at the initial hearing to be conducted
on this Motion. The Sale Order is requested to be considered at the Sale Hearing.

## JURISDICTION AND VENUE

1.     This Court has jurisdiction to consider this Motion under 28 U.S.C. §§ 157 and 1334.  This is a core proceeding under 28 U.S.C. § 157(b).  Venue of these cases and this Motion in this district is proper under 28 U.S.C. §§ 1408 and 1409.

2.     The legal predicates for the relief requested herein are Bankruptcy Code sections 105, 363, and 365, and Bankruptcy Rules 2002, 6004, and 6006.

3.     Pursuant to Rule 9013-1(f) of the Local Rules for the United States Bankruptcy Court for the District of Delaware, the Debtors consent to the entry of a final judgment or order with respect to this Motion if it is determined that Court would lack Article III jurisdiction to enter such final order or judgment absent the consent of the parties.

## BACKGROUND

**A.     The Chapter 11 Cases**

4.     On April 24, 2013 (the "Petition Date"), the Debtors each commenced a case by filing a petition for relief under chapter 11 of the Bankruptcy Code (collectively, the "Chapter 11 Cases").  The Debtors have requested that the Chapter 11 Cases be jointly administered.

5.     The Debtors continue to operate their businesses and manage their properties as debtors and debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

6.     To date, no creditors' committee has been appointed in these Chapter 11 Cases by the United States Trustee.  No trustee or examiner has been appointed in the Debtors' Chapter 11 Cases.

## B.     The Debtors' Business

7.     Synagro—including the Debtors and their Non-Debtor Affiliates—is the largest recycler of biosolids and organic residuals in the United States and is one of the largest national companies focused exclusively on biosolids recycling, which has a market size of approximately $2 billion.  In particular, Synagro offers a broad range of water and wastewater residuals management services focusing on the beneficial reuse of organic, nonhazardous residuals, including solid or liquid material generated by  municipal wastewater treatment or residuals management facilities, known as biosolids.

8.     The Company's operations are divided into four primary divisions— Facilities, Services, Rail, and Drilling.  Currently, the Company has nine heat-drying and pelletization facilities, three composting facilities, and three incineration facilities located throughout the country (collectively, the "Facilities").  In addition to services provided at its Facilities, the Company's Services division provides biosolids treatment services to municipal and industrial customers at facilities owned by such customers.  These services include: (i) residuals dewatering services through permanent and mobile dewatering units, (ii) cleaning and maintenance of the digesters and lagoons at municipal and industrial wastewater facilities and agricultural land application or landfilling of the removed biosolids, (iii) alkaline stabilization through the Company's BIO*FIX process, (iv) collection and transportation of removed residuals via the Company's fleet of tankers to either a land application site, a landfill, or one of the Company's residuals processing facilities, (v) recycling of biosolids through agricultural land application programs in 25 states, and (vi) provision of Synagro's proprietary Residuals Management System.  The Company's newly-acquired Drilling division provides sustainable, closed-loop solids control and waste management expertise to oil and gas exploration and production companies. Finally, the Company provides an intermodal rail transportation service

through its Rail division, employing an extensive fleet of rail cars and intermodal containers to transport both non-hazardous and hazardous materials including biosolids, contaminated soils, municipal solid waste and coal combustion byproducts.

## C.    Events Leading to the Chapter 11 Cases

9.    In early and mid-2012, Synagro recognized that that it likely would not satisfy its leverage ratio covenants under its first lien and second lien credit agreements (the "First Lien Credit Agreement" and "Second Lien Credit Agreement" respectively, and together, the "Prepetition Credit Facilities") in upcoming quarters due to several factors.  These factors include, among other things, a challenging operating environment in late 2011 and early 2012, a reduction in the permitted total leverage ratio under the First Lien Credit Agreement, and the discontinuation of a government program providing for credits in the form of cash payments to entities which utilized alternative liquid fuels.  In light of these issues, the upcoming maturity of its first lien revolver facility under the First Lien Credit Agreement in April of 2012 and the generally over-leveraged state of the Company, Synagro retained restructuring advisors and commenced negotiations with the its lenders under the First and Second Lien Credit Agreements (the "First Lien Lenders" and "Second Lien Lenders" respectively, and together, the "Prepetition Lenders") regarding a restructuring of its credit facilities.

10.    In late 2012, the Company determined that it had not satisfied certain of its financial covenants under the Prepetition Credit Facilities.  To address these defaults, in December of 2012, the Company entered into temporary waivers with the First Lien and Second Lien Lenders, waiving all defaults until February 28, 2013, which period was later extended to July 19, 2013.

11.    As further set forth below, during the waiver period, in accordance with the requirements of the first lien waiver, the Company, with the assistance of its advisors,

commenced and conducted a comprehensive sale process, resulting in the execution of the

Purchase Agreement with the Stalking Horse Bidder.  Accordingly, the Debtors filed these

Chapter 11 Cases to effectuate a sale to the Stalking Hose Bidder or another bidder presenting a

higher or otherwise better offer.  The Debtors anticipate that consummation of the sale will

enable them to delever their balance sheets and emerge as a stronger company.

## RELIEF REQUESTED

12.    By this Motion, the Debtors first request entry of the Bidding Procedures

Order, which will authorize and approve, among other things: (i) the Bidding Procedures for

conducting the auction for the Acquired Assets; (ii) the Bid Protections (as defined herein); (iii)

the Assumption and Assignment Procedures; (iv) the scheduling of the Sale Hearing to approve

any such Sale Transaction with respect to any bid accepted by the Debtors; and (v) the form and

manner of notice with respect to all procedures, protections, schedules and agreements.

13.    Second, at the Sale Hearing, the Debtors will request entry of the Sale

Order that will, *inter alia*, approve (i) the sale of the Acquired Assets in accordance with the

terms of the Purchase Agreement executed by the Stalking Horse Bidder or such other

Successful Bidder, which shall be free and clear of all liens, claims, encumbrances, and other

interests, including rights or claims based on any taxes or successor or transferee liability (other

than certain expressly specified permitted encumbrances and assumed liabilities, all as more

specifically set forth in the Purchase Agreement); and (ii) the assumption and assignment of

certain executory contracts and unexpired leases related to the Acquired Assets and the Sale

Transaction.

## BASIS FOR RELIEF

**A.    The Debtors' Marketing and Sale Efforts**

14.    The Debtors commenced these Chapter 11 Cases after a robust exploration of restructuring alternatives, including the potential sale of their business as a going concern. Moreover, as set forth above, commencement of a sale process was a condition to the temporary waiver granted by the First Lien Lenders.  Throughout the sale process, the Company consulted with, and solicited input from, the advisors to the First Lien Lenders and the Second Lien Lenders.  As part of these efforts, between November 2012 and the Petition Date, the Debtors and its investment banker, Evercore Group L.L.C. ("Evercore"), identified and contacted approximately 112 potential financial and strategic purchasers to gauge their interest in purchasing the Debtors' business as a going concern.  Approximately 41 of those parties entered into non-disclosure agreements ("NDAs") with the Company to further explore the potential purchase of the Debtors' business.  Among other things, Evercore distributed a Confidential Information Memorandum (the "CIM") describing the Debtors' business and financial results in considerable detail, to the parties that executed NDAs.  Of the 41 parties that received the CIM, five furnished written non-binding indications of interest and one expressed a verbal indication of interest (collectively "Indications of Interest"); the other 35 parties indicated that they did not intend to participate further.

15.    After reviewing the six Indications of Interest, the Debtors invited three parties to continue to the next round of the sales process, during which the Debtors engaged extensively with the potential bidders concerning a possible transaction.  Among other things, the Debtors arranged in-person meetings between the potential bidders and the Debtors' senior managers and advisors and afforded the potential bidders the opportunity for extensive due diligence via an electronic data room.

16.     At the conclusion of this round of the sales process, one of the three potential bidders, EQT Infrastructure II Limited Partnership ("EQT"), made a formal proposal to acquire the Company. Following receipt of the formal proposal, on February 22, 2013, the Company entered into an agreement with EQT pursuant to which the Company agreed to grant EQT exclusivity for a period of 30 days, subject to extension for a further 15 days if EQT confirmed in writing that it was continuing to work in good faith toward a transaction consistent with its indication of interest.[3] EQT provided the requisite written confirmation and the exclusivity period was continued, ending April 8, 2013. During this exclusivity period, the Company and its advisors continued to work with EQT and its advisors to provide EQT all necessary diligence.

17.     The Debtors and EQT thereafter engaged in extensive arms'-length negotiations concerning the terms of EQT's proposal. As a result of these negotiations, the Debtors and their advisors determined that the sale of substantially all of the Debtors' assets to EQT, pursuant to section 363(b) of the Bankruptcy Code, would be in the best interests of the Company and its stakeholders. Accordingly, the Debtors and the Stalking Horse Bidder have entered into an asset purchase agreement (the "Purchase Agreement"), under which STI Infrastructure Company, Inc., a subsidiary of EQT (the "Stalking Horse Bidder"), will serve as stalking horse bidder for substantially all of the Debtors' assets, subject to higher or better offers received through the Bidding Procedures and subject to this Court's approval. The Debtors believe that the sale of the Acquired Assets to the Stalking Horse Bidder or to a party submitting

---

[3]     During the exclusivity period, the Debtors agreed not to engage with or solicit offers from any other potential bidders; provided, however, that the Debtors were permitted to continue discussions with American Securities Opportunity Fund II ("ASOF"), a significant lender under both the First and Second Lien Credit Agreements and a potentially interested purchaser. The Debtors provided requested information to and held discussions with ASOF but did not ultimately receive any offer from ASOF.

a higher or better offer at auction (the "Successful Bidder," such definition to include the

Stalking Horse Bidder if no other party submits a higher or better offer) will maximize the value

of the Debtors' estates for the benefit of all stakeholders.

**B.    The Purchase Agreement**

        18.    A summary of the principal terms of the Purchase Agreement, including

those terms for which a summary is required pursuant to Local Bankruptcy Rule 6004-1, is set

forth below.[4] A complete copy of the Purchase Agreement is attached hereto as Exhibit C.

(a)    Purchase Price. Section 1.6 of the Purchase Agreement provides that the
       Purchase for the Acquired Assets shall be $455,000,000 (the "Purchase Price")
       less (A) the Exit Bonuses in such amounts as set forth on Schedule 1.3(j) less (B)
       the Project Finance Debt, and any other Indebtedness of the Transferred Subs, in
       each case in such amounts as set forth on Schedule 1.4(g) less (C) the Capital
       Leases in such amounts as set forth on Schedule 1.1(e)(v) (such net amount, as
       updated as of the Closing Date pursuant to Section 1.6 (a) of the Purchase
       Agreement, the "Cash Payment at Closing").

(b)    Deposit. Section 1.6 of the Purchase Agreement provides that, on the Effective
       Date, Purchaser shall deposit with JPMorgan Chase Bank, NA, in its capacity as
       escrow agent (the "Escrow Agent"), the sum of $23,000,000 (the "Deposit
       Funds"), to be released by the Escrow Agent and delivered to either Purchaser or
       to Parent on behalf of the Sellers in accordance with the provisions of the Escrow
       Agreement entered into by and among Purchaser, Parent and the Escrow Agent
       concurrently with the execution of the Purchase Agreement. At the Closing,
       Purchaser and Parent shall provide joint written instructions, executed by their
       respective Authorized Representatives (as such term is defined in the Escrow
       Agreement), to the Escrow Agent that instruct the Escrow Agent to release the
       Deposit Funds to Parent. The Deposit Funds received by Parent shall be applied
       at the Closing toward the Cash Payment at Closing.

(c)    Acquired Assets. Section 1.1 of the Purchase Agreement lists the Acquired
       Assets and provides that the Purchaser shall purchase and accept from the Sellers,
       all right, title and interest of the Sellers in and to all rights, properties and assets of
       the Sellers, wherever located, whether tangible or intangible, as the same shall
       exist on the Closing Date, other than the Excluded Assets (collectively, the
       "Acquired Assets"), including, without limitation, (a) all right, title and interest of

---

[4]    The summary is qualified in its entirety by the provisions of the Purchase Agreement. In the event of any
       inconsistencies between the terms of the Purchase Agreement and the terms herein, the terms of the Purchase
       Agreement shall govern and control. Any capitalized terms used in this summary and not defined therein shall
       have the meanings ascribed to such terms in the Purchase Agreement

the Sellers in and to the Interests; (b) all intercompany accounts receivable as to which any Transferred Sub is an obligor or is otherwise responsible or liable and which are owed or payable to any Seller or any Affiliate thereof; (c) all accounts receivable arising out of the operation of the Business existing on the Effective Date or arising in the ordinary course of the Business after the Effective Date, including without limitation, such of the foregoing existing on the Effective Date as are listed or described on Schedule 1.1(c) (the "Accounts Receivable"), except to the extent that any of the foregoing relate to Excluded Assets or are satisfied or discharged in the ordinary course of the Business prior to the Closing; (d) the credits, claims for refunds (other than refunds for income Taxes paid by a Seller), prepaid expenses, prepaid rent, and prepaid items relating to the Business, including without limitation, such of the foregoing as are listed and described on Schedule 1.1(d), except to the extent that any of the foregoing relate to Excluded Assets; (e) all Contracts listed or described below (the "Assigned Contracts"): including (i) all of the Contracts between any Seller and a customer relating to the Business (the "Customer Contracts"), including without limitation, such of the foregoing as are listed or described on Schedule 1.1(e)(i) or that relate to the Business or arise in the ordinary course of the Business after the Effective Date; (ii) the Contracts between any Seller and a vendor or other third party providing goods or services relating to the Business (the "Supplier Contracts"), including without limitation, such of the foregoing as are listed or described on Schedule 1.1(e)(ii) or that relate to the Business or arise in the ordinary course of the Business after the Effective Date; (iii) all Contracts pursuant to which any third party grants any Seller licenses, covenants not to sue or rights in, under or with respect to any Intellectual Property related to the Acquired Assets; (iv) the Collective Bargaining Agreements; (v) the Capital Leases, together with the capitalized amounts thereof, set forth on Schedule 1.1(e)(v); (vi) that certain Membership Interest Purchase Agreement, dated June 21, 2011, by and among Burton T. Zaunbrecher, Gregory V. Campo, Mark Guidry and Synagro Drilling Solutions, LLC (and the ancillary agreements related thereto listed on Schedule 1.1(e)(vi)); and (vi) the Contracts that are listed or described on Schedule 1.1(e)(vii); (f) all rights of the Sellers under all warranties, representations and guarantees made by suppliers, manufacturers and contractors in connection with the Acquired Assets; (g) all inventory, finished goods, works in process, raw materials and packaging materials used or held for use in the operation of the Business (collectively, the "Inventory"); (h) (i) all of the real property of Sellers used in the operation of the Business, including without limitation such of the foregoing that is listed and described on Schedule 1.1(h)(i) (the "Owned Real Property") and (ii) all rights and incidents of interest of any Seller to all real property leases used in the operation of the Business, including without limitation such of the foregoing that are listed or described on Schedule 1.1(h)(ii) (to the extent not excluded under Section 1.2, the "Assumed Leases"); (i) all machinery, rolling stock equipment and other equipment, computers, furniture, furnishings, fixtures, office supplies, vehicles, tools, order entry devices and all other tangible personal property owned by any Seller that are used in the operation of the Business or located on any Owned Real Property or on premises subject to the

Assumed Leases (collectively, the "Tangible Personal Property"), including, without limitation, such of the foregoing as are listed or described on Schedule 1.1(i); (j) all Acquired Intellectual Property (including, without limitation, all of the Sellers' rights in the name "Synagro" and all marks set forth on Schedule 3.11(b)); (k) all rights in the computer software programs and information technology systems of Sellers (the "Software"); (l) to the extent transferable, all Permits issued to any Seller or otherwise used in the operation of the Business (and all pending applications therefor or renewals thereof), including, but not limited to, Environmental Permits; (m); the bank accounts and lockbox arrangements relating to the Business that are listed or described on Schedule 1.1(m) (excluding all rights or incidents of interest with respect to the cash and cash equivalents in such bank accounts or lock box arrangements on or before the Closing Date); (n) all books and records of the Sellers relating to the operation of the Business that are required by the Purchaser for the operation of the Business, including the personnel records relating to Transferred Employees; (o) the Assumed Benefit Plans and all trust agreements, administrative service contracts and other contracts and records relating thereto; (p) all receivables, claims or causes of action related solely to any Acquired Asset; (q) that certain National Grid "Energy Incentive – Custom Application Pre-Approval Account# 3850498004 App#: 2366716" grant to the Sellers of $1,478,525; (r) except as provided in Section 1.2(f), to the extent transferable, all Contracts of insurance; and (s) all the rights, properties or assets that are listed or described on Schedule 1.1(s).

(d)    Excluded Assets.  Section 1.2 of the Purchase Agreement lists rights, properties, and assets (collectively, the "Excluded Assets"), which shall not be included in the Acquired Assets, and to which the Debtors shall retain all right, title, and interest in, to, and under.  The Excluded Assets comprise (a) all cash, cash equivalents, including checks, commercial paper, treasury bills, certificates of deposit and other bank accounts, or marketable securities of the Sellers; (b) all of the Accounts Receivable that have been satisfied or discharged prior to the Closing; (c) all intercompany receivables (of any nature or kind, and whether based in common law or statute or arising under written Contract or otherwise, known or unknown, fixed or contingent, accrued or unaccrued, liquidated or unliquidated, real or potential) that are owed or payable to any Seller or any Affiliate thereof (other than a Transferred Sub), or as to which any Seller or any Affiliate thereof (other than a Transferred Sub) is an obligor or is otherwise responsible or liable; (d) all of the Contracts that have terminated or expired prior to the Closing in the ordinary course of the Business; (e) all Contracts, and all of Sellers' rights thereunder, that are not Assigned Contracts; (f) the Contracts of insurance set forth on Schedule 1.2(f); (g) any Inventory transferred outside of the Business in the ordinary course of the Business or used in the ordinary course of the Business prior to the Closing; (h) any Tangible Personal Property transferred outside of the Business in the ordinary course of the Business or disposed of in the ordinary course of the Business prior to the Closing; (i) any right that any Seller has with respect to any deferred Tax assets or refund for income Taxes; (j) any shares of capital stock or other equity interest of any Seller or any Affiliate

thereof (other than the Transferred Subs) or any securities convertible into, exchangeable or exercisable for shares of capital stock or other equity interest of any Seller or any Affiliate thereof (other than the Transferred Subs); (k) the company seal, minute books, charter documents, stock or equity record books and such other books and records as pertain to the organization, existence or capitalization of any Seller or any Affiliate thereof (other than the Transferred Subs) as well as any other records or materials relating to any Seller or any Affiliate thereof (other than the Transferred Subs) not relating in any material respect to the Acquired Assets or the operation of the Business; (l) all avoidance actions and similar rights and causes of action, including causes of action under Sections 544 through 553, inclusive, of the Bankruptcy Code; (m) any rights, claims or causes of action of any Seller arising under the Purchase Agreement or the Ancillary Documents; (n) all receivables, claims or causes of action related solely to any Excluded Asset; (o) all rights of any Seller as a beneficiary under any letters of credit that relate solely to any Excluded Asset; (p) any asset of any Seller that would constitute an Acquired Asset (if owned by a Seller on the Closing Date) that is conveyed or otherwise disposed of during the period from the Effective Date until the Closing Date as permitted by the terms of the Purchase Agreement; (q) the Benefit Plans other than the Assumed Benefit Plans, and all trust agreements, insurance policies, administrative service contracts and other contracts or records relating thereto; and (r) any right, property or asset that is listed or described on Schedule 1.2(r).

(e)    Termination Provisions. Section 7.1 of the Purchase Agreement sets forth circumstances under which the Purchase Agreement may be terminated. Among other things, these provisions allow Purchaser to terminate the Purchase Agreement if (i) the Court has not entered the Bidding Procedures Order on or before the twentieth (21st) day after the Effective Date of the Purchase Agreement or (ii) the Bankruptcy Court has not entered the Sale Order on or before the sixtieth (76th) day after the Effective Date of the Purchase Agreement. In addition, the Purchase Agreement is terminable by either the Sellers or the Purchaser if the Sellers consummate an alternative transaction (i) in which all or substantially all of the Acquired Assets are sold, transferred or otherwise disposed of and (ii) that the Bankruptcy Court has finally approved as "superior" to the transaction with the Purchaser.

(f)    Expense Reimbursement and Break-Up Fee. Section 7.2(b) of the Purchase Agreement provides that, if the Purchase Agreement is terminated pursuant to Section 7.1(c) (relating to the failure of the Bankruptcy Court to enter the Bid Procedures Order or Sale Order within a prescribed period of time, as discussed above), then Sellers shall pay to Purchaser the Expense Reimbursement, and if the Sellers subsequently consummate an Alternative Transaction prior to the first anniversary of the termination date, then Sellers shall pay to Purchaser an amount equal to the Break-Up Fee less any previously paid Expense Reimbursement, in full and complete satisfaction of all of Sellers' obligations under the Purchase Agreement.

Section 7.2(b) further provides that, from and after the entry of the Bidding Procedures Order, if the Purchase Agreement is terminated pursuant to Sections 7.1(d)(termination for material breach of Sellers) or 7.1(f)(termination to consummate an alternate transaction), then Sellers shall pay to Purchaser the Break-Up Fee in full and complete satisfaction of all of Sellers' obligations hereunder.

The amount of the Break-Up Fee is $13,800,000. The Expense Reimbursement is an amount equal to the reasonably documented, actual, out-of-pocket expenses incurred by Purchaser in connection with the transactions contemplated by the Purchase Agreement subject to a cap of $4,500,000. The Purchase Agreement provides that, subject to the approval of the Court, both the Break-Up Fee and the Expense Reimbursement shall constitute a super priority administrative expense under Section 503(b)(1) of the Bankruptcy Code.

(g)    Record Retention. Section 5.15 of the Purchase Agreement provides that, for a period of three (3) years after the Closing Date (or such longer period as may be required by any Governmental Entity or Legal Proceeding): (a) the Purchaser shall not dispose of or destroy any of the business records and files of the Business transferred to it hereunder; and (b) the Purchaser shall allow the Sellers and any of their directors, officers, employees, counsel, representatives, accountants and auditors access to all business records and files of the Sellers, the Transferred Subs or the Business that are transferred to Purchaser in connection herewith, which are reasonably required by the Sellers for purposes related to the Chapter 11 Cases, Tax matters and other reasonable business purposes, during regular business hours and upon reasonable notice, and the Sellers shall have the right to make copies of any such records and files.

(h)    Sale of Avoidance Actions. Section 1.2(l) of the Purchase Agreement provides that all avoidance actions and similar rights and causes of action, including causes of action under Sections 544 through 553, inclusive, of the Bankruptcy Code are Excluded Assets.

(i)    Releases. Paragraph 18 of the proposed form of Sale Order provides that the Debtors shall not pursue any causes of action arising under chapter 5 of the Bankruptcy Code against any current or former supplier, vendor or landlord of the Debtors or the Business (as defined in the Purchase Agreement) or against any party to a Contract (as defined in the Purchase Agreement), and each of the Debtors thereby irrevocably releases on behalf of its respective estate, effective as of the Closing, any rights it may have with respect to any such avoidance action, and, subject to the occurrence of the Closing, any and all such actions are forever barred and enjoined.

(j)    Successor Liability. Section 1.4(e) of the Purchase Agreement provides that all Taxes imposed under any bulk transfer Law of any jurisdiction, under any de facto merger Law, successor liability Law, in each case with respect to the Acquired Assets, the Business or the Assumed Liabilities, are Excluded

13

Liabilities.

In addition, paragraph 8 of the proposed form of Sale Order provides that neither the Stalking Horse Bidder, nor its affiliates, successors or assigns, shall, as a result of the consummation of the Transactions: (i) be a successor to the Debtors or the Debtors' estates; (ii) have, *de facto* or otherwise, merged or consolidated with or into the Debtors or the Debtors' estates; or (iii) be a continuation or substantial continuation of the Debtors or any enterprise of the Debtors.  Except for the Assumed Liabilities, the Stalking Horse Bidder shall not assume, nor be deemed to assume, or in any way be responsible for any liability or obligation of any of the Debtors and/or their estates including, but not limited to, any bulk sales law.  Except for the Assumed Liabilities, the transfer of the Acquired Assets to the Stalking Horse Bidder under the Purchase Agreement shall not result in (i) the Stalking Horse Bidder, its affiliates, partners, principals or shareholders, or the Acquired Assets having any liability or responsibility for any Interest against the Debtors or against an insider of the Debtors, (ii) the Stalking Horse Bidder, its affiliates, partners, principals or shareholders, or the Acquired Assets having any liability with respect to or be required to satisfy in any manner, whether at law or in equity, whether by payment, setoff or otherwise, directly or indirectly, any Interest or Excluded Liability, or (iii) the Stalking Horse Bidder, its affiliates, partners, principals or shareholders, or the Acquired Assets, having any liability or responsibility to the Debtors except as is expressly set forth in the Purchase Agreement.

(k)    <u>Arrangements with Management</u>. Consistent with the policy of EQT for its portfolio companies, certain of the Debtors' executives have entered into investment agreements with the EQT-owned holding company that owns the Purchaser, pursuant to which they agree to purchase equity in the holding company on the terms and conditions set forth in the investment agreements in connection with closing.

(l)    <u>Relief from Bankruptcy Rule 6004(h)</u>. Paragraph 24 of the proposed form of Sale Order provides that, notwithstanding the provisions of Bankruptcy Rule 6004 and Bankruptcy Rule 6006 or any applicable provisions of the Local Rules, the Sale Order shall not be stayed for ten (10) days after the entry hereof, but shall be effective and enforceable immediately upon entry, and the ten (10) day stay provided in such rules is thereby expressly waived and shall not apply.

## C.    Necessity of Sale

19.    The Debtors are highly leveraged and face substantial impending debt maturities that threaten the Company's ability to capitalize on growth opportunities and generate consistent returns in a keenly competitive industry.  The Debtors have thoroughly assessed their

financial and strategic alternatives and have determined that the best path forward is a sale of the
Acquired Assets in the manner set forth in the Bidding Procedures.

20.    A prompt sale, in accordance with the Bidding Procedures, is a condition
both of the Debtors' post-petition financing and of the Purchase Agreement, which currently
represents the Debtors' only offer.  Moreover, the Debtors believe the value of their assets and
estates will erode rapidly over the course of the Chapter 11 Cases, as the Debtors' business
depends on their ability to assure their customers of their stability.

21.    The Bidding Procedures will allow the Debtors to continue the robust sale
process commenced prior to the Petition Date and maximize returns to their stakeholders.  The
Debtors believe that the process outlined in the Bidding Procedures will attract third-party
participation.  The Debtors also expect that the process will give comfort to the Debtors'
customers, vendors, and other stakeholders that the Chapter 11 Cases will proceed swiftly and
without disrupting the Debtors' business operations.

22.    While the Debtors' underlying business is healthy, due to the Debtors'
substantial secured debt obligations, absent a sale, and without the support of the Prepetition
Lenders or financing for a chapter 11 plan, liquidation would be the Debtors' only other option.
As described above, a prompt sale of the Debtors' assets protects the Debtors' estates from this
risk and avoids any interruption to the Debtors' business, thereby providing the greatest available
protection to the Debtors' customers and stakeholders.

**D.    Approval of the Bidding Procedures**

23.    The Bidding Procedures are designed to maximize value for the Debtors'
estates, while ensuring an orderly sale process.  The Bidding Procedures describe, among other
things, the procedures for interested parties to access due diligence, the manner in which bidders
and bids become "qualified," the receipt and negotiation of bids received, the conduct of any

auction, the selection and approval of any ultimately successful bidders, and the deadlines with

respect to the foregoing (the "Bidding Process"). The Debtors further believe, with the

concurrence and support of their key constituents, that the Bidding Process affords the Debtors

the best opportunity to pursue a sale process that will maximize the value of their estates.

        24.     Certain of the key terms of the Bidding Procedures are highlighted below,

as required by Local Bankruptcy Rule 6004-1(c):[5]

(a)    Access to Diligence Materials. Neither the Debtors nor their representatives shall be obligated to furnish information of any kind to any person that the Debtors determine not to be a Qualified Bidder. The Debtors will afford any Qualified Bidder the time and opportunity to conduct reasonable due diligence; *provided, however,* that the Debtors shall not be obligated to furnish any due diligence information after the Bid Deadline. The Debtors will designate an employee or other representative to coordinate all reasonable requests for additional information and due diligence access from such Qualified Bidders. Neither the Debtors nor any of their respective representatives are obligated to furnish any information to any person other than a Qualified Bidder.

(b)    Bid Deadline. A Qualified Bidder that desires to make a bid shall deliver written copies of its bid and the Required Bid Materials (defined below) to (i) the Debtors, Synagro Technologies, Inc., 1800 Bering Drive, Suite 1000, Houston, TX 77057 (Attn: Joseph L. Page); (ii) counsel to the Debtors, Skadden, Arps, Slate, Meagher & Flom LLP, 155 N. Wacker Drive, Chicago, IL 60606 (Attn: Shilpi Gupta, Esq. and George N. Panagakis, Esq.); (iii) financial advisors to the Debtors, Evercore Partners, 55 East 52nd Street, New York, NY 10055 (Attn: Mark Williamson and Christopher Nicholson); (iv) counsel to the agent (the "DIP Agent") and lenders (the "DIP Lenders") for the Debtors' post-petition financing and the First Lien Lenders, Shearman & Sterling, 599 Lexington Avenue, New York, NY 10022 (Attn: Frederic Sosnick, Esq. and Ned Schodek, Esq.) and Ashby & Geddes, P.A., 500 Delaware Avenue, P.O. Box 1150, Wilmington, Delaware 19899 (Attn: Don A. Beskrone and Karen S. Owens); (v) counsel to the Second Lien Lenders, Brown Rudnick LLP, One Financial Center, Boston, MA 02111 (Attn: Steven B. Levine, Esq. and Robert Stark, Esq.) and (v) counsel to any creditors' committee appointed in the chapter 11 cases, not later than 5:00 p.m. (prevailing Eastern time) on June 3, 2013 (the "Bid Deadline").

---

[5] This summary is qualified in its entirety by the provisions of the Bidding Procedures. In the event of any inconsistencies between the terms of the Bidding Procedures and the terms herein, the terms of the Bidding Procedures shall govern. Unless otherwise defined in the summary set forth in the accompanying text, capitalized terms shall have the meanings ascribed to them in the Bidding Procedures.

(c)    <u>Participation Requirements</u>.  Any person that wishes to participate in the Bidding Process (a "<u>Potential Bidder</u>") must become a "<u>Qualified Bidder</u>."  As a prerequisite to becoming a Qualified Bidder, a Potential Bidder must deliver (unless previously delivered) to the Debtors at the addresses specified below, not later than May 20, 2013:

    (i)    An executed confidentiality agreement in form and substance acceptable to the Debtors on terms and conditions no less favorable in the aggregate to the Debtors than the confidentiality agreement executed by the Stalking Horse Bidder; and

    (ii)    a letter of indication stating that such bidder is prepared to enter into a legally binding purchase and sale agreement or similar agreement for the acquisition of such Acquired Assets on terms and conditions no less favorable in the aggregate to the Debtors than the terms and conditions contained in the Purchase Agreement, indicating (i) that such bidder will post the required Bid Deposit (defined below) and (ii) total cash consideration to be provided to the Debtors at Closing; and

    (iii)    sufficient information, as may be requested by the Debtors, to allow the Debtors to determine that the bidder has the financial wherewithal to close a sale of the Acquired Assets, which may include, but is not limited to, a bank account statement showing the ability of a Potential Bidder to pay cash for the Acquired Assets, and current audited financial statements (or such other form of financial disclosure and credit-quality support or enhancement acceptable to the Debtors) of the Potential Bidder or those entities that will guarantee in full the payment obligations of the Potential Bidder.

A "<u>Qualified Bidder</u>" is a Potential Bidder that delivers the documents described in subparagraphs (i) – (iii) above, and that the Debtors determine is reasonably likely (based on financial information submitted by the Potential Bidder, the Potential Bidder's financial wherewithal to close a sale of the Acquired Assets, experience, and other non-monetary considerations, such as ability to obtain required regulatory approvals, including under the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended (the "<u>HSR</u>")), to submit a *bona fide* offer, and be able to consummate a sale if selected as the Successful Bidder (as defined below).  Notwithstanding the foregoing, the Stalking Horse Bidder shall be deemed a Qualified Bidder.  Not later than three (3) business days after a Potential Bidder delivers all of the materials required by subparagraph (i) – (iii) above, the Debtors shall determine, and shall notify the Potential Bidder, if such Potential Bidder is a Qualified Bidder.

(d)     <u>Bid Requirements</u>.  All bids, other than the Stalking Horse Bid, shall be in writing and include the following information and documents (the "<u>Required Bid Materials</u>"):

    (i)     Cash consideration, or cash consideration plus assumed liabilities, equal to or greater than $20 million higher than the Purchase Price to be paid under the Purchase Agreement (the "<u>Minimum Bid Amount</u>").

    (ii)     A letter stating that the bidder's offer is irrevocable until the earlier of (i) the first business day after the Acquired Assets on which the Qualified Bidder is submitting a bid have been sold pursuant to the closing of the sale or sales approved by the Bankruptcy Court or (ii) sixty days after the Sale Hearing.

    (iii)     An executed copy of a purchase agreement and a redline of a Qualified Bidder's proposed purchase agreement reflecting variations from the Purchase Agreement (the "<u>Marked Agreement</u>").  All Qualified Bids must provide (a) a commitment to close within three business days after all closing conditions are met; (b) a representation that the Qualified Bidder will (1) make all necessary filings under the HSR, and pay the fees associated with such filings and (2) submit all necessary filings under HSR within two business days following the entry of the Sale Order, or as soon thereafter as reasonably practicable; and (c) the identity of and contact information for the bidder and full disclosure of any affiliates.

    (iv)     A cash deposit in the amount of 5% of the purchase price before any reductions, including assumed indebtedness, in the form of a wire transfer, certified check or such other form acceptable to the Debtors (the "<u>Bid Deposit</u>" which shall be placed in an escrow account, the "<u>Escrow Account</u>").

    (v)     A representation of the bidder and written evidence that the bidder has the financial wherewithal to consummate the proposed transaction, which may include executed copies of any guarantees of the payment obligations of the proposed purchaser, and which the Debtors believe to be sufficient to satisfy the standards to provide adequate assurance of future performance of any contracts and leases to be assumed and assigned under Bankruptcy Code section 365 and to consummate the transaction contemplated by the Marked Agreement.

    (vi)     The bid shall not request or entitle the bidder to any transaction or break-up fee, expense reimbursement, termination or similar type of fee or payment, and shall include an acknowledgement and

representation of the bidder that it has had an opportunity to conduct any and all due diligence regarding the Acquired Assets prior to making its offer, that it has relied solely upon its own independent review, investigation and/or inspection of any documents and/or the Acquired Assets in making its bid, and that it did not rely upon any written or oral statements, representations, warranties, or guarantees, express, implied, statutory or otherwise, regarding the Acquired Assets, the financial performance of the Acquired Assets or the physical condition of the Acquired Assets, or the completeness of any information provided in connection therewith or the Auction, except as expressly stated in the Bidding Procedures or the Marked Agreement.

(vii)    The bid shall not contain any due diligence, financing, or regulatory contingencies of any kind (other than a condition that any applicable waiting period under HSR shall have expired or been terminated), though the bid may be subject to the satisfaction of specific conditions in all material respects at Closing.

(viii)    The bid shall identify each executory contract and unexpired lease to be assumed and assigned to the bidder.

(ix)    The bid shall fully disclose the identity of each entity that will be bidding for the Acquired Assets or otherwise participating in connection with such bid, and the complete terms of any such participation.

(x)    The bid shall state that the offering party consents to the jurisdiction of the Bankruptcy Court.

(xi)    The bid shall include evidence of authorization and approval from the bidder's board of directors (or comparable governing body) with respect to the submission, execution, delivery and closing of the submitted purchase agreement of the bidder.

A bid received from a Qualified Bidder that includes all of the Required Bid Materials and is received by the Bid Deadline is a "Qualified Bid." The Debtors reserve the right to determine the value of any Qualified Bid, and which Qualified Bid constitutes the highest or best offer (subject to Bankruptcy Court approval). The Debtors shall notify the Stalking Horse Bidder within 24 hours after the Bid Deadline if one or more Qualified Bids are received and the identity of the bidders making any such Qualified Bids, and shall provide the Stalking Horse Bidder with a copy of any Marked Agreement constituting a Qualified Bid.

(e)    The Auction. If a Qualified Bid other than that submitted by the Stalking Horse Bidder has been received by the Debtors by the Bid Deadline, the Debtors may conduct an auction (the "Auction") of the Acquired Assets. The Auction shall be

conducted at the offices of Skadden, Arps, Slate, Meagher & Flom, LLP, 4 Times Square, New York, NY, 10036 (the "Auction Site") at 10:00 a.m. (prevailing Eastern time) on June 10, 2013 (the "Auction Date"), or such other place and time as the Debtors shall notify all Qualified Bidders who have submitted Qualified Bids and expressed their intent to participate in the Auction as set forth above.

The Auction shall be governed by the following procedures:

(xii)    The Stalking Horse Bidder and the Qualified Bidders shall appear in person at the Auction, or through a duly authorized representative.

(xiii)   Any improvements to the Stalking Horse Bid or any other Qualified Bids shall be announced in the presence of all participants in the Auction.

(xiv)    Only representatives of the Debtors, the Stalking Horse Bidder, other Qualified Bidders, the DIP Agent and Lenders, the First Lien Agent and Lenders, the Second Lien Agent and Lenders, and any creditors' committee appointed in these chapter 11 cases shall be entitled to be present at the Auction.

(xv)     Only the Stalking Horse Bidder and Qualified Bidders shall be entitled to make any subsequent bids at the Auction.

(xvi)    Bidding shall commence at the amount of the highest Qualified Bid submitted by the Qualified Bidders prior to the Auction, which Qualified Bid shall be provided to all Qualified Bidders prior to the Auction.

(xvii)   The Debtors may specify a minimum amount by which subsequent bids must exceed the preceding bid (the "Minimum Bid Increment"). The Debtors will take into account the Break-Up Fee and Expense Reimbursement in each round of bidding by the Stalking Horse Bidder.

(xviii)  The Auction shall continue until the Debtors determine, subject to the consultation obligations set forth in the Bidding Procedures and Bankruptcy Court approval, that the Debtors have received the highest or otherwise best offer or offers for the Acquired Assets from among the Qualified Bidders (including the Stalking Horse Bidder) submitted at the Auction (the "Successful Bid(s)").

The Debtors may employ and announce at the Auction additional procedural rules that are reasonable under the circumstances for conducting the Auction; provided that such rules are not inconsistent with the Bidding Procedures, the Bankruptcy Code, or any order of the Bankruptcy Court entered in connection herewith. After adjournment of the Auction, but prior to the Sale Hearing, the Successful

Bidder(s) shall complete and execute all agreements, contracts, instruments or other documents evidencing and containing the terms and conditions upon which the Successful Bid(s) were made and make and pay for all necessary filings with all applicable governmental or other authorities. Bids made after the close of the Auction shall not be considered by the Debtors. At the Sale Hearing, the Debtors shall present the Successful Bid to the Bankruptcy Court for approval.

(f)     <u>Return of Bid Deposits</u>. The Bid Deposits shall not be subject to the claims, liens, security interests, or encumbrances of Debtors' creditors. The Bid Deposits of Qualified Bidders (others than the Stalking Horse Bidder) shall be disbursed from the Escrow Account only as follows: (i) if the Qualified Bidder becomes the Successful Bidder, its Bid Deposit will be used to satisfy any Break-Up Fee and Expense Reimbursement to which the Stalking Horse Bidder is entitled hereunder by reason of its not being the Successful Bidder, with the balance, if any, to be released to the Debtors or applied as provided under any asset purchase agreement between the Debtors and such Successful Bidder, and (ii) if such Qualified Bidder is not the Successful Bidder at the Auction, then its Bid Deposit shall treated as set forth below. The Bid Deposit of the Stalking Horse Bidder shall be disbursed as provided for under the Purchase Agreement and the Escrow Agreement governing such Bid Deposit.

The Bid Deposits of all Qualified Bidders (including the Stalking Horse Bidder) shall be retained by the Seller, and all Qualified Bids will remain open, notwithstanding Bankruptcy Court approval of a sale pursuant to the terms of a Successful Bid by a Qualified Bidder until the earlier of (a) 48 hours after the closing of the sale of the Acquired Assets, and (b) 60 days after the conclusion of the Sale Hearing with respect to the Acquired Assets (the "<u>Return Date</u>"). On the Return Date, the Debtors shall return the Bid Deposits with actual accrued interest, if any, of all Qualified Bidders who submitted Qualified Bids in connection with the Acquired Assets (other than the Successful Bidder). In addition to any other remedies available to the Debtors, the Debtors may retain the Bid Deposit of any Qualified Bidder who breaches or fails to perform any of its obligations pursuant to the Bidding Procedures or its Qualified Bid. The treatment of the Stalking Horse Bidder's Bid Deposit by the Debtors shall be in accordance with the terms of the Purchase Agreement and the Escrow Agreement governing such Bid Deposit.

(g)     <u>Modifications</u>. Notwithstanding anything to the contrary provided in the Bidding Procedures, the Debtors shall have the right to amend the rules set forth therein for the bidding process or impose such other terms and conditions for the bidding process which the Debtors determine, in their business judgment, will better promote the goals of the bidding process and the discharge of the Debtors' fiduciary duties and which are not inconsistent with any Bankruptcy Court order, including the Bid Procedures Order; <u>provided</u>, <u>however</u>, that in connection with the exercise of their business judgment as set forth in the foregoing clause, the Debtors shall consult with counsel to the DIP Agent, the First Lien Agent, the Second Lien Agent, and any creditors' committee appointed in the chapter 11

cases; provided, further, however, that nothing in the Bidding Procedures should be construed to permit the Debtors to (i) accept any Qualified Bid that (x) does not require any Bid Deposit to be placed in a protected, segregated account, which shall serve as protection and security for the Stalking Horse Bidder as outlined therein or (y) does not equal or exceed the Overbid Amount, or (ii) impose any terms and conditions upon the Stalking Horse Bidder that are contradictory to or in breach of the terms of the Purchase Agreement.

(h)   Sale Hearing and Back-Up Bid.  The Debtors propose that the Sale Hearing be scheduled (i) if there are no Qualified Bids, on June 10, 2013, or (ii) if an Auction is conducted, on June 20, 2013, in each case unless otherwise continued by the Debtors after consultation with counsel to the DIP Agent, the First Lien Agent, the Second Lien Agent, any creditors' committee appointed in the Chapter 11 Cases, and the Successful Bidder, in the Bankruptcy Court.  Objections to the Sale Transaction must be filed on or before 5:00 p.m. (prevailing Eastern time) on (i) if there are no Qualified Bids, June 5, 2013, or (ii) if an Auction is conducted, June 14, 2013.  Following the approval of the sale of all or substantially all of the Acquired Assets to any Successful Bidder at the Sale Hearing, if the Successful Bidder fails to consummate an approved sale within the later of (1) three business days after the satisfaction of all closing conditions and (2) the expiration or termination of the applicable HSR or other regulatory waiting period, the Debtors shall be authorized, but not required, to deem the next highest or otherwise best Qualified Bid (the "Back-Up Bid" and the party submitting the Back-Up Bid, the "Back-Up Bidder"), as disclosed at the Sale Hearing, the Successful Bid, and the Debtors shall be authorized, but not required, to consummate the sale with the Back-Up Bidder submitting such bid without further order of the Bankruptcy Court.  The Back-Up Bid shall remain open until the earlier of (i) the first business day following the consummation of a Sale of the Assets to the Successful Bidder and (ii) sixty days after Sale Hearing.

## E.   Bid Protections

25.   The Purchase Agreement is the product of vigorous arms'-length negotiation.  By establishing a minimum acceptable bid, the Purchase Agreement and Bidding Procedures promote competitive bidding and allow the Debtors to maximize the value received for the Acquired Assets.  In addition, the Purchase Agreement ensures that the Debtors will generate substantial value for their estates even if no additional Qualified Bidders emerge.

26.   As part of the arms'-length negotiations leading to the execution of the Purchase Agreement, the Debtors agreed that, under certain circumstances, the Stalking Horse

Bidder should be entitled to the payment of the Break-Up Fee or the Expense Reimbursement (together with the Break-Up Fee, the "Bid Protections").

27.     Under Section 7.2(b) of the Purchase Agreement, the Stalking Horse Bidder is entitled to payment of a Break-Up Fee in the amount of $13,800,000, which represents approximately 3% of the Purchase Price, if the Purchase Agreement is terminated in certain circumstances.  Specifically, if the Purchase Agreement is terminated because the Debtors are in breach of a material term of the Purchase Agreement and fail to cure the breach within 14 days after receiving notice from the Stalking Horse Bidder, the Stalking Horse Bidder is entitled to payment of the Break-Up Fee.  In addition, if the Bankruptcy Court approves an alternative sale of substantially all the Acquired Assets as a superior transaction, and such transaction is consummated, the Stalking Horse Bidder is entitled to payment of the Break-Up Fee.  The Purchase Agreement provides that, subject to the approval of the Court, the Break-Up Fee will be deemed a super priority administrative expense under section 503(b)(1) of the Bankruptcy Code.

28.     Section 7.2(b) also entitles the Stalking Horse Bidder to an Expense Reimbursement if the Purchase Agreement is terminated because the Court does not enter the Bidding Procedures Order within 21 days of the Effective Date  or the Sale Order within 76 days of the Effective Date.  The Expense Reimbursement is equal to the reasonably documented, out-of-pocket costs and expenses incurred by the Stalking Horse Bidder in connection with the transactions contemplated by the Purchase Agreement, not to exceed $4,500,000, and, subject to Court approval, will be deemed a super priority administrative expense under section 503(b)(1) of the Bankruptcy Code.  Section 7.2(b) further provides that, if the Debtors subsequently consummate an Alternative Transaction prior to the first anniversary of the termination date, then

the Debtors shall pay to the Stalking Horse Bidder an amount equal to the Break-Up Fee less any previously paid Expense Reimbursement, in full and complete satisfaction of all of Debtors' obligations under the Purchase Agreement.

29.     The Debtors submit that the Bid Protections are fair and reasonable. The Bid Protections fairly compensate the Stalking Horse Bidder for the time and expense associated with preparing its offer and the risk that it will not be the Successful Bidder. Indeed, the Debtors believe that the Bid Protections were a material inducement for the Stalking Horse Bidder to enter into the Purchase Agreement and serve as the stalking horse bidder. By inducing the Stalking Horse Bidder to offer a substantial stalking horse bid against which other bidders will compete, the Bid Protections will encourage competitive bidding and ultimately benefit the Debtors' estates.

## F.     Assumption and Assignment Procedures

30.     The Debtors propose the following procedures for notifying counterparties to executory contracts and unexpired leases of potential cure amounts in the event the Debtors decide to assume such contracts or leases.

31.     The Schedules to Section 1.1 of the Purchase Agreement set forth a list of the Assigned Contracts which are to be included in the Acquired Assets. Within five (5) days after entry of the Bidding Procedures Order or as soon thereafter as practicable (the "Mailing Date"), the Debtors will file with the Court a notice of cure amount (the "Cure Notice"), substantially in the form attached to the Bidding Procedures Order as Exhibit 3, and serve the Cure Notice on all non-debtor parties to the Assigned Contracts (the "Contract Notice Parties").

32.     The Cure Notice shall (i) state the cure amounts that the Debtors believe are necessary to assume such Assigned Contracts pursuant to section 365 of the Bankruptcy Code (the "Cure Amount"); (ii) notify the non-debtor party that such party's contract or lease

may be assumed and assigned to a purchaser of the Acquired Assets to be identified at the

conclusion of the Auction; (iii) state the date of the Sale Hearing; and (iv) state a deadline by

which the non-debtor party shall file an objection to the Cure Amount or to the assumption and

assignment of the Assigned Contracts.  The Debtors request that the Court establish May 29,

2013 as the deadline to object to any Cure Amount or to assumption and assignment.  Any such

objection shall (i) be in writing; (ii) state the basis for such objection; and (iii) state with

specificity what cure amount the party to the Assigned Contract believes is required (in all cases

with appropriate documentation in support thereof).  The Cure Notice shall also provide that

objections to any Cure Amount or to assumption and assignment will be heard at the Sale

Hearing or at a later hearing, as determined by the Debtors.  If a Successful Bidder that is not the

Stalking Horse Bidder prevails at the Auction, then the deadline to object to assumption and

assignment shall be extended to the date of the Sale Hearing; provided, however, that the

deadline to object to the Cure Amount shall not be extended.

       33.     As soon as possible after the conclusion of the Auction, the Debtors shall

file with the Bankruptcy Court a Successful Bidder Notice (as defined below) that identifies any

Successful Bidder and provides notice that at the Sale Hearing the Debtors will seek to assume

and assign the Assigned Contracts effective upon the closing of a Sale Transaction.  At the Sale

Hearing, the Debtors shall (i) present evidence necessary to demonstrate adequate assurance of

future performance by the Successful Bidder and (ii) request entry of an order granting approval

of the assumption and assignment of any Assigned Contracts to the Successful Bidder.

       34.     In addition, to the extent that an Assumed Contract was not provided with

a Cure Notice or that an executory contract or unexpired lease was omitted from the Schedules to

Section 1.1 of the Purchase Agreement of the Purchase Agreement (the "Previously Omitted

Contract"), then the Debtors will notify the Successful Bidder within two business days.  If the Successful Bidder wishes to assume a Previously Omitted Contract, then the Debtors shall serve a notice (the "Previously Omitted Contract Notice") on the counterparties to the Previously Omitted Contract indicating the Debtors' intent to assume and assign the Previously Omitted Contract.  The counterparties will have fourteen (14) days to object to the Cure Amount or the assumption.  If the parties cannot agree on a resolution, the Debtors will seek an expedited hearing before the Court to determine the Cure Amount and approve the assumption.  If there is no objection, then the Debtors will obtain an order of this Court fixing the Cure Amount and approving the assumption of the Previously Omitted Contract.

**G.      Notice Procedures**

35.      <u>Notice of Sale Hearing</u>.  On the Mailing Date, the Debtors (or their agents) shall serve the Motion, the Purchase Agreement, the Bidding Procedures Order, and the Bidding Procedures by first-class mail, postage prepaid, on a compact disk, upon (i) all entities known to have asserted any lien, claim, interest or encumbrance in or upon any of the Assets; (ii) counsel for the Prepetition Lenders; (iii) counsel for the agent under the Debtors' post-petition financing (the "DIP Agent"); (iv) the 30 largest unsecured creditors; (v) all federal, state, county and local and foreign regulatory or taxing authorities or recording offices which have a reasonably known interest in the relief requested by the Motion; (vi) the United States Attorney's office; (vii) the Internal Revenue Service; (viii) the Office of the United States Trustee; (ix) parties that have expressed an interest in a sale transaction; and (x) those parties who have filed the appropriate notice requesting notice of all pleadings filed in these cases.  Such notice shall be sufficient and proper notice of the Sale Transaction with respect to known interested parties.

36.      <u>Sale Notice</u>.  On the Mailing Date or as soon thereafter as practicable, the Debtors (or their agents) shall serve by first-class mail, postage prepaid, a sale notice (the "Sale

Notice"), substantially in the form attached to the Bidding Procedures Order as <u>Exhibit 2</u>, upon all other known creditors of the Debtors.

37.   <u>Publication Notice</u>. The Debtors shall also publish the Sale Notice in *The Wall Street Journal* on the Mailing Date or as soon as practicable thereafter. The Debtors propose, pursuant to Bankruptcy Rules 2002 and 6004, that such publication of the Sale Notice be deemed sufficient notice to any other interested parties whose identities are unknown to the Debtors.

38.   <u>Successful Bidder Notice</u>. Within three (3) days after the Auction or, if there are no Qualified Bids, within three (3) days after the Bid Deadline, the Debtors shall file, but not serve, a notice identifying any Successful Bidder and stating the date of the Sale Hearing (the "<u>Successful Bidder Notice</u>"), substantially in the form attached to the Bidding Procedures Order as <u>Exhibit 4</u>.

## APPLICABLE AUTHORITY

39.   "Under Delaware law, the business judgment rule operates as a presumption 'that directors making a business decision, not involving self-interest, act on an informed basis, in good faith and in the honest belief that their actions are in the corporation's best interest.'" <u>Continuing Creditors' Comm. of Star Telecomms., Inc. v. Edgecomb</u>, 385 F. Supp. 2d 449, 462 (D. Del. 2004) (quoting <u>Grobow v. Perot</u>, 539 A.2d 180, 187 (Del. 1988)); <u>see also</u> <u>Ad Hoc Comm. of Equity Holders of Tectonic Network, Inc. v. Wolford</u>, 554 F. Supp. 2d 538, 555 n.111 (D. Del. 2008). Thus, this Court should grant the relief requested in this Motion if the Debtors demonstrate a sound business justification therefor. <u>See</u> <u>In re Del. & Hudson Ry. Co.</u>, 124 B.R. 169, 179 (D. Del. 1991).

40.     The Debtors have sound business justifications for selling the Acquired Assets at this time.  First, the Debtors are committed to maintaining a high level of customer service, continuing operations, and preserving the value of the business during the Chapter 11 Cases and beyond.  The Debtors have commenced the Chapter 11 Cases in order to adjust their capital structure to preserve their business and position themselves for growth.  The Debtors' current capital structure is incompatible with these ends.  Impending debt maturities and a lack of refinancing alternatives threaten the Company's long-term competitive success.  Despite these challenges, the Debtors continue to deliver critical services to their customers in a dependable and efficient manner.  Given the Debtors' delay associated with pursuing a plan of reorganization, and the milestones incorporated in the Debtors' post-petition financing, the Debtors have determined that the immediate sale of the Acquired Assets under section 363 of the Bankruptcy Code is the best available restructuring option.  The Debtors submit that the sale of the Acquired Assets to the Stalking Horse Bidder pursuant to the Purchase Agreement, or to another Successful Bidder pursuant to a Marked Agreement, is in the best interests of the Debtors and their estates and creditors and should be approved.

**H.     The Bidding Procedures Are Fair And Are Designed To Maximize The Value Received For The Acquired Assets.**

41.     Bankruptcy Code section 363(b)(1) provides that "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate."  11 U.S.C. § 363(b)(1).  The Debtors believe that the Bidding Procedures are appropriate under Bankruptcy Code sections 105 and 363 to ensure that the bidding process is fair and reasonable and will yield the maximum value for their estates and creditors.  The Bidding Procedures proposed herein are designed to maximize the value received for the Acquired Assets by facilitating a competitive bidding process in which all potential bidders are

encouraged to participate and submit competing bids.  The Bidding Procedures provide potential

bidders with sufficient notice and an opportunity to acquire information necessary to submit a

timely and informed bid.  Thus, the Debtors and all parties in interest can be assured that the

consideration for the Acquired Assets will be fair and reasonable.  At the same time, the Bidding

Procedures provide the Debtors with the opportunity to consider all competing offers and to

select, in their reasonable business judgment, and after consultation with the DIP Agent, the First

Lien Agent, the Second Lien Agent, and any committee appointed in these cases, and their

respective advisors, the highest and best offer for the Acquired Assets.

> 42.     Accordingly, the Debtors believe the Court should approve the Bidding

Procedures.  Similar procedures have been previously approved by this Court.  See, e.g., In re

Vertis Holdings, Inc., Case No. 12-12821 (CSS) (Bankr. D. Del. Nov. 2, 2012); In re A123 Sys.,

Inc., Case No. 12-12859 (KJC) (Bankr. D. Del. Nov. 8, 2012); In re Digital Domain Media

Group, Inc., Case No. 12-12568 (BLS) (Bankr. D. Del. Sept. 12, 2012); In re Tri-Valley Corp.,

Case No. 12-12291 (MFW) (Bankr. D. Del. Sept. 5, 2012).

## I.     The Bid Protections Should Be Authorized.

> 43.     As described above, the Purchase Agreement provides for the payment of

an Expense Reimbursement and/or  the Break-Up Fee to the Stalking Horse Bidder following

certain termination events.  In connection with the sale, the Debtors seek authorization to pay the

Expense Reimbursement and the Break-Up Fee in accordance with and as required by the

Purchase Agreement.  Approval of expense reimbursements, break-up fees, and other forms of

bid protection is well-established practice in chapter 11 cases.  Such bidding protections enable a

debtor to ensure a sale to a contractually committed bidder at a price the debtor believes is fair,

while providing the debtor with an opportunity to enhance the value to its estate through an

auction process.  Historically, bankruptcy courts have approved bidding incentives similar to the

Bid Protections here pursuant to the "business judgment rule." See, e.g., Official Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.), 147 B.R. 650 (S.D.N.Y. 1992); In re 995 Fifth Ave. Assocs., L.P., 96 B.R. 24, 28 (Bankr. S.D.N.Y. 1989).

44.     The United States Court of Appeals for the Third Circuit, however, has established standards for determining the propriety of bidding incentives in the bankruptcy context. In Calpine Corp. v. O'Brien Envtl. Energy, Inc. (In re O'Brien Envtl. Energy, Inc.), 181 F.3d 527 (3d Cir. 1999); see also In re Reliant Energy Channelview LP, 594 F.3d 200 (3d Cir. 2010). The O'Brien court held that, though the business judgment rule governs the propriety of bidding incentives in non-bankruptcy transactions, the administrative expense provisions of section 503(b) govern in the bankruptcy context. Accordingly, to be approved, bidding incentives must provide some postpetition benefit to the debtor's estate. See O'Brien, 527 F.3d at 533.

45.     The Bid Protections are reasonable and appropriate in light of the size and nature of the transaction, the efforts EQT and the Stalking Horse Bidder have expended and will continue to expend by the serving as the stalking horse bidder, and the risk that the Stalking Horse Bidder will not be the Successful Bidder. Moreover, the Bid Protections are actually necessary to preserve the value of the estate. The Bid Procedures were negotiated in good faith and is necessary to secure the Stalking Horse Bidder's commitment under the Purchase Agreement. A stalking horse bid establishes a baseline against which future bids are compared and encourages participation by third parties. In other words, the Debtors' ability to offer the Stalking Horse Bidder Bid Protections ensures the sale of the Acquired Assets to the Stalking Horse Bidder at a price the Debtors consider fair while also encouraging other bidders to offer an even higher price, to the benefit to the estates. Moreover, payment of the Bid Protections is

30

unlikely to diminish the Debtors' estates. The Debtors do not intend to terminate or breach the Purchase Agreement if to do so would incur an obligation to pay the Break-Up Fee, unless to accept an alternative bid, which bid must exceed the Stalking Horse Bidder's bid by an amount sufficient to pay the Bid Protections.

46.     The Break-Up Fee, which represents the maximum amount payable to the Stalking Horse Bidder, is equal to approximately 3% of the Purchase Price. This Court has approved similar Bid Protections in other cases. See, e.g., In re Magic Brands, LLC, Case No. 10-11310 (BLS) (Bankr. D. Del. May 18, 2010) (authorizing stalking horse expense reimbursement); In re Spheris, Inc., Case No. 10-10352 (KG) (Bankr. D. Del. Feb. 23, 2010) (same); see also, In re Vertis Holdings, Inc., Case No. 12-12821 (CSS) (Bankr. D. Del. Nov. 2, 2012) (approving break-up fee and expense reimbursement); In re Trident Microsystems, Inc., Case No. 12-10069 (CSS) (Bankr. D. Del. Jan. 18, 2012) (same). Indeed, Courts in this and other jurisdictions have approved break-up fees of approximately 3% in numerous past cases. See, e.g., In re Dura Automotive Sys., Inc., Case No. 06-11202, 2007 WL 7728109, at *91 (Bankr. D. Del. Aug. 15, 2007) (collecting cases); In re Tweeter Home Entm't Group, Inc., Case No. 07-10787 (PJW) (Bankr. D. Del. June 26, 2007); In re Women First Health Care, 332 B.R. 115, 118 (Bank. D. Del. 2005); In re Fruit of the Loom, Inc., Case No. 99-4497 (PJW) (Bankr. D. Del. Dec. 2001); see also In re Metaldyne Corp., 409 B.R. 661, 670 (Bankr. S.D.N.Y. 2009).

**J.    Approval of the Sale Transaction Is Warranted Under Bankruptcy Code Section 363(b).**

47.     Section 363(b)(1) of the Bankruptcy Code provides: "The trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). Bankruptcy Code section 105(a) provides in

relevant part: "The Court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a).

48.    A debtor should be authorized to sell assets out of the ordinary course of business pursuant to section 363 of the Bankruptcy Code and prior to obtaining a confirmed plan of reorganization if it demonstrates a sound business purpose for doing so. See In re Abbotts Dairies of Penn., Inc., 788 F.2d 143, 147-49 (3d Cir. 1986) (implicitly adopting the "sound business judgment test" of Lionel); In re Dura Auto. Sys., Inc., Case No. 06-11202 (KJC), 2007 WL 7728109, at *5 (Bankr. D. Del. Aug. 15, 2007) (finding that "[t]he Debtors have demonstrated compelling circumstances and a good, sufficient, and sound business purpose and justification for the Sale prior to, and outside of, a plan of reorganization"); Dai-Ichi Kangyo Bank Ltd. v. Montgomery Ward Holding Corp. (In re Montgomery Ward Holding Corp.), 242 B.R. 147, 153 (D. Del. 1999) ("In determining whether to authorize the use, sale or lease of property of the estate under [section 363(b)], courts require the debtor to show that a sound business purpose justifies such actions"); Del. & Hudson Ry. Co., 124 B.R. at 176 (sale of substantially all of debtor's assets outside of reorganization plan is appropriate when a sound business reason justifies such a sale); see also Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.), 722 F.2d 1063, 1070 (2d Cir. 1983); Titusville Country Club v. Pennbank (In re Titusville Country Club), 128 B.R. 396, 399 (Bankr. W.D. Pa. 1991) (stating that the "sound business purpose test" is appropriate); In re Mid-American Waste System, Case No. 97-104 (PJW) (Bankr. D. Del. Mar. 7, 1997). Once a court has determined there is a sound business justification for a sale outside of a plan, the court must also determine that (i) the trustee has provided the interested parties with adequate and reasonable notice, (ii) the sale price is fair and reasonable and (iii) the purchaser is proceeding in good faith. Del. & Hudson, 124 B.R. at 176.

49.    The Debtors submit that the sale of the Acquired Assets is based upon the sound business judgment of the Debtors.  As explained above, the Debtors have determined that a sale, conducted in accordance with the Bidding Procedures is in the best interests of the Company and all its stakeholders.  An orderly sale process will instill confidence in the Debtors' municipal and other customers that the critical services the Debtors provide will continue uninterrupted.  The Debtors have determined that their best, if not only, viable option to reform their capital structure and position themselves for growth and sustainable success is to sell substantially all of the Acquired Assets as a going concern.

50.    The Debtors also meet the additional requirements necessary to approve a sale under section 363 of the Bankruptcy Code.  As stated herein, the Debtors will provide adequate notice of the Sale Transaction to interested parties, and the Debtors believe that the aforementioned notice procedures are reasonable and adequate under the circumstances.  Additionally, the Debtors entered into the Purchase Agreement after a long and deliberate effort to market the Acquired Assets and, while hopeful that other bidders materialize, are confident that the sale price is fair and reasonable.  Moreover, the Stalking Horse Bidder has proceeded in good faith.  Both the Debtors and the Stalking Horse Bidder were represented by practical and experienced advisors in the arm's-length negotiations of the Purchase Agreement.  Accordingly, it is a valid exercise of the Debtors' business judgment to seek the relief requested by this Motion.

## K.    The Proposed Sale Transaction Satisfies The Requirements Of Bankruptcy Code Section 363(f) For A Sale Free And Clear of Interests.

Bankruptcy Code section 363(f) provides:

The Trustee may sell property under subsection (b) or (c) of this section free and clear of any interest in such property of an entity other than the estate, only if –

(1)     applicable non-bankruptcy law permits sale of such property free
        and clear of such interest;

(2)     such entity consents;

(3)     such interest is a lien and the price at which such property is to be
        sold is greater than the aggregate value of all liens on such
        property;

(4)     such interest is in bona fide dispute; or

(5)     such entity could be compelled, in a legal or equitable proceeding,
        to accept a money satisfaction of such interest.

11 U.S.C. § 363(f).

51.     As Bankruptcy Code section 363(f) is framed in the disjunctive, when

proceeding pursuant to section 363(b), it is only necessary to meet one of the five (5) conditions

of section 363(f).  Because the Prepetition Lenders consent to the Sale Transaction, the Debtors

believe that they have satisfied the requirements of section 363(f).  Therefore, pursuant to

Bankruptcy Code section 363, the Debtors may sell the Acquired Assets free and clear of all

liens, claims, and encumbrances.

52.     The Debtors also submit that it is appropriate to sell the Acquired Assets

free and clear of successor liability relating to the Debtors' businesses.  Such a provision ensures

that the Successful Bidder is protected from any claims or lawsuits premised on the theory that

the Successful Bidder is a successor in interest to one or more of the Debtors.  Courts have

consistently held that a buyer of a debtor's assets pursuant to a Bankruptcy Code section 363 sale

takes free and clear from successor liability relating to the debtor's business.  See, e.g., In re

Trans World Airlines, Inc., 322 F.3d 283, 288-90 (3d Cir. 2003) (sale of assets pursuant to

section 363(f) barred successor liability claims for employment discrimination and rights under

travel voucher program); In re Leckie Smokeless Coal Co., 99 F.3d 573, 585 (4th Cir. 1996)

(affirming the sale of debtors' assets free and clear of certain taxes); In re Insilco Techs., Inc.,

34

351 B.R. 313, 322 (Bankr. D. Del. 2006) (stating that a 363 sale permits a buyer to take

ownership of property without concern that a creditor will file suit based on a successor liability

theory); see also, In re Gen. Motors Corp., 407 B.R. 463, 505-06 (Bankr. S.D.N.Y. 2009)

(holding that "[t]he law in this Circuit and District is clear; the Court will permit GM's assets to

pass to the purchaser free and clear of successor liability claims, and in that connection, will

issue the requested findings and associated injunction"); In re Chrysler LLC, 405 B.R. 84, 111

(Bankr. S.D.N.Y. 2009) ("*[I]n personam* claims, including any potential state successor or

transferee liability claims against New Chrysler, as well as *in rem* interests, are encompassed by

section 363(f) and are therefore extinguished by the Sale Transaction.").

**L.      A Successful Bidder Should Enjoy The Protections of Bankruptcy Code Section 363(m).**

53.      Pursuant to section 363(m) of the Bankruptcy Code, a good faith purchaser

is one who purchases assets for value, in good faith, and without notice of adverse

claims. In re Mark Bell Furniture Warehouse, Inc., 992 F.2d 7, 9 (1st Cir. 1993); In re

Willemain v. Kivitz, 764 F.2d 1019, 1023 (4th Cir. 1985); In re Congoleum Corp., Case No. 03-

51524, 2007 WL 1428477, *2 (Bankr. D. N.J. May 11, 2007); Abbotts Dairies of Penn., 788

F.2d at 147.

54.      The Purchase Agreement was negotiated at arm's-length, with both parties

represented by their own counsel. Accordingly, the Debtors request that the Sale Order include a

provision that the Successful Bidder for the Acquired Assets, is a "good faith" purchaser within

the meaning of section 363(m) of the Bankruptcy Code. The Debtors believe that providing the

Successful Bidder with such protection will ensure that the maximum price will be received by

the Debtors for the Acquired Assets and closing of the same will occur promptly.

## M.   Assumption And Assignment Of Executory Contracts And Unexpired Leases Should Be Authorized.

55.   Section 365(a) of the Bankruptcy Code provides, in pertinent part, that a debtor in possession "subject to the court's approval, may assume or reject any executory contract or [unexpired] lease of the debtor." 11 U.S.C. § 365(a).  The standard governing bankruptcy court approval of a debtor's decision to assume or reject an executory contract or unexpired lease is whether the debtor's reasonable business judgment supports assumption or rejection.  See, e.g., In re HQ Global Holdings, Inc., 290 B.R. 507, 511 (Bankr. D. Del. 2003) (debtor's decision to assume or reject executory contract is governed by business judgment standard and can only be overturned if decision was product of bad faith, whim, or caprice); see also In re Market Square Inn, Inc., 978 F.2d 116, 121 (3d Cir. 1992) (assumption or rejection of lease "will be a matter of business judgment by the bankruptcy court"); Sharon Steel Corp. v. Nat'l Fuel Gas Distrib. Corp., 872 F.2d 36, 39-40 (3d Cir. 1989) (same).  If the debtor's business judgment has been reasonably exercised, a court should approve the assumption or rejection of an unexpired lease or executory contract.  See Group of Institutional Investors v. Chicago M. St. P. & P.R.R. Co., 318 U.S. 523 (1943); Sharon Steel Corp. v. Nat'l Fuel Gas Distrib. Corp., 872 F. 2d 36, 39-40 (3d Cir. 1989).  The business judgment test "requires only that the trustee [or debtor in possession] demonstrate that [assumption or] rejection of the contract will benefit the estate."  Wheeling-Pittsburgh Steel Corp. v. West Penn Power Co., (In re Wheeling-Pittsburgh Steel Corp.), 72 B.R. 845, 846 (Bankr. W.D. Pa. 1987) (quoting In re Stable Mews Assoc., 41 B.R. 594, 596 (Bankr. S.D.N.Y 1984)).  Any more exacting scrutiny would slow the administration of a debtor's estate and increase costs, interfere with the Bankruptcy Code's provision for private control of administration of the estate, and threaten the court's ability to control a case impartially.  See Richmond Leasing Co. v. Capital Bank, NA., 762 F.2d 1303,

36

1311 (5th Cir. 1985).  Moreover, pursuant to section 365(b)(1) of the Bankruptcy Code, for a

debtor to assume an executory contract, it must "cure, or provide adequate assurance that the

debtor will promptly cure," any default, including compensation for any "actual pecuniary loss"

relating to such default.  11 U.S.C. § 365(b)(1).

     56.    Once an executory contract is assumed, the trustee or debtor in possession

may elect to assign such contract.  See In re Rickel Home Center, Inc., 209 F.3d 291, 299 (3d

Cir. 2000) ("[t]he Code generally favors free assignability as a means to maximize the value of

the debtor's estate"); see also In re Headquarters Dodge, Inc., 13 F.3d 674, 682 (3d Cir. 1994)

(noting purpose of section 365(f) is to assist trustee in realizing the full value of the debtor's

assets).

     57.    Section 365(f) of the Bankruptcy Code provides that the "trustee may

assign an executory contract . . . only if the trustee assumes such contract . . . and adequate

assurance of future performance is provided."  11 U.S.C. § 365(f)(2).  The meaning of "adequate

assurance of future performance" depends on the facts and circumstances of each case, but

should be given a "practical, pragmatic construction."  In re DBSI, Inc., 405 B.R. 698, 708

(Bankr. D. Del. 2009); EBG Midtown S. Corp. v. McLaren/Hart Env. Eng'g Corp. (In re

Sanshoe Worldwide Corp.), 139 B.R. 585, 593 (S.D.N.Y. 1992); see also In re Decora Indus.,

2002 U.S. Dist. LEXIS 27031, at *23 (D. Del. 2002) ("adequate assurance falls short of an

absolute guaranty of payment"); Carlisle Homes, Inc. v. Azzari (In re Carlisle Homes, Inc.), 103

B.R. 524, 538 (Bankr. D.N.J. 1988).

     58.    Adequate assurance may be provided by demonstrating the assignee's

financial health and experience in managing the type of enterprise or property assigned.  See,

e.g., In re Bygaph, Inc., 56 B.R. 596, 605-06 (Bankr. S.D.N.Y. 1986) (adequate assurance is

37

present when prospective assignee of lease from debtor has financial resources and has expressed

willingness to devote sufficient funding to business to give it strong likelihood of succeeding).

59.    To facilitate and effect the Sale Transaction, the Debtors request approval

under Bankruptcy Code section 365 of the Debtors' assumption and assignment of the Assigned

Contracts to the Stalking Horse Bidder or another Successful Bidder.  The Debtors further

request that the Sale Order provide that the Assigned Contracts will be transferred to, and remain

in full force and effect for the benefit of,  the Stalking Horse Bidder or another Successful Bidder

notwithstanding any provisions in the Assigned Contracts, including those described in

Bankruptcy Code sections 365(b)(2) and (f)(1) and (3) that prohibit such assignment.

60.    The Stalking Horse Bidder will have the financial resources required to

complete the Sale Transaction, including the assumption of the Assigned Contracts at the closing

of the Purchase Agreement.  EQT is a significant private equity firm with experience in the

waste management, waste-to-energy, and other infrastructure sectors.  Moreover, the Debtors

will require that any Successful Bidder, if other than the Stalking Horse Bidder, be able to

provide adequate assurance of future performance in connection with any assigned executory

contracts and leases and require that any such Successful Bidder must submit evidence sufficient

to demonstrate its financial wherewithal and ability to consummate the sale.  Furthermore, to the

extent that any defaults exist under any executory contract or unexpired lease that is to be

assumed and assigned in connection with the sale of the Acquired Assets, the Successful Bidder

will cure any such default prior to such assumption and assignment.

61.    The Debtors will present facts at the Sale Hearing to show the financial

credibility, willingness, and ability of the Stalking Horse Bidder or another Successful Bidder to

perform under the Assigned Contracts.  The Sale Hearing thus will afford the Court and other

interested parties the opportunity to evaluate the ability of the Stalking Horse Bidder or another Successful Bidder to provide adequate assurance of future performance under the Assigned Contracts, as required under Bankruptcy Code section 365(b)(1)(C). Further, as set forth above, the Debtors will give notice to all parties to the Assigned Contracts or the Previously Omitted Contracts of their intention to assume the Assigned Contracts or the Previously Omitted Contracts, as the case may be, and the proposed Cure Amounts.

62.    Accordingly, the Debtors submit that implementation of the proposed Assumption and Assignment Procedures is appropriate in these cases. The Court, therefore, should have a sufficient basis to authorize the Debtors to reject or assume and assign contracts as will be set forth in the Successful Bidder's Purchase Agreement.

## NOTICE

63.    Notice of this Motion will be given to: (i) the United States Trustee for the District of Delaware; (ii) counsel to the DIP Agent; (iii) counsel to the First Lien Agent; (iv) counsel to the Second Lien Agent; (v) the parties included on the Debtors' lists of thirty (30) largest unsecured creditors; (vi) counsel to the Stalking Horse Bidder; (vii) all parties which have expressed an interest in purchasing the Acquired Assets; (viii) any parties asserting liens against the Acquired Assets; (ix) the Internal Revenue Service; (x) the Environmental Protection Agency; and (xi) all parties entitled to notice pursuant to Local Bankruptcy Rule 9013-1(m). The Debtors submit that no other or further notice need be provided.

## NO PRIOR REQUEST

64.    No previous request for the relief sought herein has been made to this Court or any other court.

## CONCLUSION

WHEREFORE, the Debtors respectfully request that the Court enter the Bidding

Procedures Order and Sale Order, substantially in the form annexed hereto, granting the relief

requested in the Motion and such other and further relief as may be just and proper.

Dated:      Wilmington, Delaware
            April 24, 2013

                      SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

                      */s/ Mark S. Chehi*
                      Mark S. Chehi (I.D. No. 2855)
                      Jason M. Liberi (I.D. No. 4425)
                      One Rodney Square
                      P.O. Box 636
                      Wilmington, Delaware 19899-0636
                      Telephone: (302) 651-3000
                      Fax: (302) 651-3001

                      - and -

                      George N. Panagakis (*pro hac vice admission pending*)
                      Jessica S. Kumar (*pro hac vice admission pending*)
                      155 N. Wacker Dr.
                      Chicago, Illinois 60606
                      Telephone: (312) 407-0700
                      Fax: (312) 407-0411

                      Proposed Counsel for Debtors and Debtors in Possession

# EXHIBIT A

## BIDDING PROCEDURES ORDER

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                              :
In re:                                        :    Chapter 11
                                              :
SYNAGRO TECHNOLOGIES, INC., et al.,           :    Case No. 13-11041 (BLS)
                                              :
        Debtors.[1]                           :    (Joint Administration Pending)
                                              :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**ORDER PURSUANT TO BANKRUPTCY CODE SECTIONS 105(A), 363, 365, AND BANKRUPTCY RULES 2002, 6004, 6006 (I) ESTABLISHING BIDDING PROCEDURES RELATING TO THE SALE OF SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS; (II) APPROVING BID PROTECTIONS; (III) ESTABLISHING PROCEDURES RELATING TO THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES, INCLUDING NOTICE OF PROPOSED CURE AMOUNTS; (IV) APPROVING FORM AND MANNER OF NOTICE OF ALL PROCEDURES, PROTECTIONS, SCHEDULES AND AGREEMENTS, AND (V) SCHEDULING A HEARING TO CONSIDER THE PROPOSED SALE**

Upon consideration of the motion (the "Motion")[2] of the Debtors for entry of an

order (the "Bidding Procedures Order") (i) approving the proposed auction and bidding

procedures (the "Bidding Procedures") for the potential sale of substantially all of the Debtors'

assets (the "Acquired Assets"); (ii) approving the proposed bid protections, including, without

limitation, the break-up fee (the "Break-Up Fee") and expense reimbursement (the "Expense

---

[1]   The Debtors and the last four digits of their respective taxpayer identification numbers are as follows:  Drilling Solutions, LLC (9935); Earthwise Organics, LLC (5458); Environmental Protection & Improvement Company, LLC (2397); JABB II, LLC (7433); NETCO - Waterbury, LP (5202); New Haven Residuals, LP (2758); New York Organic Fertilizer Company (8694); Providence Soils, LLC (9061); Soaring Vista Properties, LLC (4015); South Kern Industrial Center, LLC (2099); ST Interco, Inc. (4897); Synagro - Connecticut, LLC (5532); Synagro - WCWNJ, LLC (0817); Synagro - WWT, Inc. (0492); Synagro Central, LLC (2568); Synagro Composting Company of California, LLC (7671); Synagro Detroit, LLC (1107); Synagro Drilling Solutions, LLC (4598); Synagro-Hypex, LLC (2544); Synagro Management, LP (4546); Synagro Northeast, LLC (2564); Synagro of California, LLC (8598); Synagro of Minnesota - Rehbein, LLC (7969); Synagro of Texas - CDR, Inc. (8566); Synagro Product Distribution, LLC (4357); Synagro South, LLC (2567); Synagro Technologies, Inc. (9860); Synagro Texas, LLC (4372); Synagro West, LLC (2566); Synagro Woonsocket, LLC (1634); Synatech Holdings, Inc. (5544).  The Debtors' address is 1800 Bering Drive, Suite 1000, Houston, Texas 77057.

[2]   Capitalized terms used but not defined herein shall have the same meanings ascribed to them in the Motion or in the Purchase Agreement, as applicable.

1

Reimbursement") to STI Infrastructure Company, Inc. (the "Stalking Horse Bidder") in accordance with that certain Acquisition Agreement, dated [•], 2013 (the "Purchase Agreement"), for the purchase of the Acquired Assets; (iii) establishing procedures for the assumption and assignment of executory contracts and unexpired leases (the "Assigned Contracts"), including notice of proposed cure amounts (the "Assumption and Assignment Procedures"); (iv) approving the form and manner of notice of all procedures, protections, schedules, and agreements; and (v) scheduling a hearing (the "Sale Hearing") to approve such sale (the "Sale Transaction"); and it appearing that the relief requested is in the best interests of the Debtors' estates, their creditors, and other parties-in-interest; and it appearing that this Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334; and it appearing that this Motion is a core proceeding pursuant to 28 U.S.C. § 157; and adequate notice of the Motion and opportunity for objection having been given, with no objections or requests for hearing having been filed, or all objections having been overruled, as the case may be; and it appearing that no other notice need be given; and after due deliberation and sufficient cause therefore, it is hereby:

## FOUND AND DETERMINED THAT:

A.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). The statutory predicates for the relief sought herein are Bankruptcy Code Sections 105, 363, and 365[3] and Bankruptcy Rules 2002, 6004, and 6006. Venue for these cases and this Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

B.      Notice of the Motion, the proposed entry of the Bidding Procedures Order, the Bidding Procedures, the Assumption and Assignment Procedures, the Auction, and Bid

---

[3]     All section references herein shall be to title 11 of the United States Code, unless otherwise indicated.

Procedures Hearing has been provided as set forth in the Motion. The Debtors' notice of the Motion, the proposed entry of the Bidding Procedures Order, the Bidding Procedures, the Assumption and Assignment Procedures, the Auction, and Bidding Procedures Hearing is appropriate and reasonably calculated to provide all interested parties with timely and proper notice under Bankruptcy Rules 2002, 4001, 6004, and 6006, and no other or further notice of, or hearing on, the Motion or this Bidding Procedures Order is required.

C.     The Debtors' proposed notices of (i) the proposed Sale of the Acquired Assets, (ii) the assumption and assignment of and Cure Amounts for the executory contract and unexpired leases to be assumed and assigned to the Successful Bidder, (iii) the Purchase Agreement, (vi) the Successful Bidder and (v) the Bidding Procedures, substantially in the form attached hereto as Exhibit 1, are appropriate and reasonably calculated to provide all interested parties with timely and proper notice of each, and no further notice of, or hearing on, each is necessary or required.

D.     The Bidding Procedures, substantially in the form attached hereto as Exhibit 1, and the Assumption and Assignment Procedures, substantially in the form set forth in the Motion, are fair, reasonable, and appropriate and are designed to maximize the value of the Debtors' estates.

E.     The Debtors have demonstrated a compelling and sound business justification for approving the payment of the Break-Up Fee and the Expense Reimbursement under the circumstances and timing set forth in the Motion and Purchase Agreement.

F.     The Debtors' granting of bid protections to the Stalking Horse Bidder is (a) an actual and necessary cost and expense of preserving the Debtors' estates, within the meaning of section 503(b) of the Bankruptcy Code, (b) of substantial benefit to the Debtors' estates,

(c) effectively compensates the Stalking Horse Bidder for its efforts and expenditure of human and monetary capital necessary to drive the entire auction process, capital which would not have been and will not be expended absent the granting of a super priority administrative expense claim, and (d) fair, reasonable and appropriate, in light of, among other things, (i) the size and nature of the proposed Sale of the Acquired Assets, (ii) the substantial efforts that have been expended by the Stalking Horse Bidder, and (iii) the benefits the Stalking Horse Bidder has provided to the Debtors' estates and creditors and all parties-in-interest herein.

G.      The Debtors have (i) articulated good and sufficient reasons to this Court to grant the relief requested in the Motion and the Purchase Agreement and (ii) demonstrated sound business justifications to support such relief.

H.      Entry of this Bidding Procedures Order is in the best interests of the Debtors and their respective estates and creditors, and all other parties-in-interest.

**IT IS THEREFORE, ORDERED, ADJUDGED AND DECREED THAT:**

1.      The (i) Bidding Procedures, including references to the Purchase Agreement, and (ii) Assumption and Assignment Procedures are hereby APPROVED, and fully incorporated into this Bidding Procedures Order, and shall apply with respect to the proposed Sale of the Acquired Assets and assumption and assignment of contracts and unexpired leases contemplated by the Motion.  The Debtors are authorized to take any and all actions necessary or appropriate to implement the Bidding Procedures and the Assumption and Assignment Procedures.

2.      All objections to the relief requested in the Motion with respect to (i) the Bidding Procedures and (ii) the Assumption and Assignment Procedures that have not been withdrawn, waived or settled as announced at the Bid Procedures Hearing on the Motion, or

resolved by stipulation signed by the Debtors and filed with this Court, are overruled on their merits.

## I.    AUCTION AND BIDDING PROCEDURES

3.    The Debtors are authorized to conduct an auction (the "Auction") with respect to the Acquired Assets.  The Auction, if any, shall be conducted at the offices of Skadden, Arps, Slate, Meagher & Flom LLP, 4 Times Square, New York, NY, 10036 (the "Auction Site") at 10:00 a.m. (prevailing Eastern time) on June 10, 2013 (the "Auction Date"), or at such other place and time or later date as the Debtors shall notify those bidders whose bids are deemed to be Qualified Bids and who expressed their intent to participate in the Auction as set forth in the Bidding Procedures.  The Debtors are authorized, subject to the terms of this Bidding Procedures Order, to take all actions necessary, in the discretion of the Debtors, to conduct and implement such Auction.

4.    Subject to the rights of parties in interest to challenge the Debtors' decisions with respect to the sale process, and to argue that such decisions are not governed by the "business judgment" standard, and subject to the rights of parties in interest, including the Stalking Horse Bidder, to challenge the sale process, the Debtors may, after consultation with the DIP Agent, the First Lien Agent, the Second Lien Agent and any creditors' committee appointed in these cases, (i) select, in their business judgment, pursuant to the Bidding Procedures, the highest or otherwise best offer(s) and the Successful Bidder or Bidders, and (ii) reject any bid that, in the Debtors' business judgment, is (a) inadequate or insufficient, (b) not in conformity with the requirements of the Bankruptcy Code, the Bankruptcy Rules or the Bidding Procedures, or (c) contrary to the best interests of the Debtors and their estates, creditors, interest holders or parties-in-interest.

5.      The failure to specifically include or reference any particular provision, section or article of the Bidding Procedures in this Bidding Procedures Order shall not diminish or impair the effectiveness of such procedures, it being the intent of this Court that the Bidding Procedures be authorized and approved in their entirety.

6.      The Stalking Horse Bidder is deemed to be a Qualified Bidder, and the Stalking Horse Bidder's bid for the Acquired Assets is deemed a Qualified Bid.  In the event there are no other Qualifying Bids, the Debtors shall accept the Stalking Horse Bid.

## II.      THE BIDDING PROTECTIONS

7.      Pursuant to sections 105, 363, 503, and 507 of the Bankruptcy Code, the Debtors are hereby authorized to pay the Break-Up Fee and the Expense Reimbursement pursuant to the terms and conditions set forth in the Purchase Agreement and the Bidding Procedures.

8.      The Break-Up Fee and the Expense Reimbursement are hereby approved and shall be paid to the Stalking Horse Bidder as set forth in Sections 5.9, 7.2(b), and Article IX of the Purchase Agreement.

9.      The Break-Up Fee and the Expense Reimbursement shall be the sole remedy of the Stalking Horse Bidder if the Purchase Agreement is terminated under circumstances where the Break-Up Fee and the Expense Reimbursement are payable.

## III.      ADDITIONAL NOTICE PROVISIONS

10.      Within five (5) days after the entry of this Bidding Procedures Order (the "Mailing Date") or as soon thereafter as practicable, the Debtors (or their agents) shall serve the Motion, the Purchase Agreement, the Bidding Procedures and a copy of this Bidding Procedures Order by first-class mail, postage prepaid, on a compact disc, upon (i) all entities known to have asserted any lien, claim, interest or encumbrance in or upon any of the Acquired

Assets; (ii) counsel for the DIP Agent; (iii) counsel for the Prepetition Agents; (iv) the 30 largest

unsecured creditors; (v) all federal, state, county and local and foreign regulatory or taxing

authorities or recording offices which have a reasonably known interest in the relief requested by

the Motion; (vi) the United States Attorney's office; (vii) the Internal Revenue Service; (viii) the

Office of the United States Trustee; (ix) parties that have expressed an interest in a sale

transaction; and (x) those parties who have filed the appropriate notice requesting notice of all

pleadings filed in these cases.

11.     On the Mailing Date or as soon thereafter as practicable, the Debtors (or

their agents) shall serve by first-class mail, postage prepaid, a sale notice, substantially in the

form attached hereto as <u>Exhibit 2</u> (the "<u>Sale Notice</u>"), upon all other known creditors of the

Debtors.

12.     On the Mailing Date or as soon as practicable thereafter, the Debtors shall

publish the Sale Notice once in *The Wall Street Journal* and such publication notice shall be

deemed proper notice to any other interested parties whose identities are unknown to the

Debtors.

13.     Within three (3) days after the Auction or, if there are no Qualified Bids,

within three (3) days after the Bid Deadline, the Debtors shall file with this Court a notice of the

Successful Bidder, substantially in the form attached hereto as <u>Exhibit 4</u>, (the "<u>Successful Bidder</u>

<u>Notice</u>") that identifies the Successful Bidder and provides notice that at the Sale Hearing the

Debtors will seek to assume and assign the Assigned Contracts to the Successful Bidder effective

upon the occurrence of the Closing.

## IV.    ASSUMPTION AND ASSIGNMENT PROCEDURES

14.     The Assumption and Assignment Procedures are APPROVED.

15.     On the Mailing Date or as soon thereafter as practicable, the Debtors will file a notice of assumption and assignment and Cure Amount (as defined below) (the "Cure Notice"), substantially in the form attached hereto as Exhibit 3, with this Court and serve the Cure Notice on all non-debtor parties to any executory contracts and unexpired leases (including unexpired real property leases) that may be assumed by the Debtors and assigned to the Successful Bidder (the "Contract Notice Parties"); *provided*, *however*, that the presence of a contract, lease or agreement listed on the schedule to the Cure Notice does not constitute an admission that such contract or agreement is an executory contract. The Debtors reserve all of their rights, claims and causes of action with respect to the contracts, leases and agreements listed on the schedule to the Cure Notice.

16.     The Cure Notice shall state the cure amounts that the Debtors believe are necessary to assume such executory contracts or leases pursuant to section 365 of the Bankruptcy Code (the "Cure Amounts") and notify the non-debtor party that such party's contract or lease may be assumed and assigned to a purchaser of the Acquired Assets to be identified at the conclusion of the Auction. The Cure Notice shall identify the Cure Objection Deadline (as defined below). The Cure Notice shall also provide that any such objections will be heard at the Sale Hearing or at a later hearing, as determined by the Debtors.

17.     All objections by non-debtor parties to the Cure Amount, or to the possible assumption and assignment, must be filed on or before 5:00 p.m. (prevailing Eastern Time) on May 29, 2013 (the "Cure Objection Deadline") and served by mail on (a) Debtors' counsel, Skadden, Arps, Slate, Meagher & Flom LLP, 155 N. Wacker Drive, Chicago, IL  60606 (Attn: Jessica S. Kumar, Esq.), (b) counsel to the DIP Agent and the First Lien Agent, Shearman & Sterling, 599 Lexington Avenue, New York, NY 10022 (Attn: Frederic Sosnick, Esq. and Ned

Schodek, Esq.) and Ashby & Geddes, P.A., 500 Delaware Avenue, P.O. Box 1150, Wilmington,

Delaware 19899 (Attn:  Don A. Beskrone and Karen S. Owens), (c) counsel to the Second Lien

Agent, Brown Rudnick LLP, One Financial Center, Boston, MA 02111 (Attn: Steven B. Levine,

Esq. and Robert Stark, Esq.), (d) counsel to any creditors' committee appointed in the chapter 11

cases, (e) counsel to the Stalking Horse Bidder, Weil, Gotshal & Manges L.L.P., 200 Crescent

Court, Suite 300, Dallas, TX  75201 (Attn:  Michael A. Saslaw, Esq. and Martin A. Sosland,

Esq.) and Richards, Layton & Finger PA, One Rodney Square, 920 North King Street,

Wilmington, DE  19801 (Attn:  Mark D. Collins, Esq. and John H. Knight, Esq.), and (f) all other

parties that have requested notice in these cases.

18.     Unless a non-debtor party to any executory contract or unexpired lease,

including an unexpired real property lease, files an objection to the Cure Amount by the Cure

Objection Deadline, then such counterparty shall be (i) forever barred from objecting to the Cure

Amount; and (ii) forever barred and estopped from asserting or claiming any Cure Amount, other

than the Cure Amount listed on the schedule to the Cure Notice, against the Debtors, any

Successful Bidder or any other assignee of the relevant contract.

19.     All timely filed objections to any Cure Amount must set forth (i) the basis

for the objection, (ii) the exact amount the party asserts as the Cure Amount, and (iii) sufficient

documentation to support the Cure Amount alleged.

20.     Hearings on objections to any Cure Amount may be held at the Sale

Hearing or upon such other date as this Court may designate upon request by the Debtors (which

request shall not be made without the prior consent of the Successful Bidder).

21.     To the extent that an Assigned Contract was not provided with a Cure

Notice or that an executory contract or unexpired lease was omitted from the Schedules to

Section 1.1 of the Purchase Agreement (a "Previously Omitted Contract"), then the Debtors will

notify the Successful Bidder within two business days of the omission.  If the Successful Bidder

wishes to assume a Previously Omitted Contract, then the Debtors shall serve a notice (the

"Previously Omitted Contract Notice") to the counterparties to the Previously Omitted Contract

indicating the Debtors' intent to assume and assign the Previously Omitted Contract.  The

counterparties will have fourteen (14) days to object to the Cure Amount or the assumption and

assignment.  If the parties cannot agree on a resolution, the Debtors will seek an expedited

hearing before the Court to determine the Cure Amount and approve the assumption.  If there is

no objection, then counterparties will be deemed to have consented to the assumption and

assignment and the Cure Amount, and such assumption and assignment and Cure shall be

deemed approved by the Sale Order without further order of this Court.

22.    Unless a non-debtor party to any Assigned Contract, including any

Previously Omitted Contract, files a timely objection to the assumption and assignment of the

contract to the Successful Bidder, then such counterparty shall be deemed to have consented to

the assumption and assignment to the Successful Bidder and will be forever barred from

objecting to such assumption and assignment on account of Cure Amount, lack of adequate

assurance or any other grounds.

## V.    ADDITIONAL PROVISIONS

23.    The Debtors are authorized and empowered to take such actions as may be

necessary to implement and effect the terms and requirements established under this Bidding

Procedures Order.

24.    A Sale Hearing to approve the sale of substantially all of the Acquired

Assets to any Successful Bidder and authorizing the assumption and assignment of certain

executory contracts and unexpired leases shall be held (i) if there are no Qualified Bids, on June

10, 2013, or (ii) if an Auction is conducted, on June 20, 2013, in each case unless otherwise

continued by the Debtors in accordance with the Bidding Procedures.

   25.  Objections, if any, to any Sale must be filed on or before 5:00 p.m.

(prevailing Eastern time) on (i) if there are no Qualified Bids, June 5, 2013, or (ii) if an Auction

is conducted, June 14, 2013 (the "Sale Objection Deadline") and served by mail on (a) Debtors'

counsel, Skadden, Arps, Slate, Meagher & Flom LLP, 155 N. Wacker Drive, Chicago, IL 60606

(Attn: Jessica S. Kumar, Esq.), (b) counsel to the DIP Agent and the First Lien Agent, Shearman

& Sterling, 599 Lexington Avenue, New York, NY 10022 (Attn: Frederic Sosnick, Esq. and Ned

Schodek, Esq.) and Ashby & Geddes, P.A., 500 Delaware Avenue, P.O. Box 1150, Wilmington,

Delaware 19899 (Attn:  Don A. Beskrone and Karen S. Owens), (c) counsel to the Second Lien

Agent, Brown Rudnick LLP, One Financial Center, Boston, MA 02111 (Attn: Steven B. Levine,

Esq. and Robert Stark, Esq.), (d) counsel to any creditors' committee appointed in the chapter 11

cases, (e) counsel to the Stalking Horse Bidder, Weil, Gotshal & Manges L.L.P., 200 Crescent

Court, Suite 300, Dallas, TX 75201 (Attn:  Michael A. Saslaw, Esq. and Martin A. Sosland,

Esq.) and Richards, Layton & Finger PA, One Rodney Square, 920 North King Street,

Wilmington, DE 19801 (Attn:  Mark D. Collins, Esq. and John H. Knight, Esq.), and (f) all other

parties that have requested notice in these cases.

   26.  This Bidding Procedures Order shall be binding on the Debtors, including

any chapter 7 or chapter 11 trustee or other fiduciary appointed for the estates of the Debtors.

Certain provisions of this Bidding Procedures Order that relate to bid protections shall inure to

the benefit of the Stalking Horse Bidder and its affiliates, successors and assigns.

   27.  This Bidding Procedures Order shall constitute the findings of fact and

conclusions of law and shall take immediate effect upon execution hereof.

28.      Notwithstanding the possible applicability of Bankruptcy Rules 6004(h), 6006(d), 7062, 9014, or otherwise, this Court, for good cause shown, orders that the terms and conditions of this Bidding Procedures Order shall be immediately effective and enforceable upon its entry.

29.      This Court shall retain jurisdiction with respect to all matters arising from or related to the implementation or interpretation of this Bidding Procedures Order, including, but not limited to, any matter, claim or dispute arising from or relating to the Expense Reimbursement, the Break-Up Fee, the Purchase Agreement, the Bidding Procedures, and the implementation of this Bidding Procedures Order.

30.      In any event of a conflict among this Bidding Procedures Order, the Bidding Procedures and the Purchase Agreement, this Bidding Procedures Order shall govern.

Date:_____, 2013
   Wilmington, Delaware

_____
The Honorable Brenan L. Shannon
UNITED STATES BANKRUPTCY JUDGE

**<u>Exhibit 1</u>**

**Bidding Procedures**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                           :

In re:                          :     Chapter 11
                           :

SYNAGRO TECHNOLOGIES, INC., et al.,  :     Case No. 13-11041 (BLS)
                           :

           Debtors.[1]        :     (Joint Administration Pending)
                           :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## BIDDING PROCEDURES
## FOR THE SALE OF THE DEBTORS' ASSETS

      Set forth below are the bidding procedures (the "Bidding Procedures") to be employed with respect to the sale (the "Sale Transaction") of substantially all of the assets (the "Acquired Assets") of Synagro Technologies, Inc., a Delaware corporation ("Synagro"), and the selling subsidiaries who, with Synagro, are debtors and debtors-in-possession in the jointly administered chapter 11 cases pending in the Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") under Case No. 13-[ ] (collectively, the "Debtors"), including the interests in the Debtors' non-debtor subsidiaries. Pursuant to the Bidding Procedures Orders (defined below), the Bankruptcy Court has approved STI Infrastructure Company, Inc. as the stalking horse bidder (the "Stalking Horse Bidder") for the Acquired Assets, as set forth more fully in that certain asset purchase agreement dated [•], 2013 (the "Purchase Agreement").[2]

      On [•], 2013, the Debtors filed Motion For Orders (A)(I) Establishing Bidding Procedures Relating To The Sale Of Substantially All Of The Debtors' Assets; (II) Approving Bid Protections; (III) Establishing Procedures Relating To The Assumption And Assignment Of Certain Executory Contracts And Unexpired Leases, Including Notice Of Proposed Cure

---

[1]    The Debtors and the last four digits of their respective taxpayer identification numbers are as follows: Drilling Solutions, LLC (9935); Earthwise Organics, LLC (5458); Environmental Protection & Improvement Company, LLC (2397); JABB II, LLC (7433); NETCO - Waterbury, LP (5202); New Haven Residuals, LP (2758); New York Organic Fertilizer Company (8694); Providence Soils, LLC (9061); Soaring Vista Properties, LLC (4015); South Kern Industrial Center, LLC (2099); ST Interco, Inc. (4897); Synagro - Connecticut, LLC (5532); Synagro - WCWNJ, LLC (0817); Synagro - WWT, Inc. (0492); Synagro Central, LLC (2568); Synagro Composting Company of California, LLC (7671); Synagro Detroit, LLC (1107); Synagro Drilling Solutions, LLC (4598); Synagro-Hypex, LLC (2544); Synagro Management, LP (4546); Synagro Northeast, LLC (2564); Synagro of California, LLC (8598); Synagro of Minnesota - Rehbein, LLC (7969); Synagro of Texas - CDR, Inc. (8566); Synagro Product Distribution, LLC (4357); Synagro South, LLC (2567); Synagro Technologies, Inc. (9860); Synagro Texas, LLC (4372); Synagro West, LLC (2566); Synagro Woonsocket, LLC (1634); Synatech Holdings, Inc. (5544). The Debtors' address is 1800 Bering Drive, Suite 1000, Houston, Texas 77057.

[2]    The Purchase Agreement is attached as Exhibit C to the Bidding Procedures and Sale Motion (as defined herein). All capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the Purchase Agreement.

Amounts; (IV) Approving Form And Manner Of Notice Of All Procedures, Protections, Schedules And Agreements, And (V) Scheduling A Hearing To Consider The Proposed Sale, And (B)(I) Approving The Sale Of Substantially All Of The Debtors' Assets Free And Clear Of Liens And Encumbrances; (II) Authorizing The Assumption And Assignment Of Certain Executory Contracts And Unexpired Leases; And (III) Granting Certain Related Relief (the "Bidding Procedures and Sale Motion"). On [•], 2013, the Bankruptcy Court entered an order approving the Bidding Procedures set forth herein (the "Bidding Procedures Order"). The Bidding Procedures Order also set (i) if there are no Qualified Bids, __:__ .m. (prevailing Eastern Time) on _____, 2013, or (ii) if an Auction is conducted, __:__ .m. (prevailing Eastern Time) on _____, 2013 as the date the Bankruptcy Court will conduct a sale hearing (the "Sale Hearing"). At the Sale Hearing, the Debtors shall seek entry of an order from the Bankruptcy Court authorizing and approving the sale of the Acquired Assets of the Debtors to the Stalking Horse Bidder or another Qualified Bidder(s) (as defined below) that the Debtors determine to have made the highest or best offer for the Acquired Assets (the "Successful Bidder").

**Acquired Assets to Be Sold**

The Debtors are offering for sale all of their Acquired Assets and Qualified Bidders may submit bids only for all of the Acquired Assets. Except as otherwise provided in the Purchase Agreement or another Successful Bidder's purchase agreement all of the Debtors' right, title and interest in and to the Acquired Assets subject thereto shall be sold free and clear of any pledges, liens, security interests, encumbrances, claims, charges, options and interests thereon (collectively, the "Interests") to the maximum extent permitted by section 363 of the Bankruptcy Code, with such Interests to attach to the net proceeds of the sale of the Acquired Assets with the same validity and priority as such Interests applied against the Acquired Assets.

**The Bidding Process**

The Debtors and their advisors shall, subject to the consultation obligations set forth herein, (i) determine whether any person is a Qualified Bidder, (ii) coordinate the efforts of Qualified Bidders in conducting their due diligence investigations, (iii) receive offers from Qualified Bidders, and (iv) negotiate any offers made to purchase the Acquired Assets (collectively, the "Bidding Process").

**Participation Requirements**

Any person that wishes to participate in the Bidding Process (a "Potential Bidder") must become a "Qualified Bidder." As a prerequisite to becoming a Qualified Bidder, a Potential Bidder must deliver (unless previously delivered) to the Debtors at the addresses specified below, not later than May 20, 2013:

    i.    An executed confidentiality agreement in form and substance acceptable to the Debtors on terms and conditions no less favorable in the aggregate to the Debtors than the confidentiality agreement executed by the Stalking Horse Bidder; and

    ii.    a letter of indication stating that such bidder is prepared to enter into a legally binding purchase and sale agreement or similar agreement for the acquisition of

such Acquired Assets on terms and conditions no less favorable in the aggregate to the Debtors than the terms and conditions contained in the Purchase Agreement, indicating (i) that such bidder will post the required Bid Deposit (defined below) and (ii) total cash consideration to be provided to the Debtors at Closing; and

iii.   sufficient information, as may be requested by the Debtors, to allow the Debtors to determine that the bidder has the financial wherewithal to close a sale of the Acquired Assets, which may include, but is not limited to, a bank account statement showing the ability of a Potential Bidder to pay cash for the Acquired Assets, and current audited financial statements (or such other form of financial disclosure and credit-quality support or enhancement acceptable to the Debtors) of the Potential Bidder or those entities that will guarantee in full the payment obligations of the Potential Bidder.

A "Qualified Bidder" is a Potential Bidder that delivers the documents described in subparagraphs (i) – (iii) above, and that the Debtors determine is reasonably likely (based on financial information submitted by the Potential Bidder, the Potential Bidder's financial wherewithal to close a sale of the Acquired Assets, experience, and other non-monetary considerations, such as ability to obtain required regulatory approvals, including under the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended (the "HSR")), to submit a *bona fide* offer, and be able to consummate a sale if selected as the Successful Bidder (as defined below). Notwithstanding the foregoing, the Stalking Horse Bidder shall be deemed a Qualified Bidder. Not later than three (3) business days after a Potential Bidder delivers all of the materials required by subparagraph (i) – (iii) above, the Debtors shall determine, and shall notify the Potential Bidder, if such Potential Bidder is a Qualified Bidder.

## Due Diligence

Neither the Debtors nor their representatives shall be obligated to furnish information of any kind to any person that the Debtors determine not to be a Qualified Bidder. The Debtors will afford any Qualified Bidder the time and opportunity to conduct reasonable due diligence; *provided, however,* that the Debtors shall not be obligated to furnish any due diligence information after the Bid Deadline. The Debtors will designate an employee or other representative to coordinate all reasonable requests for additional information and due diligence access from such Qualified Bidders. Neither the Debtors nor any of their respective representatives are obligated to furnish any information to any person other than a Qualified Bidder.

## Bid Deadline

A Qualified Bidder that desires to make a bid shall deliver written copies of its bid and the Required Bid Materials (defined below) to (i) the Debtors, Synagro Technologies, Inc., 1800 Bering Drive, Suite 1000, Houston, TX 77057 (Attn: Joseph L. Page); (ii) counsel to the Debtors, Skadden, Arps, Slate, Meagher & Flom LLP, 155 N. Wacker Drive, Chicago, IL 60606 (Attn: Shilpi Gupta, Esq. and George N. Panagakis, Esq.); (iii) financial advisors to the Debtors, Evercore Partners, 55 East 52nd Street, New York, NY 10055 (Attn: Mark Williamson and

Christopher Nicholson); (iv) counsel to the DIP Agent and the First Lien Agent, Shearman & Sterling, 599 Lexington Avenue, New York, NY 10022 (Attn: Frederic Sosnick, Esq. and Ned Schodek, Esq.) and Ashby & Geddes, P.A., 500 Delaware Avenue, P.O. Box 1150, Wilmington, Delaware 19899 (Attn: Don A. Beskrone and Karen S. Owens), (iv) counsel to the Second Lien Agent, Brown Rudnick LLP, One Financial Center, Boston, MA 02111 (Attn: Steven B. Levine, Esq. and Robert Stark, Esq.), and (v) counsel to any creditors' committee appointed in the chapter 11 cases, not later than 5:00 p.m. (prevailing Eastern time) on June 3, 2013 (the "Bid Deadline").

## Bid Requirements

All bids, other than the Stalking Horse Bid, shall be in writing and include the following information and documents (the "Required Bid Materials"):

i.      Cash consideration, or cash consideration plus assumed liabilities, equal to or greater than $20 million higher than the Purchase Price to be paid under the Purchase Agreement (the "Minimum Bid Amount").

ii.     A letter stating that the bidder's offer is irrevocable until the earlier of (i) the first business day after the Acquired Assets on which the Qualified Bidder is submitting a bid have been sold pursuant to the closing of the sale or sales approved by the Bankruptcy Court or (ii) sixty days after the Sale Hearing.

iii.    An executed copy of a purchase agreement and a redline of a Qualified Bidder's proposed purchase agreement reflecting variations from the Purchase Agreement (the "Marked Agreement"). All Qualified Bids must provide (a) a commitment to close within three business days after all closing conditions are met; (b) a representation that the Qualified Bidder will (1) make all necessary filings under the HSR, and pay the fees associated with such filings and (2) submit all necessary filings under HSR within two business days following the entry of the Sale Order, or as soon thereafter as reasonably practicable; and (c) the identity of and contact information for the bidder and full disclosure of any affiliates.

iv.     A cash deposit in the amount of 5% of the purchase price before any reductions, including for assumed indebtedness, in the form of a wire transfer, certified check or such other form acceptable to the Debtors (the "Bid Deposit" which shall be placed in an escrow account, the "Escrow Account").

v.      A representation of the bidder and written evidence that the bidder has the financial wherewithal to consummate the proposed transaction, which may include executed copies of any guarantees of the payment obligations of the proposed purchaser, and which the Debtors believe to be sufficient to satisfy the standards to provide adequate assurance of future performance of any contracts and leases to be assumed and assigned under Bankruptcy Code section 365 and to consummate the transaction contemplated by the Marked Agreement.

vi.     The bid shall not request or entitle the bidder to any transaction or break-up fee, expense reimbursement, termination or similar type of fee or payment, and shall

4

include an acknowledgement and representation of the bidder that it has had an opportunity to conduct any and all due diligence regarding the Acquired Assets prior to making its offer, that it has relied solely upon its own independent review, investigation and/or inspection of any documents and/or the Acquired Assets in making its bid, and that it did not rely upon any written or oral statements, representations, warranties, or guarantees, express, implied, statutory or otherwise, regarding the Acquired Assets, the financial performance of the Acquired Assets or the physical condition of the Acquired Assets, or the completeness of any information provided in connection therewith or the Auction, except as expressly stated in these Bidding Procedures or the Marked Agreement.

vii.     The bid shall not contain any due diligence, financing, or regulatory contingencies of any kind (other than a condition that any applicable waiting period under HSR shall have expired or been terminated), though the bid may be subject to the satisfaction of specific conditions in all material respects at Closing.

viii.    The bid shall identify each executory contract and unexpired lease to be assumed and assigned to the bidder.

ix.      The bid shall fully disclose the identity of each entity that will be bidding for the Acquired Assets or otherwise participating in connection with such bid, and the complete terms of any such participation.

x.       The bid shall state that the offering party consents to the jurisdiction of the Bankruptcy Court.

xi.      The bid shall include evidence of authorization and approval from the bidder's board of directors (or comparable governing body) with respect to the submission, execution, delivery and closing of the submitted purchase agreement of the bidder.

A bid received from a Qualified Bidder that includes all of the Required Bid Materials and is received by the Bid Deadline is a "Qualified Bid." The Debtors reserve the right to determine the value of any Qualified Bid, and which Qualified Bid constitutes the highest or best offer (subject to Bankruptcy Court approval). The Debtors shall notify the Stalking Horse Bidder within 24 hours after the Bid Deadline if one or more Qualified Bids are received and the identity of the bidders making any such Qualified Bids, and shall provide the Stalking Horse Bidder with a copy of any Marked Agreement constituting a Qualified Bid.

## No Qualified Bids

If no Qualified Bid is submitted by the Bid Deadline or all Qualified Bids that have been submitted have been withdrawn by the Bid Deadline or prior to the Auction Date (defined below), then the Debtors shall cancel the Auction and accept the Stalking Horse Bid (in which case, the Successful Bid shall be the Stalking Horse Bid, and the Successful Bidder shall be the Stalking Horse Bidder).

**The Auction**

If a Qualified Bid other than that submitted by the Stalking Horse Bidder has been received by the Debtors by the Bid Deadline, the Debtors may conduct an auction (the "Auction") of the Acquired Assets.  The Auction shall be conducted at the offices of Skadden, Arps, Slate, Meagher & Flom, LLP, 4 Times Square, New York, NY, 10036 (the "Auction Site") at 10:00 a.m. (prevailing Eastern time) on June 10, 2013 (the "Auction Date"), or such other place and time as the Debtors shall notify all Qualified Bidders who have submitted Qualified Bids and expressed their intent to participate in the Auction as set forth above.

The Auction shall be governed by the following procedures:

i.  The Stalking Horse Bidder and the Qualified Bidders shall appear in person at the Auction, or through a duly authorized representative.

ii.  Any improvements to the Stalking Horse Bid or any other Qualified Bids shall be announced in the presence of all participants in the Auction.

iii.  Only representatives of the Debtors, the Stalking Horse Bidder, other Qualified Bidders, the DIP Agent and Lenders, the First Lien Agent and Lenders, the Second Lien Agent and Lenders, and any creditors' committee appointed in these chapter 11 cases shall be entitled to be present at the Auction.

iv.  Only the Stalking Horse Bidder and Qualified Bidders shall be entitled to make any subsequent bids at the Auction.

v.  Bidding shall commence at the amount of the highest Qualified Bid submitted by the Qualified Bidders prior to the Auction, which Qualified Bid shall be provided to all Qualified Bidders prior to the Auction.

vi.  The Debtors may specify a minimum amount by which subsequent bids must exceed the preceding bid (the "Minimum Bid Increment").  The Debtors will take into account the Break-Up Fee and Expense Reimbursement (defined below) in each round of bidding by the Stalking Horse Bidder.

vii.  The Auction shall continue until the Debtors determine, subject to the consultation rights set forth herein and Bankruptcy Court approval, that the Debtors have received the highest or otherwise best offer or offers for the Acquired Assets from among the Qualified Bidders (including the Stalking Horse Bidder) submitted at the Auction (the "Successful Bid(s)").

The Debtors may employ and announce at the Auction additional procedural rules that are reasonable under the circumstances for conducting the Auction; provided that such rules are not inconsistent with these Bidding Procedures, the Bankruptcy Code, or any order of the Bankruptcy Court entered in connection herewith.  After adjournment of the Auction, but prior to the Sale Hearing, the Successful Bidder(s) shall complete and execute all agreements, contracts, instruments or other documents evidencing and containing the terms and conditions upon which the Successful Bid(s) were made and make and pay for all necessary filings with all applicable

governmental or other authorities.  Bids made after the close of the Auction shall not be considered by the Debtors.  At the Sale Hearing, the Debtors shall present the Successful Bid to the Bankruptcy Court for approval.

## Break-Up Fee and Expense Reimbursement

To compensate the Stalking Horse Bidder (i) for performing the substantial due diligence and incurring the expenses necessary and (ii) entering into the Purchase Agreement with the knowledge and risk that arises from participating in the sale and subsequent bidding process and (iii) to provide an incentive to participate in a competitive process, the Debtors have agreed to pay the Stalking Horse Bidder a break-up fee in the amount of $13,800,000 under Sections 5.9, 7.2, and Article IX of the Purchase Agreement (the "Break-Up Fee and Expense Reimbursement").  The Debtors will take into account the Break-Up Fee and Expense Reimbursement in each round of bidding.

The Break-Up Fee and Expense Reimbursement were a material inducement for, and a condition of, the Stalking Horse Bidder's entry into the Purchase Agreement.  The Break-Up Fee and Expense Reimbursement shall be payable as set forth herein, in the Bidding Procedures Order, and in the Purchase Agreement.

## Acceptance of Qualified Bids

The Debtors shall sell the Acquired Assets to any Successful Bidder only upon the approval of a Successful Bid by the Bankruptcy Court after the Sale Hearing.  The Debtors' presentation of a particular Qualified Bid to the Bankruptcy Court for approval does not constitute the Debtors' acceptance of the bid.  The Debtors will be deemed to have accepted a bid only when the bid has been approved by the Bankruptcy Court at the Sale Hearing.

## Sale Hearing

A Sale Hearing is scheduled for (i) if there are no Qualified Bids, at __:__ _.m. (prevailing Eastern Time) on _____, 2013, or (ii) if an Auction is conducted, at __:__ _.m. (prevailing Eastern Time) on _____, 2013, in the Bankruptcy Court, in each case unless otherwise continued by the Debtors after consultation in accordance with these Bidding Procedures.  Objections to the Sale Transaction must be filed on or before (i) if there are no Qualified Bids, 5:00 p.m. (prevailing Eastern Time) on June 5, 2013, or (ii) if an Auction is conducted, at 5:00 p.m. (prevailing Eastern Time) on June 14, 2013.  Following the approval of the sale of all or substantially all of the Acquired Assets to any Successful Bidder at the Sale Hearing, if the Successful Bidder fails to consummate an approved sale within the later of (1) three business days after the satisfaction of all closing conditions and (2) the expiration or termination of the applicable HSR or other regulatory waiting period, the Debtors shall be authorized, but not required, to deem the next highest or otherwise best Qualified Bid (the "Back-Up Bid" and the party submitting the Back-Up Bid, the "Back-Up Bidder"), as disclosed at the Sale Hearing, the Successful Bid, and the Debtors shall be authorized, but not required, to consummate the sale with the Back-Up Bidder submitting such bid without further order of the Bankruptcy Court.  The Back-Up Bid shall remain open until the earlier of (i) the first business

day following the consummation of a Sale of the Acquired Assets to the Successful Bidder and (ii) sixty days after Sale Hearing.

## Return of Bid Deposits

The Bid Deposits shall not be subject to the claims, liens, security interests, or encumbrances of Debtors' creditors. The Bid Deposits of Qualified Bidders (others than the Stalking Horse Bidder) shall be disbursed from the Escrow Account only as follows: (i) if the Qualified Bidder becomes the Successful Bidder, its Bid Deposit will be used to satisfy any Break-Up Fee and Expense Reimbursement to which the Stalking Horse Bidder is entitled hereunder by reason of its not being the Successful Bidder, with the balance, if any, to be released to the Debtors or applied as provided under any asset purchase agreement between the Debtors and such Successful Bidder, and (ii) if such Qualified Bidder is not the Successful Bidder at the Auction, then its Bid Deposit shall treated as set forth below. The Bid Deposit of the Stalking Horse Bidder shall be disbursed as provided for under the Purchase Agreement and the Escrow Agreement governing such Bid Deposit.

The Bid Deposits of all Qualified Bidders (including the Stalking Horse Bidder) shall be retained by the Seller, and all Qualified Bids will remain open, notwithstanding Bankruptcy Court approval of a sale pursuant to the terms of a Successful Bid by a Qualified Bidder until the earlier of (a) 48 hours after the closing of the sale of the Acquired Assets, and (b) 60 days after the conclusion of the Sale Hearing with respect to the Acquired Assets (the "Return Date"). On the Return Date, the Debtors shall return the Bid Deposits with actual accrued interest, if any, of all Qualified Bidders who submitted Qualified Bids in connection with the Acquired Assets (other than the Successful Bidder). In addition to any other remedies available to the Debtors, the Debtors may retain the Bid Deposit of any Qualified Bidder who breaches or fails to perform any of its obligations pursuant to these Bidding Procedures or its Qualified Bid. The treatment of the Stalking Horse Bidder's Bid Deposit by the Debtors shall be in accordance with the terms of the Purchase Agreement and the Escrow Agreement governing such Bid Deposit.

## Modifications

Notwithstanding anything to the contrary provided herein, the Debtors shall have the right to amend the rules set forth herein for the bidding process or impose such other terms and conditions for the bidding process which the Debtors determine, in their business judgment, will better promote the goals of the bidding process and the discharge of the Debtors' fiduciary duties and which are not inconsistent with any Bankruptcy Court order, including the Bid Procedures Order; provided, however, that in connection with the exercise of their business judgment as set forth in the foregoing clause, the Debtors shall consult with counsel to the DIP Agent, the First Lien Agent, the Second Lien Agent and any creditors' committee appointed in the chapter 11 cases; provided, further, however, that nothing in these Bidding Procedures should be construed to permit the Debtors to (i) accept any Qualified Bid that (x) does not require any Bid Deposit to be placed in a protected, segregated account, which shall serve as protection and security for the Stalking Horse Bidder as outlined herein or (y) does not equal or exceed the Overbid Amount, or (ii) impose any terms and conditions upon the Stalking Horse Bidder that are contradictory to or in breach of the terms of the Purchase Agreement.

**Miscellaneous**

The Auction and Bid Procedures are solely for the benefit of the Debtors' estates and the Stalking Horse Bidder and nothing contained in the Bidding Procedures Order or Bid Procedures shall create any rights in any other person or bidder (including without limitation rights as third party beneficiaries or otherwise) other than the rights expressly granted to a Successful Bidder under the Bidding Procedures Order.

The Debtors shall consult with advisors to the DIP Agent, the First Lien Agent, the Second Lien Agent, and the creditors' committee, if one is appointed in these chapter 11 cases, in connection with determinations to be made hereunder.

Except as provided in the Bidding Procedures Orders and Bidding Procedures, the Bankruptcy Court shall retain jurisdiction to hear and determine all matters arising from or relating to the implementation of the Bidding Procedures Order.

In the event the Stalking Horse Bidder is not the Successful Bidder, the Stalking Horse Bidder shall have standing to object to the sale of the Acquired Assets or any portion thereof (including the conduct of the Auction and interpretation of these Bidding Procedures) at the Sale Hearing.

# Exhibit 2

**Sale Notice**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                          :
In re:                                    :    Chapter 11
                                          :
SYNAGRO TECHNOLOGIES, INC., et al.,       :    Case No. 13-11041 (BLS)
                                          :
                    Debtors.[1]           :    (Joint Administration Pending)
                                          :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## NOTICE OF AUCTION AND SALE HEARING

**PLEASE TAKE NOTICE OF THE FOLLOWING:**

        1.      On April 24, 2013, the above-captioned debtors and debtors in possession (collectively, the "Debtors"), each filed voluntary petitions for relief pursuant to chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court").

        2.      On April 24, 2013, the Debtors filed a motion (the "Bidding Procedures and Sale Motion"), pursuant to sections 105, 363, and 365 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004, and 6006, seeking entry of an order (the "Bidding Procedures Order")[2] (i) establishing bidding procedures (the "Bidding Procedures") relating the sale of substantially all of the Debtors' assets (the "Acquired Assets") pursuant to the Acquisition Agreement (the "Purchase Agreement") with the STI Infrastructure Company, Inc. to act as a "stalking horse bidder" (the "Stalking Horse Bidder"); (ii) approving certain Bid Protections for the Stalking Horse Bidder; (iii) establishing procedures relating to the assumption and assignment of certain executory contracts and unexpired leases to any purchaser(s) of the

---

[1]    The Debtors and the last four digits of their respective taxpayer identification numbers are as follows: Drilling Solutions, LLC (9935); Earthwise Organics, LLC (5458); Environmental Protection & Improvement Company, LLC (2397); JABB II, LLC (7433); NETCO - Waterbury, LP (5202); New Haven Residuals, LP (2758); New York Organic Fertilizer Company (8694); Providence Soils, LLC (9061); Soaring Vista Properties, LLC (4015); South Kern Industrial Center, LLC (2099); ST Interco, Inc. (4897); Synagro - Connecticut, LLC (5532); Synagro - WCWNJ, LLC (0817); Synagro - WWT, Inc. (0492); Synagro Central, LLC (2568); Synagro Composting Company of California, LLC (7671); Synagro Detroit, LLC (1107); Synagro Drilling Solutions, LLC (4598); Synagro-Hypex, LLC (2544); Synagro Management, LP (4546); Synagro Northeast, LLC (2564); Synagro of California, LLC (8598); Synagro of Minnesota - Rehbein, LLC (7969); Synagro of Texas - CDR, Inc. (8566); Synagro Product Distribution, LLC (4357); Synagro South, LLC (2567); Synagro Technologies, Inc. (9860); Synagro Texas, LLC (4372); Synagro West, LLC (2566); Synagro Woonsocket, LLC (1634); Synatech Holdings, Inc. (5544). The Debtors' address is 1800 Bering Drive, Suite 1000, Houston, Texas 77057.

[2]    Capitalized terms not otherwise defined herein shall have the meanings ascribed to such terms in the Bidding Procedures and Sale Motion or the Bidding Procedures Order.

Acquired Assets, including notice of cure amounts; (iv) approving the form and manner of notice of the auction and the sale hearing; and (v) scheduling a hearing to consider the proposed sale [Docket No. [•]].

       3.      On [•], 2013 the Bankruptcy Court entered the Bidding Procedures Order [Docket No. [•]]. Pursuant to the Bidding Procedures Order, if the Debtors receive any Qualified Bids for the Acquired Assets, the Auction shall take place on **June 10, 2013 at 10:00 a.m. (prevailing Eastern Time)** at the offices of Skadden, Arps, Slate, Meagher & Flom, 4 Times Square, New York, NY 10036. Only parties that have submitted a Qualified Bid, as set forth in the Bidding Procedures Order, by no later than **June 3, 2013 at 5:00 p.m. (prevailing Eastern Time)** (the "Bid Deadline") may participate at the Auction. Any party that wishes to take part in this process and submit a bid for the Acquired Assets must submit their competing bid prior to the Bid Deadline and in accordance with the Bidding Procedures.

       4.      A hearing to approve the Sale Transaction (the "Sale Hearing") will be held (i) if there are no Qualified Bids, at __:__ _.m. **(prevailing Eastern Time) on _____, 2013**, or (ii) if an Auction is conducted, at __:__ _.m. **(prevailing Eastern Time) on _____, 2013**, in each case , unless otherwise continued by the Debtors pursuant to terms of the Bidding Procedures. The Sale Hearing will take place before the Honorable [•] United States Bankruptcy Judge, 824 North Market Street, 6th Floor, [•], Wilmington, Delaware 19801. The Sale Hearing may be adjourned from time to time without further notice to creditors or parties in interest other than by announcement of the adjournment in open court on the date scheduled for the Sale Hearing.

       5.      Objections, if any, to the sale, must: (i) be in writing; (ii) comply with the Bankruptcy Rules and Local Bankruptcy Rules; and (iii) be filed with the clerk of the Bankruptcy Court for the District of Delaware, Third Floor, 824 North Market Street, Wilmington, Delaware 19801, on or before **5:00 p.m. (prevailing Eastern Time) on** (i) if there are no Qualified Bids, _____, 2013, or (ii) if an Auction is conducted, _____, **2013**; and be served upon: (a) Debtors' counsel, Skadden, Arps, Slate, Meagher & Flom LLP, 155 N. Wacker Drive, Chicago, IL 60606 (Attn: Jessica S. Kumar, Esq.), (b) counsel to the DIP Agent and the First Lien Agent, Shearman & Sterling, 599 Lexington Avenue, New York, NY 10022 (Attn: Frederic Sosnick, Esq. and Ned Schodek, Esq.) and Ashby & Geddes, P.A., 500 Delaware Avenue, P.O. Box 1150, Wilmington, Delaware 19899 (Attn: Don A. Beskrone and Karen S. Owens), (c) counsel to the Second Lien Agent, Brown Rudnick LLP, One Financial Center, Boston, MA 02111 (Attn: Steven B. Levine, Esq. and Robert Stark, Esq.), (d) counsel to any creditors' committee appointed in the chapter 11 cases, (e) counsel to the Stalking Horse Bidder, Weil, Gotshal & Manges L.L.P., 200 Crescent Court, Suite 300, Dallas, TX 75201 (Attn: Michael A. Saslaw, Esq. and Martin A. Sosland, Esq.) and Richards, Layton & Finger PA, One Rodney Square, 920 North King Street, Wilmington, DE 19801 (Attn: Mark D. Collins, Esq. and John H. Knight, Esq.), and (f) all other parties that have requested notice in these cases. UNLESS AN OBJECTION IS TIMELY SERVED AND FILED IN ACCORDANCE WITH THIS NOTICE, IT MAY NOT BE CONSIDERED BY THE

BANKRUPTCY COURT AND THE BANKRUPTCY COURT MAY GRANT THE RELIEF REQUESTED WITHOUT FURTHER HEARING AND NOTICE.

      6.     This Notice and the Sale Hearing is subject to the fuller terms and conditions of the Bidding Procedures Motion and the Bidding Procedures Order, which shall control in the event of any conflict, and the Debtors encourage parties-in-interest to review such documents in their entirety. Parties interested in receiving more information regarding the sale of the Acquired Assets and/or copies of any related document, including the Purchase Agreement, the Bidding Procedures Motion, or the Bidding Procedures Order, may make a written request to counsel for the Debtors (Skadden, Arps, Slate, Meagher & Flom LLP, 155 N. Wacker Dr., Chicago, IL 60606, Attn: Jessica S. Kumar). In addition, copies of the Bidding Procedures Motion, the Bidding Procedures Order and this Notice can be found on (i) the Court's website, www.deb.uscourts.gov; and (ii) the Debtors' case information website, www.kccllc.net/synagro, and are on file with the Clerk of the Bankruptcy Court, Third Floor, 824 Market Street, Wilmington, Delaware 19801.

Dated:  Wilmington, Delaware
       [•], 2013

                            SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

                            Mark S. Chehi (I.D. No. 2855)
                            Jason M. Liberi (I.D. No. 4425)
                            One Rodney Square
                            P.O. Box 636
                            Wilmington, Delaware 19899-0636
                            Telephone: (302) 651-3000
                            Fax: (302) 651-3001

                            - and -

                            George N. Panagakis
                            Jessica S. Kumar
                            155 N. Wacker Dr.
                            Chicago, Illinois 60606
                            Telephone: (312) 407-0700
                            Fax: (312) 407-0411

                            Proposed Counsel for Debtors and Debtors in Possession

## **Exhibit 3**

**Cure Notice**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                    :

In re:                      :     Chapter 11
                    :

SYNAGRO TECHNOLOGIES, INC., et al.,  :     Case No. 13-11041 (BLS)
                    :

Debtors.[1]         :     (Joint Administration Pending)
                    :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## NOTICE OF CURE AMOUNT WITH RESPECT TO EXECUTORY CONTRACTS AND UNEXPIRED LEASES TO BE ASSUMED AND ASSIGNED

**PLEASE TAKE NOTICE THAT:**

      1.      Pursuant to the Order Pursuant to Bankruptcy Code Sections 105(a), 363, 365, and Bankruptcy Rules 2002, 6004, 6006 (I) Establishing Bidding Procedures Relating to the Sale of Substantially all of the Debtors' Assets; (II) Approving Bid Protections; (III) Establishing Procedures Relating to the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, Including Notice of Proposed Cure Amounts; (IV) Approving Form and Manner of Notice of all Procedures, Protections, Schedules and Agreements, and (V) Scheduling a Hearing to Consider the Proposed Sale entered by the United States Bankruptcy Court for the District of Delaware on [•], 2013 (the "Bidding Procedures Order") [Docket No. [•]], the above captioned debtors and debtors in possession (collectively, the "Debtors"), hereby provide notice that they are seeking to assume and assign the unexpired leases or executory contracts (each, an "Assigned Contract"), listed on Exhibit A[2] attached hereto, to the Successful Bidder.[3]

---

[1]    The Debtors and the last four digits of their respective taxpayer identification numbers are as follows:  Drilling Solutions, LLC (9935); Earthwise Organics, LLC (5458); Environmental Protection & Improvement Company, LLC (2397); NETCO - Waterbury, LP (5202); New Haven Residuals, LP (2758); New York Organic Fertilizer Company (8694); Providence Soils, LLC (9061); Soaring Vista Properties, LLC (4015); South Kern Industrial Center, LLC (2099); ST Interco, Inc. (4897); Synagro - Connecticut, LLC (5532); Synagro - WCWNJ, LLC (0817); Synagro - WWT, Inc. (0492); Synagro Central, LLC (2568); Synagro Composting Company of California, LLC (7671); Synagro Detroit, LLC (1107); Synagro Drilling Solutions, LLC (4598); Synagro-Hypex, LLC (2544); Synagro Management, LP (4546); Synagro Northeast, LLC (2564); Synagro of California, LLC (8598); Synagro of Minnesota - Rehbein, LLC (7969); Synagro of Texas - CDR, Inc. (8566); Synagro Product Distribution, LLC (4357); Synagro South, LLC (2567); Synagro Technologies, Inc. (9860); Synagro Texas, LLC (4372); Synagro West, LLC (2566); Synagro Woonsocket, LLC (1634); Synatech Holdings, Inc. (5544).  The Debtors' address is 1800 Bering Drive, Suite 1000, Houston, Texas 77057.

[2]    Attached to this notice is a listing of those Assigned Contracts included on Exhibit A to which you are a party. A complete list of each Assigned Contract can be obtained free of charge on the Debtors' case website at www.kccllc.net/Synagro or upon written request to the Debtors at the address provided in paragraph 4 of this notice.

2.      When the Debtors assume and assign an Assigned Contract to which you are a party, on the Closing (as defined in the Purchase Agreement), or as soon thereafter as practicable, the Successful Bidder will pay you the amount the Debtors' records reflect is owing for prepetition arrearages as set forth on Exhibit A (the "Cure Amount"). [The Debtors' records reflect that all postpetition amounts owing under your Assigned Contract have been paid and will continue to be paid until the assumption and assignment of the Assigned Contract, and that other than the Cure Amount, there are no other defaults under the Assigned Contract.]

3.      Inclusion of an executory contract or unexpired lease as an Assigned Contract on Exhibit A is not a guarantee that such executory contract or unexpired lease will ultimately be assumed and assigned to the Successful Bidder. Should it be determined that the Assigned Contract to which you are a party will not be assumed and assigned, you will be notified in writing of such decision.

4.      Objections, if any, to the proposed Cure Amount or assumption and assignment must be made in writing and (i) state the basis for such objection and (ii) state with specificity what cure amount you believe is required (in all cases with appropriate documentation in support thereof) and be filed by the Bankruptcy Court, 824 North Market Street, 3rd Floor, Wilmington, Delaware 19801, and served on (a) Debtors' counsel, Skadden, Arps, Slate, Meagher & Flom LLP, 155 N. Wacker Drive, Chicago, IL 60606 (Attn: Jessica S. Kumar, Esq.), (b) counsel to the DIP Agent and the First Lien Agent, Shearman & Sterling, 599 Lexington Avenue, New York, NY 10022 (Attn: Frederic Sosnick, Esq. and Ned Schodek, Esq.) and Ashby & Geddes, P.A., 500 Delaware Avenue, P.O. Box 1150, Wilmington, Delaware 19899 (Attn: Don A. Beskrone and Karen S. Owens), (c) counsel to the Second Lien Agent, Brown Rudnick LLP, One Financial Center, Boston, MA 02111 (Attn: Steven B. Levine, Esq. and Robert Stark, Esq.), (d) counsel to any creditors' committee appointed in the chapter 11 cases, (e) counsel to the Stalking Horse Bidder, Weil, Gotshal & Manges L.L.P., 200 Crescent Court, Suite 300, Dallas, TX 75201 (Attn: Michael A. Saslaw, Esq. and Martin A. Sosland, Esq.) and Richards, Layton & Finger PA, One Rodney Square, 920 North King Street, Wilmington, DE 19801 (Attn: Mark D. Collins, Esq. and John H. Knight, Esq.), and (f) all other parties that have requested notice in these cases, so as to be received **on or before May 29, 2013 at 5:00 P.M. (prevailing Eastern Time)** (the "Objection Deadline").

5.      If an objection to the Cure Amount or assumption and assignment is timely filed and not resolved by the parties, a hearing with respect to the objection will take place before the Honorable [•] United States Bankruptcy Judge, 824 North Market Street, 6th Floor, Courtroom [•], Wilmington, Delaware 19801 at the Sale Hearing to be held (i) if there are no Qualified Bids, at __:__ _.m. (prevailing Eastern Time) on _____, 2013, or (ii) if an Auction is conducted, at __:__ _.m. (prevailing Eastern Time) on _____, 2013, in each case , unless otherwise continued by the Debtors pursuant to terms of the Bidding Procedures. A hearing regarding the Cure Amount, if any, may be continued at the sole discretion of the Debtors until after the Closing.

---

3    Capitalized terms not otherwise defined in this notice shall have the meanings given to them in the Bidding Procedures approved as part of the Bidding Procedures Order.

6.      After the Auction, the Debtors will file, but not serve, a notice that identifies the Successful Bidder.

7.      You will have the opportunity to evaluate and, if necessary, challenge the ability of any Successful Bidder to provide adequate assurance of future performance under the Assigned Contracts.  At the Sale Hearing, the Debtors shall present evidence necessary to demonstrate adequate assurance of future performance by the Successful Bidder.  If the Successful Bidder is not the Stalking Horse Bidder, then the deadline to object to assumption and assignment shall be extended to **5:00 p.m. (prevailing Eastern Time) on _____, 2013**; provided, however, that the deadline to object to the Cure Amount shall not be extended.

8.      The Debtors, the Stalking Horse Bidder and/or the Successful Bidder reserve all of their rights, claims and causes of action with respect to the contracts and agreements listed on Exhibit A hereto.  Notwithstanding anything to the contrary herein or in the Purchase Agreement, the proposed assumption and assignment of each of the Assigned Contracts listed on Exhibit A hereto (a) shall not be an admission as to whether any such Assigned Contract was executory or unexpired as of the Petition Date or remains executory or unexpired postpetition within the meaning of Bankruptcy Code section 365; and (b) shall be subject to the Debtors', the Stalking Horse Bidder's and/or the Successful Bidder's right to conduct further confirmatory diligence with respect to the Cure Amount of each Assigned Contract and to modify such Cure Amount accordingly.  In the event that the Debtors, the Stalking Horse Bidder and/or the Successful Bidder determine that your Cure Amount should be modified, you will receive a notice, which will provide for additional time to object to such modification.

Dated:  Wilmington, Delaware
        [•], 2013

                    SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

                    Mark S. Chehi (I.D. No. 2855)
                    Jason M. Liberi (I.D. No. 4425)
                    One Rodney Square
                    P.O. Box 636
                    Wilmington, Delaware 19899-0636
                    Telephone: (302) 651-3000
                    Fax: (302) 651-3001

                    - and -

                    George N. Panagakis
                    Jessica S. Kumar
                    155 N. Wacker Dr.
                    Chicago, Illinois 60606
                    Telephone: (312) 407-0700
                    Fax: (312) 407-0411

                    Proposed Counsel for Debtors and Debtors in Possession

**<u>Exhibit 4</u>**

**Successful Bidder Notice**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

- - - - - - - - - - - - - - - - - - - - - - - - - - x
                                :

In re:                         :     Chapter 11
                                :

SYNAGRO TECHNOLOGIES, INC., <u>et al.</u>,  :     Case No. 13-____ (___)
                                :

Debtors.[1]         :     (Joint Administration Pending)
                                :

- - - - - - - - - - - - - - - - - - - - - - - - - - x

## NOTICE OF SUCCESSFUL BIDDER AND OF ASSUMPTION
## AND ASSIGNMENT OF EXECUTORY CONTRACT OR UNEXPIRED LEASE

**PLEASE TAKE NOTICE OF THE FOLLOWING:**

       1.   Pursuant to the Order Pursuant to Bankruptcy Code Sections 105(a), 363, 365, and Bankruptcy Rules 2002, 6004, 6006 (I) Establishing Bidding Procedures Relating to the Sale of Substantially all of the Debtors' Assets; (II) Approving Bid Protections; (III) Establishing Procedures Relating to the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, Including Notice of Proposed Cure Amounts; (IV) Approving Form and Manner of Notice of all Procedures, Protections, Schedules and Agreements, and (V) Scheduling a Hearing to Consider the Proposed Sale (the "<u>Bidding Procedures Order</u>")[2] entered by the United States Bankruptcy Court for the District of Delaware (the "<u>Bankruptcy Court</u>") on [●], 2013, the above captioned debtors and debtors in possession (collectively, the "<u>Debtors</u>") have accepted the bid of [●] for the purchase of substantially all of the Debtors' assets. The terms of the bid are set forth in the asset purchase agreement (the "<u>Purchase Agreement</u>"), dated as of [●] between the Debtors and [●] (the "<u>Purchaser</u>"), substantially in the form attached hereto as <u>Exhibit A</u>.

---

[1]   The Debtors and the last four digits of their respective taxpayer identification numbers are as follows: Drilling Solutions, LLC (9935); Earthwise Organics, LLC (5458); Environmental Protection & Improvement Company, LLC (2397); JABB II, LLC (7433); NETCO - Waterbury, LP (5202); New Haven Residuals, LP (2758); New York Organic Fertilizer Company (8694); Providence Soils, LLC (9061); Soaring Vista Properties, LLC (4015); South Kern Industrial Center, LLC (2099); ST Interco, Inc. (4897); Synagro - Connecticut, LLC (5532); Synagro - WCWNJ, LLC (0817); Synagro - WWT, Inc. (0492); Synagro Central, LLC (2568); Synagro Composting Company of California, LLC (7671); Synagro Detroit, LLC (1107); Synagro Drilling Solutions, LLC (4598); Synagro-Hypex, LLC (2544); Synagro Management, LP (4546); Synagro Northeast, LLC (2564); Synagro of California, LLC (8598); Synagro of Minnesota - Rehbein, LLC (7969); Synagro of Texas - CDR, Inc. (8566); Synagro Product Distribution, LLC (4357); Synagro South, LLC (2567); Synagro Technologies, Inc. (9860); Synagro Texas, LLC (4372); Synagro West, LLC (2566); Synagro Woonsocket, LLC (1634); Synatech Holdings, Inc. (5544). The Debtors' address is 1800 Bering Drive, Suite 1000, Houston, Texas 77057.

[2]   Capitalized terms used and not otherwise defined herein shall have the meanings ascribed to such terms in the Bidding Procedures Order.

2.      The Sale Hearing will be held at __:__ _.m. (prevailing Eastern Time) on _____, 2013 before the Honorable Brenan L. Shannon, United States Bankruptcy Judge, in the Bankruptcy Court, 824 North Market Street, [●] Floor, Courtroom [●], Wilmington, Delaware 19801.  At the Sale Hearing the Debtors will seek (i) entry of an order (the "Sale Order"), approving the sale of all of the Debtors' assets and (ii) pursuant to the terms of the Purchase Agreement, to assume and assign the contracts and leases set forth on Exhibit B hereto.

3.      Objections, if any, to the sale, must: (i) be in writing; (ii) comply with the Bankruptcy Rules and Local Bankruptcy Rules; and (iii) be filed with the clerk of the Bankruptcy Court for the District of Delaware, Third Floor, 824 North Market Street, Wilmington, Delaware 19801, on or before 5:00 p.m. (prevailing Eastern Time) on _____, 2013; and be served upon:  (a) Debtors' counsel, Skadden, Arps, Slate, Meagher & Flom LLP, 155 N. Wacker Drive, Chicago, IL  60606 (Attn: Jessica S. Kumar, Esq.), (b) counsel to the DIP Agent and the First Lien Agent, Shearman & Sterling, 599 Lexington Avenue, New York, NY 10022 (Attn: Frederic Sosnick, Esq. and Ned Schodek, Esq.) and Ashby & Geddes, P.A., 500 Delaware Avenue, P.O. Box 1150, Wilmington, Delaware 19899 (Attn: Don A. Beskrone and Karen S. Owens), (c) counsel to the Second Lien Agent, Brown Rudnick LLP, One Financial Center, Boston, MA 02111 (Attn: Steven B. Levine, Esq. and Robert Stark, Esq.), (d) counsel to any creditors' committee appointed in the chapter 11 cases, (e) counsel to the Stalking Horse Bidder, Weil, Gotshal & Manges L.L.P., 200 Crescent Court, Suite 300, Dallas, TX  75201 (Attn: Michael A. Saslaw, Esq. and Martin A. Sosland, Esq.) and Richards, Layton & Finger PA, One Rodney Square, 920 North King Street, Wilmington, DE 19801 (Attn:  Mark D. Collins, Esq. and John H. Knight, Esq.), and (f) all other parties that have requested notice in these cases.  UNLESS AN OBJECTION IS TIMELY SERVED AND FILED IN ACCORDANCE WITH THIS NOTICE, IT MAY NOT BE CONSIDERED BY THE BANKRUPTCY COURT AND THE BANKRUPTCY COURT MAY GRANT THE RELIEF REQUESTED WITHOUT FURTHER HEARING AND NOTICE.

4.      Pursuant to Bankruptcy Code section 365 there is adequate assurance of the Purchaser's future performance under the executory contract or unexpired lease to be assumed and assigned because of the demonstrated financial wherewithal of the Purchaser. Moreover, if necessary, the Debtors will adduce facts at the hearing on any objection further demonstrating the financial wherewithal of the Purchaser, and their willingness and ability to perform under the contracts to be assumed and assigned by them.

Dated:  Wilmington, Delaware
       [●]

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

Mark S. Chehi (I.D. No. 2855)
Jason M. Liberi (I.D. No. 4425)
One Rodney Square
P.O. Box 636
Wilmington, Delaware 19899-0636
Telephone: (302) 651-3000
Fax: (302) 651-3001

- and -

George N. Panagakis
Jessica S. Kumar
155 N. Wacker Dr.
Chicago, Illinois 60606
Telephone: (312) 407-0700
Fax: (312) 407-0411

Proposed Counsel for Debtors and Debtors in Possession

**EXHIBIT B**

**SALE ORDER**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
:
In re:                                    :    Chapter 11
:
SYNAGRO TECHNOLOGIES, INC., et al.,       :    Case No. 13-11041 (BLS)
:
Debtors.[1]                      :    (Joint Administration Pending)
:
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## ORDER PURSUANT TO BANKRUPTCY CODE SECTIONS 105(A), 363, 365, AND BANKRUPTCY RULES 2002, 6004, 6006 (I) APPROVING THE SALE OF THE DEBTORS' ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES AND INTERESTS; (II) AUTHORIZING THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND <u>UNEXPIRED LEASES; AND (III) GRANTING CERTAIN RELATED RELIEF</u>

Upon the motion, dated [•], 2013 (the "Motion"),[2] of Synagro Technologies, Inc.

and certain of its affiliates, as debtors and debtors-in-possession (collectively, the "Debtors"),

pursuant to sections 105(a), 363, 365, and 503 of title 11 of the United States Code

(the "Bankruptcy Code") and Rules 2002, 6004, 6006 of the Federal Rules of Bankruptcy

Procedure (the "Bankruptcy Rules"), for Orders (A)(I) Establishing Bidding Procedures Relating

to the Sale of Substantially all of the Debtors' Assets; (II) Approving Bid Protections; (III)

---

[1]    The Debtors and the last four digits of their respective taxpayer identification numbers are as follows: Drilling Solutions, LLC (9935); Earthwise Organics, LLC (5458); Environmental Protection & Improvement Company, LLC (2397); JABB II, LLC (7433); NETCO - Waterbury, LP (5202); New Haven Residuals, LP (2758); New York Organic Fertilizer Company (8694); Providence Soils, LLC (9061); Soaring Vista Properties, LLC (4015); South Kern Industrial Center, LLC (2099); ST Interco, Inc. (4897); Synagro - Connecticut, LLC (5532); Synagro - WCWNJ, LLC (0817); Synagro - WWT, Inc. (0492); Synagro Central, LLC (2568); Synagro Composting Company of California, LLC (7671); Synagro Detroit, LLC (1107); Synagro Drilling Solutions, LLC (4598); Synagro-Hypex, LLC (2544); Synagro Management, LP (4546); Synagro Northeast, LLC (2564); Synagro of California, LLC (8598); Synagro of Minnesota - Rehbein, LLC (7969); Synagro of Texas - CDR, Inc. (8566); Synagro Product Distribution, LLC (4357); Synagro South, LLC (2567); Synagro Technologies, Inc. (9860); Synagro Texas, LLC (4372); Synagro West, LLC (2566); Synagro Woonsocket, LLC (1634); Synatech Holdings, Inc. (5544). The Debtors' address is 1800 Bering Drive, Suite 1000, Houston, Texas 77057.

[2]    Capitalized terms used herein but not defined herein shall have the meaning ascribed to such terms in the Motion, the Bidding Procedures, or the Bidding Procedures Order, as the case may be.

Establishing Procedures Relating to the Assumption and Assignment of Certain Executory

Contracts and Unexpired Leases, Including Notice of Proposed Cure Amounts; (IV) Approving

Form and Manner of Notice of all Procedures, Protections, Schedules and Agreements, and (V)

Scheduling a Hearing to Consider the Proposed Sale, and (B)(I) Approving the Sale of

Substantially all of the Debtors' Assets Free and Clear of Liens and Encumbrances; (II)

Authorizing the Assumption and Assignment of Certain Executory Contracts and Unexpired

Leases; and (III) Granting Certain Related Relief; after holding a hearing on [•], 2013

(the "Bidding Procedures Hearing") this Court entered an order dated [•], 2013 (the "Bidding

Procedures Order"), (I) Establishing Bidding Procedures Relating to the Sale of Substantially all

of the Debtors' Assets; (II) Approving Bid Protections; (III) Establishing Procedures Relating to

the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases,

Including Notice of Proposed Cure Amounts; (IV) Approving Form and Manner of Notice of all

Procedures, Protections, Schedules and Agreements, and (V) Scheduling a Hearing to Consider

the Proposed Sale; [and the Auction having commenced on [•], 2013 (and concluded on [•],

2013), for the consideration of Qualified Bids and the selection of a Successful Bidder (each as

defined in the Bidding Procedures Order)]; and [•] (together with its successors, assigns,

subsidiaries and affiliates, "[•]" or "Purchaser") having been selected as the Successful Bidder;

and upon the Purchaser and the Debtors having entered into that certain [Acquisition Agreement,

dated as of [•], 2013 (attached hereto as Exhibit 1, and as may be amended, supplemented or

restated, the "Purchase Agreement"), and that certain Assignment and Assumption Agreement,

to be dated [as of the date of the Closing] (the "AAA," and, together with all other agreements

contemplated by the Purchase Agreement, the "Ancillary Documents"); and the Bankruptcy

Court having conducted a hearing on the Motion on [•], 2013 (the "Sale Hearing"); and all

2

parties in interest having been heard or having had the opportunity to be heard, regarding the

Purchase Agreement; and the Bankruptcy Court having reviewed and considered the Motion and

all objections thereto (such filed objections being referred to as the "Filed Objections"), and the

arguments of counsel made, and the evidence adduced, at the Bidding Procedures Hearing and

the Sale Hearing; and upon the record of the Procedures Approval Hearing and the Sale Hearing

and these chapter 11 cases and proceedings, and after due deliberation thereon, and good cause

appearing therefor;

THE COURT HEREBY MAKES THE FOLLOWING FINDINGS:[3]

      A.      **Jurisdiction and Venue**.  This Court has jurisdiction over the Motion and the

Transactions (defined below) under 28 U.S.C. §§ 157 and 1334.  This is a core proceeding under

28 U.S.C. § 157(b).  Venue of these cases and the Motion in this District is proper under

28 U.S.C. §§ 1408 and 1409.

      B.      **Statutory Predicates**.  The statutory predicates for the relief sought in the Motion

are sections 105(a), 363, 365, and 503 of the Bankruptcy Code, Bankruptcy Rules 2002, 6004,

6006 and 9014 and the applicable Local Rules of Bankruptcy Practice and Procedure of the

United States Bankruptcy Court for the District of Delaware (the "Local Rules").

      C.      **Sale Notice**.  As evidenced by the affidavits of service filed with this Court and

based upon the representations of counsel at the Sale Hearing and as approved under the Bidding

Procedures Order:  (i) due, proper, timely, adequate and sufficient notice of the Motion, the

Auction, the Sale Hearing and the Transactions has been provided to all parties in interest;

(ii) such notice was and is good, sufficient and appropriate under the circumstances of the

Debtors' chapter 11 cases and was provided in accordance with sections 102(1) and 363(b) of the

---

[3] Findings of fact shall be construed as conclusions of law and conclusions of law shall be construed as findings of fact to the fullest extent of the law.  *See* Fed. R. Bankr. P. 7052.

Bankruptcy Code, Bankruptcy Rules 2002, 6004, 9006, and 9007 and the Local Rules; and (iii) no other or further notice of the Motion, the Auction, the Sale Hearing, the Transactions, or of the entry of this Sale Order is necessary or shall be required.

D.     **Assumption and Assignment Notices**.  Notice has been provided to all of the counterparties to executory contracts and unexpired leases to be assumed and assigned to the Purchaser (the "Assigned Contracts"), setting forth proposed Cure Costs ("Cure Notices"). Notice identifying Purchaser as the Successful Bidder to whom the Assigned Contracts will be assigned (the "Successful Bidder Notice") has been filed with this Court.  Such Cure Notices and the Successful Bidder Notice were adequate and sufficient for the assumption and assignment of the Assigned Contracts, all in accordance with and as provided by the Bidding Procedures Order.

E.     **Opportunity to Object**.  A reasonable opportunity to object and to be heard with respect to the sale of the Acquired Assets, the potential assumption and assignment of the Assigned Contracts, and the defaults and Cure Costs related thereto, the Transactions, the Motion and the relief requested therein, has been given to all interested persons and entities, including, without limitation, the following:  (i) all counterparties to the Assigned Contracts, (ii) all parties listed on the Master Services List, and (iii) all applicable federal, state and local taxing and regulatory authorities.

F.     **Auction**.  Potential bidders had the full and fair opportunity to submit bids and participate in the Auction on the terms set forth in the Bidding Procedures Order.  The Auction was conducted fairly and in good faith, without collusion, and in accordance with the Bidding Procedures Order.  At the Auction, the Purchaser was selected as the Successful Bidder.  The Purchase Agreement constitutes the highest and best offer for the Acquired Assets, and will provide a greater recovery for the Debtors' estates than would be provided by any other available

4

alternative. The Debtors' determination that the Purchase Agreement constitutes the highest and best offer for the Acquired Assets constitutes a valid and sound exercise of the Debtors' business judgment.

G.    **Purchased Acquired Assets**. The Acquired Assets constitute property of the Debtors' estates and title thereto is vested in the Debtors' estates within the meaning of section 541(a) of the Bankruptcy Code. The Debtors have all right, title, and interest in the Acquired Assets required to transfer and convey the Acquired Assets as contemplated by the Purchase Agreement and the Ancillary Agreements.

H.    **Business Justification**. The Debtors have demonstrated both (i) good, sufficient and sound business purposes and justifications for, and (ii) compelling circumstances to consummate the transactions contemplated by the Purchase Agreement (the "Transactions") other than in the ordinary course of business under Bankruptcy Code section 363(b) and before, and outside of, a plan of reorganization, and such action is an appropriate exercise of the Debtors' business judgment and in the best interests of the Debtors, their estates and their creditors. Such business reasons include, but are not limited to, the facts that: (i) there is substantial risk of depreciation of the value of the Acquired Assets if the sale is not consummated quickly; (ii) the Purchase Agreement constitutes the highest or best offer for the Acquired Assets; (iii) the Purchase Agreement and the Closing (as defined in the Purchase Agreement) will present the best opportunity to realize the value of the Debtors on a going-concern basis and avoid decline and devaluation of the Debtors' businesses; and (iv) unless the sale is concluded expeditiously as provided for in the Motion and pursuant to the Purchase Agreement, potential creditor recoveries may be substantially diminished.

The Debtors and their professionals widely marketed the Acquired Assets to potential purchasers, both before and during their chapter 11 cases, as set forth in the Motion and in accordance with the Bidding Procedures Order. The bidding and auction process set forth in the Bidding Procedures Order and the Bidding Procedures afforded a full and fair opportunity for any entity to make a higher or otherwise better offer to purchase the Acquired Assets. Based upon the record of these proceedings, all creditors and other parties in interest and all prospective purchasers have been afforded a reasonable and fair opportunity to bid for the Acquired Assets.

No other person or entity or group of persons or entities has offered to purchase the Acquired Assets for an amount that would give equal or greater economic value to the Debtors than the value being provided by the Purchaser pursuant to the Purchase Agreement. Among other things, the Transactions are the best alternative available to the Debtors to maximize the return to their creditors and limit the losses to counterparties to Assumed Contracts. Approval of the Motion, the Purchase Agreement, the Ancillary Agreements, and the Transactions by this Court on the terms of this Sale Order is in the best interests of the Debtors, their creditors and all other parties in interest. No alternative to the Transactions exists that would provide a greater value to the Debtors, their creditors, or other parties in interest.

I.    **Sale Order Required by the Purchaser**.  Entry of an order approving the Purchase Agreement, the Ancillary Agreements, and the Transactions, and all the provisions thereof, on the terms requested in the Motion and set forth in the form and substance of this Sale Order, is a necessary and appropriate condition precedent to the Purchaser's consummation of the Transactions.

J.    **Consideration**.  The total consideration provided by the Purchaser for the Acquired Assets is the highest and best offer received by the Debtors, and the purchase price for

the Acquired Assets constitutes reasonably equivalent value and fair consideration under the

Bankruptcy Code, the Uniform Fraudulent Transfer Act, the Uniform Fraudulent Conveyance

Act, and the laws of the United States, any state, territory, possession thereof or the District of

Columbia.

       K.      **Arm's-Length Sale**.  The Purchase Agreement and Ancillary Agreements and

other documents and instruments related to and connected with the Transactions and the

consummation thereof, were negotiated, proposed, and entered into by the Debtors and the

Purchaser without collusion, in good faith and from arm's-length bargaining positions.  Neither

the Purchaser nor any of its affiliates, partners, principals, or shareholders or their respective

representatives is an "insider" of any of the Debtors, as that term is defined in section 101(31) of

the Bankruptcy Code.  None of the Debtors, the Purchaser or their respective affiliates, partners,

principals, or shareholders, or their representatives has engaged in any conduct that would cause

or permit the Purchase Agreement or any Ancillary Agreements or other documents and

instruments related to or connected with the Transactions and the consummation thereof to be

avoided, or costs or damages to be imposed, under section 363(n) of the Bankruptcy Code, or has

acted in bad faith or in any improper or collusive manner with any person.  The terms and

conditions of the Purchase Agreement, Ancillary Agreements, and other documents and

instruments related to and connected with the Transactions and the consummation thereof, and

the Transactions themselves, including without limitation the consideration provided in respect

thereof, are fair and reasonable, and the Transactions are not avoidable and shall not be avoided

under section 363(n) of the Bankruptcy Code.

       L.      **Good Faith Purchaser**.  The Purchaser, its respective affiliates, partners,

principals, shareholders and their respective representatives have proceeded in good faith and

without collusion in all respects in connection with this proceeding. Such persons are therefore entitled to all of the benefits and protections section 363(m) of the Bankruptcy Code. Accordingly, the reversal or modification on appeal of the authorization provided herein to consummate the Transactions shall not affect the validity of the Transactions (including, without limitation, the Ancillary Agreements and other documents and instruments related to or connected with the Transactions and the consummation thereof, and the assumption and assignment of the Assumed Contracts). No stay pending appeal of this Sale Order has been requested, and the stay contained in Fed. R. Bankr. P. 6004(h) has been and hereby is expressly and irrevocably waived as set forth in paragraph 24 below.

M.      **Corporate Authority**. Subject to the entry of this Sale Order, the Debtors (i) have full corporate power and authority to perform all of their obligations under the Purchase Agreement, the Ancillary Agreements, and all other documents and instruments related to and connected with the Transactions and the consummation thereof; and the Debtors' prior execution and delivery of, and performance of obligations under, the Purchase Agreement, Ancillary Agreements, and other documents and instruments is hereby ratified, (ii) have all of the corporate power and authority necessary to consummate the Transactions, (iii) have taken all corporate action necessary to authorize, approve, execute, and deliver the Purchase Agreement, Ancillary Agreements, and all other documents and instruments related to or connected with the Transactions and the consummation thereof and the Transactions themselves, and (iv) no consents or approvals are required to consummate the Transactions or otherwise perform obligations under the Purchase Agreement, Ancillary Agreements, or other documents and instruments, except for the closing conditions expressly agreed to therein.

N.    **Cure/Adequate Assurance**.  The assumption and assignment or transfer of the Assumed Contracts pursuant to the terms of this Sale Order and any further orders of the Court is integral to the Purchase Agreement, does not constitute unfair discrimination, and is in the best interests of the Debtors and their estates, creditors and all other parties in interest, and represents the reasonable exercise of sound and prudent business judgment by the Debtors. As of the assumption and assignment of each Assumed Contract to the Purchaser: (i) to the extent necessary, the Purchaser shall have provided cure or adequate assurance of cure, of any default with respect to the Assumed Contracts within the meaning of sections 365(b)(1)(A) and 365(f)(2)(A) of the Bankruptcy Code and (ii) to the extent necessary, the Purchaser shall have provided compensation or adequate assurance of compensation to any party for any actual pecuniary loss to such party resulting from a default with respect to the Assumed Contracts. Based on the evidence adduced at the Sale Hearing, the Purchaser has provided sufficient adequate assurance of future performance within the meaning of sections 365(b)(l)(C) and 365(f)(2)(B) of the Bankruptcy Code, to the extent that any such assurance is required and not waived by the counterparties, to Assumed Contracts.  Objections to any Cure Costs or defaults under Assumed Contracts, or the assumption and assignment of any of the Assumed Contracts to the Purchaser, including without limitation the Filed Objections, are hereby overruled, withdrawn or otherwise treated as set forth in paragraph 2 below.

O.    **Contract Assignments in Best Interests**.  The Debtors have demonstrated that assuming and assigning the Assumed Contracts in connection with the Transactions is an exercise of their sound business judgment, and that such assumption and assignment is in the best interests of the Debtors' estates, for the reasons set forth in the Motion and on the record at the Sale Hearing, including, without limitation, because the assumption and assignment of the

Assumed Contracts in connection with the Transactions will maintain the ongoing business of the Debtors, limit the losses of counterparties to Assumed Contracts, and maximize the distribution to creditors of the Debtors.

P.     **Free and Clear**.  The transfer of the Acquired Assets to the Purchaser under the Purchase Agreement will be a legal, valid, and effective transfer, and will vest at the Closing the Purchaser with all right, title, and interest of the Debtors to the Acquired Assets free and clear of all of the following (collectively, and excluding the Assumed Liabilities and other obligations of the Purchaser as expressly set forth in the Purchase Agreement, "Interests"):  liens, claims (as defined in section 101(5) of the Bankruptcy Code), encumbrances, obligations, liabilities, demands, guarantees, actions, suits, defenses, deposits, credits, allowances, options, rights, restrictions, limitations, contractual commitments, rights of first refusal, rights of setoff or recoupment (to the extent permitted under applicable law), or interests of any kind or nature whether known or unknown, legal or equitable, matured or unmatured, contingent or noncontingent, liquidated or unliquidated, asserted or unasserted, whether arising prior to or subsequent to the commencement of these chapter 11 cases, whether imposed by agreement, understanding, law, equity or otherwise, including, but not limited to, (i) those Interests that purport to give to any party a right or option to effect a setoff against or any forfeiture, modification or termination of the Debtors' interests in the Acquired Assets, or any similar rights if any; (ii) those Interests arising under all mortgages, deeds of trust, security interests, conditional sale or other title retention agreements, pledges, liens, judgments, demands, encumbrances, rights of first refusal or charges of any kind or nature, if any, (iii) those Interests that are Excluded Liabilities set forth in the Purchase Agreement; and (iv) those Interests arising in connection with any agreements, acts, or failures to act, of any of the Debtors or any of the

10

Debtors' predecessors, affiliates, or representatives including, but not limited to, Interests arising

under any doctrines of successor liability or similar theories under applicable state or federal law

or otherwise.  For the avoidance of doubt, without limiting the effect of the foregoing, the

assumption and assignment of any Assumed Contract is free and clear of all Interests, with all

such Interests to attach to the consideration to be received by the Debtors in the same priority

and subject to the same defenses and avoidability, if any, as of the Closing.

       Q.      **Free and Clear Findings Required by the Purchaser**.  The Purchaser would not

have entered into the Purchase Agreement and would not have consummated the Transactions,

thus adversely affecting the Debtors, their estates and their creditors, if the sale of the Acquired

Assets to the Purchaser, and the assumption and assignment or transfer of the Assumed

Contracts, were not free and clear of all Interests of any kind or nature, as set forth in this Sale

Order, or if the Purchaser would, or in the future could, be liable for any of the Interests.  A sale

of the Acquired Assets other than one free and clear of all Interests would adversely impact the

Debtors' estates, and would yield substantially less value for the Debtors' estates, with less

certainty than the sale contemplated by the Purchase Agreement.  Therefore, the sale

contemplated by the Purchase Agreement is in the best interests of the Debtors, their estates and

creditors, and all other parties in interest.

       R.      **Satisfaction of Section 363(f) Standards**.  The Debtors may sell the Acquired

Assets free and clear of any Interests of any kind or nature because, in each case, one or more of

the standards set forth in section 363(f)(1) – (5) of the Bankruptcy Code has been satisfied.

Those holders of Interests who did not object to or who withdrew their objections to the sale of

the Acquired Assets, the Transactions, or the Cure Notices are deemed to have consented to the

Motion and sale and assignment of the Acquired Assets to the Purchaser pursuant to section

363(f)(2) of the Bankruptcy Code. Those holders of Interests who did object fall within one or more of the other subsections of section 363(f) of the Bankruptcy Code and are adequately protected by having their Interests attach to the net proceeds ultimately attributable to the Acquired Assets against or in which such Interests are asserted, subject to the terms of such Interests, with the same validity, force and effect, and in the same order of priority, which such Interests now have against the Acquired Assets or their proceeds, subject to any rights, claims and defenses the Debtors or their estates, as applicable, may possess with respect thereto.

S.    **No Fraudulent Transfer**. The Purchase Agreement and Ancillary Agreements were not entered into, and the Transactions are not consummated, for the purpose of hindering, delaying or defrauding creditors of the Debtors under the Bankruptcy Code or under the laws of the United States, any state, territory, possession thereof, or the District of Columbia, or any other applicable law. Neither the Debtors nor the Purchaser has entered into the Purchase Agreement or the Ancillary Agreements or are consummating the Transactions with any fraudulent or otherwise improper purpose. The consideration for the purchase of the Acquired Assets by the Purchaser and for the other Transactions that are set forth in the Purchase Agreement is at least reasonably equivalent value for the purchase of such assets and for such other Transactions.

T.    **Excluded Liabilities**. Except for the Assumed Liabilities and other obligations of the Purchase as expressly set forth in the Purchase Agreement, the transfer of the Acquired Assets to the Purchaser under the Purchase Agreement shall not result in the Purchaser having any liability or responsibility for, or any Acquired Assets being recourse for, (i) any Interest asserted against the Debtors or against an insider of Debtors or against any of the Acquired Assets or any other assets of the Debtors, or (ii) the satisfaction in any manner, whether at law or

12

in equity, whether by payment, setoff, recoupment, or otherwise, directly or indirectly, and

whether from the Acquired Assets or otherwise, of any Interest or Excluded Liability, or

(iii) otherwise to third parties or the Debtors, except, with respect to the Debtors, as is expressly

set forth in the Purchase Agreement.  The Debtors will release and forever discharge the

Purchaser and its successors and assigns from any and all claims, causes of action, obligations,

liabilities, demands, losses, costs and expenses of any kind, character or nature, known or

unknown, fixed or contingent, relating to the sale and assignment of the Acquired Assets, except

for the Assumed Liabilities and the other obligations under the Purchase Agreement.

U.    **No Successor Liability**.  Without limiting the effect or scope of the foregoing,

the transfer of the Acquired Assets from the Debtors to the Purchaser does not and will not

subject the Purchaser or its affiliates, successors or assigns or their respective properties

(including the Acquired Assets) to any liability for Interests against the Debtors or the Debtors'

Interests in such Acquired Assets by reason of such transfer or otherwise under the laws of the

United States or any state, territory, possession thereof, or the District of Columbia applicable to

such Transaction, including, without limitation, any successor liability or similar theories.  The

Transactions contemplated by the Purchase Agreement do not amount to a consolidation, merger

or *de facto* merger of the Purchaser and the Debtors and/or the Debtors' estates, there is not

substantial continuity between the Purchaser and the Debtors, there is no common identity

between the Debtors and the Purchaser, the Purchaser is not a mere continuation of the Debtors

or their estates, and the Purchaser does not constitute a successor to the Debtors or their estates.

For the avoidance of doubt, notwithstanding the consummation of the Transactions and the

employment by the Purchaser of certain persons previously employed by the Debtors, the

Purchaser shall not have any obligations or liabilities to any employee of the Debtors or in

respect of any employee benefits owing to any employee of the Debtors by the Debtors or by any

plan or program administered by the Debtors or for the benefit of the Debtors' employees, and

any obligations of the Purchaser to any such person shall be limited to (i) those obligations

expressly agreed by the Purchaser with such person on and following the later of the Closing and

the date, if any, that such person first becomes employed by the Purchaser, and (ii) those

obligations explicitly assumed by the Purchaser under the Purchase Agreement.

     V.    **Prompt Consummation**.  The Transactions must be approved by the Court and

consummated promptly in order to preserve the viability of the business subject to the sale as a

going concern, and to thereby maximize the value of the Debtors' estates, for the reasons set

forth in the Motion and on the record at the Sale Hearing.  For those reasons, time is of the

essence in consummating the Sale.  Accordingly, there is cause to lift the stay contemplated by

Bankruptcy Rule 6004 with regards to the transactions contemplated by this Sale Order.

     W.    **Avoidance Action Releases are Required**.  The avoidance action releases

described in paragraph 18 hereof, including without limitation the releases of any causes of

action under sections 544 through 553 of the Bankruptcy Code that each Debtor and each

Debtors' bankruptcy estate may have, as set forth therein, are an express condition to the

Purchaser's consummation of the Transactions and are required to implement the free and clear

nature of the Transactions.  The Transactions viewed as a whole, together with such releases,

will provide a greater benefit to the Debtors, their estates, and their creditors than would the

prosecution of the released causes of action in the absence of the Transactions.

     X.    **Sale in Best Interests**.  Good and sufficient reasons for approval of the Purchase

Agreement, Ancillary Agreements, and the Transactions have been articulated to the Court in the

Motion and on the record at the Sale Hearing, and the relief requested in the Motion and set forth

in this Sale Order is in the best interests of the Debtors, their estates, their creditors and other

parties in interest.

**NOW, THEREFORE, IT IS ORDERED THAT:**

1.      **Motion is Granted**.  The Motion and the relief requested therein is **GRANTED**

and **APPROVED** as set forth herein.

2.      **Objections Overruled**.  Objections that have not been withdrawn, waived, or

settled, or not otherwise resolved pursuant to the terms hereof, if any, hereby are denied and

overruled on the merits with prejudice.  No appeal, motion to reconsider, or similar pleading has

been filed with respect to the Bidding Procedures Order, and the Bidding Procedures Order is a

final order of the Bankruptcy Court, has not been vacated, withdrawn, rescinded, or amended,

and remains in full force and effect.

3.      **Approval**.  The Purchase Agreement, the Ancillary Agreements, and, so long as

consistent with the Purchase Agreement and this Order, all other documents and all other

instruments related to and connected with the Transactions and the consummation thereof, and

all of the terms and conditions thereto, are hereby approved.  Debtors are hereby authorized to

(i) execute the Ancillary Agreements along with any additional instruments or documents that

may be reasonably necessary or appropriate to implement the Purchase Agreement and the

Transactions, and any prior execution by the Debtors of such agreements, documents, and

instruments is hereby ratified; (ii) perform all obligations under the Purchase Agreement,

Ancillary Agreements, and other documents and instruments related to or connected with the

Transactions and the consummation thereof, including but not limited to deeds, assignments,

stock powers, and other instruments of transfer, and consummate the Transactions, and any prior

performance of such obligations and any prior consummation of such Transactions is hereby

ratified; (iii) assume and assign to the Purchaser the Assumed Contracts; and (iv) take all other and further actions as may be reasonably necessary to consummate and implement the Transactions and perform all obligations under the Purchase Agreement, the Ancillary Agreements, and all other documents and instruments related to and connected with the Transactions and the consummation thereof, without any further corporate action or orders of the Bankruptcy Court.  The Purchaser shall have no obligation to proceed with the Closing until all conditions precedent to their obligations to do so have been met, satisfied or waived.

4.      **Valid Transfer**.  As of the Closing Date, (i) the consummation of the Transactions shall effect a legal, valid, enforceable and effective sale and transfer of the Acquired Assets to the Purchaser, and shall vest the Purchaser with title to such Acquired Assets free and clear of all Interests of any kind whatsoever; and (ii) the Purchase Agreement, the Ancillary Agreements, any other documents or instruments related to or connected with the Transactions and the consummation thereof, and the Transactions shall be enforceable against and binding upon, and not subject to rejection or avoidance by, the Debtors, any successor trustee appointed with the respect thereto, and each other person and entity.

5.      **Free and Clear**.  Except as expressly provided for in the Purchase Agreement or this Sale Order, pursuant to Bankruptcy Code sections 105(a) and 363(f), the Debtors are authorized and directed to transfer the Acquired Assets to the Purchaser and the Purchaser shall take title to and possession of the Acquired Assets, upon the Closing, free and clear of all Interests of any kind or nature whatsoever, with all such Interests to attach to the proceeds ultimately attributable to the property against or in which such Interests are asserted, subject to the terms of such Interests, with the same validity, force and effect, and in the same order of priority, which such Interests now have against the Acquired Assets or their proceeds, subject to

16

any rights, claims and defenses the Debtors or their estates, as applicable, may possess with respect thereto. The provisions of this Sale Order authorizing the sale and assignment of the Acquired Assets free and clear of Interests and the Excluded Liabilities, shall be self-executing, and neither the Debtors nor the Purchaser shall be required to execute or file releases, termination statements, assignments, consents, or other instruments in order to effectuate, consummate and implement the provisions of this Sale Order.

6.    **Limitation on Actions**. The Sale is free and clear of all Interests, and all such Interests, if any, shall be, and hereby are transferred and attached to the proceeds from the Transactions in the order of their priority, with the same validity, force and effect which they have against such Acquired Assets as of the Closing, subject to any rights, claims and defenses that the Debtors' estates and Debtors, as applicable, may possess with respect thereto. All persons and entities, including, but not limited to, all debt security holders, equity security holders, governmental, tax and regulatory authorities, lenders, trade creditors, contract counterparties, customers, landlords, licensors, employees, litigation claimants and other persons, holding Interests of any kind or nature against or in the Debtors or the Debtors' interests in the Acquired Assets (whether known or unknown, legal or equitable, matured or unmatured, contingent or noncontingent, liquidated or unliquidated, asserted or unasserted, whether arising prior to or subsequent to the commencement of these chapter 11 cases, whether imposed by agreement, understanding, law, equity or otherwise), arising under or out of, in connection with, or in any way relating to, the Debtors, the Acquired Assets, the operation of the Debtors' businesses before the Closing or the transfer of the Debtors' interests in the Acquired Assets to the Purchaser, shall not assert, prosecute or otherwise pursue Interests against the Purchaser, its property (including, without limitation, the Acquired Assets), its successors and assigns, or any

17

of its affiliates, partners, principals, or shareholders; or interfere with the Purchaser's title to, use or enjoyment of the Acquired Assets, in each case, without first obtaining an Order of this Court after notice and a hearing permitting such Interest to proceed.

7.     **General Assignment**.  On the Closing Date, this Sale Order shall be construed and shall constitute for any and all purposes, a full and complete general assignment, conveyance and transfer of the Acquired Assets acquired by the Purchaser under the Purchase Agreement and/or a bill of sale or assignment transferring indefeasible title and interest in the Acquired Assets, including the Assumed Contracts.  Each and every federal, state, and local governmental agency or department is hereby directed to accept any and all documents and instruments necessary and appropriate to consummate the Transactions and to reflect the effectiveness of the Transactions.

8.     **No Successor Liability**.  Neither the Purchaser, nor its affiliates, successors or assigns, shall, as a result of the consummation of the Transactions:  (i) be a successor to the Debtors or the Debtors' estates; (ii) have, *de facto* or otherwise, merged or consolidated with or into the Debtors or the Debtors' estates; or (iii) be a continuation or substantial continuation of the Debtors or any enterprise of the Debtors.  Except for the Assumed Liabilities, the Purchaser shall not assume, nor be deemed to assume, or in any way be responsible for any liability or obligation of any of the Debtors and/or their estates including, but not limited to, any bulk sales law.  Except for the Assumed Liabilities, the transfer of the Acquired Assets to the Purchaser under the Purchase Agreement shall not result in (i) the Purchaser, its affiliates, partners, principals or shareholders, or the Acquired Assets having any liability or responsibility for any Interest against the Debtors or against an insider of the Debtors, (ii) the Purchaser, its affiliates, partners, principals or shareholders, or the Acquired Assets having any liability with respect to or

18

be required to satisfy in any manner, whether at law or in equity, whether by payment, setoff or

otherwise, directly or indirectly, any Interest or Excluded Liability, or (iii) the Purchaser, its

affiliates, partners, principals or shareholders, or the Acquired Assets, having any liability or

responsibility to the Debtors except as is expressly set forth in the Purchase Agreement.

9.     **Examples of No Successor Liability**.  Without limiting the generality, effect, or

scope of the foregoing, as a result of and following the Closing of the Transactions, the

Purchaser, except as expressly assumed under the Purchase Agreement, shall have no successor

or vicarious liabilities of any kind or character, including, but not limited to, federal, state or

other tax liabilities, U.S. foreign pension liabilities, or liabilities based on any theory of antitrust,

environmental, labor or employment or benefits law, alter ego, veil piercing, continuity of

enterprise, mere continuation, product line, *de facto* merger or substantial continuity, whether

known or unknown, legal or equitable, matured or unmatured, contingent or noncontingent,

liquidated or unliquidated, asserted or unasserted, whether arising prior to or subsequent to the

commencement of these chapter 11 cases, whether imposed by agreement, understanding, law,

equity or otherwise with respect to the Debtors or any obligations of the Debtors, including, but

not limited to, liabilities arising, accruing or payable under, out of, in connection with, or in any

way relating to or calculated or determined with respect to or based in whole or in any part upon

the operation of the Acquired Assets prior to the Closing Date, or any taxes in connection with,

or in any way relating to the cancellation of debt of the Debtors or their affiliates.  For the

avoidance of doubt, notwithstanding the consummation of the Transactions and the employment

by the Purchaser of certain persons previously employed by the Debtors, the Purchaser shall not

have any obligations or liabilities to any employee of the Debtors or in respect of any employee

benefits owing to or on behalf of any employee of the Debtors (*except* to the extent the Purchaser

19

has expressly agreed to pay certain employee benefits to designated employees in the Purchase

Agreement or Ancillary Agreements), or with respect to any plan or program administered by the

Debtors or any other person or entity or administered for the benefit of the Debtors' employees,

and any obligations of the Purchaser to any such person shall be limited to those obligations (i)

agreed to by the Purchaser with such person, if any, on and following the later of the Closing and

the date, if any, that such person first becomes employed by the Purchaser and (ii) those

obligations explicitly assumed by the Purchaser under the Purchase Agreement. In the event that

the Purchaser elects to assume any liability related to the Debtors' employees, the Purchaser

shall not by reason of any such election be deemed to have assumed any other liabilities or to be

a successor for any other purpose.

      10.    **Assumption and Assignment**. Pursuant to Bankruptcy Code section 105(a), 363,

and 365, and subject to and conditioned upon the Closing Date, the Debtors' assumption and

assignment to the Purchaser of the Assumed Contracts, and the Purchaser's acceptance of such

assignment on the terms set forth in the Purchase Agreement, the Motion, and the Bidding

Procedures Order, are hereby approved subject to the terms set forth below. The Assumed

Contracts shall remain in full force and effect for the benefit of the Purchaser in accordance with

their respective terms, notwithstanding any provision in any such Assumed Contracts of the type

described in sections 365(b)(2) and (f) of the Bankruptcy Code that prohibits, restricts, or

conditions such assignment, transfer or sublease. Pursuant to Bankruptcy Code section 365(k),

the Debtors shall be relieved from any further liability with respect to the Assumed Contracts

arising after assignment to the Purchaser, including liability for Cure Costs, which shall be

assumed by the Purchaser as set forth in the Purchase Agreement. Debtors are hereby authorized

to execute and deliver to the Purchaser such documents or other instruments as may be necessary

to assign or transfer the Assumed Contracts. Each counterparty to an Assumed Contract is hereby forever barred, estopped, and permanently enjoined from raising or asserting against the Debtors or the Purchaser, or the property of any of them, any assignment fee, default, breach, claim, pecuniary loss, liability or obligation (whether legal or equitable, secured or unsecured, matured or unmatured, contingent or non-contingent, senior or subordinate) arising under or related to the Assumed Contracts existing as of the Closing Date or arising by reason of the Closing.

11.    **Cure Notices**. The Debtors have served by first-class mail on all of the non-debtor counterparties to the Assumed Contracts, a Contract Notice, that included, to the extent applicable (i) the Assumed Contract, (ii) the name of the counterparty to the Assumed Contract, (iii) the Cure Costs, and (iv) the deadline by which any such Contract counterparty must file an objection (the "Objection") to the proposed assumption and assignment, and no other or further notice is required, except as otherwise provided herein.

12.    **Objections to Cure Notices**. If a timely Objection is received and such Objection cannot otherwise be resolved by the parties, the Bankruptcy Court may hear such Objection at a later date set by the Bankruptcy Court. The pendency of a dispute relating to a particular Contract shall not, in the discretion of the Purchaser, delay the assumption and assignment of any other Contract or the Closing, provided that the Purchaser shall have no right to delay the Closing except as set forth in the Purchase Agreement.

13.    **Payment of Cure Costs That Have Been Resolved or To Which No Objection Was Filed**. The payment of the applicable Cure Costs (if any) by the Purchaser in the amounts specified in Exhibit 2 hereof shall (a) effect a cure of all defaults existing under the subject Assumed Contracts and (b) compensate for any actual pecuniary loss to such non-Debtor party

21

resulting from such default.  After the payment of the relevant Cure Costs in the amounts

specified in Exhibit 2, neither the Debtors nor the Purchaser shall have any further liabilities to

the non-Debtor parties to the Assumed Contracts other than the Purchaser's obligations under the

Assumed Contracts as provided in the Purchase Agreement that accrue and become due and

payable on or after the Closing Date.  The Debtors' obligation to pay the Cure Costs and the

Purchaser's performance of its obligations under the Assumed Contracts after the Closing shall

constitute adequate assurance of future performance within the meaning of sections 365(b)(1)

and 365(f)(2)(B) of the Bankruptcy Code.

   14. **Determination of Cure Costs**.  Except as provided in the Bidding Procedures

Order, the Cure Costs set forth on Exhibit 2, or the disputed Cure Costs for the Assumed

Contracts set forth on Exhibit 3 (the "Disputed Cure Costs"), that are agreed in writing or

determined by the Court at a subsequent hearing, shall constitute findings of the Bankruptcy

Court and shall be final and binding on parties to such Assumed Contracts and their successors

and designees upon the Closing and shall not be subject to further dispute or audit based on

performance prior to the time of assumption and assumption and assignment, irrespective of the

terms and conditions of such Assumed Contracts.  As to Exhibit 3, to the extent not resolved

between the parties, Cure Costs shall otherwise be those determined by the Bankruptcy Court

after notice and a hearing.  Each counterparty to an Assumed Contract is hereby forever barred,

estopped, and permanently enjoined from (i) asserting against the Purchaser or its property

(including without limitation the Acquired Assets), any default arising prior to or existing as of

Closing, or any counterclaim, defense, recoupment, setoff or any other Interest asserted or

assertable against the Debtors; and (ii) imposing or charging against the Purchaser or its

affiliates, any accelerations, assignment fees, increases or any other fees as a result of the

Debtors' assumption and assignment or assumption and sublease to the Purchaser of such

Assumed Contract.  To the extent that any counterparty was notified of Cure Costs or defaults

(or the absence thereof), in accordance with the Bidding Procedures Order, and failed to object to

such Cure Costs or defaults (or the absence thereof) with respect to an Assumed Contract in

accordance with the Bidding Procedures Order, such counterparty is deemed to have consented

to such Cure Costs or defaults (or the absence thereof) and is deemed to have waived any right to

assert or collect any Cure Costs or enforce any defaults that may arise or have arisen prior to or

as of the Closing.  Each counterparty to an Assumed Contract is hereby forever barred, estopped,

and permanently enjoined from raising or asserting against the Debtors or the Purchaser, or the

property of any of them, any assignment fee, default, breach, claim, pecuniary loss, liability or

obligation (whether legal or equitable, secured or unsecured, matured or unmatured, contingent

or non-contingent, senior or subordinate) arising under or related to the Assumed Contracts

existing as of the Closing Date or arising by reason of the Closing.

15.    **Ipso Facto Clauses Ineffective**.  Upon the Debtors' assignment of the Assumed

Contracts under the provisions of this Sale Order, no default shall exist under any Assumed

Contract and no counterparty to any such Assumed Contract shall be permitted to declare or

enforce a default by the Debtor or the Purchaser thereunder or otherwise take action against the

Purchaser as a result of any Debtor's financial condition, change in control, bankruptcy, or

failure to perform any of its obligations under the relevant Assumed Contract.  Any provision in

an Assumed Contract that prohibits or conditions the assignment or sublease of such Assumed

Contract (including, without limitation, the granting of a lien therein) or allows the counterparty

thereto to terminate, recapture, impose any penalty, condition on renewal or extension, or modify

any term or condition upon such assignment or sublease, constitutes and unenforceable anti-

assignment provision that is void and of no force and effect only in connection with the assumption and assignment of such Assumed Contract to the Purchaser. The failure of the Debtors or the Purchaser to enforce at any time one or more terms or conditions of any Assumed Contract shall not be a waiver of such terms or conditions, or of the Debtors' and the Purchaser's rights to enforce every term and condition of the Assumed Contract.

16. **Binding Effect of Order**. This Sale Order shall be binding upon and shall govern the acts of all entities, including without limitation all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies, governmental departments, secretaries of state, federal, state and local officials, and all other persons and entities who may be required by operation of law, the duties of their office, or contract, to accept, file, register or otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in or to any of the Acquired Assets. The terms and provisions of the Purchase Agreement, the Ancillary Agreements, all other documents and instruments related to or connected with the Transactions and the consummation thereof, the Transactions themselves, the Bidding Procedures Order, and this Sale Order shall be binding in all respects upon the Debtors, the Debtors' estates, all creditors thereof (whether known or unknown), all holders of equity interests in any of the Debtors, the Purchaser and its respective affiliates, successors and assigns, and any and all third parties, notwithstanding any subsequent appointment of any trustee of the Debtors under any chapter of the Bankruptcy Code, as to which trustee(s) such terms and provision likewise shall be binding.

17. **Release of Interests**. This Sale Order (i) shall be effective as a determination that, on the Closing, all Interests of any kind or nature existing as to the Acquired Assets prior to

24

the Closing have been unconditionally released, discharged and terminated, and that the

conveyances described herein have been effected, and (ii) shall be binding upon and shall govern

the acts of all entities including without limitation, all filing agents, filing officers, title agents,

title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative

agencies, governmental departments, secretaries of state, federal, state, and local officials, and all

other persons and entities who may be required by operation of law, the duties of their office, or

contract, to accept, file, register or otherwise record or release any documents or instruments, or

who may be required to report or insure any title or state of title in or to any of the Acquired

Assets.  On the Closing Date, the Debtors and persons holding an Interest in the Acquired Assets

as of the Closing are authorized to execute such documents and take all other actions as may be

reasonably necessary to release their Interests in the Acquired Assets, if any, as such Interests

may have been recorded or may otherwise exist.

18.     **Avoidance Actions**.  The Debtors shall not pursue any causes of action arising

under chapter 5 of the Bankruptcy Code against any current or former supplier, vendor or

landlord of the Debtors or the Business (as defined in the Purchase Agreement) or against any

party to a Contract (as defined in the Purchase Agreement), and each of the Debtors hereby

irrevocably releases on behalf of its respective estate, effective as of the Closing, any rights it

may have with respect to any such avoidance action and, subject to the occurrence of the

Closing, any and all such actions are forever barred and enjoined.

19.     **Fees, Expenses, and Other Obligations**.  All obligations of the Debtors under

the Purchase Agreement, the Ancillary Agreements, and any and all of the documents delivered

by the Debtors in connection with the Purchase Agreement, shall be paid in the manner provided

in the Purchase Agreement and the Bidding Procedures Order, without further order of this

Court. All such obligations shall constitute allowed administrative claims in each of the Debtors' chapter 11 cases, with first priority administrative expense priority under section 507(a)(2) of the Bankruptcy Code. Until satisfied, all such obligations shall continue to have the protections provided in this Sale Order, and shall not be discharged, modified or otherwise affected by any reorganization plan for the Debtors, except by an express agreement with the Purchaser. The Break-Up Fee and Expense Reimbursement shall be paid in accordance with the Bidding Procedures Order and the Purchase Agreement.

20.    **Sale Proceeds**. Any and all valid and perfected Interests in the Acquired Assets of the Debtors shall attach to any proceeds of such Acquired Assets immediately upon receipt of such proceeds by the Debtors (or any party acting on any Debtors' behalf) in the order of priority, and with the same validity, force and effect which they now have against such Acquired Assets, subject to any rights, claims and defenses the Debtors, the Debtors' estates or any trustee for any Debtor, as applicable, may possess with respect thereto, in addition to any limitations on the use of such proceeds pursuant to any provision of this Sale Order. Except as required by the Purchase Agreement, no proceeds subject to an asserted security interest or lien shall be used or disbursed by the Debtors without the express consent of the party or parties asserting a security interest or lien therein or further order of the Bankruptcy Court after notice (to all parties who have asserted an Interest in such proceeds) and a hearing, consistent with the requirements of the Bankruptcy Code.

21.    Following Closing, the Debtors are directed on the Maturity Date (as defined in the Debtors' post-petition financing credit agreement (the "DIP Credit Agreement"), and prior to payment or repayment of any other claims, interests or obligations of the Debtor from the proceeds of the Sale Transaction (other than funding of the Carve-Out Account (as defined in the

26

[Final DIP Order] (the "Final DIP Order")) to the extent required pursuant to the Final DIP

Order), to pay, or cause to be paid, all outstanding Obligations (as defined in the DIP Credit

Agreement) in full and in cash from the proceeds of the Sale Transaction pursuant to the

Purchase Agreement.

22.    **No Material Modifications**.  The Purchase Agreement, Ancillary Agreements

and any related agreements, documents or other instruments may be modified, amended or

supplemented by the Debtors and the Purchaser, in a writing signed by such parties, and in

accordance with the terms hereof, without further order of the Court so long as any modification

to the Purchase Agreement is immaterial and is filed with the Bankruptcy Court.  With the

consent of the Purchaser and the Debtors, the Debtors and the Purchaser are expressly

authorized, without further order of the Bankruptcy Court, to execute an amendment to the

Purchase Agreement to provide for the Closing to occur on one or more Closing Dates so long as

the amendment to the Purchase Agreement is filed with the Bankruptcy Court.  Any material

modification, amendment, or supplement to the Purchase Agreement must be approved by Order

of the Bankruptcy Court following a motion on notice to all interested parties.

23.    **Subsequent Orders and Plan Provisions**.  Nothing contained in any subsequent

order of this Court or any court of competent jurisdiction in these or other chapter 11 cases

(including without limitation, an order authorizing the sale of assets pursuant to sections 363,

365 or any other provision of the Bankruptcy Code or any order entered after any conversion of a

chapter 11 case of the Debtors to a case under chapter 7 of the Bankruptcy Code) or any chapter

11 plan confirmed in any Debtors' bankruptcy cases or any order confirming any such plan shall

nullify, alter, conflict with, or in any manner derogate from the provisions of this Sale Order, and

the provisions of this Sale Order shall survive and remain in full force and effect.

24.    **Failure to Specify Provisions**.  The failure specifically to include any particular provisions of the Purchase Agreement in this Sale Order shall not diminish or impair the effectiveness of such provisions, it being the intent of the Court that the Purchase Agreement be authorized and approved in its entirety.

25.    **No Stay of Order**.  Notwithstanding the provisions of Bankruptcy Rule 6004 and Bankruptcy Rule 6006 or any applicable provisions of the Local Rules, this Sale Order shall not be stayed for ten (10) days after the entry hereof, but shall be effective and enforceable immediately upon entry, and the ten (10) day stay provided in such rules is hereby expressly waived and shall not apply.  Time is of the essence in approving the Transactions, and the Debtors and the Purchaser intend to close the Transactions as soon as practicable.  Any party objecting to this Sale Order must exercise due diligence in filing an appeal and pursuing a stay within the time prescribed by law and prior to Closing, or risk its appeal will be foreclosed as moot.

26.    **Name Change**.  Each Debtor is authorized and empowered to effectuate the change of its corporate names pursuant to Section 5.19 of the Purchase Agreement.  From and after the date that the Debtors effectuate their name change under state corporate law, the caption of these chapter 11 cases shall be revised to include the new names.  The Clerk of the Court is directed to make a docket entry in these cases as may be necessary and appropriate to implement the terms of this Paragraph.  The Debtors are authorized and empowered to take such actions as may be necessary and appropriate to implement the terms of this Paragraph.

27.    **Closing Conditions and Termination Rights**.  Nothing in this Sale Order shall modify or waive any closing conditions or termination rights in Articles VI and VII of the

28

Purchase Agreement, and all such conditions and rights shall remain in full force and effect in accordance with their terms.

28.    **Back-Up Bidder**.  In the event that the Purchase Agreement is terminated or the Sale is not consummated within the later of (i) three business days after the satisfaction of all closing conditions and (ii) the expiration or termination of the applicable HSR or other regulatory waiting period, the Debtors may close a sale with [•], as the Back-Up Bidder identified at the Auction, without further order of this Court.

29.    **Retention of Jurisdiction**.  This Court retains jurisdiction, pursuant to its statutory powers under 28 U.S.C. § 157(b)(2), to, among other things, interpret, implement, and enforce the terms and provisions of this Sale Order, all amendments thereto and any waivers and consents thereunder, including, but not limited to, retaining jurisdiction to (i) compel delivery of the Acquired Assets to the Purchaser, (ii) interpret, implement and enforce the provisions of the Bidding Procedures Order, this Sale Order, and any related order; (iii) protect the Purchaser, its affiliates, partners, principals or shareholders against any Interests against the Debtors or the Acquired Assets of any kind or nature, including, without limitation, through the grant of declaratory and injunctive relief determining that the Purchaser, its affiliates, partners, principals or shareholders and their assets (including the Acquired Assets) are not subject to such Interests and prohibiting persons and entities from asserting such Interests against the Purchaser, its affiliates, partners, principals or shareholders and their assets (including the Acquired Assets), and (iv) enter any orders under sections 363 and 365 of the Bankruptcy Code with respect to the Assumed Contracts.

Date:_____, 2013
    Wilmington, Delaware

_____
The Honorable Brenan L. Shannon
UNITED STATES BANKRUPTCY JUDGE

29

**Exhibit 1**

**Purchase Agreement**

**<u>Exhibit 2</u>**

**Cure Costs**

## Exhibit 3

**Disputed Cure Costs**

**EXHIBIT C**

**PURCHASE AGREEMENT**

EXECUTION COPY

ACQUISITION AGREEMENT

by and among

SYNAGRO TECHNOLOGIES, INC., and certain of its subsidiaries named herein,

as Sellers,

STI INFRASTRUCTURE COMPANY, INC.,

as Purchaser,

and

EQT INFRASTRUCTURE II LIMITED PARTNERSHIP,

as Guarantor

Dated as of April 23, 2013

# TABLE OF CONTENTS

## ARTICLE I

## PURCHASE AND SALE OF ASSETS

Section 1.1   Acquired Assets ....................................................................................2
Section 1.2   Excluded Assets ....................................................................................4
Section 1.3   Assumed Liabilities ..............................................................................6
Section 1.4   Excluded Liabilities ..............................................................................7
Section 1.5   Assignment of Assigned Contracts and Assumed Leases .....................9
Section 1.6   Purchase Price; Cash Payment at Closing; Deposit...............................9
Section 1.7   Allocation of Purchase Price for Tax Purposes ...................................10
Section 1.8   Withholding .........................................................................................10

## ARTICLE II

## THE CLOSING

Section 2.1   Closing ................................................................................................10
Section 2.2   Deliveries at Closing...........................................................................11

## ARTICLE III

## REPRESENTATIONS AND WARRANTIES OF THE SELLERS

Section 3.1    Organization........................................................................................12
Section 3.2    Capitalization of Transferred Subs .....................................................12
Section 3.3    Authority of Sellers.............................................................................12
Section 3.4    Consents and Approvals ......................................................................13
Section 3.5    No Violations.......................................................................................13
Section 3.6    Books and Records ..............................................................................13
Section 3.7    Title to Property; Sufficiency..............................................................13
Section 3.8    Conduct of Business ...........................................................................14
Section 3.9    Brokers.................................................................................................14
Section 3.10   Litigation.............................................................................................14
Section 3.11   Intellectual Property............................................................................14
Section 3.12   Assumed Leases ..................................................................................15
Section 3.13   Owned Real Property...........................................................................16
Section 3.14   Personal Property.................................................................................16
Section 3.15   Employee Benefit Matters ..................................................................16
Section 3.16   Labor Matters......................................................................................17
Section 3.17   Environmental Matters........................................................................17
Section 3.18   Financial Statements ...........................................................................18
Section 3.19   Absence of Undisclosed Liabilities; No Material Changes .................18
Section 3.20   Compliance with Law .........................................................................19
Section 3.21   Permits ................................................................................................19

i

Section 3.22   Insurance ....................................................................................19
Section 3.23   Material Contracts.........................................................................19
Section 3.24   Customers .....................................................................................20
Section 3.25   Suppliers .......................................................................................21
Section 3.26   Taxes .............................................................................................21
Section 3.27   Transferred Subs Bank Accounts..................................................22
Section 3.28   No Other Representations or Warranties .......................................23

## ARTICLE IV

## REPRESENTATIONS AND WARRANTIES OF THE PURCHASER

Section 4.1   Organization..................................................................................23
Section 4.2   Authority of Purchaser .................................................................23
Section 4.3   Consents and Approvals ...............................................................24
Section 4.4   No Violations ................................................................................24
Section 4.5   Brokers..........................................................................................24
Section 4.6   Financing.......................................................................................24

## ARTICLE V

## COVENANTS

Section 5.1    Conduct of Business by the Sellers Pending the Closing ......................24
Section 5.2    Access and Information; Other Financials........................................27
Section 5.3    Approvals and Consents; Cooperation; Notification ........................27
Section 5.4    Additional Matters ........................................................................28
Section 5.5    Further Assurances........................................................................28
Section 5.6    Cure Costs.....................................................................................28
Section 5.7    Bankruptcy Court Approval..........................................................28
Section 5.8    Bankruptcy Filings........................................................................29
Section 5.9    Break-Up Fee and Expense Reimbursement ..................................29
Section 5.10   Bidding Procedures; Superior Offers.............................................29
Section 5.11   Communications with Customers and Suppliers .............................30
Section 5.12   Letters of Credit; Surety Bonds ....................................................30
Section 5.13   Transfer of Guarantees of Service Contracts of Transferred Subs ......................30
Section 5.14   Employee/Labor Matters ..............................................................31
Section 5.15   Books and Records; Personnel......................................................33
Section 5.16   Termination of Intercompany Agreements.....................................33
Section 5.17   Payments Received .......................................................................33
Section 5.18   Cooperation with Financing..........................................................33
Section 5.19   Intellectual Property Matters.........................................................34
Section 5.20   Insurance Matters..........................................................................34

## ARTICLE VI

### CONDITIONS PRECEDENT

Section 6.1    Conditions Precedent to Obligation of the Sellers and the Purchaser ..................35
Section 6.2    Conditions Precedent to Obligation of the Sellers..................................................35
Section 6.3    Conditions Precedent to Obligation of the Purchaser ...........................................35

## ARTICLE VII

### TERMINATION, AMENDMENT, AND WAIVER

Section 7.1    Termination Events..................................................................................................36
Section 7.2    Effect of Termination...............................................................................................37

## ARTICLE VIII

### GENERAL PROVISIONS

Section 8.1    Survival of Representations, Warranties, and Agreements ....................................38
Section 8.2    Confidentiality ........................................................................................................38
Section 8.3    Public Announcements ...........................................................................................39
Section 8.4    Taxes ........................................................................................................................39
Section 8.5    Notices .....................................................................................................................40
Section 8.6    Descriptive Headings; Interpretative Provisions ...................................................42
Section 8.7    No Strict Construction .............................................................................................42
Section 8.8    Entire Agreement; Assignment................................................................................42
Section 8.9    Governing Law; Submission of Jurisdiction; Waiver of Jury Trial.......................42
Section 8.10   Expenses ..................................................................................................................43
Section 8.11   Amendment..............................................................................................................43
Section 8.12   Waiver......................................................................................................................43
Section 8.13   Counterparts; Effectiveness ...................................................................................43
Section 8.14   Severability; Validity; Parties in Interest...............................................................43
Section 8.15   Schedules; Materiality ............................................................................................43
Section 8.16   Specific Performance; Sole and Exclusive Remedy for Seller Breach..................43
Section 8.17   Guarantee of Purchaser's Obligations ...................................................................44

### ARTICLE IX DEFINITIONS

iii

## TABLE OF EXHIBITS

| | |
|---|---|
| Exhibit 1 | Transferred Subs |
| Exhibit 1.7 | Allocation of Purchase Price |
| Exhibit A | Form of Bill of Sale |
| Exhibit B | Form of Assignment and Assumption Agreement |
| Exhibit C | Form of Sale Order |
| Exhibit D | Form of Bidding Procedures |
| Exhibit E | Form of Bidding Procedures Order |
| Exhibit F | Forms of Intellectual Property Transfer Agreements |
| Exhibit G | Collective Bargaining Agreements |
| Exhibit H | Form of Escrow Agreement |

## ACQUISITION AGREEMENT

THIS ACQUISITION AGREEMENT, dated as of April 23, 2013 (the "Agreement"), is made by and among Synagro Technologies, Inc., a Delaware corporation ("Parent") and the selling subsidiaries identified on the signature pages hereto (collectively, the "Sellers"), STI Infrastructure Company, Inc., a Delaware corporation (the "Purchaser"), and EQT Infrastructure II Limited Partnership[1], solely for purposes of Section 8.17 ("Guarantor"). Capitalized terms used herein and not otherwise defined shall have the meanings set forth in Article IX.

WHEREAS, the Sellers and the Transferred Subs (as defined below) are engaged in the business of water and wastewater residuals management services focusing on the beneficial reuse of organic, nonhazardous residuals resulting from the wastewater treatment process, including drying and pelletization, composting, product marketing, incineration, alkaline stabilization, land application, collection and transportation, drilling and rail, regulatory compliance, dewatering, and facility cleanout services (the "Business");

WHEREAS, each Seller proposes to file a voluntary petition (collectively, the "Petitions") for relief commencing cases (the "Chapter 11 Cases") under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"), on April 24, 2013 (or such other date on which the Petitions are actually filed in the Bankruptcy Court, the "Petition Date");

WHEREAS, the Purchaser desires to purchase and acquire, and the Sellers desire to sell, convey, assign and transfer, or cause to be sold, conveyed, assigned and transferred, to the Purchaser, the Acquired Assets, and the Purchaser is willing to assume, and the Sellers desire to assign and delegate to the Purchaser, the Assumed Liabilities, all in the manner and subject to the terms and conditions set forth herein and in accordance with Sections 105, 363 and 365 of the Bankruptcy Code; and

WHEREAS, the Purchaser desires to purchase and acquire, and the Sellers desire to sell and transfer, or cause to be sold and transferred, to the Purchaser all of the equity interests owned by Sellers in the subsidiaries of Parent that are set forth on Exhibit 1 hereto (each such subsidiary, a "Transferred Sub" and, collectively, the "Transferred Subs," and such equity interests, the "Interests"), in the manner and subject to the terms and conditions set forth herein and in accordance with Sections 105, 363 and 365 of the Bankruptcy Code (together with the sale and purchase of the Acquired Assets and the assignment and assumption of the Assumed Liabilities, the "Acquisition").

NOW, THEREFORE, in consideration of the foregoing and the respective representations, warranties, covenants, and agreements set forth herein, and for other good and

---

[1] EQT INFRASTRUCTURE II LIMITED PARTNERSHIP, a limited partnership under the laws of England and Wales, having its office address at World Trade Center Schiphol, H-Tower, 4th floor, Schiphol Boulevard 355, 1118 BJ Schiphol, the Netherlands, registered with Companies' House under number LP014908, duly represented by its general partner EQT INFRASTRUCTURE II GP B.V., a private company with limited liability (besloten vennootschap met beperkte aansprakelijkheid) under the laws of the Netherlands, having its official seat in Amsterdam, the Netherlands, and its office address at World Trade Center Schiphol, H-Tower, 4th floor, Schiphol Boulevard 355, H-Tower, 4th floor, 1118 BJ Schiphol, the Netherlands, registered with the commercial register of the Chamber of Commerce under number 54468701

1

Case 13-11041-BLS   Doc 21   Filed 04/24/13   Page 116 of 233

valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

# ARTICLE I

## PURCHASE AND SALE OF ASSETS

Section 1.1    Acquired Assets. On the terms and subject to the conditions set forth in this Agreement and, subject to approval of the Bankruptcy Court, pursuant to Sections 105, 363 and 365 of the Bankruptcy Code, at the Closing, the Sellers shall sell, assign, transfer, convey, and deliver to the Purchaser, and the Purchaser shall purchase and accept from the Sellers, all right, title and interest of the Sellers in and to all rights, properties and assets of the Sellers, wherever located, whether tangible or intangible, as the same shall exist on the Closing Date, other than the Excluded Assets (collectively, the "Acquired Assets"), including, without limitation, the Acquired Assets that are listed or described below:

(a)    all right, title and interest of the Sellers in and to the Interests;

(b)    all intercompany accounts receivable as to which any Transferred Sub is an obligor or is otherwise responsible or liable and which are owed or payable to any Seller or any Affiliate thereof;

(c)    all accounts receivable arising out of the operation of the Business existing on the Effective Date or arising in the ordinary course of the Business after the Effective Date, including without limitation, such of the foregoing existing on the Effective Date as are listed or described on Schedule 1.1(c) (the "Accounts Receivable"), except to the extent that any of the foregoing relate to Excluded Assets or are satisfied or discharged in the ordinary course of the Business prior to the Closing;

(d)    the credits, claims for refunds (other than refunds for income Taxes paid by a Seller), prepaid expenses, prepaid rent, and prepaid items relating to the Business, including without limitation, such of the foregoing as are listed and described on Schedule 1.1(d), except to the extent that any of the foregoing relate to Excluded Assets;

(e)    all Contracts listed or described below (the "Assigned Contracts"):

(i)    all of the Contracts between any Seller and a customer relating to the Business (the "Customer Contracts"), including without limitation, such of the foregoing as are listed or described on Schedule 1.1(e)(i) or that relate to the Business or arise in the ordinary course of the Business after the Effective Date;

(ii)    the Contracts between any Seller and a vendor or other third party providing goods or services relating to the Business (the "Supplier Contracts"), including without limitation, such of the foregoing as are listed or described on Schedule 1.1(e)(ii) or that relate to the Business or arise in the ordinary course of the Business after the Effective Date;

2

(iii)   all Contracts pursuant to which any third party grants any Seller licenses, covenants not to sue or rights in, under or with respect to any Intellectual Property related to the Acquired Assets;

(iv)   the Collective Bargaining Agreements;

(v)   the Capital Leases, together with the capitalized amounts thereof, set forth on Schedule 1.1(e)(v);

(vi)   that certain Membership Interest Purchase Agreement, dated June 21, 2011, by and among Burton T. Zaunbrecher, Gregory V. Campo, Mark Guidry and Synagro Drilling Solutions, LLC (and the ancillary agreements related thereto listed on Schedule 1.1(e)(vi)); and

(vii)   the Contracts that are listed or described on Schedule 1.1(e)(vii);

(f)   all rights of the Sellers under all warranties, representations and guarantees made by suppliers, manufacturers and contractors in connection with the Acquired Assets;

(g)   all inventory, finished goods, works in process, raw materials and packaging materials used or held for use in the operation of the Business (collectively, the "Inventory");

(h)   (i) all of the real property of Sellers used in the operation of the Business, including without limitation such of the foregoing that is listed and described on Schedule 1.1(h)(i) (the "Owned Real Property") and (ii) all rights and incidents of interest of any Seller to all real property leases used in the operation of the Business, including without limitation such of the foregoing that are listed or described on Schedule 1.1(h)(ii) (to the extent not excluded under Section 1.2, the "Assumed Leases");

(i)   all machinery, rolling stock equipment and other equipment, computers, furniture, furnishings, fixtures, office supplies, vehicles, tools, order entry devices and all other tangible personal property owned by any Seller that are used in the operation of the Business or located on any Owned Real Property or on premises subject to the Assumed Leases (collectively, the "Tangible Personal Property"), including, without limitation, such of the foregoing as are listed or described on Schedule 1.1(i);

(j)   all Acquired Intellectual Property (including, without limitation, all of the Sellers' rights in the name "Synagro" and all marks set forth on Schedule 3.11(b));

(k)   all rights in the computer software programs and information technology systems of Sellers (the "Software");

(l)   to the extent transferable, all Permits issued to any Seller or otherwise used in the operation of the Business (and all pending applications therefor or renewals thereof), including, but not limited to, Environmental Permits;

3

(m)    the bank accounts and lockbox arrangements relating to the Business that are listed or described on Schedule 1.1(m) (excluding all rights or incidents of interest with respect to the cash and cash equivalents in such bank accounts or lock box arrangements on or before the Closing Date);

(n)    all books and records of the Sellers relating to the operation of the Business that are required by the Purchaser for the operation of the Business, including the personnel records relating to Transferred Employees;

(o)    the Assumed Benefit Plans and all trust agreements, administrative service contracts and other contracts and records relating thereto;

(p)    all receivables, claims or causes of action related solely to any Acquired Asset;

(q)    that certain National Grid "Energy Incentive – Custom Application Pre-Approval Account# 3850498004 App#: 2366716" grant to the Sellers of $1,478,525;

(r)    except as provided in Section 1.2(f), to the extent transferable, all Contracts of insurance; and

(s)    all the rights, properties or assets that are listed or described on Schedule 1.1(s).

**EXCEPT FOR SPECIFIC REPRESENTATIONS AND WARRANTIES CONTAINED IN THIS AGREEMENT, THE ACQUIRED ASSETS ARE BEING SOLD ON AN "AS IS," "WHERE IS" BASIS AND THE SELLERS MAKE NO WARRANTIES, EXPRESS OR IMPLIED, OF MERCHANTABILITY, FITNESS OR OTHERWISE WITH RESPECT TO THE ACQUIRED ASSETS WHICH EXTEND BEYOND THE AFORESAID SPECIFIC REPRESENTATIONS AND WARRANTIES.**

Section 1.2    Excluded Assets. Notwithstanding anything contained in this Agreement to the contrary, the following rights, properties and assets (collectively, the "Excluded Assets") shall not be included in the Acquired Assets, and Sellers shall retain all right, title and interest in, to and under the Excluded Assets:

(a)    all cash, cash equivalents, including checks, commercial paper, treasury bills, certificates of deposit and other bank accounts, or marketable securities of the Sellers;

(b)    all of the Accounts Receivable that have been satisfied or discharged prior to the Closing;

(c)    all intercompany receivables (of any nature or kind, and whether based in common law or statute or arising under written Contract or otherwise, known or unknown, fixed or contingent, accrued or unaccrued, liquidated or unliquidated, real or potential) that are owed or payable to any Seller or any Affiliate thereof (other than a Transferred Sub), or as to which any Seller or any Affiliate thereof (other than a Transferred Sub) is an obligor or is otherwise responsible or liable;

4

(d)     all of the Contracts that have terminated or expired prior to the Closing in the ordinary course of the Business;

(e)     all Contracts, and all of Sellers' rights thereunder, that are not Assigned Contracts;

(f)     the Contracts of insurance set forth on <u>Schedule 1.2(f)</u>;

(g)     any Inventory transferred outside of the Business in the ordinary course of the Business or used in the ordinary course of the Business prior to the Closing;

(h)     any Tangible Personal Property transferred outside of the Business in the ordinary course of the Business or disposed of in the ordinary course of the Business prior to the Closing;

(i)     any right that any Seller has with respect to any deferred Tax assets or refund for income Taxes;

(j)     any shares of capital stock or other equity interest of any Seller or any Affiliate thereof (other than the Transferred Subs) or any securities convertible into, exchangeable or exercisable for shares of capital stock or other equity interest of any Seller or any Affiliate thereof (other than the Transferred Subs);

(k)     the company seal, minute books, charter documents, stock or equity record books and such other books and records as pertain to the organization, existence or capitalization of any Seller or any Affiliate thereof (other than the Transferred Subs) as well as any other records or materials relating to any Seller or any Affiliate thereof (other than the Transferred Subs) not relating in any material respect to the Acquired Assets or the operation of the Business;

(l)     all avoidance actions and similar rights and causes of action, including causes of action under Sections 544 through 553, inclusive, of the Bankruptcy Code;

(m)     any rights, claims or causes of action of any Seller arising under this Agreement or the Ancillary Documents;

(n)     all receivables, claims or causes of action related solely to any Excluded Asset;

(o)     all rights of any Seller as a beneficiary under any letters of credit that relate solely to any Excluded Asset;

(p)     any asset of any Seller that would constitute an Acquired Asset (if owned by a Seller on the Closing Date) that is conveyed or otherwise disposed of during the period from the Effective Date until the Closing Date as permitted by the terms of this Agreement;

(q)     the Benefit Plans other than the Assumed Benefit Plans, and all trust agreements, insurance policies, administrative service contracts and other contracts or records relating thereto; and

5

(r)    any right, property or asset that is listed or described on Schedule 1.2(r).

Section 1.3    Assumed Liabilities. On the terms and subject to the conditions set forth in this Agreement, at the Closing, the Purchaser shall assume from the Sellers and thereafter pay, perform or otherwise discharge in accordance with their terms, and shall hold the Sellers and their Affiliates harmless from all of the liabilities and obligations (of any nature or kind, and whether based in common law or statute or arising under written Contract or otherwise, known or unknown, fixed or contingent, accrued or unaccrued, liquidated or unliquidated, real or potential) of the Sellers and their Affiliates with respect to, arising out of or relating to the following (collectively, the "Assumed Liabilities"):

(a)    the ownership, possession or use of the Acquired Assets and the operation of the Business on and after the Closing Date, including, without limitation, all of the obligations and liabilities arising under the Assigned Contracts and the Assumed Leases included in the Acquired Assets;

(b)    all liabilities of Sellers in respect of all trade obligations of Sellers arising in the ordinary course of the Business incurred before or after the Petition Date, including but not limited to amounts owed to vendors and service providers in respect of goods and services provided before or after the Petition Date to or for the benefit of the Acquired Assets that would have an administrative priority claim attached to them under Section 503(b)(1) or Section 503(b)(9) of the Bankruptcy Code;

(c)    all valid reclamation claims;

(d)    all intercompany payables, liabilities and obligations owed or payable to any Transferred Sub as to which any Seller or any Affiliate thereof is an obligor or is otherwise responsible or liable;

(e)    to the extent not excluded under Section 1.4(d) or discharged pursuant to the Sale Order or the Bankruptcy Code, the cleanup or remediation of Hazardous Substances, including Hazardous Substances Released prior to the Closing Date, at, under or originating at the Real Property, or non-compliance with any Environmental Laws arising on or after the Closing Date;

(f)    the Collective Bargaining Agreements;

(g)    all liabilities relating to the employment or termination of Employees that arise on or after Closing, including all liabilities specifically assumed pursuant to Section 5.14(c), (d), (e), and (f);

(h)    the Assumed Benefit Plans, including all liabilities and obligations thereunder;

(i)    the Retention Bonuses in such amounts as set forth on Schedule 1.3(i);

(j)    the Exit Bonuses in such amounts as set forth on Schedule 1.3(j);

6

(k)    the Short-Term Incentive Plan Bonuses in such amounts as set forth on Schedule 1.3(k);

(l)    that certain Membership Interest Purchase Agreement, dated June 21, 2011, by and among Burton T. Zaunbrecher, Gregory V. Campo, Mark Guidry and Synagro Drilling Solutions, LLC, and any earn-out payments payable thereunder;

(m)    the Sellers' interest in the Hunts Point, New York facility, including pursuant to that certain Lease Agreement, dated February 1, 1991, by and among JWP, Inc., Enviro-Gro Technologies, Apex Resources, Inc. and Castle Bronx Terminals, Inc., and any maintenance, security and remediation associated with the leased property or discontinued facility operations of the Hunts Point, New York facility;

(n)    any liability, obligation or expense owing to the City of Baltimore arising from water use prior to the Closing Date;

(o)    all Houston Consolidation Costs, to the extent not paid by Sellers at or prior to the Closing;

(p)    whether known or unknown, any pending or threatened workers compensation, vehicle, commercial general liability or other type of Insurance Claim arising out of, relating to or otherwise in respect of the operation of the Business on or prior to the Closing Date (including any claims by underwriters for reimbursement of deductibles), other than Insurance Claims related to those Contracts of insurance that are Excluded Assets pursuant to Section 1.2(f); and

(q)    the liabilities or obligations described on Schedule 1.3(q).

Section 1.4    Excluded Liabilities. Notwithstanding anything to the contrary contained in this Agreement, the Purchaser shall not assume or agree to pay, perform or otherwise discharge any liabilities, obligations or expenses of any Seller or any Affiliate thereof (other than the Transferred Subs) or otherwise relating to the Business other than the Assumed Liabilities, and the Excluded Liabilities (as defined below) shall not be included in the Assumed Liabilities, and Sellers shall continue to be liable and responsible for paying, performing or otherwise discharging the Excluded Liabilities. Without limiting the foregoing, the Purchaser does not assume or agree, and shall not be obligated, to pay, perform or otherwise discharge the liabilities, obligations or expenses of the Sellers or their Affiliates or otherwise, whether known or unknown, relating to the Business with respect to, arising out of or relating to the following (the "Excluded Liabilities"):

(a)    whether known or unknown, any pending or threatened Legal Proceeding arising out of, relating to or otherwise in respect of (i) the operation of the Business on or prior to the Closing Date, or (ii) any Excluded Asset;

(b)    whether known or unknown, any pending or threatened Insurance Claim arising out of, relating to or otherwise in respect of the Contracts of insurance set forth on Schedule 1.2(f) (including any claims by underwriters for reimbursement of deductibles);

7

(c)     except as provided in Section 1.3, (i) the Benefit Plans (other than any Assumed Benefit Plan), and any trust agreement, administrative service contract or other contract relating thereto, (ii) the employment or termination of employment or services of any individual with the Sellers or any Affiliate thereof other than the Employees, and (iii) any liabilities relating to the employment or termination of employment of any Employee by Sellers to the extent arising on or prior to the Closing Date;

(d)     (i) fines, penalties, damages or remedies arising out of or related to noncompliance with or violations of Environmental Laws by the Sellers or otherwise related to the Business or the Acquired Assets; (ii) the transportation, off-site storage or off-site disposal of any Hazardous Substance generated by the Sellers, the Business or Acquired Assets; (iii) third-party Actions related to Hazardous Substances that migrated from any Owned Real Property or Assumed Leases; (iv) Environmental Laws related to the Excluded Assets or (v) liabilities or obligations imposed pursuant to Environmental Laws with respect to real property formerly owned, operated or leased by Sellers or the Transferred Subs (as of the Closing) or for the Business and not otherwise included in the Acquired Assets, which, in the case of clauses (i), (ii) and (iii), arise prior to or on the Closing, and which, in the case of clauses (iv) and (v), arise prior to, on or after the Closing;

(e)     all Taxes (i) that relate to the Acquired Assets, the Business or the Assumed Liabilities for taxable periods (or portions thereof) ending on or before the Closing Date, (ii) for payments under any Tax allocation, sharing or similar agreement (whether oral or written) to which the Sellers are a Party that relate to the Acquired Assets, the Business or the Assumed Liabilities, (iii) imposed under any bulk transfer Law of any jurisdiction, under any de facto merger Law, successor liability Law or any other Law or as a result of the application of Section 6901 of the Code or any similar Law, in each case with respect to the Acquired Assets, the Business or the Assumed Liabilities, and (iv) for Taxes of Seller or any of its Affiliates;

(f)     the Excluded Assets;

(g)     Indebtedness of any of the Sellers or the Business, other than (i) Capital Leases set forth on Schedule 1.1(e)(v) and (ii) the Project Finance Debt and any other Indebtedness of the Transferred Subs, which shall, together with the amounts thereof, be collectively set forth on Schedule 1.4(g);

(h)     amounts payable by Seller, or expressly not payable by Purchaser, pursuant to this Agreement or any Order of the Bankruptcy Court;

(i)     all costs, fees and expenses incurred (whether or not paid or payable) at or prior to the Closing by the Sellers and the first-lien and second lien creditors thereof related to legal counsel, financial advisory, restructuring advisory and other professional and advisory services (including, without limitation, costs, fees and expenses of Skadden, Arps, Slate, Meagher & Flom LLP, Evercore Partners Inc. and AlixPartners LLP);

(j)     all liabilities, expenses and obligations of the Sellers or the Business associated with the ongoing Alternative Fuel Mixture Credit tax dispute with the IRS, including

8

any repayment of tax credits previously received or payments in settlement of such dispute, and including all related legal, accounting and advisory fees, costs and expenses; and

(k)   all other liabilities, obligations or expenses set forth on Schedule 1.4(k).

Section 1.5   Assignment of Assigned Contracts and Assumed Leases. To the maximum extent permitted by the Bankruptcy Code and subject to the other provisions of this Section 1.5, Sellers shall assume and transfer and assign all Acquired Assets (including the Assigned Contracts and Assumed Leases) to Purchaser pursuant to Sections 363 and 365 of the Bankruptcy Code as of the Closing Date. Notwithstanding any other provision of this Agreement or in any Ancillary Document to the contrary, this Agreement shall not constitute an agreement to assign any asset or any right thereunder if an attempted assignment without the consent of a third party, which consent has not been obtained prior to the Closing (after giving effect to the Sale Order and the Bankruptcy Code), would constitute a breach or in any way adversely affect the rights of the Purchaser or Sellers thereunder. If with respect to any Acquired Asset such consent is not obtained or such assignment is not attainable pursuant to Sections 105, 363 or 365 of the Bankruptcy Code, then such Acquired Asset shall not be transferred hereunder and the Closing shall proceed with respect to the remaining Acquired Assets without any reduction in the Purchase Price. In the case of licenses, certificates, approvals, authorizations, leases, Contracts, agreements and other commitments included in the Acquired Assets (i) that cannot be transferred or assigned effectively without the consent of third parties, which consent has not been obtained prior to the Closing (after giving effect to the Sale Order and the Bankruptcy Code), Sellers shall, at the Purchaser's sole expense and subject to any approval of the Bankruptcy Court that may be required, reasonably cooperate with the Purchaser in endeavoring to obtain such consent and, if any such consent is not obtained, Sellers shall, following the Closing, at the Purchaser's sole expense and subject to any approval of the Bankruptcy Court that may be required, cooperate with the Purchaser in all reasonable respects to provide to the Purchaser the benefits thereof in some other manner, or (ii) that are otherwise not transferable or assignable (after giving effect to the Sale Order and the Bankruptcy Code), Seller shall, following the Closing, at the Purchaser's sole expense and subject to any approval of the Bankruptcy Court that may be required, reasonably cooperate with the Purchaser to provide to the Purchaser the benefits thereof in some other manner (including the exercise of the rights of Seller thereunder); provided that nothing in this Section 1.5 shall (x) require any Seller or any Affiliate thereof to make any material expenditure or incur any material obligation on its own or on behalf of the Purchaser or (y) prohibit any Seller or any Affiliate thereof from ceasing operations or winding up its affairs following the Closing.

Section 1.6   Purchase Price; Cash Payment at Closing; Deposit.

(a)   In consideration for the Acquired Assets and the assumption of the Assumed Liabilities, the purchase price shall be $455,000,000 (the "Purchase Price") less (A) the Exit Bonuses in such amounts as set forth on Schedule 1.3(j) less (B) the Project Finance Debt, and any other Indebtedness of the Transferred Subs, in each case in such amounts as set forth on Schedule 1.4(g) less (C) the Capital Leases in such amounts as set forth on Schedule 1.1(e)(v) (such net amount, as updated as of the Closing Date pursuant to this Section 1.6(a), the "Cash Payment at Closing"). Parent shall cause the amounts reflected on Schedule 1.3(j) (in respect of Exit Bonuses being assumed by Purchaser), Schedule 1.4(g) (in respect of Project Finance Debt

9

and any other Indebtedness of the Transferred Subs being assumed by Purchaser) and Schedule 1.1(e)(v) (in respect of Capital Leases being assumed by Purchaser) to be updated prior to Closing with the actual amounts thereof as of the Closing Date, provided that Parent shall provide any supporting documentation that Purchaser may reasonably request in connection with the updating of such schedules.  The Purchaser shall pay the Cash Payment at Closing to Parent on behalf of the Sellers at the Closing, net of any Deposit Funds paid to Parent at the Closing.

(b)    On the Effective Date, Purchaser shall deposit with JPMorgan Chase Bank, NA, in its capacity as escrow agent (the "Escrow Agent"), the sum of $23,000,000 (the "Deposit Funds"), to be released by the Escrow Agent and delivered to either Purchaser or to Parent on behalf of the Sellers in accordance with the provisions of the Escrow Agreement entered into by and among Purchaser, Parent and the Escrow Agent concurrently with the execution of this Agreement.  At the Closing, Purchaser and Parent shall provide joint written instructions, executed by their respective Authorized Representatives (as such term is defined in the Escrow Agreement), to the Escrow Agent that instruct the Escrow Agent to release the Deposit Funds to Parent.  The Deposit Funds received by Parent shall be applied at the Closing toward the Cash Payment at Closing.

Section 1.7    Allocation of Purchase Price for Tax Purposes.  The Sellers and the Purchaser agree that the allocation of the Purchase Price and the Assumed Liabilities to the Acquired Assets shall be as set forth on Exhibit 1.7 attached hereto, which was prepared by Purchaser in accordance with Section 1060 of the Code and has been approved by arm's length negotiation.  If there is any adjustment to the Purchase Price or the Assumed Liabilities, the Purchaser shall make appropriate adjustments to the allocation set forth in Exhibit 1.7 attached hereto.  The Sellers and the Purchaser shall be bound by such allocation (and if necessary, any revised allocation), and shall file, or cause to be filed, all applicable federal, state, local and foreign income, franchise and excise Tax Returns in a manner that is substantially consistent with such allocation.  If the allocation set forth on Exhibit 1.7 is disputed by any Taxing Authority, the party hereto receiving notice of such dispute shall promptly notify the other party hereto concerning the existence of such dispute and the parties shall consult with each other with respect to all issues related to the allocation in connection with such dispute.

Section 1.8    Withholding.  Purchaser shall be entitled to deduct and withhold from any amounts payable to a Seller such amounts as Purchaser determines in good faith are required to be deducted or withheld therefrom or in connection therewith under the Code or any provision of state, local or foreign Tax law or under any other Law.  To the extent such amounts are so deducted or withheld and paid over to the relevant Governmental Authority, such amounts shall be treated for all purposes under this Agreement as having been paid to the Person to whom such amounts would otherwise have been paid.

## ARTICLE II

## THE CLOSING

Section 2.1    Closing.  The closing of the transactions contemplated by this Agreement (the "Closing") shall take place at the offices of Skadden, Arps, Slate, Meagher & Flom LLP, 155 North Wacker Drive, Chicago, Illinois 60606 at 10:00 a.m. local time on the later of (i) the

10

third (3rd) Business Day after the conditions set forth in <u>Article VI</u> shall have been satisfied or waived and (ii) at such other time, date and place as shall be fixed by agreement among the parties hereto (the date of the Closing being herein referred to as the "<u>Closing Date</u>"). For financial, accounting, Tax and economic purposes, including risk of loss, and for all other purposes under this Agreement, upon the occurrence of the Closing, the Closing Date shall be deemed to have occurred at 11:59 p.m. (Chicago time) on the Closing Date.

Section 2.2    <u>Deliveries at Closing</u>.

(a)    At the Closing, the Sellers shall deliver to the Purchaser:

(i)  physical share certificates (if any) evidencing the Interests, which shall be either duly endorsed in blank or accompanied by duly executed stock powers or other instruments of transfer;

(ii)  a duly executed bill of sale, substantially in the form of <u>Exhibit A</u> attached hereto, transferring the Acquired Assets to the Purchaser;

(iii)  all other conveyance documents reasonably necessary to transfer to the Purchaser the Acquired Assets, including deeds regarding the Owned Real Property purchased by the Purchaser;

(iv)  the Acquired Assets by making the Acquired Assets available to the Purchaser at their present location;

(v)  the assignment and assumption agreement to be entered into between the Sellers and the Purchaser (the "<u>Assignment and Assumption Agreement</u>") substantially in the form of <u>Exhibit B</u> attached hereto, duly executed by the Sellers evidencing the assignment and assumption by the Purchaser of the Assumed Liabilities;

(vi)  duly executed assignments of the Acquired Intellectual Property substantially in the form of <u>Exhibit F</u> hereto, transferring the Acquired Intellectual Property to the Purchaser; and

(vii)  copies of all Tax Notices; and

(viii)  affidavits of non-foreign status from each of the Sellers that comply with Section 1445 of the Code.

(b)    At the Closing, the Purchaser shall deliver to the Sellers:

(i)  the Cash Payment at Closing by wire transfer in immediately available funds to an account or accounts designated by the Sellers; and

(ii)  the Assignment and Assumption Agreement duly executed by the Purchaser.

11

# ARTICLE III

## REPRESENTATIONS AND WARRANTIES OF THE SELLERS

Except as disclosed in the written statement delivered by the Sellers to the Purchaser at or prior to the execution of this Agreement (the "Seller Disclosure Schedule"), the Sellers represent and warrant to the Purchaser solely with respect to the Business, the Acquired Assets and the Assumed Liabilities as follows:

Section 3.1    Organization. Each Seller and each Transferred Sub is validly existing and in good standing under the Laws of the jurisdiction of its incorporation and has the requisite power and authority to own, lease and operate its properties and to carry on its business as it is now being conducted, except where the failure to be so existing and in good standing or to have such power and authority would not be material to the Business, taken as a whole. Each Seller and each Transferred Sub is duly qualified or licensed to do business as a foreign corporation and is in good standing in each jurisdiction in which the nature of the business conducted by it makes such qualification or licensing necessary, except where the failure to be so duly qualified, licensed and in good standing would not have a Material Adverse Effect. The Data Room contains a complete and correct copy of the organizational documents of each Seller and each Transferred Sub, as currently in effect.

Section 3.2    Capitalization of Transferred Subs. The authorized and outstanding Interests of each Transferred Sub are set forth on Schedule 3.2. All of the Interests of each Transferred Sub are owned beneficially and of record by the applicable Seller as set forth on Schedule 3.2. Except as set forth on Schedule 3.2, there are no existing (i) options, warrants, calls, subscriptions or other rights, convertible securities, agreements or commitments of any character obligating any Seller or Transferred Sub to issue, transfer or sell any Interests or other equity interests in such Transferred Sub or securities convertible into or exchangeable for such Interests or other equity interests, (ii) contractual obligations of any Seller or Transferred Sub to repurchase, redeem or otherwise acquire any Interests or other equity interests in such Transferred Sub or (iii) voting trusts or similar agreements to which any Seller or Transferred Sub is a party with respect to the voting of Interests or other equity interests in such Transferred Sub.

Section 3.3    Authority of Sellers. Except as set forth on Schedule 3.3, each Seller has full power and authority to execute, deliver and, subject to the entry of the Sale Order, perform its obligations under this Agreement and each of the Ancillary Documents to which such Seller is a party. The execution, delivery and performance of this Agreement and such Ancillary Documents by each Seller have been duly authorized and approved by all requisite corporate (or other organizational) action. Subject to the entry and effectiveness of the Sale Order, this Agreement and each Ancillary Document have been duly and validly executed and delivered by each Seller and (assuming this Agreement and each Ancillary Document constitute a valid and binding obligation of the Purchasers) constitute a valid and binding obligation of each Seller enforceable against each such Seller in accordance with its terms, subject to applicable bankruptcy, reorganization, insolvency, moratorium and other Laws affecting creditors' rights generally from time to time in effect and to general equitable principles.

12

Section 3.4    Consents and Approvals. No consent, approval, or authorization of, or declaration, filing or registration with, any Governmental Entity is required to be made or obtained by any Seller or any Transferred Sub in connection with the execution, delivery and performance of this Agreement and the consummation of the Acquisition, except (a) for consents, approvals or authorizations of, or declarations or filings with, the Bankruptcy Court, (b) for filings pursuant to the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended (the "HSR Act"), (c) for consents, approvals, authorizations, declarations, filings or registrations set forth on Schedule 3.4 and (d) for consents, approvals, authorizations, declarations, filings or registrations, which, if not obtained, would not, individually or in the aggregate, have a Material Adverse Effect.

Section 3.5    No Violations. Assuming that the consents, approvals, authorizations, declarations, and filings referred to in Sections 3.4 and 4.3 have been made or obtained and shall remain in full force and effect and the conditions set forth in Article VI have been satisfied or waived, except as set forth on Schedule 3.5, neither the execution, delivery or performance of this Agreement by the Sellers, nor the consummation by the Sellers of the transactions contemplated hereby, nor compliance by the Sellers with any of the provisions hereof, will (a) conflict with or result in any breach of any provisions of the articles or certificates of incorporation, as the case may be, bylaws or other organizational documents of any of the Sellers or the Transferred Subs, (b) result in a violation or breach of, or constitute (with or without due notice or lapse of time) a default (or give rise to any right of termination, cancellation, acceleration, vesting, payment, exercise, suspension, or revocation) under any of the terms, conditions or provisions of any note, bond, mortgage, deed of trust, security interest, indenture, license, Contract, agreement, plan or other instrument or obligation to which any of the Sellers or the Transferred Subs is a party or by which any of the Sellers or the Transferred Subs or any of the Sellers' or the Transferred Subs' properties or assets (including the Acquired Assets) may be bound or affected, (c) violate any order, writ, injunction, decree, statute, rule or regulation applicable to any of the Sellers or the Transferred Subs or any of the Sellers' or the Transferred Subs' properties or assets (including the Acquired Assets), (d) result in the creation or imposition of any Encumbrance on any asset of any of the Sellers or the Transferred Subs (including the Acquired Assets) or (e) cause the suspension or revocation of any Permit necessary for any of the Sellers or the Transferred Subs to conduct the Business as currently conducted, except in the case of clauses (b), (c), (d) and (e) for violations, breaches, defaults, terminations, cancellations, accelerations, creations, impositions, suspensions or revocations that (i) would not, individually or in the aggregate, have a Material Adverse Effect, or (ii) are excused by or unenforceable as a result of the filing of the Petitions or as a result of the entry of the Sale Order.

Section 3.6    Books and Records. The books, records and accounts of the Sellers maintained with respect to the Business accurately and fairly reflect, in all material respects and in reasonable detail, the transactions and the assets and liabilities of the Sellers and the Transferred Subs with respect to the Business.

Section 3.7    Title to Property; Sufficiency.

(a)    Except as set forth on Schedule 3.7(a), upon the entry and effectiveness of the Sale Order, the Sellers will have the power and right to sell, or assign, transfer and deliver, as the case may be, to the Purchaser, the Acquired Assets and the Interests and, on the Closing

13

Date, the Sellers will sell, assign, transfer and deliver the Acquired Assets (other than the Interests) free and clear of all Encumbrances other than Permitted Encumbrances, the Sellers will sell, assign, transfer and deliver the Interests free and clear of all Encumbrances, and each Transferred Sub will hold all of its assets and properties free and clear of all Encumbrances other than Permitted Encumbrances and Encumbrances arising solely out of the Project Finance Debt.

(b)    Except as set forth on Schedule 3.7(b), the Acquired Assets are sufficient for the continued conduct of the Business from and after the Closing in all material respects as it is currently conducted by the Sellers.

Section 3.8    Conduct of Business. Except as set forth on Schedule 3.8, from January 1, 2013 to the Effective Date, neither the Sellers nor the Transferred Subs have taken any action that, if taken after the Effective Date, would violate Section 5.1 hereof.

Section 3.9    Brokers. Except for Evercore Partners Inc., no Person is entitled to any brokerage, financial advisory, finder's or similar fee or commission payable by the Sellers in connection with the transactions contemplated by this Agreement based upon arrangements made by or on behalf of the Sellers.

Section 3.10    Litigation. As of the Effective Date, except as set forth on Schedule 3.10:

(a)    there are no material Actions pending or, to the Knowledge of the Sellers, threatened, against the Business, any Transferred Sub, any assets or properties of any Transferred Sub, or any of the Acquired Assets; and

(b)    the Sellers have not received written notice of, and to the Knowledge of the Sellers, there are no, Orders against any Seller or any Transferred Sub that restrict the operation of the Business in any material respect.

Section 3.11    Intellectual Property.

(a)    The Sellers and the Transferred Subs (i) exclusively own, free and clear of all Encumbrances other than Permitted Encumbrances, all Acquired Intellectual Property and (ii) have a valid right to use (in the manner used as of the Effective Date), free and clear of all Encumbrances other than Permitted Encumbrances, the other material Intellectual Property that is used or held for use in or necessary for the conduct of the Business as it is being conducted as of the Effective Date; provided however, for the avoidance of doubt, the foregoing clauses (i) and (ii) shall not be deemed to constitute a representation with respect to infringement, misappropriation or other violation of any Intellectual Property of third parties, which is addressed in Section 3.11(c). The Acquired Intellectual Property is subsisting, in full force and effect, and has not been cancelled, expired or abandoned.

(b)    As of the Effective Date, Schedule 3.11(b) is a complete and correct (in all material respects) list of the Registered Intellectual Property. To the Knowledge of the Sellers, the Registered Intellectual Property is valid and enforceable.

(c)    Except as set forth on Schedule 3.11(c) or as would not, individually or in the aggregate, be material to the Business, taken as a whole, (i) the conduct of the Business does

14

not infringe, misappropriate or otherwise violate any Intellectual Property of any Person and (ii) as of and during the two (2) year period prior to the Effective Date, no Person has provided written notice to any Seller that the conduct of the Business infringes, constitutes or results from a misappropriation of or otherwise violates any Intellectual Property of any Person.

(d)    Except as set forth on Schedule 3.11(d) or as would not, individually or in the aggregate, be material to the Business, taken as a whole, to the Knowledge of the Sellers, no Person is infringing, misappropriating or otherwise violating any of the Acquired Intellectual Property.

(e)    Each of the Sellers and Transferred Subs has taken reasonable measures to protect the confidentiality of all material Trade Secrets included in the Acquired Intellectual Property and any confidential information of any Person to whom any of the Sellers or Transferred Subs has a confidentiality obligation.

(f)    Schedule 3.11(f) is a correct and complete list (in all material respects) of all Contracts pursuant to which any Seller or any Transferred Sub has granted to any Person any license, covenant not to sue or right in, under or with respect to any Acquired Intellectual Property.

Section 3.12    Assumed Leases.

(a)    On the Closing Date, the Sellers will sell, transfer and assign to the Purchaser a valid leasehold interest with respect to each of the Assumed Leases which is a lease (as opposed to a sublease), and a valid subleasehold interest with respect to each of the Assumed Leases which is a sublease, in each case free and clear of all Encumbrances other than Permitted Encumbrances. Schedule 1.1(h)(ii) identifies the instruments through which the Sellers derive their leasehold and subleasehold interests in the Assumed Leases (including all amendments thereto).

(b)    Set forth on Schedule 3.12(b) is a complete and correct list of all real property leases and all real property leased by the Transferred Subs, setting forth the address, landlord and tenant for each real property lease.

(c)    Complete and correct copies of the Assumed Leases and the real property leases of the Transferred Subs are contained in the Data Room and, except to the extent such modifications are disclosed by the copies contained in the Data Room, none of the Assumed Leases or any real property leases of any Transferred Sub has been modified in any material respect.

(d)    The Sellers and the Transferred Subs, as applicable, have valid and enforceable leasehold interests under each of the applicable Assumed Leases and real property leases of the Transferred Subs. Each of the Assumed Leases and the real property leases of the Transferred Subs is in full force and effect, and none of the Sellers or the Transferred Subs has received or given any notice of any default or event that with notice or lapse of time, or both, would constitute a default by any Seller or Transferred Sub under any such leases and, to the Knowledge of the Sellers, no other party thereto is in default thereof.

15

Section 3.13    Owned Real Property.

(a)    Set forth on Schedule 1.1(h)(i) is a complete and correct list of all Owned Real Property setting forth the address of each such parcel of property.

(b)    Set forth on Schedule 3.13(b) is a complete and correct list of all owned real property of the Transferred Subs used in the operation of the Business, setting forth the address for each such parcel of property.

(c)    Complete and correct copies of all deeds, title reports and surveys for the Owned Real Property and the owned real property of the Transferred Subs in the possession of the Sellers and the Transferred Subs, respectively, are contained in the Data Room.

(d)    The Real Property: (i) constitutes all interests in real property currently used in the Business and which are necessary for the continued operation of the Business by Purchaser as the Business is conducted immediately prior to the Effective Date by Sellers; and (ii) is not, to the Knowledge of the Sellers, the subject of any condemnation or eminent domain proceedings.

Section 3.14    Personal Property. Except as set forth on Schedule 3.14, each Seller and Transferred Sub owns good and valid title or valid and enforceable leasehold interest, as the case may be, free and clear of all Encumbrances other than Permitted Encumbrances (and in the case of the Transferred Subs, Encumbrances under the Project Finance Debt), to or in all of the material Tangible Personal Property and assets used in the Business. All such items of Tangible Personal Property and assets are, in all material respects, in good operating condition and repair (ordinary wear and tear excepted).

Section 3.15    Employee Benefit Matters.

(a)    Schedule 3.15(a) lists, as of the Effective Date, a true and complete list of each material Benefit Plan and separately identifies the Benefit Plans sponsored by any of the Sellers and the Benefit Plans sponsored by any of the Transferred Subs ("Subsidiary Benefit Plans"). Sellers have provided Purchaser with a complete and correct copy of each material Benefit Plan and, to the extent applicable, each of the following documents relating thereto: (i) most recent summary plan description and any summaries of material modifications relating thereto, (ii) most recent Form 5500, (iii) most recent IRS determination or opinion letter, (iv) most recent trust report, (v) most recent actuarial valuation and (vi) most recent insurance policy, administrative service contract or other contracts relating thereto.

(b)    Each Benefit Plan has been operated and administered, in all material respects, in accordance with its terms and applicable Law, including, but not limited to, ERISA and the Code.

(c)    Each Benefit Plan which is intended to qualify under Section 401(a) of the Code does so qualify, and to the Knowledge of the Sellers nothing has occurred which would reasonably be expected to affect such qualified status.

(d)    Sellers have provided to Purchaser a true and complete list of all Employees and each Employee's employer, position, annual salary or wage rate, target annual bonus or

16

other cash incentive compensation opportunity, prior year's annual bonus, hire date, principal work location, accrued and unused vacation days, accrued and unused paid time off, accrued and unused sick leave or other leave, and status (exempt or non-exempt, active or inactive), and such list shall be updated no more than seven (7) days prior to the Closing Date.

Section 3.16   Labor Matters.

(a)   Exhibit G lists, as of the Effective Date, a true and complete list of each collective bargaining agreement in effect that covers any Employees with respect to their employment with the Sellers or the Transferred Subs (each, a "Collective Bargaining Agreement").

(b)   There is no organized labor strike, slowdown, lockout, or stoppage pending or, to the Knowledge of the Sellers, threatened against the Sellers or the Transferred Subs. Since January 1, 2010, the Sellers have not received written notice of any material unfair labor practice as defined in the National Labor Relations Act. To the Knowledge of the Sellers, the Sellers and the Transferred Subs have good labor relations.

Section 3.17   Environmental Matters.

(a)   Except as set forth on Schedule 3.17(a) or as would not reasonably be expected to result in, individually or in the aggregate, a Material Adverse Effect: (i) each of the Sellers and the Transferred Subs is in compliance with all applicable Environmental Laws, which compliance includes obtaining, maintaining and complying with all Environmental Permits required to operate the Business and to own and operate the Acquired Assets and there are no Actions pending or, to the Knowledge of the Sellers, threatened to revoke, adversely modify or terminate any such Environmental Permit, (ii) there has been no Release of any Hazardous Substance by any of the Sellers or the Transferred Subs, or to the Knowledge of the Sellers, any other Person in any manner that would reasonably be expected to result to the Sellers or the Transferred Subs incurring any investigation or remedial obligation or corrective action requirement under Environmental Laws, (iii) there are no Actions pending or, to the Knowledge of the Sellers, threatened against any of the Sellers or Transferred Subs alleging noncompliance with or liability under, any Environmental Law or Environmental Permit and (iv) the Sellers are not aware of any specific circumstances (excluding, for the avoidance of doubt, circumstances generally relating to the nature of the Business or the operations of the Sellers and the Transferred Subs), which the Sellers believe will result in any material Actions under Environmental Laws against the Sellers or Transferred Subs or require the Sellers or Transferred Subs to make material, unbudgeted capital expenditures to achieve or maintain compliance with Environmental Laws or Environmental Permits.

(b)   Schedule 3.17(b) sets forth a list of all Environmental Permits held by each of the Sellers and the Transferred Subs that are material to the operation of the Business and (i) cannot be transferred to Purchaser under their respective terms or Environmental Laws or (ii) will require pre-Closing notification to, filing with or consent of a Governmental Entity to effectively transfer or modify the Permit so that it remains valid and in effect and can be used to operate the Business from and after the Closing Date.

Section 3.18    Financial Statements.

(a)    Attached hereto as Schedule 3.18(a) are copies of (i) the audited consolidated balance sheet, as of December 31, 2012, of Parent and its subsidiaries (the "Annual Balance Sheet") and the audited consolidated statements of earnings, stockholders equity and cash flows of Parent and its subsidiaries and the notes thereto for the year ended December 31, 2012 (collectively, together with the Annual Balance Sheet, the "Annual Financial Statements") and (ii) the unaudited consolidated balance sheet, as of February 28, 2013, of Parent and its subsidiaries (the "Interim Balance Sheet") and the unaudited consolidated statements of earnings and cash flows of Parent and its subsidiaries for the two month period ended February 28, 2013 (collectively, together with the Interim Balance Sheet, the "Interim Financial Statements"). Except as set forth on Schedule 3.18(a), the Annual Financial Statements and the Interim Financial Statements present fairly, in all material respects, the consolidated financial condition of Parent and its subsidiaries as of the dates thereof and the consolidated results of operations of Parent and its subsidiaries for the periods referred to therein. The Annual Financial Statements have been prepared in accordance with GAAP.

(b)    Attached hereto as Schedule 3.18(b) are true, correct and complete copies of (i) the unaudited consolidated balance sheets, as of December 31, 2011 and December 31, 2012, of Sacramento Project Finance, Inc. and Synagro Organic Fertilizer Company of Sacramento, Inc., and the related unaudited consolidated statements of operations and cash flows for the periods then ended, (ii) the unaudited consolidated balance sheets, as of December 31, 2011 and December 31, 2012, of Philadelphia Project Finance, LLC, Philadelphia Renewable Bio-Fuels, LLC and Philadelphia Project Holding, Inc., and the related unaudited consolidated statements of operations and cash flows for the periods then ended, and (iii) the unaudited balance sheet, as of December 31, 2011 and December 31, 2012, of Synagro-Baltimore, LLC, and the related unaudited statements of operations and cash flows for the periods then ended (collectively, the "Transferred Subs Financial Statements"), to the extent such Transferred Subs Financial Statements have been prepared and/or disclosed pursuant to Section 6.11 of the Baltimore SPE Loan Agreement, Section 5.9 of the Philadelphia SPE Loan Agreement and Section 5.3(b) of the Sacramento SPE Loan Agreement. Except as set forth on Schedule 3.18(b), the Transferred Subs Financial Statements present fairly, in all material respects, the financial condition of the Transferred Subs as of the dates thereof and the results of operations of the Transferred Subs for the periods referred to therein.

Section 3.19    Absence of Undisclosed Liabilities; No Material Changes

(a)    Except as set forth in Schedule 3.19(a), none of the Sellers has any liabilities or obligations of any nature, that are required under GAAP to be reflected on or reserved for in a balance sheet, whether accrued, absolute, contingent, unliquidated or otherwise, whether due or to become due and whether arising out of transactions entered into or any condition or state of facts existing on or prior to the Effective Date, other than (i) liabilities and obligations set forth on the Annual Balance Sheet, (ii) liabilities and obligations which have arisen after the date of the Annual Balance Sheet in the ordinary course of business consistent with past practice or (iii) liabilities or obligations that would not materially impair the financial condition or operations of the Parent and its subsidiaries taken as a whole.

18

(b)    Except as set forth in <u>Schedule 3.19(b)(i)</u>, none of the Transferred Subs (other than the Non-SPE Transferred Subs) has any liabilities or obligations of any nature, that are required under GAAP to be reflected on or reserved for in a balance sheet, whether accrued, absolute, contingent, unliquidated or otherwise, whether due or to become due and whether arising out of transactions entered into or any condition or state of facts existing on or prior to the Effective Date, other than (i) liabilities and obligations set forth on the balance sheets contained in the Transferred Subs Financial Statements, (ii) liabilities and obligations which have arisen after the date of the balance sheets contained in the Transferred Subs Financial Statements in the ordinary course of business consistent with past practice or (iii) liabilities or obligations that would not materially impair the financial condition or operations of the applicable Transferred Sub. Except as set forth on <u>Schedule 3.19(b)(ii)</u>, none of the Non-SPE Transferred Subs has any material liabilities.

(c)    Except as set forth in <u>Schedule 3.19(c)</u>, since the date of the Annual Balance Sheet, there has been no (i) Material Adverse Effect or (ii) material change in accounting methods used by any Seller or Transferred Sub.

(d)    Except as set forth in <u>Schedule 3.19(d)</u>, since the date of the Interim Balance Sheet, the Sellers have, in all material respects, (i) conducted the Business and managed the Acquired Assets in the ordinary and regular course and (ii) collected accounts receivable and paid accounts payable utilizing normal procedures without materially accelerating collection of or discounting accounts receivable and without materially delaying payment of accounts payable.

Section 3.20    <u>Compliance with Law</u>. Except as set forth on <u>Schedule 3.20</u>, as of the Effective Date, (i) each of the Sellers, the Transferred Subs and the Business is in compliance, in all material respects, with all applicable material Laws and has been since January 1, 2010, and (ii) no written claim has been filed against any of the Sellers, the Transferred Subs or the Business alleging a material violation of any material Laws. To the Knowledge of the Sellers, as of the Effective Date, none of the Sellers, the Transferred Subs or the Business is under investigation by a Governmental Entity with respect to the violation of any Law.

Section 3.21    <u>Permits</u>. <u>Schedule 3.21</u> contains a complete listing, as of the Effective Date, of all material licenses, permits, authorizations, approvals and certificates from federal, state and local authorities (other than Environmental Permits) (collectively, the "<u>Permits</u>") used by any of the Sellers or the Transferred Subs in the conduct of the Business or to own or operate its properties. As of the Effective Date, each Seller and Transferred Sub has, in full force and effect, in all material respects, all necessary material Permits to conduct the Business.

Section 3.22    <u>Insurance</u>. <u>Schedule 3.22</u> sets forth a complete and correct list, as of the Effective Date, of all material insurance policies and bonds maintained by any Seller or Transferred Sub with respect to the Business or the Acquired Assets, including in respect of properties, buildings, equipment, fixtures, employees and operations. Since January 1, 2010, no material insurance policy maintained or once maintained by any Seller or Transferred Sub with respect to the Business or the Acquired Assets has been cancelled.

Section 3.23    <u>Material Contracts</u>.

19

(a)    Schedule 3.23 contains a true, correct and complete list of all of the following Contracts to which any Seller or Transferred Sub is a party, which are currently in effect, and which relate to the operation of the Business or Acquired Assets or the Transferred Subs (collectively, the "Material Contracts"), in each case, as of the Effective Date:

(i)    Contracts with or in respect of any labor union, including the Collective Bargaining Agreements;

(ii)    Contracts regarding equity of the Sellers or the Transferred Subs, including any stock purchase, stock option and other benefits plans;

(iii)    Contracts for the employment of any officer, individual employee or other Person on a full-time or consulting basis (A) providing annual base compensation in excess of $250,000, (B) providing for the payment of cash or other compensation upon or by reason of the consummation of the transactions contemplated by this Agreement, or (C) otherwise restricting its ability to terminate the employment of any managerial employee following the Closing for any lawful reason or for no reason without payment of severance in excess of $100,000, other than as described on Schedule 3.23;

(iv)    Contracts relating to Indebtedness in excess of $1,000,000;

(v)    Contracts which place any material limitation or restriction on any Seller or Transferred Sub from freely engaging in any material aspect of the Business or from soliciting or hiring any individual with respect to employment;

(vi)    Customer Contracts reasonably likely to result in receipts or disbursements in excess of $1,000,000 during calendar year 2013;

(vii)    Supplier Contracts to the Business reasonably likely to result in disbursements in excess of $1,000,000 during calendar year 2013;

(viii)    Contracts or commitments for capital expenditures in excess of $1,000,000; or

(ix)    Contracts (other than Contracts set forth on Schedule 3.23(i) through (viii)) involving aggregate payments to be made or received in excess of $1,000,000.

(b)    None of the Sellers or Transferred Subs has received any written claim by any other party of material default by any Seller or Transferred Sub under any Material Contract. All Material Contracts are valid, binding and enforceable in accordance with their respective terms against the applicable Seller or Transferred Sub and, to the Knowledge of each Seller, each other party thereto. None of the Sellers or Transferred Subs is in material breach of or default under the terms of any Material Contract. To the Knowledge of the Sellers, no other party to any Material Contract is in material breach of or default thereunder.

Section 3.24    Customers. Schedule 3.24 lists the ten largest customers (the "Material Customers") of the Business by revenues for the twelve months ended December 31, 2012. Since January 1, 2013 to the Effective Date, no Material Customer has terminated its customer

20

relationship with the Business or provided written notice (or oral notice to the Knowledge of the Sellers) that it intends to terminate its relationship with the Business.

Section 3.25    Suppliers.    Schedule 3.25 lists the ten largest suppliers ("Material Suppliers") of the Business by payments or expenses for the twelve months ended December 31, 2012. Since January 1, 2013 to the Effective Date, no Material Supplier has terminated its supplier relationship with the Business or provided written notice  (or oral notice to the Knowledge of the Sellers) that it intends to terminate its relationship with the Business.

Section 3.26    Taxes.

(a)    Except as set forth under Schedule 3.26(a), (i) all income and other material Tax Returns required to be filed by or on behalf of each of the Sellers and the Transferred Subs have been duly and timely filed with the appropriate Taxing Authority in all jurisdictions in which such Tax Returns are required to be filed (after giving effect to any valid extensions of time in which to make such filings), and all such Tax Returns are true, complete and correct in all material respects; and (ii) all material amounts of Taxes payable by or on behalf of each of the Sellers and the Transferred Subs have been fully and timely paid.  With respect to any period for which Tax Returns have not yet been filed or for which Taxes are not yet due or owing, to the Knowledge of the Sellers, the Sellers and the Transferred Subs have made due and sufficient accruals for such Taxes in their financial statements and their books and records.

(b)    Except as set forth under Schedule 3.26(b), the Sellers and the Transferred Subs have complied in all material respects with all applicable Laws relating to the payment and withholding of Taxes and have duly and timely withheld and paid over to the appropriate Taxing Authority all material amounts required to be so withheld and paid under all applicable Laws.

(c)    The Data Room contains (i) all federal, state, local and foreign income or franchise Tax Returns of the Sellers and any Affiliate thereof relating to all taxable periods beginning after December 31, 2008 and (ii) any audit report issued within the last three years relating to any Taxes due from or with respect to the Sellers and any Affiliate thereof.

(d)    No unresolved claim has been made by a Taxing Authority in a jurisdiction where the Sellers and any Affiliate thereof does not file Tax Returns such that a Seller or any Affiliate thereof may be subject to taxation by that jurisdiction.

(e)    Except as set forth under Schedule 3.26(e), all deficiencies asserted or assessments made as a result of any examinations by any Taxing Authority of the Tax Returns of, or including, the Sellers or any Affiliate thereof have been fully paid, and there are no other material audits or investigations by any Taxing Authority in progress, nor have the Sellers and any Affiliate thereof received any notice from any Taxing Authority that it intends to conduct such an audit or investigation. Except as set forth under Schedule 3.26(e), no issue has been raised by a Taxing Authority in any prior examination of the Sellers and any Affiliate thereof which, by application of the same or similar principles, could reasonably be expected to result in a proposed deficiency for any subsequent taxable period.

(f)    Except as set forth under Schedule 3.26(f), none of the Sellers or any Affiliate thereof nor any other Person on their behalf has (i) agreed to or is required to make any

21

adjustments pursuant to Section 481(a) of the Code or any similar provision of Law or has any knowledge that any Taxing Authority has proposed any such adjustment, or has any application pending with any Taxing Authority requesting permission for any changes in accounting methods that relate to the Sellers and their Affiliates or (ii) granted to any Person any power of attorney that is currently in force with respect to any Tax matter. None of the Transferred Subs is or has been party to any "listed transactions" within the meaning of Treasury Regulations Section 1.6011-4(b).

(g)    No Seller is a foreign Person within the meaning of Section 1445 of the Code.

(h)    None of the Transferred Subs is a party to any tax sharing, allocation, indemnity or similar agreement or arrangement (whether or not written) pursuant to which it will have any obligation to make any payments after the Closing.

(i)    None of the Transferred Subs is subject to any private letter ruling of the IRS or comparable rulings of any Taxing Authority.

(j)    There are no Encumbrances upon any of the assets of the Sellers or any Affiliate thereof other than Permitted Encumbrances.

(k)    None of the Transferred Subs has ever been a member of any consolidated, combined, affiliated or unitary group of corporations for any Tax purposes, except for the current consolidated, combined, affiliated and/or unitary groups of the Sellers and their Affiliates of which Sacramento Project Finance, Inc., Synagro Organic Fertilizer Company of Sacramento, Inc. and Philadelphia Project Holding, Inc. are currently members.

(l)    There is no taxable income of the Sellers or any Affiliate thereof that will be required under applicable Tax Law to be reported by the Purchaser or any of its Affiliates for a taxable period beginning after the Closing Date which taxable income was realized (or reflects economic income) prior to the Closing Date.

(m)    Except as would not be material to the Business, no property owned by the Sellers or any Affiliate thereof is (i) property required to be treated as being owned by another Person pursuant to the provisions of Section 168(f)(8) of the Internal Revenue Code of 1954, as amended and in effect immediately prior to the enactment of the Tax Reform Act of 1986, (ii) "tax-exempt use property" within the meaning of Section 168(h)(1) of the Code, (iii) "tax-exempt bond financed property" within the meaning of Section 168(g) of the Code, (iv) "limited use property" within the meaning of Rev. Proc. 76-30, (v) subject to Section 168(g)(1)(A) of the Code, or (vi) subject to any provision of state, local or foreign Law comparable to any of the provisions listed above.

Section 3.27    Transferred Subs Bank Accounts.    Schedule 3.27 lists, as of the Effective Date, a true and complete list of bank accounts owned by any of the Transferred Subs. Such list specifies, with respect to each such bank account, the legal owner, the Persons with control or withdrawal rights and the cash balance (restricted and unrestricted).

Section 3.28   <u>No Other Representations or Warranties</u>. EXCEPT AS SPECIFICALLY AND EXPRESSLY SET FORTH IN THIS <u>ARTICLE III</u>, (I) THE SELLERS MAKE NO REPRESENTATION OR WARRANTY, EXPRESS OR IMPLIED, AT LAW OR IN EQUITY, RELATING TO THE ACQUIRED ASSETS, THE INTERESTS, THE ASSUMED LIABILITIES OR THE BUSINESS, INCLUDING, WITHOUT LIMITATION, ANY REPRESENTATION OR WARRANTY AS TO VALUE, MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE OR FOR ORDINARY PURPOSES, OR ANY OTHER MATTER, (II) THE SELLERS MAKE NO, AND HEREBY DISCLAIM ANY, OTHER REPRESENTATION OR WARRANTY REGARDING THE ACQUIRED ASSETS, THE INTERESTS, THE ASSUMED LIABILITIES OR THE BUSINESS AND (III) THE ACQUIRED ASSETS, THE INTERESTS, THE ASSUMED LIABILITIES AND THE BUSINESS BEING TRANSFERRED TO THE PURCHASER ARE CONVEYED ON AN "<u>AS IS, WHERE IS</u>" BASIS AS OF THE CLOSING, AND THE PURCHASER SHALL RELY UPON ITS OWN EXAMINATION THEREOF. WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, THE SELLERS MAKE NO REPRESENTATION OR WARRANTY REGARDING ANY ASSETS OTHER THAN THE ACQUIRED ASSETS AND THE INTERESTS OR ANY LIABILITIES OTHER THAN THE ASSUMED LIABILITIES OR ANY BUSINESS OTHER THAN THE BUSINESS, AND NONE SHALL BE IMPLIED AT LAW OR IN EQUITY.

**ARTICLE IV**

**REPRESENTATIONS AND WARRANTIES OF THE PURCHASER**

The Purchaser represents and warrants to the Sellers as follows:

Section 4.1   <u>Organization</u>. The Purchaser is a corporation validly existing and in good standing under the Laws of its jurisdiction of incorporation and has the corporate power and authority and all necessary governmental approvals to own, lease and operate its properties and to carry on its business as it is now being conducted. On the Closing Date, the Purchaser will be duly qualified as a foreign corporation to do business, and in good standing, in each jurisdiction where the character of its properties owned or held under lease or the nature of its activities make such qualification necessary, except where the failure to be so duly qualified, licensed and in good standing would not have a material adverse effect on the Purchaser. All of the issued and outstanding capital stock of Purchaser is indirectly owned by Guarantor.

Section 4.2   <u>Authority of Purchaser</u>. The Purchaser has the corporate power and authority to enter into this Agreement and to carry out its obligations hereunder. The execution, delivery and performance of this Agreement by the Purchaser and the consummation by the Purchaser of the transactions contemplated hereby have been duly authorized by all requisite corporate actions. This Agreement has been duly and validly executed and delivered by the Purchaser and (assuming this Agreement constitutes a valid and binding obligation of the Sellers) constitutes a valid and binding agreement of the Purchaser, enforceable against the Purchaser in accordance with its terms, and each Ancillary Document to which the Purchaser is a party has been duly authorized by the Purchaser and upon execution and delivery by Purchaser will be a valid and binding obligation of Purchaser enforceable against Purchaser in accordance with its terms, subject to applicable bankruptcy, reorganization, insolvency, moratorium and

23

other Laws affecting creditors' rights generally from time to time in effect and to general equitable principles.

Section 4.3    Consents and Approvals. Except for consents, approvals or authorizations which may be required under the HSR Act, no consent, approval or authorization of, or declaration, filing or registration with, any Governmental Entity is required to be made or obtained by the Purchaser in connection with the execution, delivery and performance of this Agreement and the consummation of the transactions contemplated hereby.

Section 4.4    No Violations. Assuming that the consents, approvals, authorizations, declarations, and filings referred to in Sections 3.4 and 4.3 have been made or obtained and shall remain in full force and effect and the conditions set forth in Article VI have been satisfied or waived, neither the execution, delivery or performance of this Agreement by the Purchaser, nor the consummation by the Purchaser of the transactions contemplated hereby, nor compliance by the Purchaser with any of the provisions hereof, will (a) conflict with or result in any breach of any provisions of the certificate of incorporation or bylaws of the Purchaser, (b) result in a violation or breach of, or constitute (with or without due notice or lapse of time) a default (or give rise to any right of termination, cancellation, acceleration, vesting, payment, exercise, suspension, or revocation) under any of the terms, conditions or provisions of any note, bond, mortgage, deed of trust, security interest, indenture, license, Contract, agreement, plan or other instrument or obligation to which the Purchaser is a party or by which the Purchaser or the Purchaser's properties or assets may be bound or affected, (c) violate any order, writ, injunction, decree, statute, rule or regulation applicable to the Purchaser or the Purchaser's properties or assets, (d) result in the creation or imposition of any encumbrance on any asset of the Purchaser or (e) cause the suspension or revocation of any Permit necessary for the Purchaser to conduct its business as currently conducted, except in the case of clauses (b), (c), (d) and (e) for violations, breaches, defaults, terminations, cancellations, accelerations, creations, impositions, suspensions or revocations that would not, individually or in the aggregate, have a material adverse effect on the Purchaser's ability to consummate the transactions contemplated by this Agreement.

Section 4.5    Brokers. Except for RBC Capital Markets, LLC, no Person is entitled to any brokerage, financial advisory, finder's or similar fee or commission payable by the Purchaser in connection with the transactions contemplated by this Agreement based upon arrangements made by or on behalf of a Purchaser.

Section 4.6    Financing. As of the Effective Date, the Purchaser has access to, and on the Closing Date, the Purchaser will have, sufficient funds available to deliver the Cash Payment at Closing to the Sellers and consummate the transactions contemplated by this Agreement, including the timely satisfaction of the Assumed Liabilities.

## ARTICLE V

## COVENANTS

Section 5.1    Conduct of Business by the Sellers Pending the Closing. The Sellers covenant and agree that, except (i) as expressly provided in this Agreement, (ii) as disclosed in the Seller Disclosure Schedule, (iii) as required by, arising out of, relating to or resulting from

24

any Order of the Bankruptcy Court in connection with the prosecution of the Chapter 11 Cases or (iv) with the prior written consent of the Purchaser, from the Effective Date through the Closing Date:

(a)    the Sellers shall use commercially reasonable efforts to (i) conduct the Business and manage the Acquired Assets only in the ordinary and regular course and (ii) continue to collect accounts receivable and pay accounts payable utilizing normal procedures and without accelerating collection of or discounting accounts receivable and without delaying payment of accounts payable; and

(b)    the Sellers shall not, and shall cause the Transferred Subs not to, take or permit to occur any of the following actions with respect to the Business, the Acquired Assets, the Interests or the Transferred Subs:

(i)    an amendment to the articles or certificates of incorporation, bylaws or other organizational documents of any Seller or any Transferred Sub;

(ii)    the issuance or sale of any shares of, or securities convertible into or exchangeable for, or options, warrants, calls, commitments or rights or any kind to acquire the shares of, the capital stock or equity interest of any Transferred Sub;

(iii)    an acquisition, sale, lease, license or disposition of (A) any of the Acquired Assets, other than the Interests (except in the ordinary course), (B) any of the Interests or (C) any of the assets or properties of the Transferred Subs (except in the ordinary course and in accordance with the Project Finance Indentures and the Project Finance Debt, as applicable);

(iv)    except for Encumbrances under the Sellers' existing credit facility, the Encumbrance (other than Permitted Encumbrances) of any material assets, tangible or intangible, of the Business;

(v)    (A) the incurrence or assumption of any Indebtedness except for borrowings under existing lines of credit in the ordinary course and in a manner consistent with past practice; or (B) the making of any loans, advances or capital contributions to, or investments in, any other Person;

(vi)    the acquisition (by merger, consolidation or acquisition of stock or assets) of any corporation, partnership or other business organization or division thereof or any equity interest therein (other than purchases of marketable securities in the ordinary course of the Business);

(vii)    a material change of any of the accounting methods used by any Seller or any Transferred Sub, unless required by GAAP or applicable Law;

(viii)    other than in the ordinary course of the Business, terminate, amend, restate, supplement or waive any rights under (A) a Contract included in the Acquired Assets or any material Contract to which a Transferred Sub is a party or (B) a Permit used in the Business;

25

(ix)   except as set forth on Schedule 5.1(b)(ix), settling, compromising or waiving any Action or legal right (including with respect to Taxes) affecting the validity or value of any Acquired Assets, the Interests, the Business or any assets or properties of the Transferred Subs if the amount in question is in excess of $1,000,000 on an individual basis or $2,500,000 in the aggregate;

(x)   the payment of any dividends or distributions or other return of capital (including any equity redemption) by any Transferred Sub, or the transfer or sweep of any cash in the bank account of any Transferred Sub, except in the ordinary course and in accordance with the Project Finance Indentures and the Project Finance Debt, as applicable;

(xi)   the material amendment, or any termination other than by expiration, with respect to which applicable Sellers do not have a unilateral right to extend the term, of any Assumed Lease or rights thereunder or any real property lease of any Transferred Sub or rights thereunder;

(xii)   the grant or acceptance of any lease in respect of the Owned Real Property or any owned real property of the Transferred Subs;

(xiii)   other than in the ordinary course of the Business, the entering into of any lease, sublease, license, broker agreement, service contract, management contract, utility agreement or other agreement relating to any of the Acquired Assets which would be binding on the Purchaser after the Closing;

(xiv)   enter into any commitments for capital expenditures that in the aggregate exceed the capital expenditures budget made available to Purchaser in the Data Room prior to the Effective Date by more than $1,000,000;

(xv)   except as required by applicable Law or by any Collective Bargaining Agreement or other Benefit Plan as of the Effective Date, increase the salary, wages, compensation or benefits of any Employee (other than, in the case of any non-executive employee, an increase in the ordinary course of the Business consistent with past practices and not greater than 3% of such employee's base salary or wages), or establish, adopt or materially amend any Benefit Plan;

(xvi)   (A) make, change or revoke any material Tax election that would be binding on Purchaser or a Transferred Sub after the Closing, settle or compromise any material Tax claim or liability or enter into a settlement or compromise, or change (or make a request to any Taxing Authority to change) any material aspect of its method of accounting for Tax purposes or (B) prepare or file any material Tax Return of the Transferred Subs or for which the Transferred Subs could have liability (or any amendment thereof) unless such Tax Return shall have been prepared in a manner consistent with past practice and Sellers shall have provided Purchaser a copy of all material Tax Returns (together with supporting papers) at least three (3) days prior to the due date thereof for Purchaser to review and approve (such approval not to be unreasonably withheld or delayed);

(xvii)  fail to maintain at all times current insurance coverage (and renew such insurance coverage, as applicable) consistent with past practices; and

(xviii)  the authorization or entering into an agreement to do any of the foregoing.

Section 5.2    Access and Information; Other Financials.

(a)    Subject to the Bidding Procedures and applicable Law (including without limitation, applicable antitrust or competition Law, and Laws with regard to employee privacy rights), the Sellers shall afford to the Purchaser and to the Purchaser's financial advisors, legal counsel, accountants, consultants, financing sources and other authorized representatives reasonable access during normal business hours throughout the period prior to the Closing Date to the books, records, properties and personnel of the Sellers and, during such period, shall furnish reasonably promptly to the Purchaser such information as the Purchaser reasonably may request; provided, that all such access shall occur only following reasonable prior notice to an individual designated by the Sellers and, at the Sellers' reasonable discretion, only if accompanied by a designee of the Sellers.

(b)    From the Effective Date until the Closing Date, Parent shall furnish to Purchaser each of the financial statements of Parent and its subsidiaries, and related supporting information, that Parent is required to prepare and deliver to its lender under Sellers' existing credit facility and any waivers or amendments thereto (including, for the avoidance of doubt, all rolling 13-week cash flow projections), such financial statements and related supporting information to be furnished by Parent to Purchaser reasonably promptly (but in any event no later than two (2) Business Days) after being furnished to Parent's lender.

Section 5.3    Approvals and Consents; Cooperation; Notification.

(a)    The parties hereto shall use their respective reasonable best efforts, and cooperate with each other, to obtain as promptly as practicable all approvals, consents or waivers from Governmental Entities required in order to consummate the transactions contemplated by this Agreement, including any required approvals, consents or waivers related to Permits or Environmental Permits; provided, that the obligations of the parties to obtain any consent, approval or waiver from the Bankruptcy Court shall be governed exclusively by Section 5.7 herein.  With respect to Environmental Permits, the Sellers shall , if requested by Purchaser, participate in  Permit transfer meetings, between the Effective Date and the Closing Date and thereafter as needed between Sellers and Purchaser.

(b)    The Sellers and the Purchaser shall take all actions necessary to file as soon as practicable all notifications, filings and other documents required to obtain all approvals, consents or waivers from Governmental Entities, including, without limitation, under the HSR Act, and to respond as promptly as practicable to any inquiries received from the Federal Trade Commission, the Antitrust Division of the Department of Justice and any other Governmental Entity for additional information or documentation and to respond as promptly as practicable to all inquiries and requests received from any Governmental Entity in connection therewith. The Purchaser agrees to take promptly any and all steps necessary to avoid or eliminate each and

27

every impediment under any antitrust or competition Law that may be asserted by any national, state or local antitrust or competition authority so as to enable the parties to expeditiously close the transactions contemplated by this Agreement, including committing to or effecting, by consent decree, hold separate orders, or otherwise, the sale or disposition of such of its assets or businesses, or of the business to be acquired by it pursuant to this Agreement, as is required to be divested in order to avoid the entry of, or to effect the dissolution of, any decree, order, judgment, injunction, temporary restraining order or other order in any suit or proceeding, that would otherwise have the effect of materially delaying or preventing the consummation of the transactions contemplated by this Agreement. In addition, without limiting the generality of the foregoing regarding Governmental Entities, the Purchaser agrees to take promptly any and all steps necessary to attempt to vacate or lift any order or other restraint relating to antitrust matters that would have the effect of making the transaction contemplated by this Agreement illegal or otherwise prohibiting its consummation.

(c)    Each of the Sellers and the Purchaser shall give prompt notice to the other of the occurrence or failure to occur of an event that would, or with the lapse of time would, cause any condition to the consummation of the transactions contemplated hereby not to be satisfied.

Section 5.4    Additional Matters. Subject to the terms and conditions herein provided, each of the parties hereto agrees to use all reasonable best efforts to take, or cause to be taken, all action and to do, or cause to be done, all things necessary, proper or advisable under applicable Laws and regulations to consummate and make effective the transactions contemplated by this Agreement; provided, that the obligations of the parties to obtain any consent, approval or waiver from the Bankruptcy Court shall be governed exclusively by Section 5.7 herein. The obligations of each of the Purchaser and the Seller pursuant to this Article V shall be subject to any orders entered or approvals or authorizations granted by the Bankruptcy Court and the Bankruptcy Code.

Section 5.5    Further Assurances. In addition to the provisions of this Agreement, from time to time after the Closing Date, the Sellers and the Purchaser shall use reasonable best efforts to execute and deliver such other instruments of conveyance, transfer or assumption, as the case may be, and take such other action as may be reasonably requested to implement more effectively the conveyance and transfer of the Acquired Assets to the Purchaser, the assumption of the Assumed Liabilities by the Purchaser, and the effectuation of the post-Closing covenants contained herein; provided that nothing in this Section 5.5 shall (x) require Sellers to make any material expenditure or incur any material obligation on their own or on behalf of the Purchaser or (y) prohibit Sellers or any of their Affiliates from ceasing operations or winding up its affairs following the Closing.

Section 5.6    Cure Costs. On or prior to the Closing, the Purchaser shall pay, pursuant to Section 365 of the Bankruptcy Code and the Sale Order, any and all cure and reinstatement costs or expenses (the "Cure Costs") of or relating to the assumption and assignment of the Assigned Contracts and Assumed Leases included in the Acquired Assets.

Section 5.7    Bankruptcy Court Approval.

28

(a)     Sellers and Purchaser acknowledge that this Agreement and the sale of the Acquired Assets are subject to Bankruptcy Court approval. Sellers and Purchaser acknowledge that (i) to obtain such approval, Sellers must demonstrate that they have taken reasonable steps to obtain the highest or otherwise best offer possible for the Acquired Assets, including, but not limited to, giving notice of the transactions contemplated by this Agreement to creditors and certain other interested parties as ordered by the Bankruptcy Court, and, if necessary, conducting an auction in respect of the Acquired Assets (the "Auction"), and (ii) Purchaser must provide adequate assurance of future performance under the Assigned Contracts and Assumed Leases included in the Acquired Assets.

(b)     As soon as reasonably possible after execution of this Agreement, but in any event no later than two (2) Business Days after the Effective Date, Sellers shall file the Motion to Approve the Bidding Procedures and Sale with the Bankruptcy Court, together with appropriate supporting papers and notices.

(c)     Sellers shall use reasonable best efforts to obtain entry of the Sale Order.

(d)     In the event an appeal is taken or a stay pending appeal is requested, from either the Bidding Procedures Order or the Sale Order, Sellers shall promptly notify Purchaser of such appeal or stay request and shall promptly provide to Purchaser a copy of the related notice of appeal or order of stay. Sellers shall also provide Purchaser with written notice of any motion or application filed in connection with any appeal from either of such orders. Sellers shall use reasonable best efforts to vigorously defend any such appeal.

(e)     From and after the Effective Date, and to the extent Purchaser is the Successful Bidder at the Auction, Sellers shall not take any action that is intended to result in, or fail to take any action the intent of which failure to act would result in, the reversal, voiding, modification or staying of the Bidding Procedures Order or the Sale Order. Sellers shall use reasonable best efforts to obtain the Bankruptcy Court's approval of the Bidding Procedures Order and the Sale Order.

Section 5.8     Bankruptcy Filings. From and after the Effective Date, Sellers shall use reasonable best efforts to provide such prior notice as may be reasonable under the circumstances before filing any papers in the Chapter 11 Cases that relate, in whole or in part, to this Agreement or Purchaser such that Purchaser and Purchaser's counsel shall have a reasonable opportunity to review such papers, discuss such papers with the Sellers and Sellers' counsel and recommend changes or raise objection to such papers. Under no circumstances shall Sellers file any pleading with the Bankruptcy Court contrary to this Agreement or any provision hereof.

Section 5.9     Break-Up Fee and Expense Reimbursement. Notwithstanding anything in this Agreement to the contrary, Sellers agree to pay Purchaser the Break-Up Fee and Expense Reimbursement in accordance with Section 7.2(b) of this Agreement and, if approved by the Bankruptcy Court, the Bidding Procedures Order.

Section 5.10    Bidding Procedures; Superior Offers. The bidding procedures to be employed with respect to this Agreement shall be those reflected in the Bidding Procedures Order. The Purchaser agrees and acknowledges that Sellers and their representatives and

29

Affiliates are and may continue soliciting inquiries, proposals or offers for the Acquired Assets and the Interests in connection with any alternative transaction pursuant to the terms of the Bidding Procedures Order and agrees and acknowledges that the bidding procedures contained in the Bidding Procedures Order may be supplemented by other customary procedures not inconsistent with the matters otherwise set forth herein and the terms of this Agreement.

Section 5.11    Communications with Customers and Suppliers. Prior to the Closing, the Purchaser shall not, and shall cause its Affiliates and representatives not to, contact, or engage in any discussions or otherwise communicate with, Sellers' customers, suppliers and other Persons with which Sellers have material commercial dealings without obtaining the prior consent of Sellers.

Section 5.12    Letters of Credit; Surety Bonds.

(a)    On or prior to the Closing Date, the Purchaser shall, with respect to each letter of credit described on Schedule 5.12(a), and any similar or replacement letters of credit issued between the Effective Date and the Closing, but excluding any letter of credit that is collateral for, or otherwise secures, any of the Contracts of insurance set forth on Schedule 1.2(f) (the "Existing Letters of Credit"), at Purchaser's sole option with respect to each Existing Letter of Credit, (i) (a) cause replacement letters of credit to be issued to the beneficiaries of such Existing Letter of Credit and (b) coordinate with the Sellers to obtain the originals of such Existing Letter of Credit from each beneficiary thereof to return to the issuing financial institution ("Lender") and deliver to Lender each such Existing Letter of Credit, (ii) post cash collateral in a bank account controlled by Lender in an amount sufficient to cover the amounts outstanding on the Existing Letter of Credit or (iii) provide other arrangements satisfactory to the Lender in the form of back-up letters of credit or other credit support.

(b)    On or prior to the Closing Date, the Purchaser shall, with respect to each surety bond described on Schedule 5.12(b), and any similar or replacement surety bonds issued between the Effective Date and the Closing (the "Existing Surety Bonds"), at Purchaser's sole option with respect to each Existing Surety Bond, (i) (a) cause replacement surety bonds to be issued to the beneficiaries of such Existing Surety Bonds and (b) coordinate with the Sellers to obtain the originals of such Existing Surety Bonds from each beneficiary thereof to return to the applicable surety (each, a "Surety") and deliver to such Surety each such applicable Existing Surety Bond, (ii) post cash collateral in a bank account controlled by the applicable Surety in an amount sufficient to cover the amounts outstanding on the applicable Existing Surety Bond or (iii) provide other arrangements satisfactory to the applicable Surety in the form of other credit support.

(c)    For the avoidance of doubt, any cash posted by Sellers as cash collateral to secure obligations under the Existing Letters of Credit or Existing Surety Bonds shall be returned to Sellers and treated as an Excluded Asset hereunder.

Section 5.13    Transfer of Guarantees of Service Contracts of Transferred Subs. On or prior to the Closing, the Purchaser shall (i) take all steps necessary to assume the obligations of Parent as guarantor of each of the Service Contracts (which assumption shall result in the release of the Parent from all obligations as guarantor of such Service Contracts) in compliance with

30

each of (a) Article 4.1(A) of that certain Guaranty Agreement between Synagro Technologies, Inc. and The Philadelphia Municipal Authority, dated as of October 8, 2008; (b) Article 4.1(A) of that certain Guaranty Agreement between Synagro Technologies, Inc. and the Sacramento Regional County Sanitation District, dated as of May 6, 2003; and (c) Section 4.01(A) of that certain Guaranty Agreement from Synagro Technologies, Inc. to U.S. Bank National Association, dated as of July 1, 2008 and (ii) take such other actions in connection with the assumption of the obligations of the Parent under each of the agreements described in clause (i) above as may be reasonably requested by the trustee or, if applicable, bond insurer under the applicable Project Finance Indenture; provided that Sellers shall use commercially reasonable efforts to assist Purchaser in its undertaking of such steps and actions described in this Section 5.13, including the provision of customary legal opinions of Parent's General Counsel and officer's certificates and interactions with credit rating agencies.

Section 5.14    Employee/Labor Matters.

(a)    Except as set forth on Schedule 5.14(a), each Employee shall receive an offer of employment from Purchaser at least fifteen (15) days prior to the Closing, or within five (5) Business Days of the applicable date of hire by Sellers with respect to any Employee hired within the 15-day period prior to the Closing. Such offer of employment shall be initially at the same annual base salary or base hourly wage rate, work location, target annual bonus opportunity and substantially comparable position as provided to such Employee by Sellers or an Affiliate of Sellers as of immediately prior to the Closing and which shall provide that employment with Purchaser or one of its Affiliates will commence effective as of the Closing, provided that such offer of employment to any Employee who is subject to the Collective Bargaining Agreements (collectively, the "Union Employees") shall be upon the terms and conditions set forth in the Collective Bargaining Agreements without change, which Purchaser shall assume and be bound by in their entirety. Purchaser shall have sole responsibility for all obligations and liabilities arising under such Collective Bargaining Agreements. Each Employee who accepts the offer of employment pursuant to the prior sentence and commences employment with Purchaser or an Affiliate of Purchaser as of the Closing shall be deemed a "Transferred Employee" as of immediately following the Closing; provided, that any Employee who is on long-term disability leave shall not be deemed a Transferred Employee until such time as the individual returns from such leave.

(b)    For at least twelve (12) months following the Closing Date, Purchaser shall provide, or shall cause any of Purchaser's Affiliates to provide, each Transferred Employee (other than Union Employees) who remains employed by Purchaser or any of Purchaser's Affiliates with compensation, benefits, position and principal work location (other than any Exit Bonuses or Retention Bonuses) that are substantially comparable in the aggregate as provided to such individual as of immediately prior to the Closing.

(c)    Purchaser shall, or shall cause one of its Affiliates to, provide to each Transferred Employee who remains employed by Purchaser or any Affiliate full credit for such Transferred Employee's service with Sellers or any of their respective Affiliates prior to the Closing for all purposes, including for purposes of eligibility, vesting, benefit accruals and determination of the level of benefits (including, for purposes of vacation, severance and retirement benefits), under any benefit plan in which such Transferred Employee participates on

31

or following the Closing to the same extent recognized by Sellers or any of their respective Affiliates immediately prior to the Closing under any similar type of compensation or Benefit Plan set forth in Schedule 3.15(a), provided, however, that such service shall not be recognized to the extent that such recognition would result in a duplication of benefits (including, without limitation, duplication of coverage). Purchaser shall, or shall cause one of its Affiliates to: (i) waive any limitation on health and welfare coverage of such Transferred Employees due to pre-existing conditions, waiting periods, active employment requirements, and requirements to show evidence of good health under any applicable health and welfare plan of Purchaser or any of its Affiliates to the extent such Transferred Employees were covered under a similar Benefit Plan of the Sellers or any of their respective Affiliates and (ii) credit each such Transferred Employee with all eligible payments, co-payments and co-insurance paid by such employee under any Benefit Plan of the Sellers or any of their respective Affiliates prior to the Closing Date during the year in which the Closing occurs for the purpose of determining the extent to which any such employee has satisfied any applicable deductible and whether such employee has reached the out-of-pocket maximum under any benefit plan of Purchaser or any Affiliate for such year. Unless required by Law to be paid to Employees upon the Closing (or any Transferred Employee consents to recognition and credit by Purchaser), Purchaser shall recognize and credit, and shall cause its Affiliates to recognize and credit, the vacation days and paid time off accrued by such Transferred Employees prior to the Closing.

(d)    In accordance with Treasury Regulation Section 54.4980B-9 Q&A 7, as of the Closing Date, Purchaser will assume all liabilities for providing and administering all required notices and continuation coverage following the Closing Date under Section 4980B of the Code ("COBRA") to all Employees and their respective dependents and to all M & A Qualified Beneficiaries (as defined in Treasury Regulation Section 54.4980B-9 Q&A 4). Seller will have no COBRA liability or obligations to such Employees and their respective dependents or to such M&A Qualified Beneficiaries after the Closing Date, except as required by Law.

(e)    Purchaser acknowledges and agrees that it shall be liable for, and hereby expressly assumes all liabilities under, those Benefit Plans listed on Schedule 5.14(e).

(f)    Purchaser may, at its option and in its sole discretion, identify Benefit Plans in addition to those set forth on Schedule 5.14(e) that it chooses to assume and shall provide written notice at least five (5) Business Days prior to the Closing to Sellers of Purchaser's decision to assume any Benefit Plans (together with Subsidiary Benefit Plans, the "Assumed Benefit Plans") and the Assumed Benefit Plans shall be listed on such notice and Schedule 5.14(e), and Purchaser acknowledges and agrees that it hereby expressly assumes all liabilities under, such Assumed Benefit Plans.

(g)    As of the Closing, Sellers shall cease to employ all Employees, except as set forth on Schedule 5.14(g).

(h)    Notwithstanding any provision in this Section 5.14 to the contrary, nothing in this Section 5.14 shall constitute or be construed as (i) an amendment, termination or other modification of any employee benefit or compensation plan or arrangement, or a restriction or other limitation on the right of any party hereto to amend, terminate or otherwise modify any such plans or arrangements, or (ii) a guarantee of employment for any period, or a restriction or

32

other limitation on the right of any party hereto to terminate the employment of any individual at any time.

Section 5.15    Books and Records; Personnel. For a period of three (3) years after the Closing Date (or such longer period as may be required by any Governmental Entity or Legal Proceeding):

(a)    the Purchaser shall not dispose of or destroy any of the business records and files of the Business transferred to it hereunder; and

(b)    the Purchaser shall allow the Sellers and any of their directors, officers, employees, counsel, representatives, accountants and auditors access to all business records and files of the Sellers, the Transferred Subs or the Business that are transferred to Purchaser in connection herewith, which are reasonably required by the Sellers for purposes related to the Chapter 11 Cases, Tax matters and other reasonable business purposes, during regular business hours and upon reasonable notice, and the Sellers shall have the right to make copies of any such records and files.

(c)    Notwithstanding the foregoing or anything to the contrary in this Agreement, (i) Purchaser may dispose of any such business records or files of the Business which are offered to, but not accepted by, the Sellers within ninety (90) days of receipt of such offer, and (ii) Purchaser shall not be required to share any such business records or files in any dispute with or relating to any of the Sellers, the Transferred Subs or the Business, other than as required by Law or any Legal Proceeding.

Section 5.16    Termination of Intercompany Agreements.

(a)    On or prior to the Closing Date, the Sellers shall terminate, or shall cause to be terminated, all Contracts between any Transferred Sub on the one hand, and any Seller or its Affiliates (other than the Transferred Subs) on the other hand relating to the provision of services, cost-sharing or any other intercompany arrangement, except as are listed or described on Schedule 5.16.

(b)    The Sellers shall terminate, or shall cause to be terminated, all tax sharing, allocation, indemnity or similar agreements or arrangements that the Sellers and any Affiliates thereof are currently parties to, such that no payments under any existing agreements will need to be made on or after the Closing Date.

Section 5.17    Payments Received. The Sellers and the Purchaser each agree that after the Closing they will hold and will promptly transfer and deliver to the other, from time to time as and when received by them, any cash, checks with appropriate endorsements (using their best efforts not to convert such checks into cash) or other property that they may receive on or after the Closing which properly belongs to the other party and will account to the other for all such receipts.

Section 5.18    Cooperation with Financing. Sellers shall, and shall use commercially reasonable efforts to cause the representatives of the Sellers to, at Purchaser's expense, (i) make members of senior management reasonably available to participate in meetings, drafting sessions

33

and due diligence sessions related to Purchaser's financing of the Cash Payment at Closing (the "Financing"), (ii) furnish Purchaser and its representatives with financial and other pertinent information of the Sellers as may be reasonably requested by Purchaser, including all information contemplated to be delivered after the Effective Date, as is necessary or customary in connection with the Financing, (iii) assist Purchaser and its financing sources in the preparation of information memoranda, lender presentations and similar documents and materials, in connection with the Financing (provided that no Seller shall be required to issue any such memoranda, presentation or other document), (iv) facilitate the pledging of collateral for the Financing (provided that no Seller or any officer or employee thereof shall be required to execute any documents, including any pledge or security documents or any other definitive financing documents, prior to the Closing) and (v) use commercially reasonable efforts to obtain such consents, approvals, authorizations and instruments which may be reasonably requested by Purchaser in connection with the Financing and collateral arrangements, including, without limitation, customary payoff letters, releases of liens and instruments of termination or discharge. If the Closing does not occur, Sellers, the Transferred Subs and their respective officers, directors, employees and representatives shall be indemnified and held harmless by Purchaser for and against any and all liabilities, losses, damages, claims, costs, expenses, interest, awards, judgments and penalties suffered or incurred by them in connection with the Financing and any information utilized in connection therewith. Notwithstanding anything contained in this Agreement to the contrary, Purchaser acknowledges and agrees that Purchaser's obligations hereunder are not conditioned in any matter upon Purchaser obtaining any financing.

Section 5.19    Intellectual Property Matters.

(a)    Sellers hereby acknowledge and agree that, from and after the Closing, Purchaser shall have the sole right, and Sellers shall have no further right, to use the marks included in the Acquired Assets and any marks containing, comprising or confusingly similar to any of the foregoing (each, a "Restricted Mark"), other than in the case of disclosures by Sellers of their former ownership of the Business. As soon as possible following the Closing, but in any event within one hundred twenty (120) days following the Closing, each of the Sellers shall take, and shall cause their Affiliates to take, such corporate, limited liability company and any other action necessary to change its corporate and company name to a name that does not contain or include any Restricted Mark, including any necessary filings required by applicable Law.

(b)    Prior to the Closing, Sellers shall use commercially reasonable efforts to provide Purchaser with a schedule of all payments, fees, responses to office actions or filings required to be made with respect to any Registered Intellectual Property that is material to the Business and having a due date within sixty (60) days after the Closing.

Section 5.20    Insurance Matters. In furtherance, and not in limitation, of Section 1.5 of this Agreement, to the extent that any Contracts of insurance included in the Acquired Assets cannot be transferred to Purchaser, if requested by Purchaser and permitted under the applicable policies, Sellers shall use commercially reasonable efforts to cooperate with Purchaser, at Purchaser's sole cost and expense, to (i) provide Purchaser with the benefits of formerly in effect insurance policies under which the Transferred Subs were insureds for all liabilities, occurrences and claims arising out of events, conditions or circumstances involving the Transferred Subs

34

which took place or existed prior to the Closing, and (ii) take such actions as may be necessary or desirable to enable Purchaser to access and recover under such insurance policies.

## ARTICLE VI

## CONDITIONS PRECEDENT

Section 6.1    Conditions Precedent to Obligation of the Sellers and the Purchaser. The respective obligations of each party hereto to effect the transactions contemplated by this Agreement shall be subject to the satisfaction of the following conditions:

(a)    the Sale Order shall have been entered and the Sale Order shall have become a Final Order;

(b)    the waiting period applicable to the Acquisition, if any, under the HSR Act shall have expired or been terminated; and

(c)    there shall not be issued in effect by or before any court or other governmental body an Order or injunction restraining or prohibiting the transactions contemplated hereby.

Section 6.2    Conditions Precedent to Obligation of the Sellers. The obligation of the Sellers to effect the transactions contemplated by this Agreement shall be subject to the satisfaction or waiver at or prior to the Closing Date of the following additional conditions:

(a)    the Purchaser shall have performed in all material respects its obligations under this Agreement required to be performed by the Purchaser at or prior to the Closing Date; and

(b)    the representations and warranties of the Purchaser contained in this Agreement shall be true and correct in all material respects (without giving effect to any materiality or material adverse effect qualifications contained therein) as of the Closing Date as if made at and as of such date (except to the extent such representations and warranties are expressly made as of a specific date, in which case such date shall apply).

Section 6.3    Conditions Precedent to Obligation of the Purchaser. The obligation of the Purchaser to effect the transactions contemplated by this Agreement shall be subject to the satisfaction or waiver at or prior to the Closing Date of the following additional conditions:

(a)    the Sellers shall have performed in all material respects the obligations under this Agreement required to be performed by the Sellers at or prior to the Closing Date;

(b)    the representations and warranties of the Sellers contained in this Agreement shall be true and correct (without giving effect to any materiality or Material Adverse Effect qualifications contained therein, except as set forth in Section 3.19(c)(i)) as of the Closing Date as if made at and as of such date (except to the extent such representations and warranties are expressly made as of a specific date, in which case such date shall apply), except to the extent

35

that any breaches of such representations and warranties, individually or in the aggregate, have not had, or would not reasonably be expected to have, a Material Adverse Effect;

(c)    the Sellers shall have provided to Purchaser (i) a written waiver, in a form reasonably acceptable to Purchaser, from the parties set forth on Schedule 6.3(c), in respect of the rights or restrictions described on such Schedule 6.3(c) or (ii) evidence reasonably satisfactory to Purchaser that such rights or restrictions described in clause (i) with respect to the transactions contemplated herein have lapsed; and

(d)    the Sellers shall have obtained any Permit transfers and/or Permit-related consents (which may include a written consent or agreement, or other written permission, from the applicable Governmental Entity to allow Purchaser to operate the Business using the Sellers' existing Permit pending Purchaser's receipt of the new, modified or reissued Permit), the failure of which to be obtained prior to the Closing Date would materially and adversely disrupt the ordinary operation of the Business, taken as a whole, by Purchaser following the Closing.

## ARTICLE VII

## TERMINATION, AMENDMENT, AND WAIVER

Section 7.1    Termination Events. Anything contained in this Agreement to the contrary notwithstanding, this Agreement may be terminated at any time prior to the Closing Date:

(a)    by mutual written consent of Parent and the Purchaser;

(b)    by either Parent or the Purchaser if a Governmental Entity issues an Order prohibiting the transactions contemplated hereby, which Order is final and non-appealable;

(c)    by Purchaser in the event that the Bidding Procedures Order has not been entered by the Bankruptcy Court on or before the twenty-first (21st) day after the Effective Date or (B) the Sale Order has not been entered by the Bankruptcy Court on or before the seventy-sixth (76th) day after the Effective Date;

(d)    by Purchaser in the event of (i) any material breach by Sellers of any of their agreements, covenants, representations or warranties contained herein, which such breach would (if it occurred or was continuing as of the Closing Date) give rise to the failure of a condition set forth in Section 6.3(a) or Section 6.3(b) to be fulfilled, or (ii) any material breach in the Bidding Procedures Order or the Sale Order, and in either case, the failure of Sellers to cure such breach within fourteen (14) days after receipt of the Purchaser Termination Notice; provided, however, that Purchaser (1) is not itself in material breach of any of its agreements, covenants, representations or warranties contained herein or in the Bidding Procedures Order or the Sale Order, (2) notifies Sellers in writing (the "Purchaser Termination Notice") of its intention to exercise its rights under this Agreement as a result of the breach, and (3) specifies in such Purchaser Termination Notice the agreement, covenant, representation or warranty contained herein or in the Bidding Procedures Order or the Sale Order of which Sellers are allegedly in material breach;

36

(e)   by Parent in the event of any material breach by Purchaser of any of Purchaser's agreements, covenants, representations or warranties contained herein or in the Bidding Procedures Order or the Sale Order, and the failure of the Purchaser to cure such breach within fourteen (14) days after receipt of a Seller Termination Notice; provided, however, that Sellers (i) are not in material breach of any of their agreements, covenants, representations or warranties contained herein or in the Bidding Procedures Order or the Sale Order, (ii) notifies Purchaser in writing (the "Seller Termination Notice") of its intention to exercise its rights under this Agreement as a result of the breach, and (iii) specifies in such Seller Termination Notice the agreement, covenant, representation or warranty contained herein or in the Bidding Procedures Order or the Sale Order of which Purchaser is allegedly in material breach; or

(f)   by either Purchaser or Parent, if the Sellers consummate an alternative transaction (i) in which all or substantially all of the Acquired Assets are sold, transferred or otherwise disposed of and (ii) that the Bankruptcy Court has finally approved in an Order as "superior," in accordance with the Bidding Procedures Order, to the Acquisition contemplated by this Agreement.

Section 7.2    Effect of Termination.

(a)   In the event of termination of this Agreement by either party hereto, except as otherwise provided in this Section 7.2, all rights and obligations of the parties under this Agreement shall terminate without any liability of any party to any other party; provided, however, that nothing herein shall relieve any party from liability for fraud or the intentional breach of this Agreement prior to such termination or abandonment of the transactions contemplated by this Agreement. The provisions of Sections 5.9, 7.2 and Article 8 shall expressly survive the expiration or termination of this Agreement.

(b)   Notwithstanding Section 7.2(a), if this Agreement is terminated pursuant to Section 7.1(c), then Sellers shall pay to Purchaser the Expense Reimbursement, and if the Sellers subsequently consummate an Alternative Transaction prior to the first anniversary of the termination date, then Sellers shall pay to Purchaser an amount equal to the Break-Up Fee less any previously paid Expense Reimbursement, in full and complete satisfaction of all of Sellers' obligations hereunder. Notwithstanding Section 7.2(a), from and after the entry of the Bidding Procedures Order, if this Agreement is terminated pursuant to Sections 7.1(d) or 7.1(f), then Sellers shall pay to Purchaser the Break-Up Fee in full and complete satisfaction of all of Sellers' obligations hereunder. The payment of the Break-Up Fee and/or Expense Reimbursement shall be made by wire transfer of immediately available funds promptly (but in any event within two (2) Business Days) following the occurrence of one of the applicable events set forth in this paragraph, and shall be granted super priority administrative expense status in the Chapter 11 Cases. Notwithstanding anything to the contrary in this Agreement, the Purchaser's right to receive payment of the Break-Up Fee and/or Expense Reimbursement from Sellers as herein provided shall be the sole and exclusive remedy available to the Purchaser against Sellers or any of their respective former, current or future equityholders, directors, officers, Affiliates or agents with respect to this Agreement and the transactions contemplated hereby in the event that this Agreement is terminated pursuant to Sections 7.1(c), 7.1(d) or 7.1(f), and upon payment of the Break-Up Fee and/or Expense Reimbursement in the circumstances described herein, none of Sellers or any of their respective former, current or future equityholders, directors, officers,

Affiliates or agents shall have any further liability or obligation relating to or arising out of this Agreement or the transactions contemplated hereby.

(c)    In the event of termination of this Agreement pursuant to Section 7.1(a), (b), (c), (d) or (f), Purchaser and Parent shall provide joint written instructions, executed by their respective Authorized Representatives, to the Escrow Agent that instruct the Escrow Agent to promptly release the Deposit Funds and all other monies in the escrow account containing the Deposit Funds to Purchaser.

(d)    Notwithstanding Section 7.2(a), if this Agreement is terminated pursuant to Section 7.2(e), Purchaser and Parent shall provide joint written instructions, executed by their respective Authorized Representatives, to the Escrow Agent that instruct the Escrow Agent to promptly release the Deposit Funds and all other monies in the escrow account containing the Deposit Funds to Parent, as liquidated damages as Sellers' sole and exclusive remedy against Purchaser in all respects for any claim against Buyer arising out of any termination of this Agreement pursuant to Section 7.2(e). For the avoidance of doubt, nothing in this Section 7.2(d) shall limit Parent's ability to obtain specific performance of the terms of this Agreement pursuant to Section 8.16 hereof in the event of any breach by Purchaser of this Agreement.

## ARTICLE VIII

## GENERAL PROVISIONS

Section 8.1    Survival of Representations, Warranties, and Agreements.    No representations or warranties in this Agreement or in any instrument delivered pursuant to this Agreement shall survive beyond the Closing Date.

Section 8.2    Confidentiality. The Purchaser agrees to be bound by the terms of the confidentiality agreement, dated December 4, 2012, between Parent and the Guarantor. Such confidentiality agreement shall continue in full force and effect notwithstanding the execution and delivery by the parties of this Agreement, except that it will terminate on the Closing Date. From and after the Closing Date until the fifth (5th) anniversary thereof, the Sellers shall not and shall cause their Affiliates and their respective officers, and directors not to, directly or indirectly, disclose, reveal, divulge or communicate to any Person other than authorized officers, directors and employees of Purchaser or use or otherwise exploit for its own benefit or for the benefit of anyone other than Purchaser, any Confidential Information (as defined below). The Sellers and their respective officers, directors and Affiliates shall not have any obligation to keep confidential any Confidential Information if and to the extent disclosure thereof is specifically required by Law; provided, however, that in the event disclosure is required by applicable Law, the Sellers shall, to the extent reasonably possible, provide Purchaser with prompt notice of such requirement prior to making any disclosure so that Purchaser may seek an appropriate protective order. For purposes of this Section 8.2, "Confidential Information" shall mean any confidential information with respect to the Business, including, methods of operation, customers, customer lists, products, prices, fees, costs, Intellectual Property, inventions, trade secrets, know-how, Software, marketing methods, plans, personnel, suppliers, competitors, markets or other specialized information or proprietary matters; provided that such term shall not include, and there shall be no obligation hereunder with respect to, information that (i) is generally available

38

to the public on the Closing Date or (ii) becomes generally available to the public other than as a result of a disclosure not otherwise permissible thereunder.

Section 8.3    Public Announcements. Unless otherwise required by applicable Law or by obligations of Sellers or the Purchaser or their respective Affiliates pursuant to any listing agreement with or rules of any securities exchange, Sellers and the Purchaser shall consult with each other before issuing any other press release or otherwise making any public statement with respect to this Agreement, the transactions contemplated hereby or the activities and operations of the other and shall not issue any such release or make any such statement without the prior written consent of the other (such consent not to be unreasonably withheld or delayed).

Section 8.4    Taxes.

(a)    All sales, use, excise, transfer, documentary, conveyance and other similar Taxes ("Transfer Taxes") payable in connection with the sale, conveyance, assignments, transfers and deliveries with respect to real or personal property to be acquired by the Purchaser hereunder shall be borne and paid by the Purchaser. The parties hereto shall reasonably cooperate to timely file or cause to be filed all necessary documents (including all Tax Returns) with respect to Transfer Taxes, and to minimize any such Transfer Taxes, including with respect to delivery location.

(b)    Sellers shall use reasonable best efforts to timely file or cause to be filed notices to all relevant federal, state, local and foreign Tax Authorities ("Tax Notices") informing the relevant Tax Authorities of the Chapter 11 Case in a manner sufficient to limit Purchaser's liability for Tax obligations associated with time periods prior to the Closing Date.

(c)    The Sellers and the Purchaser shall promptly provide each other with any reasonably requested information for purposes of determining any Tax liability in respect of the Acquired Assets, and shall otherwise make available to each other all information, records, or documents relating to liabilities for Taxes in respect of the Acquired Assets. The Sellers and the Purchaser shall preserve all such information, records and documents until the expiration of any statute of limitations or extensions thereof.

(d)    As to any Acquired Asset acquired by the Purchaser, the Sellers and the Purchaser shall apportion the liability for real and personal property Taxes, ad valorem Taxes, and similar Taxes ("Periodic Taxes") for all Tax periods including but not beginning or ending on the Closing Date applicable to such Acquired Asset (all such periods of time being hereinafter called "Proration Periods"). The Periodic Taxes described in this Section 8.4(d) shall be apportioned between the Sellers and the Purchaser as of the Closing Date, with the Purchaser liable for that portion of the Periodic Taxes equal to the Periodic Tax for the Proration Period multiplied by a fraction, the numerator of which is the number of days remaining in the applicable Proration Period on and after the Closing Date, and the denominator of which is the total number of days covered by such Proration Period. The Sellers shall be liable for that portion of the Periodic Taxes for a Proration Period for which the Purchaser is not liable under the preceding sentence. The Purchaser and the Seller shall pay or be reimbursed for Periodic Taxes (including instances in which such Periodic Taxes have been paid before the Closing Date) on this prorated basis at Closing. To the extent the liability for Periodic Taxes for a certain Proration

Period or pre-Closing Tax period is not determinable at the time of Closing or such Periodic Taxes are charged in arrears, such Periodic Taxes shall be prorated for such Proration Period, or, in the case of Periodic Taxes for a pre-Closing Tax period, the amount shall be determined for purposes of this Agreement, based on the most recent ascertainable full tax year without adjustment. Purchaser shall prepare all Tax Returns for the Taxes described in this Section 8.4(d) consistent with past practice unless otherwise required by Law and the party hereto responsible under applicable Law for paying a Tax described in this Section 8.4(d) shall be responsible for administering the payment of such Tax. For purposes of this Section 8.4(d), the Proration Period for ad valorem Taxes and real and personal property Taxes shall be the fiscal period for which such Taxes were assessed by the applicable Tax jurisdiction.

(e)     Purchaser hereby waives compliance by Seller and its Affiliates with the requirements and provisions of any "bulk-transfer" Laws of any jurisdiction that may otherwise be applicable with respect to the sale of any or all of the Acquired Assets to Purchaser. Pursuant to Section 363(f) of the Bankruptcy Code, the transfer of the Acquired Assets shall be free and clear of any security interests in the Acquired Assets, including any liens or claims arising out of the bulk transfer laws, and the parties shall take such steps as may be necessary or appropriate to so provide in the Sale Order.

(f)     Sellers shall use reasonable best efforts to have in place a valid election under Section 754 of the Code for all of the Transferred Subs that are partnerships for U.S. federal income tax purposes with respect to any taxable year (or portion thereof) which includes the Closing Date.

Section 8.5     Notices. All notices, claims, demands, and other communications hereunder shall be in writing and shall be deemed given upon (a) confirmation of receipt of a facsimile transmission, (b) confirmed delivery by a standard overnight carrier or when delivered by hand, or (c) the expiration of five (5) Business Days after the day when mailed by registered or certified mail (postage prepaid, return receipt requested), addressed to the respective parties at the following addresses (or such other address for a party hereto as shall be specified by like notice):

        (a)     If to the Guarantor, to

        EQT Infrastructure II Limited Partnership
        Attention: EQT Infrastructure II GP B.V.
        World Trade Center Schiphol
        H Tower, Floor 4
        Schiphol Boulevard 355
        1118 BJ Schiphol
        The Netherlands
        Attention: Gideon J. Van der Ploeg

        with a copy to

        STI Infrastructure Company, Inc.
        c/o EQT Partners Inc.

40

1114 Avenue of Americas, 38th Floor
New York, New York 10036
Facsimile: (917) 281-0845
Attention: Glen Matsumoto

with another copy to
Weil, Gotshal & Manges LLP
200 Crescent Court, Suite 300
Dallas, Texas 75201
Facsimile: (214) 746-7777
Attention: Michael A. Saslaw
     Martin A. Sosland

(b)    If to the Purchaser, to

STI Infrastructure Company, Inc.
c/o EQT Partners Inc.
1114 Avenue of Americas, 38th Floor
New York, New York 10036
Facsimile: (917) 281-0845
Attention: Glen Matsumoto

with a copy to

Weil, Gotshal & Manges LLP
200 Crescent Court, Suite 300
Dallas, Texas 75201
Facsimile: (214) 746-7777
Attention: Michael A. Saslaw
     Martin A. Sosland

and

(c)    If to the Sellers, to

Synagro Technologies, Inc.
435 Williams Court, Suite 100
Baltimore, Maryland 21220
Facsimile: (713) 369-1751
Attention: General Counsel

with a copy to

Skadden, Arps, Slate, Meagher & Flom LLP
155 N. Wacker Drive
Chicago, Illinois 60606

41

port

of venue of any such litigation in the Bankruptcy Court. EACH PARTY HERETO IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

Section 8.10   Expenses. Except as otherwise expressly provided herein, whether or not the transactions contemplated by this Agreement are consummated, all costs and expenses incurred in connection with this Agreement and the transactions contemplated thereby shall be paid by the party hereto incurring such expenses.

Section 8.11   Amendment. This Agreement may not be amended except by an instrument in writing signed on behalf of all the parties hereto.

Section 8.12   Waiver. At any time prior to the Closing Date, the parties hereto may (a) extend the time for the performance of any of the obligations or other acts of the other parties hereto, (b) waive any inaccuracies in the representations and warranties contained herein or in any document delivered pursuant hereto and (c) waive compliance with any of the agreements or conditions contained herein. Any agreement on the part of a party hereto to any such extension or waiver shall be valid only if set forth in an instrument in writing signed on behalf of such party.

Section 8.13   Counterparts; Effectiveness. This Agreement may be executed in two or more counterparts, each of which shall be deemed to be an original but all of which shall constitute one and the same agreement. This Agreement shall become effective when each party hereto shall have received counterparts thereof signed by all the other parties hereto.

Section 8.14   Severability; Validity; Parties in Interest. If any provision of this Agreement or the application thereof to any Person or circumstance is held invalid or unenforceable, the remainder of this Agreement, and the application of such provision to other Persons or circumstances, shall not be affected thereby, and to such end, the provisions of this Agreement are agreed to be severable. Nothing in this Agreement, express or implied, is intended to confer upon any Person not a party to this Agreement any rights or remedies of any nature whatsoever under or by reason of this Agreement.

Section 8.15   Schedules; Materiality. The inclusion of any matter in any Schedule shall be deemed to be an inclusion for all purposes of this Agreement, to the extent that such disclosure is sufficient to identify the Section to which such disclosure is responsive, but inclusion therein shall not be deemed to constitute an admission, or otherwise imply, that any such matter is material or creates a measure for materiality for purposes of this Agreement. The disclosure of any particular fact or item in any Schedule shall not be deemed an admission as to whether the fact or item is "material" or would constitute a "Material Adverse Effect."

Section 8.16   Specific Performance; Sole and Exclusive Remedy for Seller Breach.

(a)   The parties hereto recognize that if Purchaser breaches this Agreement (whether or not such breach is material or willful), monetary damages alone would not be adequate to compensate the Sellers for their injuries. The Sellers shall therefore be entitled, in

43

addition to any other remedies that may be available, to obtain specific performance of the terms of this Agreement. If any action is brought by the Sellers to enforce this Agreement, Purchaser shall waive the defense that there is an adequate remedy at Law.

(b)    In the event of any material breach prior to the Closing by any Seller of any of Sellers' agreements, covenants, representations or warranties contained herein or in the Bidding Procedures Order or the Sale Order (including any such breach that is willful), Purchaser's sole and exclusive remedy shall be to exercise Purchaser's rights to terminate this Agreement pursuant to Section 7.1(d), in accordance with the terms of such Section 7.1(d), and to receive payment of the Break-Up Fee as provided in Section 7.2(b). Upon receipt of the Break-Up Fee, Purchaser shall not have any further cause of action for damages, specific performance or any other legal or equitable relief against Sellers or any of their respective former, current or future equityholders, directors, officers, Affiliates or agents with respect thereto.

Section 8.17    Guarantee of Purchaser's Obligations.

(a)    Guarantor hereby absolutely, irrevocably and unconditionally guarantees to Parent the payment of the Cash Payment at Closing by Purchaser arising under this Agreement (collectively, the "Obligation"). Without limiting the generality of the foregoing, this guarantee is one of payment, not collection, and a separate action or actions may be brought and prosecuted against Guarantor to enforce this guarantee, irrespective of whether any action is brought against Purchaser or whether Purchaser is joined in any such actions.

(b)    If Purchaser fails to perform the Obligation requiring payment, in whole or in part, when such Obligation is due, Guarantor shall promptly pay such Obligation in lawful money of the United States. Guarantor shall pay such amount within five (5) Business Days of receipt of written demand for payment from Parent. Parent may enforce Guarantor's obligations under this Section 8.17 without first suing Purchaser or joining Purchaser in any suit against Guarantor, or enforcing any rights and remedies against Purchaser, or otherwise pursuing or asserting any claims or rights against Purchaser or any other Person or any of its or their property which may also be liable with respect to the matters for which Guarantor is liable under this Section 8.17. Notwithstanding the foregoing, Guarantor shall not owe or pay more than one Obligation, and Guarantor reserves the right to assert any defenses which Purchaser may have to payment or performance of the Obligation.

**[Remainder of Page Intentionally Left Blank]**

851107 06C-CHISR01A - MSW

## ARTICLE IX

## DEFINITIONS

As used herein, the terms below shall have the following meanings:

"*Accounts Receivable*" has the meaning set forth in Section 1.1(c).

"*Acquired Assets*" has the meaning set forth in Section 1.1.

"*Acquired Intellectual Property*" means all Intellectual Property owned by any of the Sellers or any of the Transferred Subs.

"*Acquisition*" has the meaning set forth in the Recitals.

"*Action*" means any claim, charge, action, suit, arbitration, mediation, inquiry, proceeding or investigation by any person or Governmental Entity before any Governmental Entity or any arbitrator or mediator.

"*Affiliate*" means, with respect to any Person, any other Person directly or indirectly controlling or controlled by, or under direct or indirect common control with, such Person.

"*Agreement*" has the meaning set forth in the Preamble.

"*Alternative Transaction*" means (i) any transaction or series of related transactions (including by merger, stock purchase, asset purchase, reorganization or other type of transaction) in which any Person (other than Purchaser) (A) becomes the beneficial owner of a majority of the voting stock of Parent or (B) acquires a majority of the Acquired Assets or (ii) a standalone plan of reorganization of any of the Sellers.

"*Ancillary Documents*" means the Bill of Sale, Assignment and Assumption Agreement and each other agreement, document or instrument (other than this Agreement) executed and delivered by the parties hereto in connection with the consummation of the transactions contemplated by this Agreement.

"*Annual Balance Sheet*" has the meaning set forth in Section 3.18(a).

"*Annual Financial Statements*" has the meaning set forth in Section 3.18(a).

"*Assigned Contracts*" has the meaning set forth in Section 1.1(e).

"*Assignment and Assumption Agreement*" has the meaning set forth in Section 2.2(a)(v).

"*Assumed Benefit Plans*" has the meaning set forth in Section 5.14(f).

"*Assumed Leases*" has the meaning set forth in Section 1.1(h).

"*Assumed Liabilities*" has the meaning set forth in Section 1.3.

45

"*Auction*" has the meaning set forth in Section 5.7(a).

"*Baltimore SPE Loan Agreement*" has the meaning set forth in the definition of Project Finance Debt.

"*Bankruptcy Code*" has the meaning set forth in the Recitals.

"*Bankruptcy Court*" has the meaning set forth in the Recitals.

"*Benefit Plan*" means an "employee benefit plan" (within the meaning of Section 3(3) of ERISA), and any employment, termination, severance, retention, change in control, deferred compensation, bonus or other incentive compensation, equity compensation, retirement, welfare benefit, Tax gross up, vacation or other paid time off, educational assistance, or flexible benefit (including expense reimbursement account) plan, program, agreement or arrangement or other material employee benefit plan, program, agreement or arrangement, in each case as to which any Seller or Transferred Sub has any obligation or liability, contingent or otherwise with respect to the Employees.

"*Bidding Procedures*" means bid procedures in substantially the form attached hereto as Exhibit D, to be approved by the Bankruptcy Court pursuant to the Bidding Procedures Order.

"*Bidding Procedures Order*" means an Order of the Bankruptcy Court in substantially the form attached hereto as Exhibit E.

"*Break-Up Fee*" means a dollar amount equal to $13,800,000, which shall, subject to Bankruptcy Court approval, constitute a super priority administrative expense under Section 503(b)(1) of the Bankruptcy Code and shall be paid as set forth in Section 7.2.

"*Business*" has the meaning set forth in the Recitals.

"*Business Day*" means any day that is not a Saturday, Sunday or other day on which banking institutions in New York, New York are authorized or required by Law or executive order to close.

"*Capital Lease*" has the meaning set forth in the definition of Indebtedness.

"*Cash Payment at Closing*" has the meaning set forth in Section 1.6(a).

"*Chapter 11 Cases*" has the meaning set forth in the Recitals.

"*Closing*" has the meaning set forth in Section 2.1.

"*Closing Date*" has the meaning set forth in Section 2.1.

"*COBRA*" has the meaning set forth in Section 5.14(d).

"*Code*" means the Internal Revenue Code of 1986, as amended.

"*Collective Bargaining Agreements*" has the meaning set forth in Section 3.16(a).

"*Confidential Information*" has the meaning set forth in Section 8.2.

"*Contract*" means any loan or credit agreement, bond, debenture, note, mortgage, indenture, lease, supply agreement, license agreement, development agreement or other contract, agreement, obligation, commitment or instrument that is legally binding, including all amendments thereto.

"*Cure Costs*" has the meaning set forth in Section 5.6.

"*Customer Contracts*" has the meaning set forth in Section 1.1(e)(i).

"*Data Room*" means the virtual data room hosted by IntraLinks Holdings, Inc. that was established by Sellers for the purpose of making information, agreements, documents and other due diligence materials regarding the Sellers, the Transferred Subs, the Business or the Acquired Assets available to Purchaser and its representatives in connection with the transactions contemplated by this Agreement.

"*Deposit Funds*" has the meaning set forth in Section 1.6(b).

"*Effective Date*" means the date as of which this Agreement was executed as set forth in the first sentence of this Agreement.

"*Employee*" means each individual who is employed by Sellers in connection with the Business.

"*Encumbrance*" means any charge, lien, claim, mortgage, lease, hypothecation, deed of trust, pledge, security interest, option, right of use, first offer or first refusal, easement, servitude, restrictive covenant, encroachment, encumbrance, or other similar restriction of any kind.

"*Environmental Laws*" means all laws relating to pollution, the protection of human health or safety or the protection, restoration or remediation of or prevention of harm to the environment or natural resources.

"*Environmental Permit*" means all licenses, certificates, permits, authorizations, registrations, certificates of authority, approvals and other similar authorizations that have been issued or granted by any Governmental Entity under or pursuant to Environmental Laws.

"*ERISA*" means the Employee Retirement Income Security Act of 1974, as amended.

"*Escrow Agent*" has the meaning set forth in Section 1.6(b).

"*Escrow Agreement*" means that certain Escrow Agreement in the form attached hereto as Exhibit H.

"*Excluded Assets*" has the meaning set forth in Section 1.2.

"*Excluded Liabilities*" has the meaning set forth in Section 1.4.

"*Existing Letters of Credit*" has the meaning set forth in Section 5.12(a).

"*Existing Surety Bonds*" has the meaning set forth in Section 5.12(b).

"*Exit Bonuses*" means the bonuses payable by the Sellers pursuant to that certain Key Employee Incentive Plan in connection with, related to, or arising out of the consummation of the transactions contemplated by this Agreement that were approved by the board of directors of the Parent on February 9, 2013 and are set forth on the Schedule 1.3(j).

"*Expense Reimbursement*" means a dollar amount equal to the reasonably documented, actual, out-of-pocket costs and expenses incurred by the Purchaser in connection with the transactions contemplated by this Agreement, which shall (i) subject to Bankruptcy Court approval, constitute a super priority administrative expense under Section 503(b)(1) of the Bankruptcy Code, (ii) be paid as set forth in Section 7.2 and (iii) be subject to a cap of $4,500,000.

"*Final Order*" means an action taken or Order issued by the applicable Governmental Entity as to which: (i) no request for stay of the action or Order is pending, no such stay is in effect, and, if any deadline for filing any such request is designated by statute or regulation, it is passed, including any extensions thereof, (ii) no petition for rehearing or reconsideration of the action or Order, or protest of any kind, is pending before the Governmental Entity and the time for filing any such petition or protest is passed, (iii) the Governmental Entity does not have the action or Order under reconsideration or review on its own motion and the time for such reconsideration or review has passed, and (iv) the action or Order is not then under judicial review, there is no notice of appeal or other application for judicial review pending, and the deadline for filing such notice of appeal or other application for judicial review has passed, including any extensions thereof.

"*Financing*" has the meaning set forth in Section 5.18.

"*GAAP*" means United States generally accepted accounting principles (consistently applied throughout the periods indicated, as applicable).

"*Governmental Entity*" means any federal, state, provincial, local, county or municipal government, governmental, judicial, regulatory or administrative agency, commission, board, bureau or other authority or instrumentality, domestic or foreign, including any court, arbitration panel or similar body.

"*Guarantor*" has the meaning set forth in the Preamble.

"*Hazardous Substances*" means any chemicals, materials or substances defined as or included in the definition of "hazardous substances," "hazardous wastes," "controlled waste," "hazardous materials," "hazardous constituents," "restricted hazardous materials," "extremely hazardous substances," "toxic substances," "contaminants," "pollutants," "toxic pollutants," or words of similar meaning and regulatory effect under any applicable Environmental Law including, without limitation, petroleum, petroleum products, polychlorinated biphenyls and asbestos.

851107 06C-CHSR01A - MSW

"*Houston Consolidation Costs*" means all costs incurred by Sellers in connection with the consolidation of Sellers' Houston facility, including, without limitation, any moving costs, relocation costs and employee retention or severance costs.

"*HSR Act*" has the meaning set forth in Section 3.4.

"*Indebtedness*" means (without duplication): (i) all current and long-term obligations of any of the Sellers or the Business for borrowed money (excluding any trade payables or accounts payable that are required under GAAP to be reflected on or reserved for in a balance sheet)); (ii) all obligations of any of the Sellers or the Business in respect of letters of credit, to the extent drawn, and notes, debentures, bonds or other similar debt instruments; (iii) all obligations of any of the Sellers or the Business issued or assumed as the deferred purchase price of property, all conditional sale obligations of any of the Sellers or the Business and all obligations of any of the Sellers or the Business under any title retention agreement (but excluding trade accounts payable and other accrued current liabilities included in liabilities on the Interim Balance Sheet (other than the current liability portion of any indebtedness for borrowed money)); (iv) all obligations of any of the Sellers or the Business under interest rate or current swap transactions (valued at the termination value thereof); (v) all obligations of any of the Sellers or the Business to pay any amounts under a lease which is required to be classified as a capital lease or other capitalized liability on the face of a balance sheet prepared in accordance with GAAP (each, a "Capital Lease"); (vi) all obligations of the type referred to in clauses (i) through (v) of any of the Sellers or the Business for the payment of which any of the Sellers or the Business is responsible or liable, directly or indirectly, as obligor, guarantor, surety or otherwise, including guarantees of such obligations; (vii) all obligations of the type referred to in clauses (i) through (v) of Persons other than any of the Sellers or the Business secured by (or for which the holder of such obligations has an existing right, contingent or otherwise, to be secured by) any Encumbrance (other than Permitted Encumbrances) on any property or asset of the Sellers or the Business; and (viii) any accrued interest and fees (including prepayment and redemption premiums or penalties and expense reimbursements) related to any of the foregoing.

"*Insurance Claim*" means reimbursement obligations of the insured relating to deductibles, among other liabilities owing from the insured to the underwriter based on and subject to the terms of the applicable insurance policy.

"*Intellectual Property*" means all: (a) trade names, trademarks, service marks, trade dress, logos, slogans, Internet domain names and other similar designations of source or origin, together with the goodwill symbolized by, and any registrations, applications, renewals and extensions for, any of the foregoing; (b) patents and patent applications (including continuation, continuation-in-part, divisional and provisional applications) and any renewals extensions and substitutes of any of the foregoing; (c) copyrights and any copyright registrations and applications and any renewals, extensions and reversions of any of the foregoing; (d) trade secrets and confidential know-how, information, processes, methods, formulae, technology, inventions, improvements, works of authorship, compositions, algorithms, databases, customer lists and supplier lists; (e) software; and (f) other similar intellectual property.

"*Interests*" has the meaning set forth in the Recitals.

49

"*Interim Balance Sheet*" has the meaning set forth in <u>Section 3.18(a)</u>.

"*Interim Financial Statements*" has the meaning set forth in <u>Section 3.18(a)</u>.

"*Inventory*" has the meaning set forth in <u>Section 1.1(g)</u>.

"*IRS*" means the Internal Revenue Service.

"*Knowledge of the Sellers*" means the actual knowledge (without inquiry) of Eric Zimmer, Carolyn Stone, Joe Page, Mark McCormick, Pam Racey, Geoff Clark, Mark Sheppard, Brian Kendall and Steve Slauter.

"*Law*" means any United States federal, state, local or foreign statute, law, ordinance, regulation, rule, code, Order, other requirement or rule of law.

"*Legal Proceeding*" means any judicial, administrative or arbitral actions, suits, proceedings (public or private) or claims or any proceedings by or before a Governmental Entity.

"*Lender*" has the meaning set forth in <u>Section 5.12(a)</u>.

"*Material Adverse Effect*" means any event or condition in respect of the operation of the Business, the Acquired Assets, and the Assumed Liabilities that in the aggregate results in a material adverse effect on the business, financial condition and operations of the Business taken as a whole, other than the effects of events or conditions resulting from (i) the Chapter 11 Cases, (ii) changes in general economic, financial market or geopolitical conditions in the United States, (iii) general changes or developments in the industries and markets in which the Business operates, (iv) the announcement and performance of this Agreement and the other transactions contemplated by this Agreement, including termination of, reduction in or similar negative impact on relationships, contractual or otherwise, with any customers, suppliers, distributors, partners or employees of the Business to the extent due to the announcement and performance of this Agreement or the identity of Purchaser, (v) any actions required under this Agreement to obtain any approval or authorization required under applicable antitrust or competition Laws for the consummation of the transactions contemplated by this Agreement, (vi) changes in (or proposals to change) any applicable Laws or regulations or applicable accounting regulations or principles or interpretations thereof or (vii) any outbreak or escalation of hostilities or war or any act of terrorism shall, in each case, be excluded from the determination of a Material Adverse Effect; provided that such events or conditions referred to in <u>clauses (ii)</u>, <u>(iii)</u>, <u>(vi)</u> and <u>(vii)</u> above do not disproportionately affect the Business, taken as a whole, as compared to other businesses in the industries in which the Business operates.

"*Material Contracts*" has the meaning set forth in <u>Section 3.23(a)</u>.

"*Material Customers*" has the meaning set forth in <u>Section 3.24</u>.

"*Material Suppliers*" has the meaning set forth in <u>Section 3.25</u>.

"*Motion to Approve the Bidding Procedures and Sale*" means the motion filed or to be filed by the Sellers requesting that the Bankruptcy Court enter the Bidding Procedures Order and the Sale Order.

"*Non-SPE Transferred Subs*" means JABB II, LLC, Parsippany-Troy Hills Bio-Energy Center, LLC, Charlotte County Bio-Recycling Center, LLC and Philadelphia Biosolids Services, LLC.

"*Obligation*" has the meaning set forth in Section 8.17(a).

"*Order*" means any order, injunction, judgment, decree, ruling, writ, assessment or arbitration award of a Governmental Entity.

"*Owned Real Property*" has the meaning set forth in Section 1.1(h)(i).

"*Parent*" has the meaning set forth in the Preamble.

"*Periodic Taxes*" has the meaning set forth in Section 8.4(d).

"*Permits*" has the meaning set forth in Section 3.21.

"*Permitted Encumbrances*" means (i) statutory liens for current property Taxes and assessments (a) not yet due and payable or (b) being contested in good faith and by appropriate proceedings and which are reflected as current liabilities on the Interim Balance Sheet, (ii) statutory liens and rights of set-off of landlords, banks, carriers, warehousemen, mechanics, repairmen, workmen, suppliers and materialmen, and other Encumbrances imposed by Law, in each case, incurred in the ordinary course of business (x) for amounts not yet overdue, (y) being contested in good faith and by appropriate proceedings and which are reflected as current liabilities on the Interim Balance Sheet, or (z) for which payment and enforcement is stayed under the Bankruptcy Code or pursuant to orders of the Bankruptcy Court, (iii) rights of third parties pursuant to ground leases, leases, subleases, licenses, concessions or similar agreements that do not individually or in the aggregate in any material respect interfere with the Business' present use of the property subject thereto, (iv) easements, covenants, conditions, restrictions and other similar matters of record or imperfections of title with respect to the Real Property on Real Property or personalty that do not individually or in the aggregate in any material respect interfere with the Business' present use of the property subject thereto, (v) local, county, state and federal Laws, ordinances or governmental regulations, including ordinances or building codes, now or hereafter in effect relating to the Real Property, including liens set forth in any permits, licenses, governmental authorizations, registrations or approvals, that do not individually or in the aggregate in any material respect interfere with the Business' present use of the property subject thereto, (vi) Encumbrances caused by or resulting from the acts of Purchaser or any of its Affiliates, employees, officers, directors, agents, contractors, invitees or licensees, (vii) encroachments, overlaps, boundary line disputes, and any other matters which would be disclosed by an accurate survey and inspection of the Real Property and that do not materially impair the use of the Real Property for its intended purpose, (viii) rights granted to any licensee of any Intellectual Property in the ordinary course of business consistent with past practice, and (ix) those matters identified on the Permitted Encumbrances Schedule attached hereto.

51

"*Person*" means any individual, corporation, partnership, limited partnership, joint venture, limited liability company, trust or unincorporated organization or Governmental Entity or any other entity.

"*Petition Date*" has the meaning set forth in the Recitals.

"*Petitions*" has the meaning set forth in the Recitals.

"*Philadelphia SPE Loan Agreement*" has the meaning set forth in the definition of Project Finance Debt.

"*Project Finance Debt*" means: (i) that certain Loan Agreement, dated December 1, 2009, between Philadelphia Project Holdings, Inc. and Pennsylvania Economic Development Financing Authority (the "Philadelphia SPE Loan Agreement"); (ii) that certain Loan Agreement, dated December 1, 2002, between Sacramento Project Finance, Inc. and California Pollution Control Financing Authority (the "Sacramento SPE Loan Agreement"); (iii) that certain Amended and Restated Loan Agreement, dated July 1, 2008, between Synagro-Baltimore, L.L.C. and Maryland Industrial Development Financing Authority (the "Baltimore SPE Loan Agreement"); and (iv) Section 7.5(b) of that certain Amended and Restated Operating Agreement – Sludge Disposal Facility, dated November 5, 2003, by and among the City of Woonsocket, Woonsocket Regional Wastewater Commission and Synagro Woonsocket, Inc. (and any promissory note relating thereto).

"*Project Finance Indentures*" means: (i) that certain Indenture of Trust, dated December 1, 2009, between Pennsylvania Economic *Development* Financing Authority and U.S. Bank National Association, (ii) that certain Indenture of Trust, dated as of December 1, 2002, between California Pollution Control Financing Authority and BNY Western Trust Company and (iii) that certain Amended and Restated Trust Indenture, dated as of July 1, 2008, between Maryland Industrial Development Financing Authority and U.S. Bank National Association.

"*Proration Periods*" has the meaning set forth in Section 8.4(d).

"*Purchase Price*" has the meaning set forth in Section 1.6(a).

"*Purchaser*" has the meaning set forth in the Preamble.

"*Purchaser Termination Notice*" has the meaning set forth in Section 7.1(d).

"*Real Property*" means the Owned Real Property, real property owned by the Transferred Subs, the real property that is the subject of the Assumed Leases and real property leased by the Transferred Subs.

"*Registered Intellectual Property*" means all issued patents, pending patent applications, trademark or service mark registrations, applications for trademark or service mark registrations, copyright registrations, applications for copyright registration and Internet domain name registrations owned, filed or applied for by any of the Sellers or Transferred Subs.

52

"*Release*" means any release, spill, emission, discharge, leaking, pumping, injection, deposit, disposal, dispersal, leaching or migration into the environment (including, without limitation, ambient air, surface water, groundwater and surface or subsurface strata) or into or out of any property, including the movement of Hazardous Substances through or in the air, soil, surface water, groundwater or property.

"*Restricted Mark*" has the meaning set forth in *Section 5.19(a)*.

"*Retention Bonuses*" means the retention bonuses payable by the Sellers pursuant to that certain Key Employee Retention Plan in connection with, related to, or arising out of the consummation of the transactions contemplated by this Agreement that were approved by the board of directors of the Parent on February 9, 2013 and are set forth on the Schedule 1.3(i).

"*Sacramento SPE Loan Agreement*" has the meaning set forth in the definition of Project Finance Debt.

"*Sale Order*" means an Order of the Bankruptcy Court in substantially the form attached hereto as Exhibit C authorizing and approving the sale of the Acquired Assets to Purchaser on the terms and conditions set forth herein.

"*Seller*" and "*Sellers*" have the meanings set forth in the Preamble.

"*Seller Disclosure Schedule*" has the meaning set forth in the introductory paragraph to Article III.

"*Seller Termination Notice*" has the meaning set forth in Section 7.1(e).

"*Short-Term Incentive Plan Bonuses*" means the bonuses payable by the Sellers pursuant to that certain Short-Term Incentive Plan in connection with, related to, or arising out of the consummation of the transactions contemplated by this Agreement that were approved by the board of directors of the Parent on February 9, 2013 and are set forth on the Schedule 1.3(k).

"*Software*" has the meaning set forth in Section 1.1(k).

"*Subsidiary Benefit Plans*" has the meaning set forth in Section 3.15(a).

"*Successful Bidder*" has the meaning specified in the Bidding Procedures.

"*Supplier Contracts*" has the meaning set forth in Section 1.1(e)(ii).

"*Surety*" has the meaning set forth in Section 5.12(b).

"*Tangible Personal Property*" has the meaning set forth in Section 1.1(i).

"*Tax*" or "*Taxes*" means (i) all federal, state, local or foreign taxes, assessments, duties, fees, levies, imposts or other assessments and similar charges, including all income, environmental, profits, inventory, capital stock, license, withholding, franchise, transfer, sales, gross receipt, use, ad valorem, unclaimed property, property, excise, severance, stamp, payroll,

social security, employment, unemployment, withholding, and estimated taxes and any charges of any kind whatsoever, (ii) all additions to tax, penalties, and interest related thereto or additional amounts imposed by any Taxing Authority in connection with any item described in clause (i), and (iii) any transferee liability in respect of any items described in clauses (i) or (ii) payable by reason of contract, assumption, transferee or successor liability, operation of Law, Treasury Regulation Section 1.1502-6(a) (or any predecessor or successor thereof of any analogous or similar provision under Law) or otherwise.

"*Tax Notices*" has the meaning set forth in Section 8.4(b).

"*Tax Return*" means any tax return, filing or information statement filed or required to be filed in connection with or with respect to any Tax (including any elections, declarations, schedules or attachments thereto, and any amendment thereof) including any information return, claim for refund, amended return or declaration of estimated Tax, and including, where permitted or required, combined, consolidated or unitary returns for any group of entities that includes the Sellers or any Affiliates thereof.

"*Taxing Authority*" means the IRS and any other governmental body responsible for the administration of any Tax.

"*Transfer Taxes*" has the meaning set forth in Section 8.4(a).

"*Transferred Employee*" shall have the meaning set forth in Section 5.14(a).

"*Transferred Sub*" and "*Transferred Subs*" have the meanings set forth in the Recitals.

"*Transferred Subs Financial Statements*" has the meaning set forth in Section 3.18(b).

"*Union Employees*" has the meaning set forth in Section 5.14(a).

IN WITNESS WHEREOF, the Sellers, the Purchaser and the Guarantor have caused this Agreement to be executed as of the Effective Date.

**SELLERS:**

SYNAGRO TECHNOLOGIES, INC.

By: _____
Name: Joseph L. Page
Title: Vice President


SYNAGRO – WWT, INC.

By: _____
Name: Joseph L. Page
Title: Vice President


ST INTERCO, INC.

By: _____
Name: Joseph L. Page
Title: Vice President


SYNAGRO CENTRAL LLC

By: _____
Name: Joseph L. Page
Title: Vice President


SYNAGRO NORTHEAST, LLC

By: _____
Name: Joseph L. Page
Title: Vice President


**[Signature Page to Acquisition Agreement]**

SYNAGRO SOUTH, LLC

By: _____
Name: _____Joseph L. Page_____
Title: _____Vice President_____


SYNAGRO WEST, LLC

By: _____
Name: _____Joseph L. Page_____
Title: _____Vice President_____


SYNAGRO DRILLING SOLUTIONS, LLC

By: _____
Name: _____Joseph L. Page_____
Title: _____Vice President_____


SYNAGRO – WCWNJ, LLC

By: _____
Name: _____Joseph L. Page_____
Title: _____Vice President_____


SOARING VISTA PROPERTIES, LLC

By: _____
Name: _____Joseph L. Page_____
Title: _____Vice President_____


[Signature Page to Acquisition Agreement]

SOUTH KERN INDUSTRIAL CENTER, LLC

By: _____
Name: _____ Joseph L. Page _____
Title: _____ Vice President _____


SYNAGRO - CONNECTICUT, LLC

By: _____
Name: _____ Joseph L. Page _____
Title: _____ Vice President _____


SYNAGRO WOONSOCKET, LLC

By: _____
Name: _____ Joseph L. Page _____
Title: _____ Vice President _____


SYNAGRO MANAGEMENT, L.P.

By: _____
Name: _____ Joseph L. Page _____
Title: _____ Vice President of its General Partner,
           Synagro Texas, LLC


SYNAGRO TEXAS, LLC

By: _____
Name: _____ Joseph L. Page _____
Title: _____ Vice President _____


[Signature Page to Acquisition Agreement]

PROVIDENCE SOILS, LLC

By:
Name: Joseph L. Page
Title: Vice President

SYNAGRO DETROIT, LLC

By:
Name: Joseph L. Page
Title: Vice President

SYNAGRO HYPEX, LLC

By:
Name: Joseph L. Page
Title: Vice President

SYNAGRO PRODUCT DISTRIBUTION, LLC

By:
Name: Joseph L. Page
Title: Vice President

[Signature Page to Acquisition Agreement]

SYNAGRO OF MINNESOTA – REHBEIN, LLC

By: _____
  Name:   Joseph L. Page
  Title:   Vice President


ENVIRONMENTAL PROTECTION & IMPROVEMENT
COMPANY, LLC

By: _____
  Name:   Joseph L. Page
  Title:   Vice President

[Signature Page to Acquisition Agreement]

SYNAGRO OF TEXAS – CDR, INC.

By:

Name:  Joseph L. Page
Title:   Vice President


EARTHWISE ORGANICS, LLC

By:

Name:  Joseph L. Page
Title:   Vice President


DRILLING SOLUTIONS, LLC

By:

Name:  Joseph L. Page
Title:   Vice President


NETCO - WATERBURY, LP

By:

Name:  Joseph L. Page
Title:   Vice President of its General Partner
         Synagro of Texas-CDR, Inc.


[Signature Page to Acquisition Agreement]

NEW YORK ORGANIC FERTILIZER COMPANY

By: _____
    Name:    Joseph L. Page
    Title:    Vice President


SYNAGRO COMPOSTING COMPANY OF CALIFORNIA, LLC

By: _____
    Name:    Joseph L. Page
    Title:    Vice President


NEW HAVEN RESIDUALS, LP

By: _____
    Name:    Joseph L. Page
    Title:    Vice President of its General Partner,
                Synagro of Texas-CDR, Inc.


SYNAGRO OF CALIFORNIA LLC

By: _____
    Name:    Joseph L. Page
    Title:    Vice President

PURCHASER:

STI INFRASTRUCTURE COMPANY, INC.

By: _____
Name:    Gideon Johannes Van der Ploeg
Title:    Chairman, President and
         Chief Executive Officer


By: _____
Name:    Marc Hugo Joan Hedeman Joosten
Title:    Director, Secretary and Treasurer

[Signature Page to Acquisition Agreement]

**GUARANTOR:**

EQT INFRASTRUCTURE II LIMITED
PARTNERSHIP, represented by its general partner
EQT Infrastructure II GP B.V., solely for purposes
of Section 8.17

By: _____

Name:    Gideon Johannes Van der Ploeg

Title:    Director


By: _____

Name:    Marc Hugo Joan Hedeman Joosten

Title:    Director

[Signature Page to Acquisition Agreement]

## Exhibit 1

## Transferred Subs

Synagro - Baltimore, L.L.C.

Sacramento Project Finance, Inc.

Synagro Organic Fertilizer Company of Sacramento, Inc.

Philadelphia Project Holding, Inc.

Philadelphia Project Finance, LLC

Philadelphia Renewable Bio-Fuels, LLC

Philadelphia Biosolids Services, LLC

JABB II, LLC

Parsippany-Troy Hills Bio-Energy Center, LLC

Charlotte County Bio-Recycling Center, LLC

**Circular 230 language and disclaimer**

Project Compost

ANY TAX ADVICE IN THIS COMMUNICATION IS NOT INTENDED OR WRITTEN BY KPMG TO BE USED, AND CANNOT BE USED, BY A CLIENT OR ANY OTHER PERSON OR ENTITY FOR THE PURPOSE OF (i) AVOIDING PENALTIES THAT MAY BE IMPOSED ON ANY TAXPAYER OR (ii) PROMOTING, MARKETING OR RECOMMENDING TO ANOTHER PARTY ANY MATTERS ADDRESSED HEREIN.

WE ARE RELYING UPON THE RELEVANT PROVISIONS OF THE INTERNAL REVENUE CODE OF 1986, AS AMENDED, THE REGULATIONS THEREUNDER, AND THE JUDICIAL AND ADMINISTRATIVE INTERPRETATIONS THEREOF, WHICH ARE SUBJECT TO CHANGE OR MODIFICATION BY SUBSEQUENT LEGISLATIVE, REGULATORY, ADMINISTRATIVE, OR JUDICIAL DECISIONS.  UNLESS YOU SPECIFICALLY REQUEST OTHERWISE, WE WILL NOT UPDATE OUR ADVICE OR CALCULATIONS FOR SUBSEQUENT CHANGES OR MODIFICATIONS TO THE LAW AND REGULATIONS, OR TO THE JUDICIAL AND ADMINISTRATIVE INTERPRETATIONS THEREOF.

THE ADVICE OR OTHER INFORMATION IN THIS DOCUMENT WAS PREPARED FOR THE SOLE BENEFIT OF KPMG'S CLIENT AND MAY NOT BE RELIED UPON BY ANY OTHER PERSON OR ORGANIZATION.  KPMG ACCEPTS NO RESPONSIBILITY OR LIABILITY IN RESPECT OF THIS DOCUMENT TO ANY PERSON OR ORGANIZATION OTHER THAN KPMG'S CLIENT.

| | FMV of Corporate Transferred Subs and Property, Plant and Equipment | |
|---|---|---|
| **Code** | **Legal Entity** | **Fair market value of Corporate Transferred Subs and PP&E** |
| CLASS IV | FMV OF ACQUIRED CORPORATE ENTITIES | |
| | Sacramento Project Finance, Inc. | 1,650,803 |
| | Synagro Organic Fertilizer Company of Sacramento, Inc. | 4,270,679 |
| | Philadelphia Project Holding, Inc. and subsidiaries | |
| | **Total FMV OF ACQUIRED CORPORATE ENTITIES** | **5,921,282** |
| CLASS V | FMV OF PROPERTY, PLANT & EQUIPMENT | |
| | 1610 Land | 8,939,000 |
| | 1612 Buildings & Leasehold Improvements | 40,409,945 |
| | 1631 Vehicles | 2,938,474 |
| | 1634 Machinery and Equipment | 169,613,318 |
| | 1635 Office Equipment | 2,038,287 |
| | 1640 Furniture and Fixtures | 2,347 |
| | 1645 Work in Process | 13,042,469 |
| **TOTAL CLASS V** | **TOTAL FMV OF PROPERTY, PLANT & EQUIPMENT** | **236,983,842** |

Note:

(1) The above FMV of PP&E excludes the FMV of PP&E in the Transferred Subs as this value is accounted for in the value of the equity interests in the Corporate Transferred Subs.

(2) The corporate Transferred Subs include the following legal entities:
- Sacramento Project Finance, Inc.
- Synagro Organic Fertilizer Company of Sacramento, Inc.
- Philadelphia Project Holding, Inc.
   - Philadelphia Project Finance, LLC
   - Philadelphia Renewable Biofuels, LLC

**Circular 230 language and disclaimer**

**Project Compost**

ANY TAX ADVICE IN THIS COMMUNICATION IS NOT INTENDED OR WRITTEN BY KPMG TO BE USED, AND CANNOT BE USED, BY A CLIENT OR ANY OTHER PERSON OR ENTITY FOR THE PURPOSE OF (i) AVOIDING PENALTIES THAT MAY BE IMPOSED ON ANY TAXPAYER OR (ii) PROMOTING, MARKETING OR RECOMMENDING TO ANOTHER PARTY ANY MATTERS ADDRESSED HEREIN.

WE ARE RELYING UPON THE RELEVANT PROVISIONS OF THE INTERNAL REVENUE CODE OF 1986, AS AMENDED, THE REGULATIONS THERFUNDER, AND THE JUDICIAL AND ADMINISTRATIVE INTERPRETATIONS THEREOF, WHICH ARE SUBJECT TO CHANGE OR MODIFICATION BY SUBSEQUENT LEGISLATIVE, REGULATORY, ADMINISTRATIVE, OR JUDICIAL DECISIONS.  UNLESS YOU SPECIFICALLY REQUEST OTHERWISE, WE WILL NOT UPDATE OUR ADVICE OR CALCULATIONS FOR SUBSEQUENT CHANGES OR MODIFICATIONS TO THE LAW AND REGULATIONS, OR TO THE JUDICIAL AND ADMINISTRATIVE INTERPRETATIONS THEREOF.

THE ADVICE OR OTHER INFORMATION IN THIS DOCUMENT WAS PREPARED FOR THE SOLE BENEFIT OF KPMG'S CLIENT AND MAY NOT BE RELIED UPON BY ANY OTHER PERSON OR ORGANIZATION.  KPMG ACCEPTS NO RESPONSIBILITY OR LIABILITY IN RESPECT OF THIS DOCUMENT TO ANY PERSON OR ORGANIZATION OTHER THAN KPMG'S CLIENT.

**FMV of Corporate Transferred Subs and Property, Plant and Equipment**

| Code | Legal Entity | Synagro Consolidated | Sacramento Project Finance | Synagro Organic Fertilizer Company of Sacramento, Inc. | Philadelphia Project Holding, Inc. | Philadelphia Project Finance, LLC | Philadelphia Renewable Biofuels, LLC | Total Corporate Transferred Subs | Fair market value of Corporate Transferred Subs and PP&E |
|---|---|---|---|---|---|---|---|---|---|
| CLASS IV | FMV OF ACQUIRED CORPORATE ENTITIES | | | | | | | | |
| | Sacramento Project Finance, Inc. | | | | | | | | 1,650,603 |
| | Synagro Organic Fertilizer Company of Sacramento, Inc. | | | | | | | | 4,270,679 |
| | Philadelphia Project Holding, Inc. and subsidiaries | | | | | | | | |
| | Total FMV OF ACQUIRED CORPORATE ENTITIES | | | | | | | | 5,921,282 |
| CLASS V | FMV OF PROPERTY, PLANT & EQUIPMENT | | | | | | | | |
| | 1610 Land | 8,939,000 | - | - | - | - | - | - | 8,939,000 |
| | 1612 Buildings & Leasehold Improvements | 78,879,694 | 15,699,749 | - | - | 22,770,000 | - | 38,469,749 | 60,409,945 |
| | 1631 Vehicles | 2,962,319 | - | 5,465 | - | - | 8,359 | 13,844 | 2,936,474 |
| | 1634 Machinery and Equipment | 189,944,767 | - | 207,597 | - | 19,805,812 | 318,040 | 20,331,449 | 169,613,318 |
| | 1636 Office Equipment | 2,049,570 | - | 7,226 | - | - | 4,037 | 11,263 | 2,038,307 |
| | 1640 Furniture and Fixtures | 2,347 | - | - | - | - | - | - | 2,347 |
| | 1645 Work in Process | 13,026,755 | - | - | - | - | (15,714) | (15,714) | 13,042,469 |
| TOTAL CLASS V | TOTAL FMV OF PROPERTY, PLANT & EQUIPMENT | 295,794,452 | 15,699,749 | 220,308 | - | 42,575,812 | 314,742 | 58,810,611 | 236,983,842 |

Note:
(1) The above FMV of PP&E excludes the FMV of PP&E in the Transferred Subs as this value is accounted for in the value of the equity interests in the Corporate Transferred Subs.
(2) The corporate Transferred Subs includes the following legal entities:
- Sacramento Project Finance, Inc.
- Synagro Organic Fertilizer Company of Sacramento, Inc.
- Philadelphia Project Holding, Inc.
  - Philadelphia Project Finance, LLC
  - Philadelphia Renewable Biofuels, LLC

## FORM OF BILL OF SALE

This BILL OF SALE (this "Bill of Sale") is made as of this [____] day of [_____], 2013 by and among Synagro Technologies, Inc., Synagro – WWT, Inc., ST Interco, Inc., Synagro Central LLC, Synagro Northeast, LLC, Synagro South, LLC, Synagro West, LLC, Synagro Drilling Solutions, LLC, Synagro – WCWNJ, LLC, Soaring Vista Properties, LLC, South Kern Industrial Center, LLC, Synagro – Connecticut, LLC, Synagro Woonsocket, LLC, Synagro Management, L.P., Synagro Texas, LLC, Providence Soils, LLC, Synagro Detroit, LLC, Synagro Hypex, LLC, Synagro Product Distribution, LLC, Synagro of Minnesota – Rehbein, LLC, Environmental Protection & Improvement Company, LLC, Synagro of Texas – CDR, Inc., Earthwise Organics, LLC, Drilling Solutions, LLC, NETCO – Waterbury, LP, New York Organic Fertilizer Company, Synagro Composting Company of California, LLC, New Haven Residuals, LP, and Synagro of California LLC (each, a "Seller" and collectively, the "Sellers"), in favor and for the benefit of STI Infrastructure Company, Inc. (the "Purchaser").

WHEREAS, the Purchaser, the Sellers and the other parties named therein have entered into that certain Acquisition Agreement, dated as of April 23, 2013 (the "Acquisition Agreement"), pursuant to which the Sellers have agreed to sell, assign, transfer, convey and deliver to the Purchaser the Acquired Assets. Capitalized terms used, but not defined, herein shall have the respective meanings ascribed to them in the Acquisition Agreement.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Sellers agree as follows:

1.     The Sellers, intending to be legally bound, do hereby sell, assign, transfer, convey and deliver to the Purchaser all of the Sellers' right, title and interest in and to the Acquired Assets in accordance with the terms and conditions of the Acquisition Agreement.

2.     Upon the reasonable request of the Purchaser and without further consideration, the Sellers shall on and after the date hereof execute and deliver, and cause to be executed and delivered, to the Purchaser such deeds, assignments and other instruments as may be reasonably requested by the Purchaser, or as otherwise required, to effectuate completely the sale, assignment, transfer, conveyance and delivery to the Purchaser of the Sellers' right, title and interest in and to the Acquired Assets, and to otherwise carry out the purposes of the Acquisition Agreement.

3.     Nothing in this Bill of Sale, express or implied, is intended or shall be construed to confer upon, or give to, any Person other than the parties hereto and their respective successors and permitted assigns, any remedy or claim under or by reason of this Bill of Sale or any term, covenant or condition hereof, and all the terms, covenants, conditions and agreements contained in this instrument shall be for the sole and exclusive benefit of the parties hereto and their successors and permitted assigns. Notwithstanding the foregoing, this Bill of Sale shall inure to the benefit of, and be enforceable in all respects by, the Purchaser and its successors and permitted assigns.

4.      Nothing in this Bill of Sale shall in any way supersede, modify, replace, amend, rescind, waive, narrow or broaden any provision set forth in the Acquisition Agreement (including, without limitation, all representations, warranties, covenants, conditions and agreements therein contained) or any of the rights, remedies or obligations arising therefrom.  In the event of a conflict between this Bill of Sale and the Acquisition Agreement, the terms of the Acquisition Agreement shall take precedence and control.

5.      This Bill of Sale (i) may be executed in counterparts, each of which as so executed shall be deemed to be an original, but all of which together shall constitute one instrument, (ii) shall be governed by and construed in accordance with the Laws of the State of New York without regard to the rules of conflict of Laws of the State of New York or any other jurisdiction, and (iii) shall be binding upon and inure to the benefit of the Sellers and the Purchaser and their respective successors and permitted assigns.

*    *    *    *    *

IN WITNESS WHEREOF, the undersigned Sellers have executed this Bill of Sale as of the date first written above.

SYNAGRO TECHNOLOGIES, INC.

By:_____

Name:_____

Title:_____


SYNAGRO – WWT, INC.

By:_____

Name:_____

Title:_____


ST INTERCO, INC.

By:_____

Name:_____

Title:_____


SYNAGRO CENTRAL LLC

By:_____

Name:_____

Title:_____

SYNAGRO NORTHEAST, LLC

By:_____

Name:_____

Title:_____


SYNAGRO SOUTH, LLC

By:_____

Name:_____

Title:_____


SYNAGRO WEST, LLC

By:_____

Name:_____

Title:_____

SYNAGRO DRILLING SOLUTIONS, LLC

By:_____

Name:_____

Title:_____


SYNAGRO – WCWNJ, LLC

By:_____

Name:_____

Title:_____


SOARING VISTA PROPERTIES, LLC

By:_____

Name:_____

Title:_____


SOUTH KERN INDUSTRIAL CENTER, LLC

By:_____

Name:_____

Title:_____

SYNAGRO - CONNECTICUT, LLC

By:_____

Name:_____

Title:_____


SYNAGRO WOONSOCKET, LLC

By:_____

Name:_____

Title:_____


SYNAGRO MANAGEMENT, L.P.

By:_____

Name:_____

Title:_____


SYNAGRO TEXAS, LLC

By:_____

Name:_____

Title:_____

PROVIDENCE SOILS, LLC

By:_____

Name:_____

Title:_____


SYNAGRO DETROIT, LLC

By:_____

Name:_____

Title:_____


SYNAGRO HYPEX, LLC

By:_____

Name:_____

Title:_____


SYNAGRO PRODUCT DISTRIBUTION, LLC

By:_____

Name:_____

Title:_____

SYNAGRO OF MINNESOTA – REHBEIN, LLC

By:_____

Name:_____

Title:_____


ENVIRONMENTAL PROTECTION &
IMPROVEMENT COMPANY, LLC

By:_____

Name:_____

Title:_____

SYNAGRO OF TEXAS – CDR, INC.

By:_____

Name:_____

Title:_____


EARTHWISE ORGANICS, LLC

By:_____

Name:_____

Title:_____


DRILLING SOLUTIONS, LLC

By:_____

Name:_____

Title:_____


NETCO - WATERBURY, LP

By:_____

Name:_____

Title:_____

NEW YORK ORGANIC FERTILIZER COMPANY

By:_____

Name:_____

Title:_____


SYNAGRO COMPOSTING COMPANY OF
CALIFORNIA, LLC

By:_____

Name:_____

Title:_____


NEW HAVEN RESIDUALS, LP

By:_____

Name:_____

Title:_____


SYNAGRO OF CALIFORNIA LLC

By:_____

Name:_____

Title:_____

EXHIBIT B

## FORM OF ASSIGNMENT AND ASSUMPTION AGREEMENT

This Assignment and Assumption Agreement (the "Agreement"), dated as of [_____], 2013, is by and among Synagro Technologies, Inc., Synagro – WWT, Inc., ST Interco, Inc., Synagro Central LLC, Synagro Northeast, LLC, Synagro South, LLC, Synagro West, LLC, Synagro Drilling Solutions, LLC, Synagro – WCWNJ, LLC, Soaring Vista Properties, LLC, South Kern Industrial Center, LLC, Synagro – Connecticut, LLC, Synagro Woonsocket, LLC, Synagro Management, L.P., Synagro Texas, LLC, Providence Soils, LLC, Synagro Detroit, LLC, Synagro Hypex, LLC, Synagro Product Distribution, LLC, Synagro of Minnesota – Rehbein, LLC, Environmental Protection & Improvement Company, LLC, Synagro of Texas – CDR, Inc., Earthwise Organics, LLC, Drilling Solutions, LLC, NETCO – Waterbury, LP, New York Organic Fertilizer Company, Synagro Composting Company of California, LLC, New Haven Residuals, LP and Synagro of California LLC (each, an "Assignor" and, collectively, the "Assignors"), and STI Infrastructure Company, Inc. ("Assignee"). Capitalized terms used, but not defined, herein shall have the respective meanings ascribed to such terms in that certain Acquisition Agreement, dated as of April 23, 2013, by and among the Assignors, Assignee and the other parties named therein (the "Acquisition Agreement").

WHEREAS, this Agreement is executed and delivered by the Assignors and Assignee pursuant to the Acquisition Agreement.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Assignors and Assignee agree as follows:

1.    Assignment and Assumption of Assumed Liabilities.  As of the Closing, the Assignors hereby assign, and Assignee hereby assumes and agrees to pay, perform or otherwise discharge, the Assumed Liabilities in accordance with the terms and conditions of the Acquisition Agreement.

2.    Further Assurances.  Assignee hereby covenants and agrees that, at any time and from time to time after the delivery of this instrument, at the Assignors' reasonable request and without further consideration, Assignee will use reasonable best efforts to do, execute, acknowledge and deliver, or cause to be done, executed, acknowledged and delivered, all and every such further acts, deeds, conveyances, transfers, assignments, powers of attorney and assurances as reasonably may be required to more effectively assume, pay, perform or otherwise discharge the Assumed Liabilities in accordance with the terms hereof.

3.    Acquisition Agreement; Order of Precedence.  This Agreement is made subject to and with the benefit of the respective representations and warranties, agreements, covenants, terms, conditions, limitations and other provisions of the Acquisition Agreement (including without limitation the Seller Disclosure Schedule attached thereto), and nothing contained in this Agreement shall in any way supersede, modify, replace, amend, rescind, waive, narrow or broaden any provision set forth in the Acquisition Agreement or any of the rights, remedies or obligations arising therefrom.  To the extent any terms and provisions of this Agreement are in any way inconsistent with or in conflict with any term, condition or provision of the Acquisition Agreement, the Acquisition Agreement shall govern and control.

4.    Successors and Assigns.  The rights and obligations of the Assignors and Assignee shall extend to, be binding upon and inure solely to the benefit of their respective successors and permitted assigns.  Nothing in this instrument, express or implied, is intended or shall be construed to confer upon, or give to, any person, firm or corporation, other than the Assignors and their successors and

permitted assigns, any remedy or claim under or by reason of this instrument or any terms, covenants or condition hereof, and all the terms, covenants and conditions, promises and agreements in this instrument shall be for the sole and exclusive benefit of the Assignors and their successors and permitted assigns.

        5.      <u>Governing Law</u>.  This Agreement shall be governed by and construed in accordance with the Laws of the State of New York without regard to the rules of conflict of Laws of the State of New York or any other jurisdiction.

        6.      <u>Counterparts; Effectiveness</u>.  This Agreement may be executed in two or more counterparts, each of which shall be deemed to be an original but all of which shall constitute one and the same agreement.  This Agreement shall become effective when each party hereto shall have received counterparts thereof signed by all the other parties hereto.

[Signature page follows.]

IN WITNESS WHEREOF, the Assignors and Assignee have executed this Agreement as of the day and year first above written.

**ASSIGNORS:**

SYNAGRO TECHNOLOGIES, INC.

By: _____

Name: _____

Title: _____


SYNAGRO – WWT, INC.

By: _____

Name: _____

Title: _____


ST INTERCO, INC.

By: _____

Name: _____

Title: _____


SYNAGRO CENTRAL LLC

By: _____

Name: _____

Title: _____

SYNAGRO NORTHEAST, LLC

By: _____

Name: _____

Title: _____


SYNAGRO SOUTH, LLC

By: _____

Name: _____

Title: _____


SYNAGRO WEST, LLC

By: _____

Name: _____

Title: _____


SYNAGRO DRILLING SOLUTIONS, LLC

By: _____

Name: _____

Title: _____

SYNAGRO – WCWNJ, LLC

By: _____

Name: _____

Title: _____


SOARING VISTA PROPERTIES, LLC

By: _____

Name: _____

Title: _____


SOUTH KERN INDUSTRIAL CENTER, LLC

By: _____

Name: _____

Title: _____


SYNAGRO - CONNECTICUT, LLC

By: _____

Name: _____

Title: _____

SYNAGRO WOONSOCKET, LLC

By: _____

Name: _____

Title: _____


SYNAGRO MANAGEMENT, L.P.

By: _____

Name: _____

Title: _____


SYNAGRO TEXAS, LLC

By: _____

Name: _____

Title: _____

PROVIDENCE SOILS, LLC

By: _____

Name: _____

Title: _____


SYNAGRO DETROIT, LLC

By: _____

Name: _____

Title: _____


SYNAGRO HYPEX, LLC

By: _____

Name: _____

Title: _____


SYNAGRO PRODUCT DISTRIBUTION, LLC

By: _____

Name: _____

Title: _____

SYNAGRO OF MINNESOTA – REHBEIN, LLC

By: _____

Name: _____

Title: _____


ENVIRONMENTAL PROTECTION &
IMPROVEMENT COMPANY, LLC

By: _____

Name: _____

Title: _____

SYNAGRO OF TEXAS – CDR, INC.

By: _____

Name: _____

Title: _____


EARTHWISE ORGANICS, LLC

By: _____

Name: _____

Title: _____


DRILLING SOLUTIONS, LLC

By: _____

Name: _____

Title: _____


NETCO - WATERBURY, LP

By: _____

Name: _____

Title: _____

NEW YORK ORGANIC FERTILIZER COMPANY

By: _____

Name: _____

Title: _____


SYNAGRO COMPOSTING COMPANY OF
CALIFORNIA, LLC

By: _____

Name: _____

Title: _____


NEW HAVEN RESIDUALS, LP

By: _____

Name: _____

Title: _____


SYNAGRO OF CALIFORNIA LLC

By: _____

Name: _____

Title: _____

**ASSIGNEE:**

STI INFRASTRUCTURE COMPANY, INC.

By: _____

Name: _____

Title: _____

**EXHIBIT C**

**FORM OF SALE ORDER**

**<u>Exhibit D</u>**

**Form of Bidding Procedures**

# EXHIBIT E

## FORM OF BIDDING PROCEDURES ORDER

## PATENT ASSIGNMENT

THIS PATENT ASSIGNMENT (this "Patent Assignment") is entered into as of [●], 2013, by and between Synagro Technologies, Inc., a Delaware corporation, and the selling subsidiaries named on Appendix 1 hereto (collectively, the "Sellers") and STI Infrastructure Company, Inc., a Delaware corporation (the "Purchaser"). Capitalized terms used herein and not otherwise defined shall have the meanings ascribed thereto in the Acquisition Agreement (as defined below).

### RECITALS

WHEREAS, the Sellers, the Purchaser and EQT Infrastructure II Limited Partnership have entered into that certain Acquisition Agreement, dated as of April 23, 2013 (the "Acquisition Agreement"), pursuant to which, among other things, the Sellers have agreed to sell, assign, transfer, convey and deliver to the Purchaser all right, title and interest of the Sellers in and to the Assigned Patents (as defined below), and the Purchaser has agreed to purchase and accept all right, title and interest of the Sellers in and to the Assigned Patents from the Sellers.

NOW, THEREFORE, in consideration of the premises and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1.      Assigned Patents.  "Assigned Patents" means the patent and patent applications listed on Schedule 1 attached hereto.

2.      Assignment.  Each of the Sellers does hereby sell, assign, transfer, convey and deliver to the Purchaser all right, title and interest of the Sellers in and to the Assigned Patents, together with any continuation, continuation-in-part, divisional and provisional applications of any of the Assigned Patents, any renewals, extensions and substitutes of any of the Assigned Patents and the right to sue and recover damages for past, present and future infringement of any of the foregoing.

3.      Recordation.  Each of the Sellers hereby requests and authorizes the Commissioner of Patents and Trademarks, and any other applicable Governmental Entity, to record the Purchaser as the owner of the Assigned Patents, as assignee of the entire right, title and interest in and to the same.  The Purchaser shall have the right to record this Patent Assignment with all applicable Governmental Entities so as to perfect its ownership of the Assigned Patents.

4.      Counterparts; Effectiveness.  This Patent Assignment may be executed in two or more counterparts, each of which shall be deemed to be an original but all of which shall constitute one and the same agreement.  This Patent Assignment shall become effective when each party hereto shall have received counterparts thereof signed by all the other parties hereto.

5.      Governing Law; Submission of Jurisdiction; Waiver of Jury Trial.  This Patent Assignment shall be governed by and construed in accordance with the Laws of the State

of New York without regard to the rules of conflict of Laws of the State of New York or any other jurisdiction. Each of the parties hereto irrevocably and unconditionally consents to submit to the exclusive jurisdiction of the Bankruptcy Court for any litigation arising out of or relating to this Patent Assignment and the transactions contemplated thereby (and agrees not to commence any litigation relating thereto except in the Bankruptcy Court), and waives any objection to the laying of venue of any such litigation in the Bankruptcy Court. EACH PARTY HERETO IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS PATENT ASSIGNMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

[THE REMAINDER OF THIS PAGE IS INTENTIONALLY LEFT BLANK]

2

IN WITNESS WHEREOF, the undersigned have caused this Patent Assignment to be duly executed and delivered as of the date first set forth above.

**SELLERS:**

SYNAGRO TECHNOLOGIES, INC.

By: _____
    Name:
    Title:

**[OTHER SELLERS]**

**PURCHASER:**

STI INFRASTRUCTURE COMPANY, INC.

By: _____
    Name:
    Title:

[SIGNATURE PAGE TO PATENT ASSIGNMENT]

# Appendix 1

## Selling Subsidiaries

Synagro Technologies, Inc.

Synagro – WWT, Inc.

ST Interco, Inc.

Synagro Central LLC

Synagro Northeast, LLC

Synagro South, LLC

Synagro West, LLC

Synagro Drilling Solutions, LLC

Synagro – WCWNJ, LLC

Soaring Vista Properties, LLC

South Kern Industrial Center, LLC

Synagro - Connecticut, LLC

Synagro Woonsocket, LLC

Synagro Management, L.P.

Synagro Texas, LLC

Providence Soils, LLC

Synagro Detroit, LLC

Synagro Hypex, LLC

Synagro Product Distribution, LLC

Synagro of Minnesota – Rehbein, LLC

Environmental Protection & Improvement Company, LLC

Synagro of Texas – CDR, Inc.

Earthwise Organics, LLC

Drilling Solutions, LLC

NETCO - Waterbury, LP

New York Organic Fertilizer Company

Synagro Composting Company of California, LLC

New Haven Residuals, LP

Synagro of California LLC

5

US_ACTIVE:\44239574\3\44114.0009
853234.01-CHISR01A - MSW

**Schedule 1**

**Assigned Patents**

## TRADEMARK ASSIGNMENT

THIS TRADEMARK ASSIGNMENT (this "Patent Assignment") is entered into as of [●], 2013, by and between Synagro Technologies, Inc., a Delaware corporation, and the selling subsidiaries named on Appendix 1 hereto (collectively, the "Sellers") and STI Infrastructure Company, Inc., a Delaware corporation (the "Purchaser"). Capitalized terms used herein and not otherwise defined shall have the meanings ascribed thereto in the Acquisition Agreement (as defined below).

## RECITALS

WHEREAS, the Sellers, the Purchaser and EQT Infrastructure II Limited Partnership have entered into that certain Acquisition Agreement, dated as of April 23, 2013 (the "Acquisition Agreement"), pursuant to which, among other things, the Sellers have agreed to sell, assign, transfer, convey and deliver to the Purchaser all right, title and interest of the Sellers in and to the Assigned Trademarks (as defined below), and the Purchaser has agreed to purchase and accept all right, title and interest of the Sellers in and to the Assigned Trademarks from the Sellers.

NOW, THEREFORE, in consideration of the premises and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1.    Assigned Trademarks.  "Assigned Trademarks" means the trademark and service mark registrations and applications listed on Schedule 1 attached hereto.

2.    Assignment.  Each of the Sellers does hereby sell, assign, transfer, convey and deliver to the Purchaser all right, title and interest of the Sellers in and to the Assigned Trademarks, together with all goodwill symbolized by any of the Assigned Trademarks, any registrations, applications, renewals and extensions of any of the Assigned Trademarks and the right to sue and recover damages for past, present and future infringement or dilution of any of the Assigned Trademarks.

3.    Recordation.  Each of the Sellers hereby requests and authorizes the Commissioner of Patents and Trademarks, and any other applicable Governmental Entity, to record the Purchaser as the owner of the Assigned Trademarks, as assignee of the entire right, title and interest in and to the same.  The Purchaser shall have the right to record this Trademark Assignment with all applicable Governmental Entities so as to perfect its ownership of the Assigned Trademarks.

4.    Counterparts; Effectiveness.  This Trademark Assignment may be executed in two or more counterparts, each of which shall be deemed to be an original but all of which shall constitute one and the same agreement.  This Trademark Assignment shall become effective when each party hereto shall have received counterparts thereof signed by all the other parties hereto.

5.      <u>Governing Law; Submission of Jurisdiction; Waiver of Jury Trial</u>.  This Trademark Assignment shall be governed by and construed in accordance with the Laws of the State of New York without regard to the rules of conflict of Laws of the State of New York or any other jurisdiction.  Each of the parties hereto irrevocably and unconditionally consents to submit to the exclusive jurisdiction of the Bankruptcy Court for any litigation arising out of or relating to this Trademark Assignment and the transactions contemplated thereby (and agrees not to commence any litigation relating thereto except in the Bankruptcy Court), and waives any objection to the laying of venue of any such litigation in the Bankruptcy Court. EACH PARTY HERETO IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS TRADEMARK ASSIGNMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

[THE REMAINDER OF THIS PAGE IS INTENTIONALLY LEFT BLANK]

C:\Users\jvickery\Desktop\aquamarine\jmv US_ACTIVE_Project Aquamarine - IP Assignment Agreement_44114879_4.doc
US_ACTIVE:\44239574\3\44114.0009
853234.01-CHISR01A - MSW

IN WITNESS WHEREOF, the undersigned have caused this Trademark Assignment to be duly executed and delivered as of the date first set forth above.

**SELLERS:**

SYNAGRO TECHNOLOGIES, INC.

By: _____
     Name:
     Title:

**[OTHER SELLERS]**

**PURCHASER:**

STI INFRASTRUCTURE COMPANY, INC.

By: _____
     Name:
     Title:

[SIGNATURE PAGE TO TRADEMARK ASSIGNMENT]

## Appendix 1

## Selling Subsidiaries

Synagro Technologies, Inc.

Synagro – WWT, Inc.

ST Interco, Inc.

Synagro Central LLC

Synagro Northeast, LLC

Synagro South, LLC

Synagro West, LLC

Synagro Drilling Solutions, LLC

Synagro – WCWNJ, LLC

Soaring Vista Properties, LLC

South Kern Industrial Center, LLC

Synagro - Connecticut, LLC

Synagro Woonsocket, LLC

Synagro Management, L.P.

Synagro Texas, LLC

Providence Soils, LLC

Synagro Detroit, LLC

Synagro Hypex, LLC

Synagro Product Distribution, LLC

Synagro of Minnesota – Rehbein, LLC

Environmental Protection & Improvement Company, LLC

Synagro of Texas – CDR, Inc.

Earthwise Organics, LLC

Drilling Solutions, LLC

NETCO - Waterbury, LP

New York Organic Fertilizer Company

Synagro Composting Company of California, LLC

New Haven Residuals, LP

Synagro of California LLC

11

**Schedule 1**

**Assigned Trademarks**

EXECUTION COPY

Synagro Technologies, Inc.
Exhibit G - Collective Bargaining Agreements

| Union | Legal Entity | | Start Date | Expires |
|---|---|---|---|---|
| Local 125 (945), I.B.T | Environmental Protection and Improvement Company, LLC | | 1-Apr-11 | 31-Mar-14 |
| INTERNATIONAL UNION OF OPERATING ENGINEERS, AFL-CIO LOCAL UNION NO. 825 | Environmental Protection and Improvement Company, LLC | | 1-Apr-10 | 30-Jun-13 |

Execution Version

# ESCROW AGREEMENT
## (Basic Three Party Escrow)

THIS ESCROW AGREEMENT is entered into as of April 23, 2013, by and among STI Infrastructure Company, Inc., a Delaware corporation ("Party A"), Synagro Technologies, Inc., a Delaware corporation ("Party B", and together with Party A, sometimes referred to individually as "Party" and collectively as the "Parties"), and JPMorgan Chase Bank, NA (the "Escrow Agent").

1.    **Appointment.** The Parties hereby appoint Escrow Agent as their escrow agent for the purposes set forth herein, and Escrow Agent hereby accepts such appointment under the terms and conditions set forth herein.

2.    **Fund.** Party A agrees to deposit with Escrow Agent the sum of $23,000,000 ("Escrow Deposit"). Escrow Agent shall hold the Escrow Deposit in cash on an uninvested basis (such deposit, together with any proceeds thereof, the "Fund"); provided that, upon written instructions from an Authorized Representative (as defined in Section 3 below) of Party A received by the Escrow Agent, the Escrow Agent shall hold the Escrow Deposit in one demand deposit account and shall invest the Fund in the JPMorgan Money Market Deposit Account ("MMDA") or a successor investment offered by Escrow Agent. MMDAs have rates of interest or compensation that may vary from time to time as determined by the Escrow Agent. As may be necessary to effectuate the written instructions from an Authorized Representative of Party A (i.e., with respect to investing the uninvested cash in the Fund in the MMDA or a successor investment), the Escrow Agent is hereby authorized to execute purchases and sales of investments through the facilities of its own trading or capital markets operations or those of any affiliated entity. Escrow Agent will not provide supervision, recommendations or advice relating to either the investment of monies held in the Fund or the purchase, sale, retention or other disposition of any investment described herein, and Escrow Agent shall not have any liability for any loss sustained as a result of any investment made pursuant to the terms of this Agreement or as a result of any liquidation of any investment prior to its maturity or for the failure of an Authorized Representative of Party A to give Escrow Agent instructions to invest or reinvest the Fund. Escrow Agent shall have the right to liquidate any investments held in order to provide funds necessary to make required payments under this Agreement. All interest or other income earned under this Agreement, if any, shall be allocated to Party A and reported by Escrow Agent to the IRS, or any other taxing authority, on IRS Form 1099 or 1042S (or other appropriate form) as income earned from the Escrow Deposit by Party A whether or not said income has been distributed during such year. Escrow Agent shall withhold any taxes it deems appropriate in the absence of proper tax documentation or as required by law, and shall remit such taxes to the appropriate authorities. The Parties hereby represent to Escrow Agent that no other tax reporting of any kind is required given the underlying transaction giving rise to this Agreement.

3.    **Disposition and Termination.** (a) Promptly (but, in any event, within two (2) Business Days) following receipt by the Escrow Agent of either (i) written instructions that are executed by an Authorized Representative of each of the Parties, or (ii) a final, non-appealable order from a court of competent jurisdiction ordering the release of amounts from the Fund (an "Order"), accompanied by a written certification from counsel for the instructing Party attesting that such Order is final and not subject to further proceedings or appeal along with a written instruction from an Authorized Representative of the instructing Party given to effectuate such Order, the Escrow Agent shall, in accordance with the terms of such written instructions of the Parties or such Order, release monies from the Fund to the specified persons or entities, and in the specified amounts (up to the amount of monies in the Fund at the time of the release), as set forth in such written instructions of the Parties or such Order. Any instructions setting forth, claiming, containing, objecting to, or in any way related to the transfer or distribution of the Fund, must be in writing or set forth in a Portable Document Format ("PDF"), executed by the appropriate Party or Parties as evidenced by the signatures of the person or persons signing this Agreement or one of their designated persons as set forth in Schedule 1 (each an "Authorized Representative"), and delivered to Escrow Agent only by confirmed facsimile or attached to an email on a Business Day only at the fax number or email address set forth in Section 8 below. No instruction for or related to the transfer or distribution of the Fund shall be deemed delivered and effective unless Escrow Agent actually shall have received it on a Business Day by facsimile or as a PDF attached to an email only at the fax number or email address set forth in Section 8 and as evidenced by a confirmed transmittal to the Party's or Parties' transmitting fax number or email address and Escrow Agent has been able to satisfy any applicable security procedures as may be required hereunder. Escrow Agent shall not be liable to any Party or other person for refraining

1

Execution Version

from acting upon any instruction for or related to the transfer or distribution of the Fund if delivered to any other fax number or email address, including but not limited to a valid email address of any employee of Escrow Agent. The Parties each acknowledge that Escrow Agent is authorized to use the following funds transfer instructions to disburse any funds due to Party A and/or Party B, respectively, without a verifying call-back as set forth in Section 3(b) below:

Party A: Bank name: JPMorgan Chase, N.A.
        Bank Address: New York, NY
        ABA number: 021000021
        Account name: STI Infrastructure Company, Inc.
        Account number: 202701350

Party B: Bank name: Bank of America
        Bank Address: Charlotte, NC
        ABA number: 26009593
        Account Name: Synagro Tech Concentration
        Account Number: 8666610149

Additionally, the Parties agree that repetitive funds transfer instructions may be given to Escrow Agent for one or more beneficiaries where only the date of the requested transfer, the amount of funds to be transferred, and/or the description of the payment shall change within the repetitive instructions ("Standing Settlement Instructions"). Any such Standing Settlement Instructions shall be set up in writing in advance of any actual transfer request and shall contain complete funds transfer information (as set forth above) for the beneficiary. Any such set-up of Standing Settlement Instructions (other than those established concurrently with the execution of this Agreement), and any changes in existing set-up, shall be confirmed by means of a verifying callback to an Authorized Representative. Standing Settlement Instructions will continue to be followed until cancelled by the Parties jointly in a writing signed by an Authorized Representative and delivered to Escrow Agent in accordance with this Section. Once set up as provided herein, Escrow Agent may rely solely upon such Standing Settlement Instructions and all identifying information set forth therein for each beneficiary. Each Party agrees that any Standing Settlement Instructions shall be effective as the funds transfer instructions of such Party or the Parties, as applicable, without requiring a verifying callback, as set forth in Section 3(b) below, if such Standing Settlement Instructions are consistent with previously authenticated Standing Settlement Instructions for that beneficiary.

(b) In the event any other funds transfer instructions are set forth in a permitted instruction from a Party or the Parties in accordance with Section 3(a), Escrow Agent is authorized to seek confirmation of such funds transfer instructions by a single telephone call-back to one of the Authorized Representatives, and Escrow Agent may rely upon the confirmation of anyone purporting to be that Authorized Representative. The persons and telephone numbers designated for call-backs may be changed only in a writing executed by Authorized Representatives of the applicable Party and actually received by Escrow Agent via facsimile or as a PDF attached to an email. Except as set forth in Section 3(a) above, no funds will be disbursed until an Authorized Representative is able to confirm such instructions by telephone callback. Escrow Agent, any intermediary bank and the beneficiary's bank in any funds transfer may rely upon the identifying number of the beneficiary's bank or any intermediary bank included in a funds transfer instruction provided by a Party or the Parties and confirmed by an Authorized Representative. Further the beneficiary's bank in the funds transfer instruction may make payment on the basis of the account number provided in such Party's or the Parties' instruction and confirmed by an Authorized Representative even though it identifies a person different from the named beneficiary.

(c) The Parties acknowledge that there are certain security, corruption, transmission error and access availability risks associated with using open networks such as the internet and the Parties hereby expressly assume such risks.

(d) As used in this Section 3, "Business Day" shall mean any day other than a Saturday, Sunday or any other day on which Escrow Agent located at the notice address set forth below is authorized or required by law or executive order to remain closed. The Parties acknowledge that the security procedures set forth in this Section 3 are commercially reasonable. Upon delivery of the Fund by Escrow Agent, this Agreement shall terminate, subject to the provisions of Section 6.

4.      **Escrow Agent.** Escrow Agent shall have only those duties as are specifically and expressly provided herein, which shall be deemed purely ministerial in nature, and no other duties, including but not limited to any

Execution Version

fiduciary duty, shall be implied. Escrow Agent has no knowledge of, nor any obligation to comply with, the terms and conditions of any other agreement between the Parties, nor shall Escrow Agent be required to determine if any Party has complied with any other agreement. Notwithstanding the terms of any other agreement between the Parties, the terms and conditions of this Agreement shall control the actions of Escrow Agent. Escrow Agent may conclusively rely upon any written notice, document, instruction or request delivered by the Parties believed by it to be genuine and to have been signed by an Authorized Representative(s), as applicable, without inquiry and without requiring substantiating evidence of any kind and Escrow Agent shall be under no duty to inquire into or investigate the validity, accuracy or content of any such document, notice, instruction or request. Escrow Agent shall not be liable for any action taken, suffered or omitted to be taken by it in good faith except to the extent that Escrow Agent's gross negligence or willful misconduct was the cause of any direct loss to either Party. Escrow Agent may execute any of its powers and perform any of its duties hereunder directly or through affiliates or agents. In the event Escrow Agent shall be uncertain, or believes there is some ambiguity, as to its duties or rights hereunder, or receives instructions, claims or demands from any Party hereto which in Escrow Agent's judgment conflict with the provisions of this Agreement, or if Escrow Agent receives conflicting instructions from the Parties (where instructions from both Parties are called for herein), Escrow Agent shall be entitled either to: (a) refrain from taking any action until it shall be given (i) a joint written direction executed by Authorized Representatives of the Parties which eliminates such conflict or (ii) a court order issued by a court of competent jurisdiction (it being understood that Escrow Agent shall be entitled conclusively to rely and act upon any such court order and shall have no obligation to determine whether any such court order is final); or (b) file an action in interpleader. Escrow Agent shall have no duty to solicit any payments which may be due it or the Fund, including, without limitation, the Escrow Deposit nor shall the Escrow Agent have any duty or obligation to confirm or verify the accuracy or correctness of any amounts deposited with it hereunder. Anything in this Agreement to the contrary notwithstanding, in no event shall Escrow Agent be liable for special, incidental, punitive, indirect or consequential loss or damage of any kind whatsoever (including but not limited to lost profits), even if Escrow Agent has been advised of the likelihood of such loss or damage and regardless of the form of action.

5.      **Resignation; Succession.**  Escrow Agent may resign and be discharged from its duties or obligations hereunder by giving thirty (30) days advance notice in writing of such resignation to the Parties. Escrow Agent's sole responsibility after such thirty (30) day notice period expires shall be to hold the Fund (without any obligation to reinvest the same) and to deliver the same to a designated substitute escrow agent, if any, appointed by the Parties, or such other person designated by the Parties, or in accordance with the directions of a final court order, at which time of delivery, Escrow Agent's obligations hereunder shall cease and terminate. If prior to the effective resignation date, the Parties have failed to appoint a successor escrow agent, or to instruct the Escrow Agent to deliver the Fund to another person as provided above, at any time on or after the effective resignation date, Escrow Agent either (a) may interplead the Fund with a court located in the State of Delaware and the costs, expenses and reasonable attorney's fees which are incurred in connection with such proceeding may be charged against and withdrawn from the Fund; or (b) appoint a successor escrow agent of it own choice. Any appointment of a successor escrow agent shall be binding upon the Parties and no appointed successor escrow agent shall be deemed to be an agent of Escrow Agent. Escrow Agent shall deliver the Fund to any appointed successor escrow agent, at which time Escrow Agent's obligations under this Agreement shall cease and terminate. Any entity into which Escrow Agent may be merged or converted or with which it may be consolidated, or any entity to which all or substantially all of the escrow business may be transferred, shall be the Escrow Agent under this Agreement without further act.

6.      **Compensation.**  The Parties agree jointly and severally to pay Escrow Agent upon execution of this Agreement and from time to time thereafter reasonable compensation for the services to be rendered hereunder, which unless otherwise agreed in writing, shall be as described in Schedule 2. Each of the Parties further agrees to the disclosures set forth in Schedule 2.

7.      **Indemnification and Reimbursement.**  The Parties agree jointly and severally to indemnify, defend, hold harmless, pay or reimburse Escrow Agent and its affiliates and their respective successors, assigns, directors, agents and employees (the "Indemnitees") from and against any and all losses, damages, claims, liabilities, penalties, judgments, settlements, litigation, investigations, costs or expenses (including, without limitation, the fees and expenses of outside counsel and experts and their staffs and all expense of document location, duplication and shipment) (collectively "Losses"), arising out of or in connection with (a) Escrow Agent's performance of this Agreement, except to the extent that such Losses are determined by a court of competent jurisdiction to have been

3

Execution Version

caused by the gross negligence, willful misconduct, or bad faith of such Indemnitee; and (b) Escrow Agent's following any instructions or directions, whether joint or singular, from the Parties received in accordance with this Agreement. The Parties hereby grant Escrow Agent a lien on, right of set-off against and security interest in the Fund for the payment of any claim for indemnification, fees, expenses and amounts due to Escrow Agent or an Indemnitee. In furtherance of the foregoing, Escrow Agent is expressly authorized and directed, but shall not be obligated, to charge against and withdraw from the Fund for its own account or for the account of an Indemnitee any amounts due to Escrow Agent or to an Indemnitee under Section 6 or 7. The obligations set forth in this Section 7 shall survive the resignation, replacement or removal of Escrow Agent or the termination of this Agreement.

8.      **Notices.** All communications hereunder shall be in writing or set forth in a PDF attached to an email, and all instructions from a Party or the Parties to the Escrow Agent shall be executed by an Authorized Representative, and shall be delivered in accordance with the terms of this Agreement by facsimile, email or overnight courier only to the appropriate fax number, email address, or notice address set forth for each party as follows:

| | |
|---|---|
| If to Party A: | STI Infrastructure Company, Inc.<br>c/o EQT Partners Inc.<br>1114 Avenue of Americas, 38th Floor<br>New York, New York 10036<br>Attention: Glen Matsumoto<br>Tel No.: (917) 281-0838<br>Fax No.: (917) 281-0845 |
| With copies to: | Weil, Gotshal & Manges LLP<br>200 Crescent Court, Suite 300<br>Dallas, Texas 75201<br>Attention: Martin A. Sosland<br>                  Michael A. Saslaw<br>Tel No.: (214) 746-7700<br>Fax No.: (214) 746-7777 |
| If to Party B: | Synagro Technologies, Inc.<br>435 Williams Court, Suite 100<br>Baltimore, Maryland 21220<br>Attention: General Counsel<br>Tel No.: (312) 407-0700<br>Fax No.: (713) 369-1751 |
| With copies to: | Skadden, Arps, Slate, Meagher & Flom LLP<br>155 N. Wacker Drive<br>Chicago, Illinois 60606<br><br>Attention: George Panagakis<br>                  Shilpi Gupta<br>Tel No.: (312) 407-0700<br>Fax No.: (312) 407-0411 |
| If to Escrow Agent: | JPMorgan Chase Bank, N.A.<br>Escrow Services<br>712 Main Street 5th Floor South<br>Houston, Texas 77002<br>Attention: Ruth Chipongian<br>Fax No.: (713) 216-6927<br>Email Address: |

4

Execution Version

(Houston) sw.escrow@jpmorgan.com

9.     **Compliance with Court Orders.**  In the event that a legal garnishment, attachment, levy restraining notice or court order is served with respect to any of the Fund, or the delivery thereof shall be stayed or enjoined by an order of a court, Escrow Agent is hereby expressly authorized, in its sole discretion, to obey and comply with all such orders so entered or issued, which it is advised by legal counsel of its own choosing is binding upon it, whether with or without jurisdiction, and in the event that Escrow Agent obeys or complies with any such order it shall not be liable to any of the Parties hereto or to any other person by reason of such compliance notwithstanding such order be subsequently reversed, modified, annulled, set aside or vacated.

10.     **Miscellaneous.**  The provisions of this Agreement may be waived, altered, amended or supplemented only by a writing signed by the Escrow Agent and the Parties.  Neither this Agreement nor any right or interest hereunder may be assigned by any Party without the prior consent of Escrow Agent and the other Party.  This Agreement shall be governed by and construed under the laws of the State of Delaware.  Each Party and Escrow Agent irrevocably waives any objection on the grounds of venue, forum non-conveniens or any similar grounds and irrevocably consents to service of process by mail or in any other manner permitted by applicable law and consents to the jurisdiction of the courts located in the State of Delaware.  To the extent that in any jurisdiction either Party may now or hereafter be entitled to claim for itself or its assets, immunity from suit, execution, attachment (before or after judgment) or other legal process, such Party shall not claim, and hereby irrevocably waives, such immunity.  Escrow Agent and the Parties further hereby waive any right to a trial by jury with respect to any lawsuit or judicial proceeding arising or relating to this Agreement.  No party to this Agreement is liable to any other party for losses due to, or if it is unable to perform its obligations under the terms of this Agreement because of, acts of God, fire, war, terrorism, floods, strikes, electrical outages, equipment or transmission failure, or other causes reasonably beyond its control.  This Agreement and any joint instructions from the Parties may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument or instruction, as applicable.  All signatures of the parties to this Agreement may be transmitted by facsimile or as a PDF attached to an email, and such facsimile or PDF will, for all purposes, be deemed to be the original signature of such party whose signature it reproduces, and will be binding upon such party.  If any provision of this Agreement is determined to be prohibited or unenforceable by reason of any applicable law of a jurisdiction, then such provision shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions thereof, and any such prohibition or unenforceability in such jurisdiction shall not invalidate or render unenforceable such provisions in any other jurisdiction.  The Parties represent, warrant and covenant that each document, notice, instruction or request provided by such Party to Escrow Agent shall comply with applicable laws and regulations.  Except as expressly provided in Section 7 above, nothing in this Agreement, whether express or implied, shall be construed to give to any person or entity other than Escrow Agent and the Parties any legal or equitable right, remedy, interest or claim under or in respect of the Fund or this Agreement.

5

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date set forth above.

STI INFRASTRUCTURE COMPANY, INC.

By: _____
Name:   Gideon Johannes Van der Ploeg
Title: Chairman, President and Chief
       Executive Officer

By: _____
Name: Marc Hugo Joan Hedeman Joosten
Title: Director, Secretary and Treasurer


By: _____
Name:  Glen T. Matsumoto
Title:   Vice President

Signature page to Escrow Agreement

**IN WITNESS WHEREOF,** the parties hereto have executed this Agreement as of the date set forth above.

**STI INFRASTRUCTURE COMPANY, INC.**

By:_____
Name:  Gideon Johannes Van der Ploeg
Title: Chairman, President and Chief
       Executive Officer


By:_____
Name: Marc Hugo Joan Hedeman Joosten
Title: Director, Secretary and Treasurer

By:_____
Name:  Glen T. Matsumoto
Title:    Vice President

Signature page to Escrow Agreement

**SYNAGRO TECHNOLOGIES, INC.**

By: _____

Name: _____Joseph L. Page_____

Title: _____Vice President_____

Signature page to Escrow Agreement

**JPMORGAN CHASE BANK, NA,**
As Escrow Agent

By:

Name:

Title:

RUTH CHIPONGIAN
VICE PRESIDENT & TRUST OFFICER

**SCHEDULE I**

**Telephone Numbers and Authorized Signatures for**
**Person(s) Designated to Give Instructions and Confirm Funds Transfer Instructions**

For Party A:

| | Name | Telephone Number | Signature |
|---|---|---|---|
| 1. | Glen Matsumoto | (917) 281-0838 | |
| 2. | Gideon Johannes Van der Ploeg | +31 20 577 6680 | |
| 3. | Marc Hugo Joan Hedeman Joosten | +31 20 577 6653 | |

For Party B:

| | Name | Telephone Number | Signature |
|---|---|---|---|
| 1. | Joseph L. Page | 713-369-1703 | |
| 2. | | | |
| 3. | | | |

All instructions, including but not limited to funds transfer instructions, whether transmitted by facsimile or set forth in a PDF attached to an email, must include the signature of the Authorized Representative authorizing said funds transfer on behalf of such Party.

Schedule I to Escrow Agreement

**SCHEDULE 1**

**Telephone Numbers and Authorized Signatures for**
**Person(s) Designated to Give Instructions and Confirm Funds Transfer Instructions**

For Party A:

| Name | Telephone Number | Signature |
|------|-----------------|-----------|
| 1. Glen Matsumoto | (917) 281-0838 | |
| 2. Gideon Johannes Van der Ploeg | +31 20 577 6680 | |
| 3. Marc Hugo Joan Hedeman Joosten | +31 20 577 6653 | |

For Party B:

| Name | Telephone Number | Signature |
|------|-----------------|-----------|
| 1. Joseph L. Page | 713-369-1703 | _____ |
| 2. _____ | _____ | _____ |
| 3. _____ | _____ | _____ |

All instructions, including but not limited to funds transfer instructions, whether transmitted by facsimile or set forth in a PDF attached to an email, must include the signature of the Authorized Representative authorizing said funds transfer on behalf of such Party.

Schedule I to Escrow Agreement

**SCHEDULE 1**

**Telephone Numbers and Authorized Signatures for**
**Person(s) Designated to Give Instructions and Confirm Funds Transfer Instructions**

For Party A:

| | Name | Telephone Number | Signature |
|---|---|---|---|
| 1. | Glen T. Matsumoto | (917) 281-0838 | _____ |
| 2. | Gideon Johannes Van der Ploeg | +31 20 577 6680 | _____ |
| 3. | Marc Hugo Joan Hedeman Joosten | +31 20 577 6653 | _____ |

For Party B:

| | Name | Telephone Number | Signature |
|---|---|---|---|
| 1. | Joseph L. Page | 713-369-1703 | _[signature]_ |
| 2. | _____ | _____ | _____ |
| 3. | _____ | _____ | _____ |

All instructions, including but not limited to funds transfer instructions, whether transmitted by facsimile or set forth in a PDF attached to an email, must include the signature of the Authorized Representative authorizing said funds transfer on behalf of such Party.

Schedule I to Escrow Agreement

SCHEDULE 2

# J.P.Morgan

## Schedule of Fees and Disclosures for Escrow Agent Services

Based upon our current understanding of your proposed transaction, our fee proposal is as follows:

**Account Acceptance Fee** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .**$0.00**
Encompassing review, negotiation and execution of governing documentation, opening of the account, and completion of all due diligence documentation. Payable upon closing.

**Annual Administration Fee** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **$2,500.00**
The Administration Fee covers our usual and customary ministerial duties, including record keeping, distributions, document compliance and such other duties and responsibilities expressly set forth in the governing documents for each transaction. Payable upon closing and annually in advance thereafter, without pro-ration for partial years.

### Extraordinary Services and Out-of Pocket Expenses
Any additional services beyond our standard services as specified above, and all reasonable out-of-pocket expenses including attorney's or accountant's fees and expenses will be considered extraordinary services for which related costs, transaction charges, and additional fees will be billed at the Escrow Agent's then standard rate. Disbursements, receipts, investments or tax reporting exceeding 25 items per year may be treated as extraordinary services thereby incurring additional charges. The Escrow Agent may impose, charge, pass-through and modify fees and/or charges for any account established and services provided by the Escrow Agent, including but not limited to, transaction, maintenance, balance-deficiency, and service fees, agency or trade execution fees, and other charges, including those levied by any governmental authority.

**Fee Disclosure & Assumptions**: Please note that the fees quoted are based on a review of the transaction documents provided and an internal due diligence review. The Escrow Agent reserves the right to revise, modify, change and supplement the fees quoted herein if the assumptions underlying the activity in the account, level of balances, market volatility or conditions or other factors change from those used to set our fees. Payment of the invoice is due upon receipt.

Unless the Escrow Agent is otherwise instructed by Party A pursuant to Section 2, the escrow deposit shall be continuously held uninvested.

### Disclosures and Agreements

**Patriot Act Disclosure.** Section 326 of the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 ("USA PATRIOT Act") requires Escrow Agent to implement reasonable procedures to verify the identity of any person that opens a new account with it. Accordingly, you acknowledge that Section 326 of the USA PATRIOT Act and Escrow Agent's identity verification procedures require Escrow Agent to obtain information which may be used to confirm your identity including without limitation name, address and organizational documents ("identifying information"). You agree to provide Escrow Agent with and consent to Escrow Agent obtaining from third parties any such identifying information required as a condition of opening an account with or using any service provided by the Escrow Agent.

**OFAC Disclosure.** Escrow Agent is required to act in accordance with the laws and regulations of various jurisdictions relating to the prevention of money laundering and the implementation of sanctions, including but not limited to regulations issued by the U.S. Office of Foreign Assets Control. Escrow Agent is not obligated to execute payment orders or effect any other transaction where the beneficiary or other payee is a person or entity with whom the Escrow Agent is prohibited from doing business by any law or regulation applicable to Escrow Agent, or in any case where compliance would, in Escrow Agent's opinion, conflict with

10

applicable law or banking practice or its own policies and procedures. Where Escrow Agent does not execute a payment order or effect a transaction for such reasons, Escrow Agent may take any action required by any law or regulation applicable to Escrow Agent including, without limitation, freezing or blocking funds.

**Abandoned Property.** Escrow Agent is required to act in accordance with the laws and regulations of various states relating to abandoned property and, accordingly, shall be entitled to remit dormant funds to any state as abandoned property in accordance with such laws and regulations.

**THE FOLLOWING DISCLOSURES ARE REQUIRED TO BE PROVIDED UNDER APPLICABLE U.S. REGULATIONS, INCLUDING, BUT NOT LIMITED TO, FEDERAL RESERVE REGULATION D. WHERE SPECIFIC INVESTMENTS ARE NOTED BELOW, THE DISCLOSURES APPLY ONLY TO THOSE INVESTMENTS AND NOT TO ANY OTHER INVESTMENT.**

**Demand Deposit Account Disclosure.** Escrow Agent is authorized, for regulatory reporting and internal accounting purposes, to divide an escrow demand deposit account maintained in the U.S. in which the Fund is held into a non-interest bearing demand deposit internal account and a non-interest bearing savings internal account, and to transfer funds on a daily basis between these internal accounts on Escrow Agent's general ledger in accordance with U.S. law at no cost to the Parties. Escrow Agent will record the internal accounts and any transfers between them on Escrow Agent's books and records only. The internal accounts and any transfers between them will not affect the Fund, any investment or disposition of the Fund, use of the escrow demand deposit account or any other activities under this Agreement, except as described herein. Escrow Agent will establish a target balance for the demand deposit internal account, which may change at any time. To the extent funds in the demand deposit internal account exceed the target balance, the excess will be transferred to the savings internal account, unless the maximum number of transfers from the savings internal account for that calendar month or statement cycle have already occurred. If withdrawals from the demand deposit internal account exceeds the available balance in the demand deposit internal account, funds from the savings internal account will be transferred to the demand deposit internal account up to the entire balance of available funds in the savings internal account to cover the shortfall and to replenish any target balance that Escrow Agent has established for the demand deposit internal account. If a sixth transfer is needed during a calendar month or statement cycle, it will be for the entire balance in the savings internal account, and such funds will remain in the demand deposit internal account for the remainder of the calendar month or statement cycle.

**MMDA Disclosure and Agreement.** If MMDA is the investment for the escrow deposit as set forth above or anytime in the future, you acknowledge and agree that U.S. law limits the number of pre-authorized or automatic transfers or withdrawals or telephonic/electronic instructions that can be made from an MMDA to a total of six (6) per calendar month or statement cycle or similar period. Escrow Agent is required by U.S. law to reserve the right to require at least seven (7) days notice prior to a withdrawal from a money market deposit account.

**Unlawful Internet Gambling.** The use of any account to conduct transactions (including, without limitation, the acceptance or receipt of funds through an electronic funds transfer, or by check, draft or similar instrument, or the proceeds of any of the foregoing) that are related, directly or indirectly, to unlawful Internet gambling is strictly prohibited.