**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| *In re*: | : | Chapter 11 |
| | : | |
| Synagro Technologies, Inc., *et al.*, | : | Case No. 13-11041 (BLS) |
| | : | |
| Debtors. | : | **Hearing Date: 5/13/13 at 10:00 a .m.** |
| | : | **Objection Deadline: 5/6/13 at 4:00 p.m.** |
| | : | **Extended by Agreement to 5/8/13 at 4:00 p.m.** |

**UNITED STATES TRUSTEE'S OBJECTION TO DEBTORS' MOTION FOR ORDER UNDER BANKRUPTCY CODE SECTIONS 105, 363(b) AND 503(c)(3) APPROVING THE IMPLEMENTATION OF (I) THE KEY EXECUTIVE INCENTIVE PLAN, (II) THE KEY EMPLOYEE RETENTION PLAN AND (III) THE OFFICE CONSOLIDATION PROGRAM (D.I. 58)**

In support of her Objection to the Debtors' Motion For an Order Under Bankruptcy Code Sections 105, 363(b) and 503(c)(3) Approving the Implementation of (I) the Key Executive Incentive Plan, (II) the Key Employee Retention Plan and (III) the Office Consolidation Program (the "Motion"), Roberta A. DeAngelis, United States Trustee for Region 3 ("U.S. Trustee"), by undersigned counsel, avers as follows:

1. This Court has jurisdiction to hear this Objection.

2. Pursuant to 28 U.S.C. § 586, the U.S. Trustee is charged with overseeing the administration of Chapter 11 cases filed in this judicial district. This duty is part of the U.S. Trustee's overarching responsibility to enforce the bankruptcy laws as written by Congress and interpreted by the courts. *See United States Trustee v. Columbia Gas Sys., Inc. (In re Columbia Gas Sys., Inc.)*, 33 F.3d 294, 295-96 (3d Cir. 1994) (noting that U.S. Trustee has "public interest standing" under 11 U.S.C. § 307, which goes beyond mere pecuniary interest); *Morgenstern v. Revco D.S., Inc. (In re Revco D.S., Inc.)*, 898 F.2d 498, 500 (6th Cir. 1990) (describing the U.S. Trustee as a "watchdog").

3. Pursuant to 11 U.S.C. § 307, the U.S. Trustee has standing to raise and be heard on this Objection.

**BACKGROUND**

4. The Debtors filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code on April 24, 2013 (the "Petition Date").

5. The U.S. Trustee appointed an official committee of unsecured creditors ("Creditors' Committee") on May 6, 2013.

6. On April 24, 2013, the Debtors filed a motion for, among other things, approval of bidding procedures in connection with a proposed sale of substantially all of their assets to EQT Infrastructure II Limited Partnership ("EQT"), subject to higher and better offers ("Bidding Procedures Motion"). The stalking horse price offered by EQT is $455 million, less Project Finance Debt and Capital Leases (disclosed as $96 million and $12 million) and less unpaid payments under the proposed key employee incentive plan.

7. On April 25, 2013, the Debtors filed the instant Motion, seeking approval of (a) a Key Employee Incentive Plan ("KEIP") for 7 executive officers, (b) a Key Employee Retention Plan ("KERP") for 22 employees whom the Debtors assert are not insiders, and (c) an Office Consolidation Program ("OCP") for approximately 43 employees.[1]

**The KEIP**

8. The proposed KEIP provides for incentive payments aggregating between $850,000 and $2.1 million, allocated among the participants as described in the Motion.

(a) KEIP participants will share a bonus of $850,000 if the "Minimum Threshold" (estimated in the KEIP at $412 million) is met. The "Minimum Threshold" is

[1] The Office Consolidation Program provides for other expenditures to which the U.S. Trustee does not object.

a Valuation (defined as total enterprise value or acquisition value, less transaction fees) that would pay 100% of the Debtors' Obligations under the First Lien Credit Agreement.

(b) The KEIP also provides for a "1st Threshold" of a Valuation sufficient to pay 100% of the Debtors' obligations under the First Lien Credit Agreement and 30% of their obligations under the Second Lien Credit Agreement, where participants will share a bonus of $1.476 million . The KEIP estimates the 1st Threshold at $442 million.

(c) The KEIP provides for a "Maximum Threshold" of a Valuation sufficient to pay 100% of the Debtors' obligations under both the First and Second Lien Credit Agreements, where participants will share a bonus of $2.1 million. The KEIP estimates the Maximum Threshold at $512 million.

(d) At Valuations between Minimum and Maximum Thresholds, KEIP participants will also share a proportionate increase in bonus payments.

9. The Castellano Declaration discloses obligations under the First Lien Credit Agreement and Second Lien Credit Agreements of $328 million and $100 million, respectively.[2]

**The KERP**

10. The proposed KERP would pay 22 employees a total of $540,000, allocated among participants as described in the Motion, upon recapitalization of the Debtors or consummation of a sale of substantially all of their assets.

11. The Debtors characterize the KERP participants as non-insider employees. However, the job titles of two participants suggest they are insiders.

---

[2] Based on the $108 million of Project Finance Debt and capital leases disclosed in the Castellano Declaration and the $455 million purchase price described in the Bidding Procedures Motion, it appears that the adjusted purchase price is approximately $347 million and the Minimum Threshold is as low as $328 million.

**The OCP**

12. The OCP would pay $1.2 million to approximately 45 employees located in the Debtors' administrative office in Houston, as the Debtors consolidate that office into their White Marsh, Maryland offices. Most Houston employees will be discharged rather than transferred to White Marsh. The Debtors describe the OCP payments as having three purposes: (i) to encourage key employees to remain with the Debtors through the consolidation process, (ii) to incentivize them to provide a smooth and efficient consolidation process, and (iii) to compensate non-transferred employees for the loss of their jobs. The Debtors have disclosed the aggregate amount of the proposed payment to each OCP employee, but have not disclosed how (or whether) each employee's OCP payment is allocated among the three discrete purposes described in the Motion. Such disclosure is critical with respect to two proposed OCP participants who appear to be insiders and to whom payments would be restricted under 11 U.S.C. §§ 503(c)(1) and 503(c)(2).

**ARGUMENT**

13. The U.S. Trustee objects to the Motion on the grounds that the Debtors have not satisfied their burdens under 11 U.S.C. §§ 503(b)(1)(A) and 503(c) with respect to each of the KEIP, the KERP and the OCP.

(a) The Debtors have not satisfied their burden to demonstrate that (i) payments under the KEIP are not retention payments to insiders, and (ii) the KEIP is justified by the facts and circumstances of these cases. Notwithstanding the Debtors' assertion that the KEIP is an incentive plan, for the reasons discussed below, at the Minimum Threshold the KEIP as proposed is primarily retentive.

(b) The Debtors have not satisfied their burden to demonstrate that no KERP

participant is an insider.

(c) The Debtors have not satisfied their burden to demonstrate that insider payments under the OCP (i) are not retention payments governed by 11 U.S.C. § 503(c)(1), (ii) do not exceed the limits on severance payments set forth in 11 U.S.C. 503(c)(2), and (iii) impose challenging performance requirements and carry sufficient risk of non-payment to qualify as incentive payments to the extent that they are not qualified severance payments.

14. Section 503(c) of the Bankruptcy Code limits retention or severance payments to insiders unless the applicable requirements of section 503(c) are satisfied.[3] *See, e.g. In re Foothills Texas, Inc.*, 408 B.R. 573, 577 (Bankr. D. Del. 2009). Congress added section 503(c) to the Bankruptcy Code in 2005 to "eradicate the notion that executives were entitled to bonuses

---

[3] Section 503(c)(1), provides, in pertinent part, as follows:

> (c) Notwithstanding subsection (b), there shall neither be allowed, nor paid—
>
> (1) a transfer made to, or an obligation incurred for the benefit of, an insider of the debtor for the purpose of inducing such person to remain with the debtor's business, absent a finding by the court based on evidence in the record that—
> (A) the transfer or obligation is essential to retention of the person because the individual has a bona fide job offer from another business at the same or greater rate of compensation;
> (B) the services provided by the person are essential to the survival of the business; and
> (C) either—
>     (i) the amount of the transfer made to, or obligation incurred for the benefit of, the person is not greater than an amount equal to 10 times the amount of the mean transfer or obligation of a similar kind given to nonmanagement employees for any purpose during the calendar year in which the transfer is made or the obligation is incurred; or
>     (ii) if no such similar transfers were made to, or obligations were incurred for the benefit of, such nonmanagement employees during such calendar year, the amount of the transfer or obligation is not greater than an amount equal to 25 percent of the amount of any similar transfer or obligation made to or incurred for the benefit of such insider for any purpose during the calendar year before the year in which such transfer is made or obligation is incurred;

simply for staying with the Company through the bankruptcy process." *In re Global Home Products, LLC*, 369 B.R. 778, 784 (Bankr. D. Del. 2007). In order for a debtor to avoid running afoul of section 503(c)(1)'s restriction on retention pay, a debtor must demonstrate "based on evidence in the record" that its bonus plan is tied to significant hurdles that are difficult to achieve. *See In re Dana Corp.*, 358 B.R. 567, 582 (Bankr. S.D.N.Y. 2006) (court found that benchmarks for the debtors' long-term incentive plan "are difficult targets to reach and are clearly no 'lay-ups'"); *In re Nobex Corp*., No. 05-20050, 2006 WL 4063024 (Bankr. D. Del. Jan. 19, 2006) (plan that provided payments exclusively upon *improvements* to "stalking horse" bid did not violate 11 U.S.C. § 503(c)(1)).

13. The law is clear that the burden is on the Debtors to either show that the proposed KEIP is not a disguised retention plan. *In re Hawker Beechcraft*, 479 B.R. 308, 314 (Bankr. S.D.N.Y. 2012) (stating that "[t]he proponent of the KEIP bears the burden of proving that the plan is not a retention plan governed by § 503(c)(1).") *See also In re Residential Capital, LLC,* 478 B.R. 154, 170 (Bankr. S.D.N.Y. 2012) (stating that "[i]n order to show that the more permissive section 503(c)(3) applies, the Debtors must establish by a preponderance of the evidence that the KEIP is primarily incentivizing and not primarily retentive. If the Debtors fail to meet their burden of proof, the KEIP cannot be approved.")

15. The Debtors have failed to demonstrate that the proposed KEIP complies with the limitations on insider compensation set forth in section 503(c) of the Bankruptcy Code. Although the Debtors assert that Section 503(c)(1) is inapplicable to the KEIP as a performance based incentive plan, the Motion fails to demonstrate that the targets are "difficult targets to reach," rather than being "lay-ups." *Dana Corp.*, 358 B.R. at 583. In *Residential Capital, LLC*, 478 B.R. at 168, the bankruptcy court recognized that "triggering bonus awards solely on the

basis of a sale transaction, confirming a reorganization plan or exiting bankruptcy are not sufficient to shift consideration of a plan providing for payments to insiders from section 503(c)(1) to section 503(c)(3)." Rather, there should be difficult targets or hurdles connected with such events.

16. As discussed above, the adjusted stalking horse bid submitted by EQT on or before the Petition Date is approximately $347 million (after adjustments of $96 million for Project Finance Debt and $12 million for Capital Leases), and the Valuation necessary to achieve the Minimum Threshold after payment of transaction costs is 100% of the Debtors' Obligations under the First Lien Credit Agreement, or approximately $328 million. Even if transaction costs were as high as $10 million, the stalking horse bid produces a Valuation from the outset that is at least $9 million over the Minimum Threshold.

17. When a proposed incentive plan sets the performance bar so low that the targets are well within reach, it is a not a true incentive plan; it is a disguised retention plan. *In re Hawker Beechcraft, Inc.*, 479 B.R. 308, 313 & n.7 (Bankr. S.D.N.Y. 2012) (noting that while targets were not "lay-ups," "they are more like free throws than half court flings at the buzzer").

18. Here, the KEIP participants need do nothing but remain in the Debtors' employ until the sale closes to collect bonus compensation in excess of $850,000. Notwithstanding any challenges in reaching the 1st Threshold and the Maximum Threshold, the Minimum Threshold makes this a retention plan and does not meet the requirements of Section 501(c)(3).

19. The Debtors acknowledge that the proposed KERP is designed to induce employees to remain in the Debtors' employ. However, two proposed KERP participants have officer titles which suggest that they are executive officers and therefore insiders. As discussed above, Bankruptcy Code Section 503(c)(1) imposes stringent requirements on retention

payments to insiders; the Debtors make no pretense of demonstrating compliance with those requirements, as they assert that all proposed KERP participants, including those holding the title of Vice President, are non-insiders.

20. Section 101(31) of the Bankruptcy Code defines "insider" to include, without limitation, an "officer of the debtor" or a "person in control of the debtor." The definition is in the disjunctive. Although the Debtors cite numerous cases in which persons holding the officer title of Vice President were found not to be insiders of a debtor, those findings were necessarily bound to the facts of a specific case; no case holds that a Vice President of a debtor is *per se* not an officer and therefore not an insider.

21. The Debtors must either (i) meet their burden of proving that the two employees holding officer titles are not insiders, or (ii) remove them from the KERP.

22. Similarly, with respect to the OCP, the Debtors acknowledge that one of the proposed participants is their Chief Financial Officer. The participant list also includes one other employee whose job title suggests executive officer and insider status.[4]

23. The Debtors argue that the Chief Financial Officer should not be treated as an insider for purposes of the Motion because her role is being transitioned out in preparation for a new incoming CFO, and because she was not involved in the development of the Office Consolidation Program. This argument begs the question. Regardless of her role in promulgating the Office Consolidation Program, the Chief Financial Officer is a senior executive officer of the Debtors and therefore an insider. A Chief Financial Officer is in a position to influence corporate policy and is therefore also one of the persons in control of a debtor. That her role is being eliminated is of no moment; the Chief Financial Officer is still a senior executive officer. Indeed, if senior executives were absolved of their insider status whenever

[4] The same employee is also a proposed participant under the KERP.

their roles were being eliminated or their successors took office, the severance payment restrictions set forth in Section 502(c)(2) would be rendered meaningless.

24. Because the CFO and the employee holding a Vice President title are insiders and do not qualify for retention payments pursuant to Bankruptcy Code Section 503(c)(1), the Debtors must demonstrate that the payments to these individuals (i) comply with the limitations of Section 503(c)(2) to the extent allocated to severance and/or (ii) are incentive payments justified by the facts and circumstances of the case pursuant to Section 503(c)(3). Moreover, if any portion of the Office Consolidation Program payments to these individuals is allocated to incentive payments, the Debtors must (as with the KEIP) establish and disclose challenging performance targets that are difficult to reach rather than lay-ups or free-throws.

(a) The Debtors do not disclose what portion (if any) of the OCP payments for these two individuals is allocated to severance payments, nor do they disclose the data necessary to compute the maximum severance payments permissible under Bankruptcy Code Section 503(c)(2).

(b) Similarly, the Debtors do not disclose what portion (if any) of the OCP payments for these two individuals is allocated to incentive payments, nor do they disclose any performance metrics that must be achieved to qualify for such incentive payments. Absent disclosure of the amounts of incentive payments and the applicable performance metrics, it is impossible to assess whether such payments are justified by the facts and circumstances of this case.

WHEREFORE, the United States Trustee respectfully requests that the Court deny the Motion with respect to the proposed Key Employee Incentive Plan, condition approval of the Key Employee Retention Plan on satisfactory evidence that no participant therein is an insider,

deny approval of the Office Consolidation Program with respect to insider participants, and grant such other relief as is appropriate.

                                              Respectfully submitted,

                                              ROBERTA A. DeANGELIS
                                              UNITED STATES TRUSTEE

Dated: May 8, 2013                BY: /s/ Mark S. Kenney
                                                 Mark S. Kenney
                                                 Trial Attorney
                                                 Office of the United States Trustee
                                                 J. Caleb Boggs Federal Building
                                                 844 King Street, Suite 2207, Lockbox 35
                                                 Wilmington, DE 19801
                                                 (302) 573-6491
                                                 (302) 573-6497 (Fax)